IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

ELIZABETH HORTON,                    )
                                     )
    Plaintiff,                       )
                                     )
vs.                                  )    CASE NO. 02:06-CV-00526-MHT
                                     )
DON WILLIAMS, et al.,                )
                                     )
    Defendants.                      )

MEMORANDUM OF FACT AND LAW IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT SUBMITTED BY
NATIONAL SEATING AND MOBILITY, INC. AND DON WILLIAMS

Defendants National Seating and Mobility, Inc. (NSM) and Don Williams (Williams) submit this memorandum in support of their joint motion for summary judgment.

## I.    INTRODUCTION

In 2004 plaintiff Elizabeth Horton was, for two and a half months, a temporary worker at defendant NSM. She was reassigned from NSM because her performance was unsatisfactory, and threatened to cause a problem with an agency that regulated NSM's business.

After Horton's reassignment from NSM, she alleged that NSM engaged in fraudulent Medicaid billing. This very serious allegation was investigated by, among others, defendant Gerald Shockley, from the Alabama Attorney General's office, and determined to be meritless. Subsequently, the Attorney General's office filed a complaint against Horton, who was arrested and unsuccessfully prosecuted for making false statements to law enforcement officers. After she was acquitted, Horton brought this action complaining that her arrest and prosecution violated her constitutional rights.

The Amended Complaint has three counts. Count One is directed at defendant Special Agent Gerald Shockley for alleged violations of Horton's rights under the Fourth, Fifth, and

Fourteenth amendments as a result of allegedly causing her to be arrested and prosecuted without probable cause. (doc. no. 31 at ¶¶ 17-23 and prayer for relief (a)). Count Two, which is directed at defendant Williams, alleges violations of these same constitutional rights because Williams, allegedly acting "in conjunction with defendant Shockley,"[1] "caused her to be subjected to a criminal proceeding whose sole basis was the now proven false statement of defendant Williams" in which "he accused her of lying because her employment with National Seating and Mobility, Inc. was terminated." (*Id.,* ¶¶ 32, 34-37 and prayer for relief (a)). Count Three is directed at NSM and alleges that it has liability for the alleged acts of Williams under the doctrine of *respondeat superior.* (*Id.,* ¶¶ 48-49 and prayer for relief (a)). In this brief, we show that Williams and NSM are entitled to summary judgment against Horton's claims.

## II.    STATEMENT OF FACTS

### A.    Don and Emily Williams and NSM

In 2004, while Horton was an employee of Kelly Services, a temporary staffing agency, she was assigned to work at NSM's small office in Montgomery. (Don Williams Aff., ¶ 2.) NSM provides customized wheelchairs and seating systems for Medicaid patients, mostly children, who have been diagnosed with a permanent or long-term loss of mobility, and whose disabilities require them to use made-to-order wheelchairs for mobility. (*Id.,* ¶ 4).

While Horton was at NSM, Don Williams also worked there as a technician. (*Id.,* ¶ 3). His wife, Emily Williams (Emily), was the branch manager. (*Id.,* ¶ 5). Emily worked with physicians and physical therapists to develop a plan for medical equipment, including

---

[1] Although Horton alleges that Williams acted "in conjunction with" Shockley, in her deposition she denied that there was a conspiracy between the two: "Q: Do you claim in this case that there's some type of conspiracy between National Seating and Don Williams and the State of Alabama against you? A: Wait a minute. First of all, no, I don't think there's any conspiracy…." (*Horton depo.* at 229:22-230:4).

customized wheelchairs, that met the individual needs of each patient who sought NSM's services. (*Id.*, ¶ 6.) After a plan for medical equipment was prepared, and the appropriate prescriptions and paperwork received, Emily was responsible for submitting the prescriptions for preliminary approval to the Alabama Medicaid Agency's ("Medicaid") Prior Approval Unit. (*Id.*)

The role of the Prior Approval Unit was to review and approve these submissions. (See deposition of Felecia Barrrows at 8:15-9:22). The approval process requires a provider of durable medical equipment, such as NSM, to obtain Medicaid's approval before a wheelchair can be built for a patient, and to prove that the equipment was delivered to the patient before the provider receives payment from Medicaid. *Id., 8:15-9:8.* The request for approval should be submitted to the Prior Approval Unit within 60 days after a prescription is written for a wheelchair, and the Prior Approval Unit must act on the request within 60 days. (*Id.* at 9:23-10:13).

Unlike Emily, who dealt primarily with the physicians, therapists, and paperwork, Williams' primary responsibility as a technician was to assemble each individualized wheelchair from specialized parts, and to handle shipping, packing, and delivering the assembled equipment to NSM's clients. (Williams Aff., ¶ 7).

### B.    Horton's Work With NSM

Horton worked for NSM from approximately April 9, 2004 to June 25, 2004. (*Id.*, ¶ 9). While Horton was at NSM, her duties were clerical; she was responsible primarily for answering the telephone and forwarding to Medicaid information prepared by Emily. (*Id.*, ¶ 8). Soon after Horton began at NSM, Emily and Don Williams noticed problems with Horton's work and work habits. (*Id.*, ¶ 9). Williams believed that Horton, who wore mini-skirts and other unprofessional attire, often dressed inappropriately for work. (*Id.*) However, more troubling to Williams was

the relationship Horton appeared to develop with Felecia Barrow, who at the time was the Associate Director of Medicaid's Prior Approval Unit. (*Id.*) Because NSM submits requests for approval and payment to Medicaid, relationships between its workers and Medicaid must be strictly professional. (*Id.*) To that end, NSM strives to avoid the appearance of impropriety and potential conflicts of interest. (*Id.*) Despite this objective, it appeared to Williams that Horton was developing a personal relationship with Barrow. (*Id.*) For example, Horton and Barrow discussed personal matters during telephone calls, and planned to attend a concert together. (*Id.*; accord, Barrow depo. at 85:15-85:20).[2] Horton also invited Barrow to visit the NSM workplace during lunch; an invitation that Barrow accepted, although she denied that she ate lunch with Horton, and later claimed the visit was work-related. (Williams Aff., ¶ 9; Barrow depo. at 22:16-23:6; 85:23-86:5). Shortly after this event, and primarily because of Williams' concern that Horton was developing an inappropriate personal relationship with Barrow, Williams recommended that NSM ask Kelly Services to reassign Horton. (Williams' Aff., ¶ 9).[3] William's recommendation was accepted, and Horton completed her last day of work with NSM on June 25, 2004. (*Id.* at ¶ 9).

## C.    The Investigation Into Horton's Allegations Against NSM

On July 9, 2004, Felecia Barrow, acting as Associate Director of the Medicaid Prior Approval Unit, sent a memorandum to the Medicaid Review Department alleging that NSM had

---

[2] Barrow contends that she and Horton were simply acquaintances, but she admits that Horton invited Barrow to attend a concert with her and that Barrow agreed to meet her there. *Barrow depo. at 24:3-11; 85:6-14.* Sometime after Horton's separation from NSM, Barrow acknowledges she attended a party at Horton's home. *Id., 86:3-23.*

[3] A telling indication of the nature of the relationship between Horton and Barrow can be found in the fact that when Barrow learned that Horton was reassigned from NSM, Barrow called NSM's national headquarters and left a message implying that it would be in NSM's best interest to rehire Horton, otherwise NSM could face delay or denial of its Medicaid payment approvals. (Barrow depo. at 93:20-97:5; see also 2nd Shockley aff., ¶ 9, and Declaration of Danielle Pirkle at ¶¶ 4-5).

made fraudulent claims. (Barrow depo. at 48:23-49:7; Plaintiff's Exhibit 9). Barrow alleged that a former employee of NSM was willing to provide information regarding the allegations. (Barrow depo. at 48:23-49:7; Plaintiff's Ex. 9; Affidavit of Michael Roeder, ¶¶ 3-4). Barrow has acknowledged that the complaint she received and upon which her July 2004 memorandum was based came from Horton. (Barrow depo. at 48:23-49:7). Sometime later, Medicaid received an anonymous complaint about NSM, which again alleged that NSM was billing for services not rendered and was forging recipients' names on delivery tickets for equipment. (Deposition of Clifford Johnson at 13:14-18).

Medicaid investigated these allegations, as did the Attorney General's office. (*See Id.,* 16:5-18:6). Michael Roeder, with the Attorney General's Office, Medicaid Fraud Control Unit, interviewed Horton on April 15, 2005. (Roeder Aff., ¶ 6; see also 2nd Shockley Aff., ¶ 6). Horton alleged that NSM was engaged in fraudulent activity, primarily alleging that NSM had billed Medicaid for wheelchairs that it had not delivered. (Roeder Aff., ¶ 6). Roeder showed Horton a printout of patients for whom NSM had submitted invoices to Medicaid, and Horton identified 37 names that she recognized, but she could not say whether these patients had been fraudulently billed. (Roeder Aff., ¶ 7; see Horton depo. at 343:17-344:5; *1st* Shockley Aff., p.1).

Subsequently, Senior Special Agent Gerald Shockley handled the investigation by the Attorney General's office. (1st Shockley Aff., p. 1). Shockley was a highly experienced investigator. He was employed as a Special Agent by the FBI for twenty-five years, and at the time of this investigation he had been employed as an investigator at the Attorney General's office for more than 10 years. (1st Shockley Aff., p. 1).

During the course of the investigation, Shockley interviewed 24 of the 37 parents or guardians of Medicaid-recipient children who Horton had identified to Roeder. (*Id.)* All of the

children had received their wheelchairs from NSM. (*Id.*; 2nd Shockley Aff., ¶ 7). None of the clients with whom Shockley spoke substantiated Horton's allegations that NSM had billed for wheelchairs that had not been delivered. (1st Shockley Aff., p.1; 2d Shockley Aff., ¶ 7). As part of Shockley's investigation he also interviewed Don Williams twice. (2d Shockley Aff., ¶ 5; Ex. A, at 43-44). Williams denied Horton's allegations of fraud and provided documentation to Shockley which established that the wheelchairs for which Medicaid had been billed were in fact delivered to NSM's clients. (2d Shockley Aff., ¶¶ 5,  8, Ex. A at 43-44).

Under questioning from Shockley, Williams stated his belief that Horton had made the anonymous complaints against NSM and that she was doing so in retaliation for her dismissal from NSM. (Williams Aff., ¶ 10; 2d Shockley Aff., ¶ 8).

Shockley found no support for the allegation that NSM was engaged in fraudulent activity, and concluded that Horton had made the unsubstantiated allegations. (2d Shockley Aff., ¶ 10; see also 1st Shockley Aff., p.2).[4] After he closed his investigation, Shockley discussed the matter with Assistant Attorney General Bruce M. Lieberman, the Director of the Attorney General's Medicaid Fraud Control unit. (1st Shockley Aff., p.2). Mr. Lieberman, after hearing the facts, instructed Shockley to file a complaint in Montgomery County District Court for violation of *Ala. Code* 13A-10-9 (making a false report to law enforcement), and to obtain a warrant for the arrest of Horton. (*Id.*) On August 1, 2005, Shockley appeared before Montgomery County District Court Magistrate Holly Faems, filed a complaint, and after reviewing the facts with the Magistrate, he was issued an arrest warrant. (*Id.* at attachment 4).

---

[4] Medicaid, at the conclusion of its investigation, also found no support for the allegations against NSM. (See Anthony Green depo. at 49:12-19; 55:6-15, Plaintiff's Exhibit 1).

Horton was subsequently arrested,[5] and was tried in a non-record bench trial on October 13, 2005. (Ex. J (Docket sheet, *State of Alabama v. Elizabeth Walton Horton*, Crim. No. DC-2005-00444 (Montgomery Co. District Court))).[6]   Witnesses who testified at the trial were Felecia Barrow, Don Williams, Gerald Shockley, and Michael Roeder. *Horton dep.* 227:3-227:12. Horton was acquitted. Ex. J.

Horton has no evidence that NSM asked the Attorney General's office or Medicaid to investigate her, or that it did anything other than respond to the Attorney General's investigation. (Horton depo. at 232:4-8, 233:3-7).   Horton has no evidence that NSM gave the Attorney General's office anything that resulted in her arrest. (*Id.* at 229:6-229:13). She also has no evidence that Williams swore out a warrant for her arrest, *id. at* 233:13-233:16, or that NSM and Williams and the State of Alabama had an agreement to have her arrested.  (*Id.* at 233:17-233:21).  She testified that Williams did not give any information to Medicaid that resulted in her arrest.  (*Id. at* 229:14-:17). There is no evidence that Williams signed a statement, affidavit, complaint, or arrest warrant that lead to her arrest.

### D.     Horton's Claims Against NSM and Williams

Horton's claims against NSM are intertwined with her claims against Williams, NSM's employee. First, Horton pled that she reported alleged fraud by NSM to Medicaid. (*See* doc. No. 31 at ¶¶ 13, 30, 44.)  She then stated that during the investigation of the fraud charges,

---

[5] Following her arrest, Horton denied having made any complaints against NSM. (2nd Shockley aff. at ¶ 5, Ex. A at 67). In her amended complaint, however, Horton states that she reported alleged fraudulent activity of NSM to the Director of the Medicaid Prior Approval Department. (doc. no. 31). Nevertheless, in her deposition, Horton denied having made a complaint about NSM and instead claimed that Medicaid contacted her regarding potential fraudulent activity. *Horton depo.* at 119:2-120:10; 123:7-126:5; 302:14-304:1.

[6] The Court is requested to take judicial notice of these adjudicative facts. *See Fed. R. Evid.* 201.

Williams was interviewed by Shockley and that, during this interview, Williams opined to Shockley that Horton brought her fraud complaint because she was asked not to return to NSM. (*Id.* at ¶¶ 15, 32, 46.) Next, she says that this statement by Williams was false and led to her being deprived of her federal rights under the Fourth, Fifth, and Fourteenth Amendments. (*Id.* at ¶¶ 33-34, 47.) Finally, Horton claims that, under the doctrine *respondeat superior*, NSM should be held liable for Williams' allegedly erroneous statement. Thus, she seeks to hold NSM liable because of Williams' alleged action. (*Id.* at ¶¶ 48-49.)

Specifically, when asked about her claims against NSM and Williams, Horton testified as follows:

> Q.    Well, what is it that you're claiming that National Seating did wrong in this case?
>
> A.    I never filed a report. Once again, I said that the State said they found information of their irregular billing. I only saw two prescriptions that did not have any dates on them. I never said anything to National - - to Medicaid even about that, at all. I left there, and I never said anything whatsoever.
>
> Q.    Okay. And what are you claiming they did wrong in this lawsuit?
>
> A.    Why was I arrested - - why did Don tell them that we were best friends? Why did Don say that I worked for them and I didn't? Why did Don say that I just was retaliating against them? Why did Don say that I reported that to them? I never reported anything. I never said nothing.
>
>        . . . .
>
> Q.    Is it because of the actions of Don? Is that what you're saying, what Don said?
>
> A.    Don said this, and it was on paper that he reported back to Mr. Shockley.
>
> Q.    Okay. And my question to you is, are you suing National Seating because of the things that Don said and did?
>
> A.    Don could have told the truth before court.

Q.   I'm asking you - -

A.   I didn't even want to sue them, but you arrested me and caused me to lose my job; you caused my character to be questioned; you caused me to - - I couldn't apply for a job at - - of course. Of course, I'm suing them for what - - you were - - you lied on me.

. . . .

Q.   . . . . Are the claims that you're making in this lawsuit against National Seating because of the things that Don Williams allegedly said and did, or are there other people that you are claiming did or said things wrong about you?

A.   Don Williams, for reporting it back to his main office and telling all that information . . . . And Don, and with National Seating for saying that, okay, they got off another subject and got undeliverable chairs. They were under some kind of other impression that I was saying that, oh, these chairs were not undeliverable. I had no - - I don't even know why Don said that. That's what I was arrested for, lying. It was all on that piece of paper. I have no idea. To this day, I'm still trying to figure out how and why, I mean, what's going on. That's why I had to call Cliff Johnson and Felicia to ask them - - you need to clarify this up to me, why I'm arrested. I didn't say anything about National Seating. I never reported National Seating to you guys. I never told y'all about no undeliverable chairs. I never said - - I never even told you about those prescriptions, so why am I being arrested. I was arrested because we were perpetrated as being best friends and I was fired. And I was arrested for lying on them because - - and retaliating because I was wanting to keep that job and I was fired for fraternizing.

Q.   Is there any - -

A.   No.

Q.   - - other conduct that you claims that some employee of National Seating did to you?

A.   Emily and Don.

Q.   Anyone else?

A.   National Seating, no. And Gerry Shockley.

Q.   And have you told us everything that Emily and Don did to you that you're suing about?

A.    Yeah.

(Horton Depo. 164:8-170:22.)

Horton complains: (1) that Williams told Shockley during the Attorney General's investigation that Horton was retaliating against NSM, and (2) that Williams testified at Horton's criminal trial that Horton was retaliating against NSM. Horton seeks to impose liability on NSM simply because of these alleged statements by Williams. At no point does she claim that she was investigated because of NSM and Williams. Neither NSM nor Williams caused her arrest. Finally, Horton does not allege that NSM encouraged Williams' alleged statements.

## III.    SUMMARY JUDGMENT STANDARD

On a motion for summary judgment, the court considers evidence and makes factual inferences in the light most favorable to the nonmoving party. *Strickland v. Wayne Farms-Southland Hatchery*, 132 F. Supp. 2d 1331, 1332 (M.D. Ala. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). "Summary judgment is entered only if it is shown 'that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Strickland*, 132 F. Supp. 2d at 1332 (citing Fed. R. Civ. P. 56(c)). The court does not weigh evidence and determine the truth of the matter but, instead, "solely determines whether there is more than 'some metaphysical doubt' about whether there is a genuine issue for trial." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986), and *Matsushita Electric Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

## IV.    ARGUMENT

### A.    Horton's claim under the Fifth Amendment must fail.

Horton alleges that, under 42 U.S.C. § 1983, NSM and Williams deprived her of her Fifth Amendment right to liberty. (*See* doc. no. 31, counts two and three). In order to prevail on this

claim, she must meet the 1983 requirements and the Fifth Amendment requirements. *See Whitehorn v. Harrelson*, 758 F.2d 1416, 1419 (11th Cir. 1985). Section 1983 allows a private person to seek redress when a government actor deprives her of a constitutional right. *See id.* In addition, a person may recover from a private corporation when the corporation conspires with the governmental actor to cause the constitutional deprivation. *See Dennis v. Sparks*, 449 U.S. 24, 27-28 (1980). A Fifth Amendment deprivation occurs when a party is "deprived of life, liberty, or property, without due process of law." *U.S. Const. amend. V.* Importantly, "the Fifth Amendment's due process clause applies to only the federal government." (Order and Opinion, doc. no. 42 p. 4 (citing *Riley v. Camp*, 130 F.3d 958, 972 n.19 (11th Cir. 1997).) Thus, under a Fifth Amendment Section 1983 claim, a party must plead and prove a federal action in order to establish liability. *See id.*

Horton has brought suit against two private parties, NSM and Williams, and one state employee, Shockley. (*See* doc. no. 31.) She has not alleged that any federal employee conspired with these parties. (*See id.*) Her claims involve only her state criminal investigation and state court trial. Thus, the federal government was not involved in any of the facts or allegations surrounding this matter. Horton's Fifth Amendment claim cannot, therefore, stand, and summary judgment should be granted in favor of NSM and Williams on this claim.

**B.    Horton's claim under the Fourteenth Amendment must fail.**

Horton alleges that, under 42 U.S.C. § 1983, NSM and Williams violated her Fourteenth and Fourth Amendment due process rights by causing her to be arrested without probable cause. (*See* doc. no. 42. at 5.) The Fourteenth and the Fourth Amendment each contain a due process clause. *See U.S. Const. amend. IV, XIV.* The "Fourteenth Amendment by its terms applies to the States," and the Fourth Amendment applies to the States because its terms have been

"incorporated" by the Fourteenth Amendment. (*See* doc. no. 42 at 5.) When a plaintiff brings a 1983 action, she cannot allege that both her Fourteenth Amendment and Fourth Amendment due process rights have been violated. (*See id.*) Importantly, under Section 1983, when a party brings a claim for arrest without probable cause, she must assert a Fourth Amendment claim and not a Fourteenth Amendment claim. *See Albright v. Oliver*, 510 U.S. 266, 273 (1994). Thus, the Fourteenth Amendment claim can only be asserted as a mechanism for applying the Fourth Amendment to a state, *see, e.g., Baker v. McCollan*, 443 U.S. 137, 142 (1979), and not as a separate and distinct claim, *see Albright*, 510 U.S. at 273.

It is not clear whether Horton has alleged a separate and distinct Fourteenth Amendment claim, or whether she simply claims that her Fourth Amendment right to due process, as incorporated by the Fourteenth Amendment, was violated. (*See* doc no. 42.) As discussed in *Albright*, Horton cannot bring a separate Fourteenth Amendment claim. To the extent that Horton seeks to bring a distinct Fourteenth Amendment claim, summary judgment should be granted in favor of NSM and Williams.

**C.    Plaintiff's Fourth Amendment claim fails because Williams is immune from suit.**

Testifying witnesses are provided "with immunity from Section 1983 liability." *Charles v. Wade*, 665 F. 2d 661, 666 (5th Cir. 1982); *see generally Briscoe v. LaHue*, 460 U.S. 325, 345-46 (holding that testimonial witnesses are immune from suit under Section 1983). This immunity applies regardless of whether the testimony is truthful. *See Briscoe*, 460 U.S. at 345 (stating that testimonial immunity can prevent redress from police officers who testify falsely). This immunity extends to those who "'conspire to present perjured testimony in furtherance of a criminal conviction . . . .'" *Jones v. Cannon*, 174 F.3d 1271, 1289 (11th Cir. 1999) (holding that a detective who suborns false testimony is immune from suit). Similarly, "a witness's absolute

immunity from liability for testifying forecloses any use of that testimony as evidence of the witness's membership in a conspiracy prior to his taking the stand." *Rowe v. City of Ft. Lauderdale*, 279 F.3d 1271, 1282 (11th Cir. 2002).

"A complaining witness is one 'who actively instigated or encouraged the prosecution of the plaintiff.'" *Patterson v. Burge*, 328 F. Supp. 2d 878, 891 (N.D. Ill. 2004) (quoting *Curtis v. Bembenek*, 48 F.3d 281, 285 (7th Cir.1995)); *Rivera v. Leal*, 359 F. 3d 1350, 1355 (11th Cir. 2004); *see also*, 174 F.3d 1271, 1287 n.10 (11th Cir. 1999) (refusing to waive immunity for grand jury testimony of complaining witness); *cf. Mastronianni v. Bowers*, 173 F.3d 1363 (11th Cir. 1999) (noting that an investigator who reports findings to a prosecutor is not a complaining witness). Complaining witnesses are subject to suit when "'the complaint was made maliciously and without probable cause.'" *Kalina v. Fletcher*, 522 U.S. 118, 127 n.14 (quoting *Malley v. Briggs*, 475 U.S. 335, 340-41 (1986)). A complaint is malicious when it is willful and purposeful. *Willis v. Parker*, 814 So. 2d 857, 863-64 (Ala. 2001). A complaining witness also acts with malice when he knows his actions are wrong and unlawful but continues to act wantonly or carelessly. *Id.* Probable cause exists when there are facts or circumstances that "'would cause a prudent person to believe, under the circumstances shown, that the suspect has committed . . . an offense.'" *Jordon v. Mosley*, 487 F.3d 1350, 1355 (11th Cir. 2007) (citing and quoting *Miller v. Harget*, 458 F.3d 1251, 1259 (11th Cir. 2006)).

Williams is not a complaining witness. The undisputed facts establish that Williams denied the fraud allegations, provided proof that NSM complied with Medicaid requirements, and opined that Horton was a disgruntled temporary employee. (Williams Aff. ¶ 9-10.) As defined in *Patterson*, this does not amount to evidence that Williams actively caused or encouraged Horton's prosecution, and because the evidence he provided was given in response

to an inquiry by the State's investigator, it cannot amount to a "complaint" by a witness. *See Mastronianni v. Bowers*, 173 F.3d 1363 (11th Cir. 1999). As further example, there is no evidence—such as signing affidavits or statements, executing documents for further prosecution, or filing complaints—that could lead a reasonable juror to conclude that Williams engaged in any activities suggesting that he encouraged Horton's prosecution. Indeed, Williams' only involvement in the Attorney General's investigation was two telephone interviews, nearly a year after Horton's temporary employment with NSM ceased. (Williams Aff. ¶ 10-11.) Thus, Williams should enjoy the immunity afforded to testimonial witnesses.

Even if Williams could be considered a complaining witness, there is no evidence that his statement was made maliciously. *See Kalina*, 522 U.S. at 127 n.14. Williams' statement was his opinion and belief and not a statement of fact. (*See id.* ¶ 10.) He was placed in a position in which he was accused of fraud by an employee whom he recommended be asked not to return to NSM (*id.* ¶ 9-11), and he suggested that she might be seeking to retaliate (*id.* ¶ 10). He had every reason to believe that Horton's allegations were directly tied to her employment; to infer otherwise would be unreasonable. Further, Horton has presented no evidence to the contrary, and to this day, she claims that she has no idea why Williams gave his opinion to Shockley. (*See, e.g.*, Horton Depo. 164:8-170:22.) Given that the evidence overwhelmingly supports Williams' statement and that Horton has presented no evidence to the contrary, no reasonable juror could find that Williams acted with malice when he opined that Horton sought to retaliate against NSM.

Additionally, even if Williams could be considered a complaining witness, there is no evidence that Williams' opinion as to Horton's motive was made without probable cause. *See Kalina*, 522 U.S. at 127 n.14. Williams believed that Horton was asked not to return to NSM

due to her bad performance. (Williams Aff. ¶ 9.)  Williams was then informed that Horton made fraud allegations against NSM after she was asked not to return.  (*See id.* ¶ 10.)  Because the allegations were false (*see* 1st Shockley Aff. pp. 1-2; 2nd Shockley Aff. ¶ 10), the timing and the nature of the allegations would have given Williams a reasonable belief that Horton was retaliating. *See Jordon v. Mosley*, 487 F.3d at 1355.  Williams' alleged statement to Shockley that Horton falsified her allegations in order to retaliate against NSM was, therefore, made with probable cause.

In conclusion, Williams is not liable to Horton because he enjoys testimonial privilege and because he did not speak to Shockley out of malice and without probable cause.  Horton's only allegation against NSM is that Williams acted improperly.   Because she makes no independent claims against NSM, NSM can hardly be held liable to Horton when Williams cannot be held liable.

**D.     Plaintiff's Fourth Amendment claim fails because there is no state action.**

42 U.S.C. § 1983 provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

There are two general requirements for a plaintiff to successfully state a cause of action for deprivation of civil rights under 42 U.S.C. § 1983.  The plaintiff must show that the conduct complained of was "committed by a person acting under color of state law," and she must prove that the conduct "deprived the plaintiff of rights, privileges, or immunities secured by the

Constitution or the laws of the United States." *Whitehorn v. Harrelson*, 758 F.2d 1416, 1419 (11th Cir. 1985).

The U.S. Supreme Court has acknowledged that there is a right of action under Section 1983 against a private corporation. *See Dennis v. Sparks*, 449 U.S. 24, 27-28 (1980). A corporation is liable when it is involved in a state action. *See id.* at 29. It is not simply enough for a corporation to be regulated by the government. *See Barber v. Dale County Mental Health Ctr.*, 898 F. Supp. 832, 836-37 (M.D. Ala. 1995) (determining that accepting Medicaid does not make a company a state actor). State action is only present when a corporation is jointly engaged with a state actor to violate a constitutionally protected right. *Dennis*, 449 U.S. at 27-29.

In defining the level of collusion required to establish a conspiracy between a private actor and a state actor, the Eleventh Circuit has ruled that there must be a tacit understanding among the parties to deny the plaintiff of her federally protected rights. *N.A.A.C.P. v. Hunt*, 891 F.2d 1555, 1563 (11th Cir. 1990). There are three separate tests used in the Eleventh Circuit to determine if there is a state action: first, the "public function" test; second, the "state compulsion" test; and third, the "nexus/joint action" test. *See Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263 (11th Cir. 2003).

NSM and Williams are not liable under the public function test. Under the public function test, a court will find state action when a private party performs a task that is traditionally reserved for state operation. *Rowe v. City of Ft. Lauderdale*, 279 F.3d 1271, 1277 (11th Cir. 2002). For example, when a private corporation assumes the administration of a state prison, it is a state actor under the public function test. *Id.* In order for private parties' actions to be construed as state action under the public function test, the challenged action must be an act that the government traditionally performs to the exclusion of all others. *Campbell v. Civil Air*

*Patrol*, 131 F. Supp. 2d 1303, 1310 n. 8 & 1311 (M.D. Ala. 2001) (discussing public function

test in a *Bivens* action). In the instant case, Horton has alleged that Williams lied to the State's

investigator and that he testified as a witness. Unlike in *Rowe*, 279 F.3d at 1277, where the court

held that the defendants were engaged in running a prison and that the State normally maintains

the exclusive right to run a prison, there is no evidence or allegation by Horton that fact

witnesses are historically State officials and are never private individuals. Thus, because

Williams was a fact witness, the public function test does not apply.

The conduct of NSM and Williams clearly fail the state compulsion test. The state

compulsion test imputes state action when a state actor coerces or encourages the challenged

action. *See Rowe*, 279 F.3d at 1277. This test is only applied in the limited instances where a

state actor compels or significantly encourages the private actor to commit the complained of act.

*NBC v. Commc's Workers of Am.*, 860 F.2d 1022 (11th Cir. 1988). A private party must be

compelled to participate in the alleged wrong; he cannot be a willful participant. *Lowe v.

Aldridge*, 958 F.2d 1565, 1572 (11th Cir. 1992). Here, there is no evidence (or even allegation)

that Shockley compelled Williams' statement. Thus, there is no state action under the state

compulsion test.

The third test, the nexus/joint action test, fails to implicate NSM or Williams. When "the

state has so far insinuated itself into a position of interdependence with the [private party] that it

was a joint participant in the enterprise", there is a state action under the nexus/joint action test.

*See Rowe*, 279 F.3d at 1277. Under this approach, private actions are state actions when the

State is a joint participant in an enterprise that the private party undertakes. *Focus on the

Family*, 344 F.3d at 1277; *Loren v. Sasser*, 309 F.3d 1296, 1303 (11th Cir. 2002) (A close nexus

exists when the private action "'may be fairly be treated as that of the State itself.'" (quoting

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001))). In determining whether the actions of a private individual can be attributed to the State under the nexus/joint action test, the court should determine whether there is a symbiotic relationship between the State and a private party. *Lowe*, 958 F.2d at 1572. For example, in *Lowe*, a mother took her child to see a psychiatrist. The psychiatrist determined that the father was likely sexually abusing the child. Pursuant to state law, the psychiatrist forwarded her findings to the district attorney and other law enforcement agencies. The Eleventh Circuit determined that the psychiatrist was acting as a private citizen. *Id.* at 1573. It was particularly important to the court that the psychiatrist did not help prepare an affidavit in support of a search warrant that led to the challenged action. *Id.*; *see also Fullman v. Graddick*, 739 F. 2d 553, 563-64 (11th Cir. 1984) (holding that engaging an accused in a conversation cannot establish a conspiracy, and that blank assertions, without more, that a private individual conspired with police officers and fabricated conversations with the accused in order to have an arrest warrant issued are insufficient to establish a conspiracy).

There is no evidence of a "symbiotic relationship" between NSM or Williams and Shockley. *See Willis v. Univ. Health Srvs., Inc.*, 993 F.2d 837, 840 (11th Cir. 1993). Horton made an allegation against NSM. (*See* 2nd Shockley Aff. ¶ 4). The State investigated this complaint. (*Id.* ¶ 2-5.) During the course of the investigation, the State interviewed NSM employees (*see id.* ¶ 8), including Williams, and Williams gave his opinion and belief that Horton was disgruntled and was retaliating against NSM (Williams Aff. ¶ 10-12). Like *Lowe*, his opinion was never sworn in an affidavit; he was simply a fact witness. (*See* Williams Aff. ¶ 10-11). Moreover, Williams had no involvement in the decision of the office of the Attorney General to file a complaint against Horton and secure her arrest. (*Id.* ¶ 11.) There is no evidence

of any agreement between NSM or Williams and the State to have Horton arrested (Horton Depo. 233:17-21), or even that Williams or NSM gave any information to Medicaid that resulted in her arrest (*id. at* 229:6-17). The evidence in this case cannot, therefore, support a finding that there is a state action under the nexus/joint action test.

Because there is no state action under the public function test, the state compulsion test, or the nexus/joint action test, Williams was not a state actor and is not liable to Horton. Since Williams is not liable to Horton, NSM cannot be liable to Horton. Summary judgment should be granted in favor of NSM and Williams.

### E.    Plaintiff's Fourth Amendment claim fails because there cannot be any *respondeat superior* liability.

Generally, corporations are not liable for the constitutional torts of their employees under 42 U.S.C. § 1983. *See Harvey v. Harvey*, 949 F.2d 1127, 1129-30 (11th Cir. 1992) (citations omitted). The Eleventh Circuit has not carved any exceptions to this rule for corporations. At least two Eleventh Circuit district courts, however, have recognized that the municipality exceptions to employer liability also apply to corporations. *See, e.g., Allen v. Morton*, No. CV507-74, 2007 WL 4257070, *2 (M.D. Ga. Nov. 30, 2007) (noting that *Harvey* extended municipal liability rules to private corporations). Thus, "a corporation may be held liable for the unconstitutional acts of employees where there is a policy, custom, or action by those who represent official policy which causes the injury." *Edwards v. Acadia Realty Trust, Inc.*, 141 F. Supp. 2d 1340, 1347-48 (M.D. Fla. 2001) (citing *Davis v. DeKalb County Sch. Dist.*, 233 F.3d 1367, 1375 (11th Cir. 2000), *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991), and *Scutieri v. Estate of Revitz*, 683 F. Supp. 795, 800 (S.D. Fla. 1988)).

There can be no *respondeat superior* liability for NSM. Under the general rule set forth in *Harvey*, corporations cannot be liable when a plaintiff has only alleged that the corporation's

employee is the source of the constitutional deprivation. (*Id.*) Horton's sole claim against NSM is that its employee deprived her of her constitutional rights. (Horton Depo. 168:11-169:20.) *Harvey* establishes that NSM cannot be liable for these actions because *Harvey* holds that a corporation cannot be liable for the constitutional torts of its employees.

Furthermore, none of the *Harvey* exceptions apply. Horton has not alleged or claimed that NSM maintained any policy or practice that encouraged, sanctioned, or allowed its employees to cover-up Medicaid fraud. (*See* Horton Depo. 168:11-169:20.) Similarly, Horton has not alleged or claimed that NSM maintained any policy or practice that encouraged, sanctioned, or allowed its employees to lie to the State's investigators. (*See id.*) In fact, she has not alleged or set forth any facts that NSM engaged in any pattern, practice, or policy that led to Williams' actions. (*See id.*) She cannot, therefore, meet any exceptions to the bar on corporate *respondeat superior* liability. In order to establish *respondeat superior* liability, Horton must set forth some act by NSM that led to her deprivation and because she has failed to allege—must less establish—any pattern, practice, or policy of NSM, NSM cannot be held liable for any of Williams' constitutional violations. Summary judgment is, thus, due in its favor.

## II.    CONCLUSION

The Fifth and Fourteenth Amendments are not applicable when a party claims that a State caused a due process violation. Williams' actions in this case are immune from suit. There is no proof of a conspiracy with the State such that Section 1983 liability can be applied to NSM or to Williams. Finally, the doctrine of respondeat superior is not a viable theory of recovery against NSM. As a result, Defendant NSM and Defendant Williams respectfully request this Court to grant summary judgment in their favor.

Respectfully submitted February 19, 2008.

s/Dorman Walker
Dorman Walker (WAL086)
Kelly F. Pate (FIT014)
Balch & Bingham
P.O. Box 78
Montgomery, AL 36101
Telephone: (334) 834-6500
Facsimile: (334) 269-3115
**Attorneys for Defendant Don Williams**

s/Charles A. Stewart, III
Charles A. Stewart, III (STE067)
Quindal C. Evans (EVA040)
Bradley Arant Rose & White LLP
The Alabama Center for Commerce
401 Adams Avenue, Suite 780
Montgomery, AL 36104
Telephone: (334) 956-7700
Facsimile: (334) 956-7701
**Attorneys for National Seating & Mobility, Inc.**


## CERTIFICATE OF SERVICE

I hereby certify that on February 19, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Deborah M. Nickson
Attorney for Petitioner
2820 Fairlane Drive, Suite A-10
Montgomery, Alabama 36116

Jack W. Wallace, Jr.
Office of the Attorney General
11 South Union Street
Montgomery, AL 36130


s/Dorman Walker
Of Counsel