# EXHIBIT A

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 1

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

ELIZABETH HORTON,

      Plaintiff,

vs.                         CIVIL ACTION NO.
                            2:06-cv-526-MHT-TFM

DON WILLIAMS, individually
and in his capacity as the
Manager of National Seating
and Mobility, Inc., NATIONAL
SEATING AND MOBILITY, INC.,
GERALD SHOCKLEY, individually
and in his capacity as
special agent of the Alabama
Attorney General's Office,

      Defendants.

     *    *    *    *    *


     DEPOSITION OF ELIZABETH HORTON,

taken pursuant to notice and stipulation

on behalf of the Defendants, in the

offices of Bradley, Arant, Rose & White,

401 Adams Avenue, Suite 780, Montgomery,

Alabama, before Nicole Paulk, Certified

Shorthand Reporter and Notary Public in

and for the State of Alabama at Large, on

November 20, 2007, commencing at 9:05 a.m.



EXHIBIT

A

tabbies

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

---

**Page 2**

```
 1        APPEARANCES
 2
 3   FOR THE PLAINTIFF:
 4        Deborah M. Nickson, Esquire
          Attorney at Law
 5        2820 Fairlane Drive, Suite A-10
          Montgomery, Alabama 36116
 6
     FOR THE DEFENDANTS:
 7
          Charles A. Stewart, III, Esquire
 8        Bradley, Arant, Rose & White, LLP
          Alabama Center for Commerce
 9        401 Adams Avenue, Suite 780
          Montgomery, Alabama 36104
10
          Dorman Walker, Esquire
11        Balch & Bingham, LLP
          2 Dexter Avenue
12        Montgomery, Alabama 36104
13        Jack Wallace, Esquire
          Assistant Attorney General
14        Office of the Attorney General
          State of Alabama
15        11 South Union Street
          Montgomery, Alabama 36130
16
     ALSO PRESENT:
17
          Don Williams
18
19
20
21
22
23
```

---

**Page 4**

```
 1   By Mr. Walker                      287
 2   By Mr. Wallace                     329
 3   By Mr. Stewart                     345
 4   By Mr. Walker                      355
 5   Defendant's Exhibits         Page
 6   1 - Letter to Ms. Horton from      185
 7      Ms. Turpen, dated 6/13/06
 8   2 - Notice of Deposition Duces     222
 9      Tecum
10   3 - Letter to Ms. Horton from      290
11      Mr. Chase, dated 3/22/06
12   4 - National Seating & Mobility    340
13      Recipient Chart
14   5 - Ms. Horton's Employment        346
15      Application for Hyundai
16   6 - Ms. Horton's Resume            351
17   7 - Plaintiff's Response to        356
18      Defendant Don Williams'
19      Interrogatories and Request
20      For Production
21          *   *   *   *   *
22        ELIZABETH HORTON, of lawful
23   age, having first been duly sworn,
```

---

**Page 3**

```
 1        STIPULATIONS
 2
 3        It is stipulated and agreed by
 4   and between counsel representing the
 5   parties that the deposition of ELIZABETH
 6   HORTON may be taken before Nicole Paulk,
 7   Certified Court Reporter and Notary Public
 8   in and for the State of Alabama at Large,
 9   without the formality of a commission; and
10   all formality with respect to other
11   procedural requirements is waived; that
12   objections to questions, other than
13   objections as to the form of the questions
14   need not be made at this time, but may be
15   reserved for a ruling at such time as the
16   deposition may be offered in evidence or
17   used for any other purpose by either party
18   as provided by the Federal Rules of Civil
19   Procedure.
20          *   *   *   *   *
21        I N D E X
22   Examination              Page
23   By Mr. Stewart              5
```

---

**Page 5**

```
 1   testified as follows:
 2        EXAMINATION
 3   BY MR. STEWART:
 4   Q.   Ms. Horton, we met right before your
 5        deposition began, but other than that,
 6        we've never seen each other before, have
 7        we?
 8   A.   I've never met you before, no.
 9   Q.   Okay.  I'm going to take your deposition
10        today in this case that you've filed
11        against National Seating, Don Williams,
12        and Gerald Shockley.  Have you ever given
13        a deposition before?
14   A.   No.
15   Q.   I'm sure your lawyer has given you a brief
16        overview at least about what's going to
17        take place today, but let me just go ahead
18        and tell you what the ground rules are.
19        I'm asking questions to you; your
20        responses are given under oath.  Do you
21        understand that?
22   A.   I do.
23   Q.   Do you understand that because your
```

---

2 (Pages 2 to 5)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 6

1    answers are given under oath, that you are
2    subject to the laws of perjury in the
3    event that you don't tell the truth?
4    A.   I do understand that.
5    Q.   Okay.  When giving your deposition,
6    sometimes people tend to nod or shake
7    their head to say yes or no, but in this
8    environment, it's very important that you
9    speak your answer out.  And if you forget
10   or if I forget at one point to actually
11   speak out an answer, I will correct us
12   somehow.  Usually I just point at the
13   microphone to remind you we're taking your
14   testimony down, and I'll point at that
15   thing there, okay?
16   A.   Okay.
17   Q.   For that reason, it's also important to
18   speak out your answers.  You're sort of
19   soft-spoken, and that's not a problem
20   normally, but sometimes when you're taking
21   a deposition, if a soft-spoken person is
22   giving their testimony, it doesn't get
23   recorded very well, okay?

Page 7

1    A.   Okay.
2    Q.   After the deposition takes place, you will
3    have the right to read and sign the
4    deposition to make sure that it was taken
5    down properly by the court reporter.  You
6    can waive that right; you can also
7    exercise that right.  I don't know if
8    you've had a chance to talk with your
9    lawyer about that and what you would
10   prefer to do.  Nicole is a good court
11   reporter.  You can't change your answer,
12   but if she were to misspell something or
13   something, you can make that correction.
14   Would you like to read and sign, or do you
15   want to waive that?
16         MS. NICKSON:  Read and sign.
17   A.   Read and sign.
18   Q.   Okay.  During the deposition today, if you
19   want to take a break, get some water,
20   smoke a cigarette, take a walk, anything
21   like that, you just tell me, and we'll be
22   more than happy to stop at a natural point
23   and let you take that break, okay?

Page 8

1    A.   That's fine.  Thanks.
2    Q.   Are you on any kind of medication that
3    would affect the ability to answer
4    truthfully?
5    A.   It could.
6    Q.   Do you mean that it's possible that you
7    may give false testimony today because of
8    medication that you are on?
9    A.   I'm on medication, but it can influence me
10   to get a little hyper, if we need to take
11   that break.  As far as giving the truth,
12   I'm going to give you the truth.
13   Q.   Okay.  Great.  Is there anything about the
14   medication that you're taking that affects
15   your ability to understand questions?
16   A.   You might have to rephrase it sometimes.
17   Q.   Will you let me know?
18   A.   I will.
19   Q.   Are you aware, even when you're on your
20   medication, that you don't understand a
21   question when it's asked --
22   A.   Of course I do.  I'm aware of that.
23   Q.   Okay.  So we won't have a problem later on

Page 9

1    where you say, I didn't understand the
2    question because I was on medicine or
3    something?
4    A.   No.  I will ask you to rephrase the
5    question to make sure I understand it or
6    just ask me the question again.
7    Q.   Okay.  That's fair.  And so if you answer
8    a question without telling me to rephrase
9    it, can I assume that you understood the
10   question?
11   A.   I'm not going to answer it without telling
12   you to rephrase it or ask it again.
13   Q.   Okay.  How old are you, Ms. Horton?
14   A.   I'm 44.
15   Q.   What's your date of birth?
16   A.   June the 18th, 1963.
17   Q.   Your social security number?
18   A.   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.
19   Q.   Are you currently married?
20   A.   No.
21   Q.   Have you ever been married?
22   A.   Yes.
23   Q.   How many times?

3   (Pages 6 to 9)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| Page 10 |
|---|
| 1   A.   Twice. |
| 2   Q.   What was your first husband's name? |
| 3   A.   Levester Butler. |
| 4   Q.   Levester Butler? |
| 5   A.   Uh-huh. |
| 6   Q.   L-A-V-E-S-T-E-R? |
| 7   A.   L-E-V-E-S-T-E-R. |
| 8   Q.   And how long were you married to |
| 9       Mr. Butler? |
| 10   A.   For about 15 years. |
| 11   Q.   Where were you married? |
| 12   A.   Marianna, Arkansas. |
| 13   Q.   Did you say Mary Ann? |
| 14   A.   Marianna, M-A-R-I-A-N-N-A. |
| 15   Q.   Arkansas. And in what year were you |
| 16       married? |
| 17   A.   July the 2nd, 1982. |
| 18   Q.   And how old were you at the time? |
| 19   A.   I was 22. |
| 20   Q.   How long were you married, did you say? |
| 21       15 years? |
| 22   A.   15 years. |
| 23   Q.   When were you divorced? |

| Page 11 |
|---|
| 1   A.   Our divorce became final in September of |
| 2       '94. |
| 3   Q.   Okay. And where were you divorced? |
| 4   A.   Marianna, Arkansas. |
| 5   Q.   And who was your second marriage to? |
| 6   A.   Chris Horton -- Christopher Horton. |
| 7   Q.   When were y'all married? |
| 8   A.   We were married August the 4th of 2002. |
| 9   Q.   And where were you married? |
| 10   A.   Excuse me -- yeah, in 2002. We were |
| 11       married in Nashville, Tennessee. |
| 12   Q.   And how long were you married? |
| 13   A.   We were married four years. |
| 14   Q.   And when were you divorced? |
| 15   A.   Here in Alabama. |
| 16   Q.   When? |
| 17   A.   July -- my divorce became final June the |
| 18       26th of 1986 -- 2006. |
| 19   Q.   And is that in Montgomery County, Alabama, |
| 20       that the divorce took place? |
| 21   A.   Yes. |
| 22   Q.   Does he still live in Montgomery County? |
| 23   A.   Yes. |

| Page 12 |
|---|
| 1   Q.   What does he do? |
| 2   A.   He's an engineer for Hyundai. |
| 3   Q.   Okay. And your marriage to Mr. Butler |
| 4       that was terminated in Marianna, Arkansas, |
| 5       what county in Arkansas is that? |
| 6   A.   That's Lee County. |
| 7   Q.   What were the grounds for the divorce from |
| 8       Mr. Butler? |
| 9   A.   He was on drugs, and he was abusive. |
| 10   Q.   Physically abusive? |
| 11   A.   And emotionally sometimes. |
| 12   Q.   And what were the grounds for the divorce |
| 13       from Mr. Horton? |
| 14   A.   Chris and I -- there was another woman |
| 15       involved, so it was the best thing for us |
| 16       to do, was to get a divorce. |
| 17   Q.   Was there any abuse in that marriage? |
| 18   A.   No, not at all. |
| 19   Q.   And you've never been married any other |
| 20       time? |
| 21   A.   No. |
| 22   Q.   Is that correct? |
| 23   A.   That is correct. |

| Page 13 |
|---|
| 1   Q.   Did the divorce from Christopher Horton |
| 2       affect your physical condition in any way? |
| 3   A.   Physical, no. It was a stressed-out thing |
| 4       because we both worked at Hyundai |
| 5       together, and so did she. As far as my |
| 6       concern was, I had gotten pretty much past |
| 7       it and over it. |
| 8   Q.   You mean as you sit here today, you are? |
| 9   A.   As I left here in July I was over it, July |
| 10       of 2006. |
| 11   Q.   Okay. And did the divorce from Mr. Horton |
| 12       affect your financial condition? |
| 13   A.   Yes. |
| 14   Q.   How so? |
| 15   A.   Well, we both had two incomes at the |
| 16       moment, and when I asked for the |
| 17       separation June the 16th of 2005, Chris |
| 18       was still responsible as to -- him to |
| 19       take care of things that were there at the |
| 20       apartment, and then after the divorce, it |
| 21       was one salary. So, of course, I'm having |
| 22       to pay for my own attorney and medical |
| 23       bills at that time, and college. |

4 (Pages 10 to 13)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 14

1  Q.  Did you say maternity leave?
2  A.  No.
3  Q.  What did you say?
4  A.  Medical and college for my daughter.
5  Q.  Where is your daughter in school?
6  A.  One graduated from University of Memphis
7      the year after Chris and I got a divorce,
8      and I have one in nursing school at the
9      University of -- UAB in Helen, Arkansas.
10 Q.  I'm confused.  The one who is in nursing
11     school graduated from --
12 A.  She has one more year in nursing school.
13     The one that's graduated from college
14     after my divorce who I was supporting
15     graduated a year after I got a divorce.
16     So I was supporting her -- I was
17     supporting both of them while I was
18     married to Chris.  One graduated the year
19     after I got married -- I mean after I got
20     a divorce, and the other one is still in
21     college.
22 Q.  Okay.  Let's make it a little clearer.
23     The child that's already graduated, what's

Page 15

1      her name?
2  A.  Tamika.
3  Q.  Can you spell it?
4  A.  Tamika Nicole.  T-A-M-I-K-A.
5  Q.  Tamika Nicole?
6  A.  Tamika Nicole Butler.
7  Q.  Okay.  And she graduated from the
8      University of Memphis and now lives in
9      Arkansas?
10 A.  She's a coach at Lee Senior High School.
11 Q.  In Arkansas?
12 A.  In Arkansas.
13 Q.  Marianna, Arkansas?
14 A.  Marianna.
15 Q.  Okay.  And then your younger daughter's
16     name is?
17 A.  Tanisha, T-A-N-I-S-H-A, Rochelle Butler.
18     She's in her last year of nursing school.
19 Q.  At UAB?
20 A.  At University of -- that's in Helena,
21     Arkansas, UAB, Phillips County.  Then I
22     have a son.
23 Q.  And how old is your son?

Page 16

1  A.  He'll be 28 in December.
2  Q.  Where does he live?
3  A.  He lives in Marianna, Arkansas.
4  Q.  What does he do?
5  A.  He's a probation officer for the state
6      prison, and right now he's on military
7      leave getting ready to go to Iraq.
8  Q.  Do you have any relatives in Montgomery,
9      Alabama?
10 A.  I have no relatives except when I was
11     married to Chris.
12 Q.  Do you have any relatives in the state of
13     Alabama?
14 A.  No.
15 Q.  Where are your relatives?
16 A.  In Marianna, Arkansas, in Little Rock, St.
17     Louis, Gatlinburg -- but none here.
18 Q.  Do you have any relatives in Texas?
19 A.  No.
20 Q.  What is your maiden name?
21 A.  Walton.
22 Q.  So you were born Elizabeth --
23 A.  Walton.

Page 17

1  Q.  Do you have a middle name?
2  A.  I do not.
3  Q.  And your parents' names were what?
4  A.  Alexander Walton and Rosie May -- her
5      maiden name was Macklin before she became
6      Walton.
7          MR. WALKER:  I'm sorry, ma'am,
8          what was that?
9          THE WITNESS:  My mother's maiden
10         name was Macklin.
11 Q.  M-A-D-G --
12 A.  M-A-C-K-L-I-N.
13 Q.  So you were raised in Marianna, Arkansas?
14 A.  Yes, I was.
15 Q.  Did you complete high school there?
16 A.  Yes, I did.
17 Q.  What high school did you graduate from?
18 A.  Lee Senior High School.
19 Q.  And after you completed high school, what
20     did you do?
21 A.  Well, I got married.  I was set to go off
22     to college to Philander Smith when I got
23     married, and during my marriage, I worked

5  (Pages 14 to 17)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| Page 18 |
|---|
| 1    two jobs. |
| 2  Q.  So Farmer Smith, is that a college in |
| 3    Arkansas? |
| 4  A.   Philander.  Philander Smith is a college |
| 5    in Little Rock, Arkansas. |
| 6  Q.   What type of school is it? |
| 7  A.   It's a university. |
| 8  Q.   Four-year? |
| 9  A.   Four-year. |
| 10  Q.   Did you ever go back and complete your |
| 11    college education? |
| 12  A.   No. |
| 13  Q.   As we sit here today, the highest level of |
| 14    education you have is 12th grade? |
| 15  A.   14.  I have two years. |
| 16  Q.   Two years at what? |
| 17  A.   At Capital City Community College in |
| 18    Little Rock. |
| 19  Q.   And did you get a degree from Capital City |
| 20    Community College? |
| 21  A.   No, just a certificate there.  I'm in |
| 22    college right now. |
| 23  Q.   Studying what? |

| Page 19 |
|---|
| 1  A.   Information technology. |
| 2  Q.   What is information technology? |
| 3  A.   It's actually technical support work on |
| 4    computers, drafting, network, |
| 5    trouble-shooting. |
| 6  Q.   Okay.  And you say you're currently going |
| 7    to school there now? |
| 8  A.   I'm currently going to the University of |
| 9    Phoenix online. |
| 10  Q.   Okay.  Where are you currently living? |
| 11  A.   I live in Texas.  8301 Boat Club Road, |
| 12    Fort Worth, Texas, 76179. |
| 13  Q.   And how long have you lived at 8301 Boat |
| 14    Club Road? |
| 15  A.   Since July the 21st, 2007. |
| 16  Q.   Who do you live there with? |
| 17  A.   Ross Park. |
| 18  Q.   Who is Ross Park? |
| 19  A.   He's my boyfriend. |
| 20  Q.   And how long have y'all lived there? |
| 21  A.   He lived there -- he's from Texas -- |
| 22    maybe -- in that apartment, over a year. |
| 23  Q.   Okay.  How long have y'all been boyfriend |

| Page 20 |
|---|
| 1    and girlfriend? |
| 2  A.   For about six months. |
| 3  Q.   Okay.  Where did you live before 8301 Boat |
| 4    Club Road? |
| 5  A.   1713 Arbor Mill Circle, Apartment 1415, |
| 6    Bedford, Texas. |
| 7  Q.   Can you spell that? |
| 8  A.   B-E-D-F-O-R-D, Texas, 76021. |
| 9  Q.   And who did you live with there? |
| 10  A.   Alone. |
| 11  Q.   How long did you live at 1713 Arbor Mill |
| 12    Circle? |
| 13  A.   Since July the 22nd of 2006, I moved |
| 14    there. |
| 15  Q.   So you lived there approximately a year |
| 16    before moving in with Ross Park? |
| 17  A.   Yeah, that's correct. |
| 18  Q.   Before you lived at 1713 Arbor Mill |
| 19    Circle, where did you live? |
| 20  A.   2600 Vaughn Lakes Boulevard, Montgomery, |
| 21    Alabama, Apartment -- I forgot the |
| 22    apartment number.  Vaughn Lakes -- I don't |
| 23    know.  I forgot. |

| Page 21 |
|---|
| 1  Q.   Is that where you lived with Chris Horton? |
| 2  A.   Yes. |
| 3  Q.   How long did you live at that address? |
| 4  A.   We moved here March of 2004. |
| 5  Q.   Where did y'all move from? |
| 6  A.   Dubuque, Iowa. |
| 7  Q.   Where did you live in Dubuque, Iowa? |
| 8  A.   17 -- I think it was 17 -- no.  2173 Sunny |
| 9    Slope Drive, Dubuque, Iowa, 52002. |
| 10  Q.   How long did you live there? |
| 11  A.   Since January of 2001; I arrived there. |
| 12    Chris was there in December of 2000. |
| 13  Q.   Okay.  So you lived there by yourself |
| 14    January through December of '01, and then |
| 15    Chris moved in December -- |
| 16  A.   Chris was there in December, the end of |
| 17    December of 2000, and I arrived there |
| 18    January, right after the new year, 2001. |
| 19  Q.   So Chris was already living there? |
| 20  A.   Yes. |
| 21  Q.   Where did you live before that? |
| 22  A.   I lived in Marianna. |
| 23  Q.   What was your address in Marianna? |

6  (Pages 18 to 21)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 22

1   A.   243 Dr. Martin Luther King Drive,
2        Marianna, Arkansas, 72360.
3   Q.   How long did you live at 243 Dr. Martin
4        Luther King Drive?
5   A.   Basically all my life.
6   Q.   Okay.  Is that your parents' house?
7   A.   No.  My parents house was at -- it was on
8        -- my parents lived in Marianna, but the
9        street was Walter Street.
10  Q.   I want to make sure I understand your
11       answer.  You said your parents lived on
12       Walter Street in Marianna too?
13  A.   Uh-huh.  They're from Marianna.
14  Q.   And is that the -- Walter Street, is that
15       where you grew up?
16  A.   I did.
17  Q.   How old were you when you left Walter
18       Street?
19  A.   I got married.  That's when I moved out.
20       22.
21  Q.   Okay.  And so you and Levester moved into
22       the address at 243 Dr. Martin Luther King
23       Drive?

Page 23

1   A.   No.  When we got married, we moved into
2        Hickory Garden.  We had our own place.
3   Q.   What is it?
4   A.   This apartment at Hickory Garden in
5        Marianna, Arkansas.
6   Q.   Okay.  And that's where you moved at 22
7        years old?
8   A.   Yes.
9   Q.   And how long did you live in that
10       apartment there?
11  A.   I left -- I separated from my husband in
12       1984.  I moved out, and I moved to Little
13       Rock to live with my brother, and that was
14       2600 Green Drive in Little Rock.  Then I
15       attended Capital City there, and then I
16       went back.  I went back in -- I'm trying
17       to think what year.  1992 or '3.  But I
18       was coming home every weekend, so...
19  Q.   Well -- you said here?
20  A.   I was coming home to Marianna every
21       weekend because my kids were in school
22       there.
23  Q.   And then you finally moved back to

Page 24

1        Marianna after living in Little Rock for
2        how long?
3   A.   I moved back there in '93 permanently to
4        stay, and I left there in -- well, it was
5        '85 when I left, come to think of it.  My
6        daughter was almost a year old.
7   Q.   When you left?
8   A.   Uh-huh, Marianna.
9   Q.   Okay.  And moved to?
10  A.   To live with my brother.  So it was back
11       and forth off and on to Marianna.  I was
12       living with my brother, going to school,
13       and working there to support my kids, who
14       were still with my mother-in-law and my
15       parents.  I left my husband, so when I
16       came back home on the weekends, I stayed
17       with either my parents or I'm very close
18       with my husband's family; I still stayed
19       with them.
20  Q.   Okay.
21  A.   And when I go visit today, I still stay
22       with them.  We're very close.
23  Q.   What are their names?

Page 25

1   A.   The Butlers.  Odessa Butler; she's my
2        ex-mother-in-law.  Janelle Davis, Shirly
3        Butler, Arlene Butler.  We're still very,
4        very close, and I'm close to my
5        ex-husband.  So when I said all my life,
6        part of Little Rock and Marianna is going
7        back and forth.  I came home every
8        weekend.
9   Q.   Were the addresses, then --
10  A.   I kept my address in Marianna.
11  Q.   You kept the Walter Street address?
12  A.   Uh-huh.
13  Q.   Even though you didn't live there anymore;
14       is that correct?
15  A.   Well, I lived there on the weekends.
16  Q.   Okay.  And did you also put down at times
17       your in-laws' address as your home
18       address?
19  A.   That was the mailing address for my
20       children in school.  It was 260
21       California, which was -- 243 was on one
22       street and 260 was -- you could walk
23       through the back yard on the next street.

7  (Pages 22 to 25)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

---

Page 26

1      It was right behind each other.
2   Q.   And then the other address you had during
3      this time frame was 2600 Green Drive,
4      Little Rock?
5   A.   That was my brother's address.  That's why
6      my school information went to his home.
7   Q.   What is your brother's name?
8   A.   Calvin Lee Walton.
9   Q.   Okay.  And between the age of 22 and the
10      time you moved to Martin Luther King
11      Drive, were there any other places that
12      you lived?
13   A.   22 is when I lived in Sunny Slope -- I
14      mean at Hickory Garden with my husband;
15      that's when I got married.  I left him in
16      1985; we separated.
17   Q.   And so from 1985, you would move -- you
18      lived with your brother in Little Rock,
19      and you lived with your parents sometimes,
20      and you lived with your in-laws sometimes?
21   A.   I lived with my brother going to school.
22      I came home every weekend to see my
23      parents, and then my kids were still with

Page 27

1      -- my mother-in-law helped me with my
2      children, and her daughters, because he
3      was on drugs, and so -- and I was going to
4      get a better job for myself to support my
5      kids.  So when I came home on the
6      weekends, then I'd go see my parents --
7      I'd spend the night there with my parents
8      with my kids, and then I'd go to my
9      mother-in-law's house and spend time with
10      them because we were all very close.
11   Q.   Okay.  How long did this moving back and
12      forth go on, what period of time?
13   A.   I could stay there -- I started my job at
14      Douglas & Loamson when my father died of
15      cancer.
16   Q.   Wait.  Start over again.  I'm sorry.  My
17      question to you was, how long had you been
18      moving back and forth between Little Rock
19      and Marianna, Arkansas before you settled
20      down somewhere?
21   A.   Well, I settled down back at home
22      permanently in 1992.
23   Q.   1992?

Page 28

1   A.   Yeah.
2   Q.   So from 1985 to 1992, you lived with your
3      brother, your mother, or your in-laws
4      weekly?
5   A.   Yes.
6   Q.   You never had your own place?  Is that
7      right?
8   A.   No.
9   Q.   Okay.  1992 is when you settled down at
10      what address?
11   A.   At 243 Martin Luther King Drive.
12   Q.   Okay.  I want to focus just right now on
13      the time frame of 1985 to 1992.  For some
14      period of time, you attended Capital City
15      Community College; is that right?
16   A.   Yes.
17   Q.   Was that the first two years, 1985, '86?
18   A.   '86, '87.
19   Q.   Okay.  And then did you get a job during
20      that same time frame, or were you a
21      full-time student?
22   A.   I was a full-time student and had a job.
23   Q.   And what were you doing then?

Page 29

1   A.   I was working as a cashier.  I worked at
2      Wal-Mart on Maumelle Boulevard.
3   Q.   On what boulevard?
4   A.   Maumelle -- at the one in Arkansas, that
5      Wal-Mart.
6   Q.   Can you spell Maumelle?
7   A.   M-A-U-M-E-L-L-E.  And then I worked at
8      Conoco service station three days a week
9      from 3/11 -- and let me correct myself on
10      something too, because during the time I
11      worked at Conoco, I actually -- my sister
12      -- I have a sister Paula, Paula Walton,
13      and I actually went and got my kids.  We
14      got an apartment together, so -- and that
15      was in the Pine Tree Apartments.  I went
16      and got my kids.  I had forgotten all
17      about that.
18   Q.   For how long did you live in those
19      apartments with your children?
20   A.   I lived there with my children for -- '87
21      to '91.
22   Q.   And is that a suburb of Marianna?
23   A.   No, that's in Little Rock.  I brought my

8  (Pages 26 to 29)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 30

1    children to Little Rock.
2  Q.  Okay.  All three?
3  A.  Yes.
4  Q.  Okay.  And your sister's last name is
5    Paula --
6  A.  Paula Marie Walton.
7  Q.  So she was unmarried at the time?
8  A.  Yes.
9  Q.  Do you remember the apartment that you
10    lived in?
11  A.  It was Pine Tree Apartments, and it was on
12    -- it was in southwest Little Rock.
13  Q.  Okay.  So you initially started at the
14    school in '86; you worked as a cashier at
15    a Wal-Mart in Maumelle, Arkansas; is that
16    right?
17  A.  That's correct.
18  Q.  And you did that for a while, and then you
19    switched jobs to the Conoco service --
20  A.  No, I worked both of them.
21  Q.  You worked both at the same time?
22  A.  Uh-huh.
23  Q.  Is that right?

Page 31

1  A.  Yes.
2  Q.  And then what job did you have next?
3  A.  Well, I worked for them part-time, and
4    then I worked for -- downtown while I was
5    in school, the Corps of Engineers.
6  Q.  What did you do at the Corps of Engineers?
7  A.  I worked on computers in the computer
8    department.
9  Q.  For the state of Arkansas?
10  A.  For the State of Arkansas Corps of
11    Engineers.  It was a student program.
12  Q.  Okay.  How long did you do that?
13  A.  For about a year and a half, because the
14    program ended.
15  Q.  Okay.  Were you still working at the
16    Conoco service station and the Wal-Mart?
17  A.  Yeah.  Wal-Mart was like four days a week
18    and four hours.  The Conoco in the evening
19    was like six hours, not every day, just
20    depends on when they needed me; it was
21    PRN.  And so I worked at the Corps of
22    Engineers from like 7 in the morning to
23    11.  So all of them were like part-time

Page 32

1    positions.
2  Q.  And the Corps of Engineers job came to an
3    end after a year and a half?
4  A.  It was a student program.
5  Q.  And when it ended, did you take up another
6    job?
7  A.  I got a full-time position job, yes.
8  Q.  Where?
9  A.  Arkansas Democrat.
10  Q.  Is that a newspaper?
11  A.  Yes.
12  Q.  Where is it located?
13  A.  Little Rock, Arkansas.
14  Q.  What did you do with that newspaper?
15  A.  I worked in customer service.
16  Q.  What were your job duties?
17  A.  It was actually -- I handed out
18    subscriptions to accounts.  If people go
19    out of town, if they wanted to hold their
20    papers until they come back, to place it
21    in the computer; if they wanted to order a
22    new paper for the first time, enter those
23    orders into the system.

Page 33

1  Q.  So you were data entry?
2  A.  Customer service and --
3  Q.  Talked on the telephone to folks?
4  A.  Talk on the telephone and enter that
5    information in.
6  Q.  Okay.  And how long did you work -- I'm
7    sorry.  Did you finish?
8  A.  It was inbound; people called in.
9  Q.  Okay.  And how long did you work for the
10    Arkansas Democrat?
11  A.  I worked for them for two years until they
12    were bought out.
13  Q.  Okay.  Then where did you work?
14  A.  Then when they were bought out, I was
15    still working my part-time positions at
16    Conoco and also at Wal-Mart.
17  Q.  Okay.  What year was it that the Arkansas
18    Democrat was bought out?
19  A.  1990.  Arkansas Gazette bought them out.
20  Q.  And you were not kept on?
21  A.  I didn't participate in wanting to be kept
22    on.
23  Q.  You didn't anticipate wanting to be kept

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 34

1   on?
2   A.  Not in customer service. They were
3       eliminating that department, so we had no
4       idea where we were going to go and had no
5       idea what was going to happen. And I
6       couldn't afford to waste any time taking
7       care of my kids.
8   Q.  So what did you do?
9   A.  I still worked my part-time jobs.
10  Q.  Well, did you apply for another job?
11  A.  I didn't at the moment; I just continued
12      to go to school.
13  Q.  Did you quit your job at the Arkansas
14      Democrat?
15  A.  No, I never quit; they laid us off.
16  Q.  And you said you continued to go to
17      school?
18  A.  Yes, picking up some more classes, until
19      that school shut down.
20  Q.  What school was that?
21  A.  Capital City finally shut down in 1994.
22  Q.  Okay. When you were working at the
23      Arkansas Democrat, were you living at the

Page 35

1       243 Martin Luther King Drive address?
2   A.  I was living with my brother. It's in
3       Little Rock. Excuse me. I'm a little bit
4       confused here. When I was working for the
5       Arkansas Democrat, yeah, I was living with
6       my brother, and that's when -- later on
7       that year, my sister and I got an
8       apartment together. My brother lived down
9       the street from us, and it was at the
10      Pines, so I was still in Little Rock.
11  Q.  Okay. So it was after the Arkansas
12      Democrat job ended that you settled down
13      at 243 Martin Luther?
14  A.  I went back home. After that, my father
15      got sick with cancer, and I took his job
16      in Marianna.
17  Q.  When is it that you went back home?
18  A.  I went back home -- in the end of '93 or
19      '94, I went back home. I can't remember.
20      I know my father had died that February of
21      '93, and I took his job working at Douglas
22      & Loamson in Marianna to take care of my
23      mother and my kids.

Page 36

1   Q.  What was the name of the company?
2   A.  Douglas & Loamson, L-O-A-M-S-O-N.
3   Q.  What is that?
4   A.  They are the manufacturers that deal with
5       Chrysler seats for Chrysler and GM and add
6       attachments like door hinges and door
7       latches.
8   Q.  Okay. The Arkansas Democrat was bought
9       out in 1990 by the Arkansas Gazette. You
10      moved back home in 1993 or 1994. Do you
11      think it was '93 that you moved back in,
12      if your father passed away in February of
13      '93?
14  A.  He passed away in February of '93. I
15      didn't go to work immediately, so that's
16      why I say has to be. And it could have
17      been either the end of February -- end of
18      May through early '94. I just remember
19      that we moved back home because someone
20      had to take care of my family -- my
21      mother, which my other sisters and
22      brothers did, and I.
23  Q.  And when you moved back home to care for

Page 37

1       your mother, did you move into her home,
2       or where did you move in?
3   A.  No, because my sister, she came -- Paula
4       came back home too. She moved in with my
5       mom, and I moved in 243. She wasn't
6       working, so I had to support them both.
7   Q.  And where were your children living when
8       you lived at 243?
9   A.  My children were living at 243 with me and
10      walking in the back yard to their
11      grandmother's house. I moved in 243
12      because I got closer to my mother-in-law
13      and to my sister-in-law and their family
14      because they helped me out quite a bit
15      with my children.
16  Q.  You said that you went back when you did
17      after your father passed away, and you
18      said you took his job?
19  A.  Yes.
20  Q.  Did they offer you the job that your
21      father had had?
22  A.  Yes. My father had been there 30 years,
23      and my mother had a stroke and was -- when

10  (Pages 34 to 37)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 38

1     I was 16, so my mother was not capable of
2     actually being taken care of by herself.
3     So when someone died, they had a rule.  It
4     was their policy if someone died in the
5     family, the next closest in the family or
6     whatever could have gotten the job, and I
7     got the job.
8  Q.  Okay.  And how long did you work for this
9     Douglas -- I still didn't write it down
10    right.  I apologize -- Douglas & Loamson?
11    How did you spell it?
12 A.  L-O-A-M-S-O-N.
13 Q.  Loamson?
14 A.  Yes.
15 Q.  How long did you work at Douglas &
16    Loamson?
17 A.  From '94 until -- off and on because they
18    -- we laid off quite a bit in the season,
19    so altogether from '94 until -- I'm just
20    thinking because it was '94 until right
21    around '98.
22 Q.  Okay.  And what happened in 1998?
23 A.  They shut it down, laid a lot of people

Page 39

1     off.  They were losing the contract with
2     GM for parts, so half of the people were
3     laid off, the lower numbers than the
4     people who had been there for 30 and 40
5     years.
6  Q.  So you were laid off?
7  A.  Yes.
8  Q.  What did you do next?
9  A.  I went and worked for this company that --
10    for the City of Arkansas that actually
11    sold meat, like made wieners and hot dogs
12    and -- Boar's Head, something like that,
13    was the name of it.
14 Q.  Boar's Head?
15 A.  Uh-huh.
16 Q.  And where are they located?
17 A.  Forrest City.
18       MR. WALKER:  I'm sorry.  What's
19       that city?
20 A.  Forrest, F-O-R-R-E-S-T, City, Arkansas.
21    It's like 18 miles from Marianna, so I
22    traveled back and forth every day.
23 Q.  And what did you do for that company?

Page 40

1  A.  I worked on the assembly line packing
2     meat.  I was a meat packer.
3  Q.  Okay.  And you were an assembly line
4     employee also at Douglas & Loamson?
5  A.  That's correct.
6  Q.  And you were involved in making seats for
7     Chrysler and GM vehicles?
8  A.  Yes.  It was not really assembly line.
9     It's like a station where the robot
10    actually works the part.  You actually
11    assemble the parts into the robot.
12 Q.  All right.  How long did you work at
13    Boar's Head?
14 A.  Until they shut down.
15 Q.  When did they shut down?
16 A.  They shut down the end of '99.
17 Q.  What did you do then?
18 A.  Then I went to Yale & Horst.
19 Q.  Yellow Horse?
20 A.  Yale, Y-A-L-E, and Horst, H-O-R-S-T.
21 Q.  What is that?
22 A.  Another manufacturer.  What they do is
23    they build sort of like crane shafts that

Page 41

1     you lift motors up out of your vehicle
2     with.  So they assembled those parts and
3     built their motors to assemble those parts
4     to lift that kind of equipment from
5     vehicles or tractors or trucks, whatever.
6  Q.  Okay.  What did you do for them?
7  A.  Actually, the production scheduling there
8     for them.  The orders came in from the
9     office, and we assembled out to the
10    production people in line and said we need
11    this many parts built, had to locate the
12    parts and see if we had them in the
13    system.  And if we didn't have the parts
14    in the system, then I'd report back to the
15    office and say we need to order these
16    parts -- or to my supervisor and say we
17    need to order these parts.  So I was --
18    basically was helping the production meet
19    their standard flow for that day or for
20    that week.
21 Q.  Okay.  How long did you work at Yale &
22    Horst?
23 A.  From 2000 to -- they shut down the early

11  (Pages 38 to 41)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 42

1    part of 2006. It was the end of 2005,
2    December 2005.
3    Q.    Then what did you do?
4    A.    Let me correct something. I'm just
5    thinking about the years, because I moved
6    to Iowa with Chris. Oh, okay. Yes. I
7    remember now. I start at Yale full time
8    in 1995, because I was working at Boar's
9    Head when they were getting to shut people
10   down, so I was working there at Boar's
11   Head and I was working at Yale. I was
12   working at Yale from 11 to 7 and at Boar's
13   Head from 10 to 2. And then when Boar's
14   Head shut down permanently, I went to work
15   full time -- well, actually, went on to
16   work more extra hours at Yale Horst in
17   2005, then everybody was laid off in
18   December of 2000.
19   Q.    At Boar's Head or Yale Horst?
20   A.    Yale Horst everybody was laid off in 2000.
21   Q.    Okay. So what did you do in 2000?
22   A.    They offered us a package at Yale that we
23        can go to school -- living in that part of

Page 43

1    town in Marianna, Forrest City, there
2    wasn't very many jobs available, and so --
3    it was a little poverty town. So what
4    happened was you could draw your
5    unemployment and they would send you to
6    Crowdley Ridge Community College in
7    Forrest City.
8    Q.    Can you spell the name of that?
9    A.    Yes. C-R-O-W-D-L-E-Y Ridge Community
10        College while you're drawing unemployment
11        so you can hire yourself for other jobs in
12        Memphis and the surrounding areas. But I
13        moved to Iowa with Christopher.
14        Christopher and I met there.
15   Q.    Okay. What was he studying?
16   A.    Where was Christopher staying?
17   Q.    Studying.
18   A.    Christopher was an engineer. He moved --
19        Christopher came from Charlotte, North
20        Carolina to Yale. I met Chris there. I
21        met him in '98. I was already working
22        there. Chris moved there from Charlotte
23        to work for Yale.

Page 44

1    Q.    Okay. And so both of y'all moved to Iowa?
2    A.    Chris moved there first.
3    Q.    In December, and you moved there in
4    January?
5    A.    Yes.
6    Q.    And Chris was in 2000 and you, January of
7    2001?
8    A.    That's correct.
9    Q.    And then when what did you do once you
10        moved to Iowa in terms of employment?
11   A.    I went to Kelly Services there, and I got
12        a temporary position working for
13        Cunningham & Butler. That was an
14        insurance company that provides providers
15        with information about recipients, a
16        portion of the plan where they're kept up
17        for the year of any kind of dental,
18        medical, or any kind of procedure they
19        wanted to perform on that patient -- that
20        insurance holder. So I worked in provider
21        services, providing providers with
22        information about customers, or their --
23        their patients, customers, whatever.

Page 45

1    Q.    When you moved to Iowa, did your children
2    stay behind?
3    A.    Yes. They didn't want to come to Iowa.
4    They were in school.
5    Q.    How old were they?
6    A.    Tamika -- my son was actually 20 when I
7    left, and my daughter, she was in her --
8    Tamika was in her 10th grade. And Tanisha
9    was -- Tanisha was in the 8th grade.
10   Q.    So they stayed behind with your in-laws?
11   A.    With my in-laws, yes.
12   Q.    Okay. And so you worked as an employee of
13        Kelly Services and were first assigned a
14        position for Cunningham, Butler; is that
15        right?
16   A.    Yes, that was my first assignment.
17   Q.    And help me understand. When you're
18        employed at Kelly Services, is it Kelly
19        Services that actually pays you and they
20        get reimbursed from Cunningham, Butler?
21   A.    They pay me. I don't know whether they
22        got reimbursed. I know my checks came
23        from Kelly Services; they didn't come from

12 (Pages 42 to 45)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 46

1    the company.
2  Q.  Okay. And while you were at Cunningham
3      Butler, you would provide insurance
4      companies --
5  A.  I worked in provider services. It was an
6      insurance company.
7  Q.  It was an insurance agency or a company?
8  A.  It was an insurance company.
9  Q.  They actually wrote insurance?
10 A.  They actually did. It's a self-owned
11     company by Mr. Cunningham.
12 Q.  And so a patient would go to get some
13     procedure and --
14 A.  No, no, no. Providers would call inbound.
15     And if a patient comes in their office, we
16     have to verify their insurance, and if
17     they're having a procedure or anything
18     done, they would call us to verify, have
19     they had it done this year; you know, you
20     have a status on how many times you can
21     have a procedure done in a year.
22 Q.  Okay. So when we say providers, we're
23     talking about doctors --

Page 47

1  A.  I only spoke with providers.
2  Q.  Doctors' offices?
3  A.  Yes.
4  Q.  Okay. And they would call in and they
5      would verify whether this particular
6      patient had insurance with Cunningham
7      Butler, and if so, whether or not the
8      procedure that was planned would be
9      covered?
10 A.  That's correct. And they also wanted to
11     verify if they had any other insurance,
12     who was primary, who was first, secondary,
13     of that nature.
14 Q.  Okay. And you would take those calls,
15     research, and call them back?
16 A.  No. I'd take those calls and do the
17     research on the phone and give them that
18     information then and there.
19 Q.  So they would stay on the line while you
20     typed stuff into the computer and told
21     them; is that right?
22 A.  That's correct.
23 Q.  And how long did you work for Kelly

Page 48

1      Services?
2  A.  From January 2001 until October of --
3      October the 8th of 2001. That's when I
4      went across the street to Signa Investment
5      Retirement Company.
6  Q.  The whole time that you were working for
7      Kelly Services, were you assigned to this
8      job at Cunningham Butler?
9  A.  Uh-huh, I was.
10 Q.  And then Sigma Investments --
11 A.  Signa.
12 Q.  Signa Investment --
13 A.  Retirement Services Investment Company.
14 Q.  I'll get it right here in a second. It
15     was right across the street?
16 A.  Yeah.
17 Q.  And what did you --
18 A.  It was right off the main street.
19 Q.  Okay. And what did you do for them?
20 A.  I was a retirement account representative.
21     I went to get my license in Series 6 and
22     63, so we only handled retirement
23     accounts, 401s and 401(k)s and pension

Page 49

1      plans.
2  Q.  You're speaking a foreign language to me,
3      I'm afraid, so I may need you to slow
4      down. You were a retirement account
5      representative?
6  A.  Yes.
7  Q.  You were employed by Signa?
8  A.  Signa Investment Retirement Services.
9  Q.  Okay. And you did what?
10 A.  We worked on 401(k) accounts.
11 Q.  401(k)s. And what did you do in terms of
12     401(k)s?
13 A.  As if you would have been a customer,
14     you'd call in, and I'd provide you details
15     about your mutual funds or your stocks or
16     your pension account. I also did pension
17     plans, estimates for a customer who is
18     actually getting ready to retire in the
19     next five years, doing estimates for them
20     or doing transfers from one stock to
21     another stock for them, giving them the
22     estimate by the close of the business day;
23     if they wanted to take out loans from

13  (Pages 46 to 49)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 50

1  their accounts or withdrawals from their
2  accounts; update their address, all that
3  information.
4  Q.  Okay. You said you had to receive some
5  type of licensing to do that?
6  A.  Yes.
7  Q.  What type of licensing is that?
8  A.  From the New York Exchange Board, Series 6
9  and 63 stock brokers licenses.
10 Q.  Series 6 and 63?
11 A.  Uh-huh.
12 Q.  That was the foreign language part. And
13  when were you so licensed?
14 A.  I was licensed -- I started there in
15  October of 2001, and I was licensed
16  January of 2002.
17 Q.  And have you kept that license active?
18 A.  I kept the license active until I moved
19  here.
20 Q.  Did you enjoy that work?
21 A.  Yes, I did.
22 Q.  Why didn't you keep the license active
23  after moving here?

Page 51

1  A.  Well, you can't -- if you're not in the
2  investments, you cannot keep those
3  licenses active. If you're out for two
4  years, you have to go back and do it
5  again. But you have to be within a
6  company who requires those licenses.
7  Q.  Gotcha. So you worked --
8  A.  It's pretty confusing.
9  Q.  I'm trying to keep up with it. Let's see.
10 A.  I worked a lot.
11 Q.  You started with Signa in October of 2001?
12 A.  October 8th of 2001.
13 Q.  And how long did you work there?
14 A.  Until Chris and I moved here, March of
15  2004.
16 Q.  Was there a period of time that you lived
17  in Nashville?
18 A.  Yeah. I went to -- well, it was only a
19  brief time. I went there from -- Chris
20  was coming to Hyundai here, and I went to
21  Nashville and was taking another position
22  with the Medicaid portion until Chris
23  moved here.

Page 52

1  Q.  With who?
2  A.  It was still Signa. It was with Signa.
3  Q.  Okay. But you were doing a different type
4  of work with Signa?
5  A.  Uh-huh. The same work I was kind of doing
6  with Cunningham & Butler, providers work.
7  Q.  Was it a different branch of Signa or a
8  different company within the Signa
9  company?
10 A.  Same company, different division.
11 Q.  Okay. How long did you live in Nashville?
12 A.  I never lived there; I was just there with
13  a friend of mine staying there until Chris
14  got through with John Deere in Iowa, and
15  then I found out there wasn't a Signa in
16  Montgomery, so -- I had to come here to be
17  with my husband.
18 Q.  Your husband got hired on with Hyundai?
19 A.  Uh-huh.
20 Q.  From John Deere?
21 A.  From John Deere.
22 Q.  Was he working with John Deere in Moline?
23 A.  Moline is the main office. Dubuque, Iowa,

Page 53

1  he worked there.
2  Q.  What takes place in Dubuque?
3  A.  That's the factory there in Dubuque. The
4  factory is not in Moline; it's just the
5  office branch.
6  Q.  And what job did Chris get with Hyundai?
7  A.  Same job, engineering, that he had at John
8  Deere.
9  Q.  What type of engineering does he do,
10  design work?
11 A.  Electrical.
12 Q.  Okay. And you moved here when again?
13  Help me with that.
14 A.  March of 2004, end of March. I went to
15  work in the Nashville Signa in -- Signa
16  was being bought out by Prudential, so I
17  told Signa that I wanted to stay with the
18  Signa branch. So -- they didn't have a
19  Prudential I know here in Montgomery as an
20  investment company, so I stayed within the
21  company, and then when Chris came in
22  March, that's when I came here, leaving my
23  job back in Nashville, because Signa was

14  (Pages 50 to 53)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 54

1    here.
2  Q.  And your children stayed back in Marianna?
3  A.  Yes. By that time, my daughter was -- one
4       was in the 12th grade; the other was in
5       the 10th. My son was working for the
6       federal prison.
7  Q.  Have we covered all the places that you've
8       lived, or are there other places that
9       you've lived?
10 A.  Not that I know of, no.
11 Q.  When you came here in March of 2004, did
12      you first go to work with Kelly Services?
13 A.  Yes, that was my first job.
14 Q.  Okay.
15           MR. WALLACE: Chuck?
16           MR. STEWART: Yeah.
17           MR. WALLACE: We've been going
18           about an hour. Can we take
19           a break?
20           MR. STEWART: Sure.
21           MR. WALLACE: Thank you.
22           (Brief recess.)
23 Q.  One of the things that I want to make

Page 55

1    certain I understand is, your testimony
2    was that Chris was coming to work at
3    Hyundai in Montgomery and that you took a
4    position with Signa in Nashville at the
5    time; is that correct?
6  A.  That's correct. Because Chris had two
7       offers, one in Nashville -- that was his
8       first offer. That was the first one he
9       was going to take. And when I was working
10      in Nashville, Hyundai offered him a
11      position, and of course, his parents live
12      here, so that's where he wanted to be, so
13      either one of us has to make a choice, so
14      I had to give up my position at Signa to
15      come here. We were very familiar with
16      Nashville because we got married there and
17      he's originally from Nashville.
18 Q.  Okay. Did Chris ever go to work in
19      Nashville at the time or around the time
20      that he got the job offer at Hyundai?
21 A.  He -- no, no. When his offer came from
22      Nashville, he thought about it, and he
23      told me he was going to accept it; that's

Page 56

1    how I went to Nashville. Chris came down
2    several times to visit his new job there
3    and to visit me and -- while I was staying
4    with friends, and when he went back to
5    pack, then Hyundai had called. And he had
6    been trying to get on at Hyundai for about
7    a year because he wanted to be near his
8    parents.
9  Q.  Okay. Are there any other places that you
10      have lived that we have not identified?
11 A.  None I can think of.
12 Q.  Are there any other places that you have
13      worked that you have not identified?
14 A.  No.
15 Q.  Have you ever been fired from a job
16      before?
17 A.  No.
18 Q.  Ever in your life?
19 A.  No.
20 Q.  Up through today?
21 A.  Up until Hyundai?
22 Q.  Up to today, November 20, 2007?
23 A.  No, I haven't been fired from a job other

Page 57

1    than dismissed from Hyundai.
2  Q.  Why were you dismissed from Hyundai?
3  A.  Well, in the course of the year I worked
4       there, I helped this gentleman, his wife
5       and his kids. He was a gambler, and we
6       worked together in the same department,
7       Tommy Certain. I didn't know he was a
8       gambler, but I lent him money always
9       throughout the year, because his wife
10      would call me saying their lights were out
11      and they needed to get food or something.
12      So when Chris and I were separated during
13      that time, I needed my money back from
14      him. And he wrote me a bad check for $300
15      and it bounced in my account twice. So
16      that caused a very -- a lot of animosity
17      between us both, so I asked him every
18      other day was he going to give me back my
19      money. And I'd joke with him by saying
20      that, you know, you'll find yourself on
21      Judge Judy. And he told them that I
22      harassed him and made sexual advanced at
23      him. And that all was because of -- in

15  (Pages 54 to 57)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 58

1    fact, the cops came out there on my job to
2    arrest me, so my whole character --
3    everything with that had changed with
4    Hyundai, so the police had to go through
5    the human resource department to say that
6    I had been arrested for filing a false
7    report to a law enforcement agency. They
8    fired me because they didn't believe me,
9    and the reason why they didn't believe me
10   is because they had heard and had found
11   out that I was arrested.
12 Q.  Hyundai heard you had been arrested?
13 A.  Well, they came to Hyundai, five of them,
14   five sheriff's department guys came out
15   there twice. And the only way they could
16   get to me was through human resources and
17   General Affairs. See, you have to tell
18   General Affairs what are you out there to
19   arrest me for, and then General Affairs
20   has to get in contact with my manager, and
21   they had to tell my manager, because I'm
22   on the premises, they need me to come --
23   bring me to the office and then take me

Page 59

1    away. But fortunately, I wasn't there
2    that day.
3 Q.  What were the sheriff deputies doing
4    there?
5 A.  To arrest me.
6 Q.  For what?
7 A.  A felony, false report. A false report to
8    a law enforcement agency; that was the
9    charge.
10 Q.  So you're saying that -- when did they
11   come to arrest you?
12 A.  August.
13 Q.  Of --
14 A.  August the 5th, 2006.
15 Q.  Okay. And when were you terminated from
16   Hyundai?
17 A.  March -- no -- yeah, March. March of
18   2007.
19 Q.  And you're saying you were terminated from
20   Hyundai because --
21 A.  I was constantly questioned about that
22   incident there.
23 Q.  Let me finish my question. You're saying

Page 60

1    that you were terminated from Hyundai in
2    March of 2007 because you were arrested in
3    August of 2006?
4 A.  Well, I feel that was a reflection of what
5    happened because Tommy Certain said I
6    sexually harassed him.
7 Q.  Who said that?
8 A.  Tommy Certain.
9 Q.  Can you spell his last name?
10 A.  C-E-R-T-A-I-N.
11 Q.  And this is the guy that you lent money to
12   because his wife would call and say they
13   needed money --
14 A.  Well, his wife was the one who asked me
15   for the money, and I agreed to lend them
16   the money. She asked me to give it to
17   Tommy at work. So I wrote him a check for
18   $300 on January the 2nd.
19 Q.  Of?
20 A.  2007. So we returned back from the
21   Christmas break -- I didn't even notice
22   that the check had bounced in my account
23   until the end of January when I got a

Page 61

1    thing from the bank.
2 Q.  So you wrote a check on January 2, 2007,
3    to Tommy Certain?
4 A.  Uh-huh.
5 Q.  Is that right?
6 A.  Yes.
7 Q.  Because his wife had called and asked you
8    to lend them money?
9 A.  Well, yeah. It's not the first time I
10   ever lent them money, so it was -- it
11   didn't really bother me at the moment
12   anyway.
13 Q.  What was his wife's name?
14 A.  Jacqueline Certain.
15 Q.  Can you spell Jacqueline?
16 A.  J-A-C-K-I-N -- K-I -- J-I-N-Q-U --
17   something. I can't think of it.
18   Jacqueline.
19 Q.  I think there are about 200 spellings of
20   the name Jacqueline. But you think it's
21   J-A-C-Q-U-E-L-I-N-E? J-A-C-K-L-Y-N?
22 A.  Yeah, it is J-A-C-Q-U-E-L-I-N-E.
23 Q.  Okay. And had you known her before?

16  (Pages 58 to 61)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 62

1  A.  I met her, yes.  I met him and his whole
2     family.
3  Q.  After you went to work at Hyundai?
4  A.  Yes, because I didn't know him before I
5     went to work there.
6  Q.  And you say he had a gambling problem?
7  A.  That's when I found out.  His wife told me
8     that -- well, every time we'd get paid, a
9     couple of days later, he'd ask me for
10    money for food and things -- that didn't
11    bother me.  I didn't mind helping anybody.
12    He's not the only person I've lent money
13    to out there at Hyundai.  So -- I didn't
14    know he was gambling until his wife said
15    he was gambling off their whole check and
16    they didn't have food and stuff, so...
17 Q.  Did she have a job?
18 A.  No.
19 Q.  And does Tommy Certain still working at
20    Hyundai?
21 A.  Yes, he's still working at Hyundai, on the
22    three-year -- he's on a three-year
23    corrective action, one step from being

Page 63

1     fired, because he opened up the case and
2     he admitted that he wasn't telling the
3     truth.
4  Q.  Did you file an EEOC complaint against
5     Hyundai?
6  A.  I most certainly did.
7  Q.  Is that the first EEOC complaint you've
8     ever filed?
9  A.  No.
10 Q.  How many have you filed?
11 A.  I had one -- it was -- well, I had never
12    -- it was a group EEOC complaint.  So it
13    was one lady who filed it when I was --
14    I'm trying to think.  I don't remember.
15    It was some type of deal with
16    discrimination in pay for women.
17 Q.  When you were employed where?
18 A.  It was Conoco.
19 Q.  Okay.  Any other EEOC complaints that you
20    filed?
21 A.  No.
22 Q.  Your complaint that was filed against
23    Hyundai, you said you filed an EEOC

Page 64

1     complaint against Hyundai for your
2     termination; the EEOC then sent the notice
3     to Hyundai; an investigation took place,
4     and Tommy Certain admitted that he was not
5     telling the truth when he said you
6     sexually harassed him?
7  A.  Yeah.  They put him on a three-year
8     probation -- a three-year corrective
9     action.  They had fired me.
10 Q.  Have you asked for your job back at
11    Hyundai?
12 A.  I don't want my job back at Hyundai.  And
13    that's not closed.
14 Q.  I'm sorry?
15 A.  It's not closed.
16 Q.  What do you mean by that?
17 A.  EEOC is still with that case.
18 Q.  Okay.  So they haven't issued a
19    right-to-sue yet?
20 A.  No.
21 Q.  Is it your intention to sue Hyundai?
22 A.  No, it's not.  I just want to make it
23    right, let the truth be known.  But at one

Page 65

1     point in time, to be perfectly honest with
2     you, of course, after that lawyer called
3     me a criminal -- five cops come out there
4     to arrest me and they called me a
5     criminal.
6  Q.  Which lawyer called you a criminal?
7  A.  The lawyer at Hyundai.  I forgot his name.
8     It's a gentleman.  Anyway, I replied back
9     to his remark of me being called a
10    criminal because five officers came out
11    there to arrest me.  And I kind of got
12    that under control.
13 Q.  You're not talking about Richard Neal, are
14    you?
15 A.  Is his name Richard Lee?  I don't know.
16 Q.  Neal.
17 A.  Richard Neal?  It may be.  The only
18    attorney I knew out there.
19 Q.  Okay.
20        MS. NICKSON:  If I could, for the
21    record, that was not the
22    name of the attorney.  I
23    addressed that.

17  (Pages 62 to 65)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 66

1  A.  All I know is I know it was a gentleman,
2     so...
3  Q.  So this guy out there called you a
4     criminal in front of other people?
5  A.  He called me a criminal, not only to other
6     people, but to my attorney.
7  Q.  What other people did he say it in front
8     of?
9  A.  Britt. Britt Craft, C-R-A-F-T.
10        MR. WALKER:  Are you saying
11        Brent?
12        THE WITNESS:  Britt, B-R-I-T-T.
13        MR. WALKER:  Oh, thank you.
14  Q.  Craft, C-R-A-F-T?
15  A.  C-R-A-F-T -- C-R-A-F -- yeah, C-R-A-F-T.
16     That's right.
17  Q.  And what does he do?
18  A.  It's a she.
19  Q.  What does she do?
20  A.  She used to work at Hyundai, so -- but I
21     have no idea what she does now.
22  Q.  What was she doing at the time she was
23     working at Hyundai?

Page 67

1  A.  She was working in the quality department.
2     She's a quality engineer.
3  Q.  Okay. Who else was that statement made in
4     front of?
5  A.  Well, it was Britt and then Doris. And I
6     can't -- what's Doris's last name?  I
7     can't think of Doris's last name, but she
8     no longer works there either because --
9     how Britt came involved is, the day that I
10     was asking for my money from Tommy, she
11     was standing there in between -- this is
12     my desk; Tommy's desk is here; and there's
13     two desks in between us. So I'm standing
14     at my desk, and Tommy stood up and said,
15     well, can I write you another check for
16     that, you know, and I said no, you have to
17     give me cash. So Britt was standing there
18     because I was coming out there to fill out
19     my time card and I brought her a fish
20     plate; she asked me if I could pick her up
21     something to eat. And then I said, no,
22     you have to pay me in cash; I'm not taking
23     another check from you. And I said, I'll

Page 68

1     waive your bounce fees that went into my
2     account. So we got ready to leave. Britt
3     and I were walking down the stairs, going
4     out the back way. Tommy came out with us
5     and said hold on, because he smoked and
6     Britt smoked. So they were standing there
7     smoking outside, and I was standing there
8     till Britt got through, and she walked me
9     to my vehicle. So then after that was
10     when I learned that Tommy said that on
11     that day, that I sexually harassed him,
12     you know, that I showed him my breast and
13     that I asked him out for a date and that
14     it all came after I made a complaint about
15     my money.
16  Q.  Okay. So you used Britt as a witness --
17  A.  I didn't use Britt as anything. Tommy
18     said she was standing there. I never -- I
19     didn't even know about the charge ever
20     until March, and this happened in
21     February. I continued to ask him about my
22     money in February; that's when I learned
23     about it. He would not give me my money

Page 69

1     back. And I kept saying, I want my money
2     or I'm going to take you to Judge Judy or
3     I'm just going to tell our manager about
4     you wrote me a hot check; I need my money.
5     So -- I didn't know he had filed a charge
6     on me at all.
7  Q.  Well, what were the circumstances under
8     the attorney for Hyundai saying to Britt
9     Craft that you were a criminal?
10  A.  Well, because Britt was standing there
11     when they found out what happened to me,
12     and then Britt told them what happened,
13     that it didn't happen the way Tommy said.
14     And so Britt went and got her an attorney
15     and said well -- because Tommy said that
16     we were just best friends again and that,
17     you know, Britt was taking up for me. So
18     Britt went and got her an attorney and
19     then Britt went and got her manager and
20     director and they went over to HR to speak
21     with this attorney, and they talked about
22     the cops coming up there to my job, that
23     -- did Britt know that; Britt said yes.

18  (Pages 66 to 69)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 70

1    That shouldn't have anything to do with
2    that at all, but they mentioned that. And
3    they mentioned that, well, I ran a
4    background check on her; she's a criminal.
5 Q.  That's what the attorney said to Britt?
6 A.  Yes, he did.
7 Q.  Were there any witnesses to that
8    statement?
9 A.  I don't know who was in the office with
10   Britt, but I know Britt called me and told
11   me. And I know that's not the first time
12   I heard it.
13 Q.  When else did you hear it?
14 A.  I called him and I spoke with him.
15 Q.  You're saying the attorney at Hyundai?
16 A.  That's correct.
17 Q.  Go ahead.
18 A.  And I asked him about his remark. And he
19   said my background -- well, the cops came
20   out there and my background check showed
21   that I was arrested and that I was a
22   criminal. I was arrested for a criminal
23   charge, that's what he said. I said,

Page 71

1    well, that's not what I heard you said,
2    but I'm not a criminal.
3 Q.  Okay. And when did that phone call take
4    place?
5 A.  March. And it could be in the middle of
6    March or the end of March.
7 Q.  2007?
8 A.  Yes.
9 Q.  And then Doris, last name unknown --
10 A.  It's Alexander.
11 Q.  Okay. Doris Alexander?
12 A.  I think it's Doris Alexander.
13 Q.  You said she no longer works there either?
14 A.  No, she took a position down there with
15   the distributor. She was in quality too,
16   and now she works in -- somewhere out in
17   Tennessee or Kentucky -- closer to
18   Kentucky.
19 Q.  With a Hyundai supplier?
20 A.  Yes.
21 Q.  Do you know the name of the supplier?
22 A.  I forgot. I used to.
23 Q.  Do you keep in touch with her?

Page 72

1 A.  I did when I first -- because Doris, you
2    know, she lived with me for a moment, so
3    -- she split up with her fiance and she
4    moved in with me, so after I left and
5    moved to Texas, she took a job down there.
6    And we used to keep in contact, but we
7    don't keep in contact anymore.
8 Q.  But you have her telephone number?
9 A.  I have her old number in my phone, yes.
10 Q.  Okay. And what did she say about the
11   attorney saying something about your being
12   a criminal?
13 A.  Well, you know, because they were still
14   working out there and I was not, and, you
15   know, this stuff was continuing to go on
16   with this investigation and all this kind
17   of stuff -- on Britt, you know, and it was
18   -- it was a whole lot of mess. But I
19   wasn't there, but it was continuing to go
20   on trying to get it straight, trying to
21   get it right. So in the midst of the
22   thing, you know, I was in the middle and
23   Tommy was the one saying all this stuff.

Page 73

1    And then -- because Doris was living with
2    me and they discussed this kind of stuff
3    at work, her and Britt, all of them, they
4    told me what was going on. And, of
5    course, my husband worked in that same
6    department too.
7 Q.  You said George was living with you?
8 A.  Doris Alexander.
9 Q.  Doris was living with you.
10 A.  After Chris and I split up, she moved in
11   with me.
12 Q.  Okay. So Doris Alexander told you that
13   the attorney at Hyundai called you a
14   criminal?
15 A.  Yes. She told me -- well, as far as --
16   she told me because Britt told her. I
17   already had heard it from Britt.
18 Q.  Okay. So she didn't actually overhear the
19   attorney say that?
20 A.  She heard it from Britt.
21 Q.  Okay. And where is Britt living now?
22 A.  I have not talked to Britt since -- the
23   last time I talked to Britt was maybe a

19  (Pages 70 to 73)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 74

1    year ago.  All I know is she left Hyundai.
2    I don't know if she still lives here or
3    not.  She could be still living in
4    Montgomery.
5  Q.  Was she married?
6  A.  No.  She was not married and had three
7    kids.
8  Q.  Do you know where she was living when she
9    lived here in Montgomery?
10  A.  Off Atlanta Highway.
11  Q.  Do you know the address, street, anything
12    like that?
13  A.  No.  It's off Atlanta Highway, and it's
14    right across from these apartments, the
15    only apartments on Atlanta Highway that
16    Hyundai rents out to, you know, let
17    employees live there.  She lived right in
18    that area right over there, and I can't
19    think of it, in a house there.
20  Q.  Have you filed suit against Tommy Certain?
21  A.  I turned that over instead to EEOC.  Like
22    I said, I wanted my money.  That's why I
23    asked him to give me my money.

Page 75

1  Q.  Have you gotten your money back yet?
2  A.  No.
3  Q.  Do you intend to sue Tommy Certain for
4    making these false claims against you?
5  A.  No, I am not intending to sue him.  I want
6    Hyundai to make it right.  Everybody knows
7    Tommy don't tell the truth.  If Tommy was
8    telling the truth, then why did he come
9    back and recant his story?  It was too
10    late; I was fired by what he said.
11  Q.  Okay.  Have you ever been arrested any
12    other time?
13  A.  Not before this time when I got arrested.
14  Q.  So you've just been arrested the one time;
15    is that right?
16  A.  I've never been arrested before I got
17    arrested on August the 5th.
18  Q.  Of when?
19  A.  August the 5th.
20  Q.  2006?
21  A.  Yes.
22  Q.  And that's the only time?
23  A.  I've never been arrested before until

Page 76

1    then.
2  Q.  Okay.  Have you been arrested since then?
3  A.  Since?
4  Q.  August 5th, '06?
5  A.  No.
6  Q.  And where were you employed at the time of
7    your arrest?
8  A.  Wait a minute.  Wait a minute, wait a
9    minute.  What did you just ask me?
10  Q.  Have you been arrested since August 5,
11    '06?
12  A.  Yeah, yeah.
13  Q.  When?
14  A.  I sure have.  July 11th.
15  Q.  Of '07?
16  A.  '07, yeah.
17  Q.  And what was that for?
18  A.  I moved to Texas, I signed up on eHarmony
19    in November 2006.  EHarmony matched me up
20    with a gentleman according to my
21    background with working with kids and
22    everything.  We raised money to help the
23    kids he said he was taking care of in this

Page 77

1    division -- foster division, whatever.
2    And we would donate money to this guy and
3    that nonprofit organization, myself and my
4    daughter's coach and ex-in-laws.  And this
5    guy was a fake.  We asked for the money
6    back.  He sent me a check back.  I went to
7    my bank and said -- asked my bank was this
8    check any good.  Well, deposit it.  And so
9    -- but they said they'd have to hold it.
10    So it turned out the check was not any
11    good.  It was a stolen check from out of
12    Florida, on which I called the police.
13    And the police thought I knew this guy,
14    and eHarmony has to come in and correct
15    that information.
16  Q.  So was that all squared away?
17  A.  Oh, yeah.
18  Q.  Where were you living at the time of that
19    arrest?
20  A.  Texas.
21  Q.  How long were you in jail?
22  A.  One day.
23  Q.  How long were you in jail in August of

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 78

1      '06?
2  A.  Overnight, one day.
3  Q.  Are those the only two times you've been
4      arrested?
5  A.  Uh-huh.
6  Q.  Is that a yes?
7  A.  Yes, it is.
8  Q.  Did you file criminal charges in July of
9      '07 against anyone?
10 A.  Against that gentleman?
11 Q.  Uh-huh.
12 A.  I'm not supposed to -- well, to elaborate
13     on this, eHarmony and myself and the FBI
14     are working to catch this guy.  He's
15     actually out of Nigeria.  He was posted on
16     the eHarmony site as he lived in Memphis.
17 Q.  And did you file charges against this guy
18     at any time?
19 A.  I filed it through eHarmony.  We don't
20     know where he's at.
21 Q.  Gotcha.  And was your case dismissed for
22     having that stolen check?
23 A.  They -- it's totally cleared.

Page 79

1  Q.  Okay.  And where was it that you were
2      arrested?
3  A.  In Texas.
4  Q.  Where in Texas?
5  A.  At A-C-E check cashing place.
6  Q.  I'm sorry.  Help me again?
7  A.  Ace check cashing place.  It was a store,
8      a check-cashing store.
9  Q.  Okay.  So you weren't depositing the
10     check; you were cashing it at a
11     check-cashing store?
12 A.  Yeah.  And then I asked the lady -- when
13     she said the numbers on the check were not
14     recognized by any bank -- it was written
15     on Washington Mutual bank.  And I knew for
16     sure -- working in finance, I knew if the
17     routing number doesn't pull up,
18     something's wrong with that.  So the young
19     lady gave me back the check, and I said
20     no, let's call the bank -- and that's
21     Washington Mutual -- was this check any
22     good.  Because we had given this guy over
23     600-something dollars donated to kids for

Page 80

1      shoes and food and clothes.  And, you
2      know, how could you go wrong with a guy
3      being on eHarmony, who do background
4      checks on people?  But he was not the guy
5      he said he was.  EHarmony found him out.
6      EHarmony took him off their website and
7      said they sent out incident tickets, and
8      they didn't notify me of it.
9  Q.  You were arrested there at the store?
10 A.  Yeah, after I called them.
11 Q.  You called --
12 A.  The police.
13 Q.  From the Ace check-cashing store?
14 A.  I sure did.
15 Q.  Located where?
16 A.  Bedford, right off of Centra.
17 Q.  Okay.  Have you ever had a driver's
18     license in Alabama?
19 A.  Yes.
20 Q.  What is your number, or what was your
21     number?
22 A.  I don't know my number -- I don't know
23     what it was.  It wasn't my social security

Page 81

1      number; it was a State ID assigned number.
2  Q.  Where else have you had a driver's
3      license?
4  A.  In Texas, Arkansas.
5  Q.  Anywhere else?
6  A.  No.
7  Q.  What is your Texas driver's license
8      number?  Can you read the number to me?
9  A.  25913465.
10 Q.  Okay.  And your Arkansas driver's license,
11     what was it?
12 A.  I think it was my social security number.
13 Q.  Any other driver's licenses that you've
14     had?
15 A.  No.
16 Q.  Have you ever filed a lawsuit before this
17     one?
18 A.  As far as being in a car accident, no.
19 Q.  You were in a car accident?
20 A.  Yeah, back in 1992.
21 Q.  And where did you file suit?
22 A.  Arkansas.
23 Q.  What happened to that case?

21  (Pages 78 to 81)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 82

1  A.  A drunken driver ran into me and crushed
2      my kneecap.
3  Q.  Did it go to trial?
4  A.  No.
5  Q.  It was settled out of court?
6  A.  Yes. It was settled with the insurance
7      company.
8  Q.  What county in Arkansas was that filed in?
9  A.  St. Francis. Forrest City, that's St.
10     Francis County. My attorney was out of
11     Little Rock.
12 Q.  Okay. Who was your attorney?
13 A.  Neal Opalm.
14 Q.  Can you spell that?
15 A.  N-E-A-L. And Opalm, it was O-P-A-L-M.
16 Q.  Okay. So that's the only other lawsuit
17     that you've ever filed?
18 A.  That I can remember, yes.
19 Q.  You've never sued anybody else?
20 A.  No.
21 Q.  Have you ever been sued?
22 A.  No.
23 Q.  Have you ever filed bankruptcy?

Page 83

1  A.  No.
2  Q.  Have you ever filed a workers'
3      compensation claim?
4  A.  No.
5  Q.  Have you ever filed an insurance claim for
6      a loss to your home or car?
7  A.  No. I never had a home.
8  Q.  And as I understand it, all the jobs that
9      you went through, the only one that you've
10     been fired from was Hyundai?
11 A.  Dismissed from Hyundai, yes.
12 Q.  Okay. You were not actually an employee
13     of National Seating?
14 A.  I worked at Kelly Services.
15 Q.  And when National Seating asked that you
16     not be sent back --
17 A.  They didn't.
18 Q.  They didn't?
19 A.  No, they did not.
20 Q.  Well, tell me what happened.
21 A.  I was already gone. I had already started
22     a position. They never -- I called Kelly
23     Services and told Kelly Services that I

Page 84

1      was going to work for EDS. My three
2      months assignment was coming up -- I was
3      only temporary for three months. I didn't
4      even return after that. I talked to
5      Theresa there at Kelly Services -- and I
6      can't think of her last name. She was my
7      only contact there. National Seating
8      never asked me not to come back. They
9      never said anything to me. I was gone
10     already.
11 Q.  I just misunderstood, then. I'm sorry.
12     Thank you for squaring me away.
13 A.  I don't know where you misunderstood that
14     from, but you didn't hear it from me.
15 Q.  Okay. You only had a three-month
16     temporary assignment there at National
17     Seating?
18 A.  That's correct.
19 Q.  And was it after the three months or
20     before the three months --
21 A.  It was before my three months ended that I
22     left.
23 Q.  Why did you leave?

Page 85

1  A.  I moved to a permanent position. I was
2      interviewing all the time I was working
3      there.
4  Q.  And where did you leave to go to work?
5  A.  I went to EDS, Electronic Data System.
6  Q.  Where is EDS?
7  A.  In Montgomery, Alabama.
8  Q.  What does EDS do?
9  A.  It's a Medicaid provider with the State of
10     Alabama. They work with providers also,
11     and they work with recipients on Medicaid,
12     Medicare, any kind of benefits that's run
13     from the State. So they work both ways,
14     with the doctors and also with the
15     recipients.
16 Q.  Is EDS a private company?
17 A.  EDS was actually, as I understand it, came
18     into effect by -- I can't think of his
19     name that was --
20 Q.  Ross Perot?
21 A.  That's correct -- running for president,
22     yes.
23 Q.  Okay. And it still remains a private

22  (Pages 82 to 85)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 86

1    company today?
2  A.  I don't know what EDS is right now since
3      I've been gone.
4  Q.  Did you leave EDS on good terms?
5  A.  Yes.
6  Q.  How long did you work at EDS?
7  A.  For nine months, until I got on with
8      Hyundai.
9  Q.  So why did you leave National Seating?
10 Q.  Why did I leave National Seating?
11 Q.  Or why did you tell Kelly Services you
12     didn't want to be assigned to National
13     Seating anymore? I'm sorry.
14 A.  Theresa and I had a conversation almost
15     two weeks before I even left, and it was
16     the first -- beginning of June. A little
17     bit of uncomfortableness here. There was
18     some subscriptions coming in that didn't
19     have no dates on them, and how would
20     Medicaid know they were within the
21     guidelines if they didn't have any dates
22     on them. So I asked Emily, what was the
23     date, and she said put a date on it. I

Page 87

1      said I'm not putting a date on it.
2  Q.  My question to you was, why did you tell
3      Kelly Services that you did not want to
4      continue working at NSM?
5  A.  That's what I told Kelly Services --
6      Theresa.
7  Q.  You told Theresa at Kelly Services that
8      you had some subscriptions without dates
9      on them --
10 A.  I said there was some irregularities in
11     filing Medicaid claims. Some of the
12     subscriptions don't have dates on them,
13     and I feel very uncomfortable being asked
14     to put dates on them.
15 Q.  Okay. So -- and what did Emily say about
16     the date?
17 A.  Emily -- after she asked me to put a date
18     on it and I said I was not going to, Emily
19     said don't worry about it; she'll get it
20     and put a date -- she'll find out what the
21     date was. So I left it there.
22 Q.  So you left it alone, and then to your
23     knowledge, Emily would find out the date

Page 88

1      and put it on there?
2  A.  I don't know. I left that alone.
3  Q.  So you don't know what happened to it
4      after you talked to Emily about that?
5  A.  No. I never asked.
6  Q.  How many times did that conversation with
7      Emily take place?
8  A.  We talked about that twice.
9  Q.  And do you remember the name of the
10     patient or the customer of NSM?
11 A.  No, I don't. It's -- I don't.
12 Q.  Okay. So there were two different times
13     that that occurred? Did Emily say the
14     same thing each time?
15 A.  No. The second time she said, don't worry
16     about it; I'll get the dates. It was my
17     responsibility to make sure everything was
18     in the correct way with the dates on it,
19     the progress notes, the doctor orders and
20     everything, and they had a date on it. If
21     they didn't have a date on it, Medicaid
22     would send it back. That's how they
23     determined the 60 days cutoff.

Page 89

1  Q.  Okay. What would happen at the end of 60
2      days.
3  A.  You have to go back and re-evaluate that
4      child again, re-evaluate that child for
5      the chair, had to get them into a Children
6      Rehab Services to do a whole new
7      assessment.
8  Q.  Were there only the two orders that didn't
9      have dates on them?
10 A.  Are you talking about -- I'm talking about
11     subscriptions that don't have dates on
12     them.
13 Q.  Right.
14 A.  No, that wasn't the only subscription I
15     saw without any dates on it -- or
16     prescription I saw.
17        MR. WALKER: Are you saying
18        subscription or
19        prescription?
20     THE WITNESS: Prescription.
21     MR. WALKER: With a P?
22     THE WITNESS: With a P.
23     MR. WALKER: Thank you.

23  (Pages 86 to 89)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 90

1  Q.  How many prescriptions did you see without
2      dates on them?
3  A.  I can't tell you how many I saw without
4      dates on them. All I know is that I
5      started sending them to Medicaid and they
6      started sending them back, asking for
7      dates.
8  Q.  How many times did that happen?
9  A.  Well, they sent them back in bulk --
10     batches. I don't know how many times they
11     sent them back, but I know on most every
12     different occasion I got them back before
13     I left. And I talked to one of the PTs
14     who actually didn't have any prescriptions
15     -- he didn't have dates on his
16     prescriptions at all. It was Michael
17     Maddox, and he was with the Dothan
18     Children Rehab Services clinic there, who
19     assesses the child for the wheelchair.
20     And I would call and ask what is the date,
21     and he told me that Emily said don't ever
22     put any dates -- Emily and Don said don't
23     ever put any dates on the prescription.

Page 91

1      So I left it alone.
2  Q.  Did he tell you that anybody else said
3      that, or was it just Emily and Don?
4  A.  He only worked with Emily and Don.
5  Q.  My question to you, did he say that --
6  A.  I didn't ask about anybody else. I only
7      worked for Emily and Don.
8  Q.  Did you ever report what you're describing
9      as prescriptions without dates to anyone
10     other than Emily and Don?
11 A.  Danielle in Nashville -- and I don't
12     remember her last name, but she was the
13     regional manager or Emily and Don -- when
14     she'd call and ask, said, you need to
15     hurry up and get these claims to be
16     billed; they're on the file too long. And
17     I said, well, I can't do anything without
18     any dates.
19 Q.  And what did she say?
20 A.  Well, you're the administrative assistant;
21     you need to tell Emily and Don that they
22     need to get dates. So I'm in the middle
23     between that.

Page 92

1  Q.  Anything wrong with Danielle telling you
2      that you need to get dates?
3  A.  I don't see the patient, so how am I going
4      to get dates? And then I call for dates,
5      and then they tell me that they said don't
6      put dates on them -- they were told not to
7      put dates on there, so -- you know, I go
8      to Danielle, then I go to Emily, then I
9      call the PT. What am I supposed to do, go
10     to the clinic? They're not putting the
11     dates on there. I don't assess that
12     child; the PT does; the doctors do; the
13     nurses do. So I called all over trying to
14     get a date. And if -- I'm not putting a
15     date on there. That's the way I'm going
16     to do it. They need to put the date on
17     there or send me a new prescription with
18     the date. I'm not doing it. I wasn't
19     going to do it.
20 Q.  Well, let's start at the beginning, then.
21     Who writes the prescription?
22 A.  There are a series of people who write a
23     prescription. A PT actually assesses the

Page 93

1      child. For whatever the child's
2      disability, the doctor has to see it and
3      determine, does this child need a certain
4      type of wheelchair? When he determines
5      what type of wheelchair this child needs,
6      he goes to the PT. The PT determines what
7      type of attachments, what type of
8      equipment this child needs according to
9      their disability. Then from the PT, it's
10     a progress note that's written in there by
11     the doctor with the same date. There's a
12     progress note written by the PT telling
13     about the assessments. So it goes through
14     a whole sequence of people.
15 Q.  Let me see if I understand you. The
16     prescription originates from a child going
17     to a doctor when that child needs a
18     wheelchair or needs to be assessed for a
19     wheelchair; is that correct?
20 A.  These were children -- that's correct.
21     These were children who actually their
22     only capability of getting around was
23     their wheelchair.

24  (Pages 90 to 93)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| Page 94 |
|---|

```
 1   Q.   Okay.  So the doctor would send the child
 2        to a physical therapist and ask the
 3        physical therapist to determine exactly
 4        what type of wheelchair works best for
 5        that child?
 6   A.   They actually go to a clinic.  This was a
 7        clinic the doctor works in, so actually,
 8        the physical therapist was located in that
 9        clinic also.  The PT and the social
10        worker, all of them were located in there
11        together.  So all the assessments and all
12        the -- the social worker that they deal
13        with, all of this is done in the same day
14        when the child is in that clinic.
15   Q.   What clinic are you talking about?
16   A.   There's several clinics.  There's one in
17        Dothan; there's one in Opelika; there's
18        one in Montgomery.  Children Rehab
19        Services; it's all clinics.
20   Q.   Is the Dothan one -- what's the name of
21        the Dothan one?
22   A.   Children Rehab Center of Dothan, Alabama.
23   Q.   What's the one in Montgomery?
```

| Page 95 |
|---|

```
 1   A.   Children Rehab Center in Montgomery,
 2        Alabama.
 3   Q.   And the one in Opelika?
 4   A.   Same, Children Rehab Services in Opelika.
 5   Q.   Did you receive prescriptions from any
 6        other entities or individuals other than
 7        those three?
 8   A.   The only one that I talked with was Mike
 9        Maddox.  I received a prescription from --
10        I'm sure from all of them.
11   Q.   Any other clinics that you received
12        prescriptions from --
13   A.   Yes.
14   Q.   -- for wheelchairs for children?
15   A.   Yes.
16   Q.   What?
17   A.   All three of those clinics.  Just that.
18        No other besides them.
19   Q.   Okay.  Those are the only three?
20   A.   Those are the only three that I worked
21        with.
22   Q.   Of those three, did all of them come in
23        without dates on them?
```

| Page 96 |
|---|

```
 1   A.   No.
 2   Q.   Was there ever one that you got without a
 3        date from Opelika?
 4   A.   I -- you know, I didn't just actually just
 5        look at it from Opelika or anything like
 6        that.  The one I noticed -- because Jerry
 7        -- first of all, Jerry Sanders worked at
 8        the one here, so Jerry Sanders did his
 9        own.  Jerry Sanders was in Medicaid, and
10        he worked with Emily together.  They go to
11        clinics together; they go see a child
12        together on certain days of the week.  So
13        I never got to see those at all, because
14        Jerry Sanders gave those directly to Emily
15        and Emily worked on them.
16   Q.   Is Jerry Sanders a Medicaid employee?
17   A.   Jerry Rogers, I'm sorry.  Yeah, he's a
18        Medicaid employee.
19   Q.   So you never saw any prescriptions from
20        Montgomery that did not have a date?
21   A.   I never saw those, period.  They were
22        never given to me.
23   Q.   Okay.  Opelika, did you ever see any of
```

| Page 97 |
|---|

```
 1        those prescriptions without a date?
 2   A.   You know, I could have.  I just don't
 3        remember.
 4   Q.   Do you recall today having seen a
 5        prescription from Opelika --
 6   A.   I don't know --
 7   Q.   Let me finish my question, please, ma'am,
 8        or we'll never have a clean record.  Do
 9        you remember as you sit here today ever
10        seeing a prescription from Opelika --
11   A.   What did you say?
12             MS. NICKSON:  Hold on.
13   Q.   I said let me finish asking my question
14        before you answer or we'll never have a
15        clear record here.
16             MS. NICKSON:  Okay.  Could I --
17             Elizabeth, let the counselor
18             finish --
19             THE WITNESS:  I didn't understand
20             what he said.
21             MS. NICKSON:  -- the question.
22             Okay.  But just let him --
23             what he's saying is that the
```

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 98

1    court reporter cannot record
2    your statement and his
3    statement if you're talking
4    simultaneously, okay, so let
5    him finish the question,
6    then you answer.
7  Q.  As you sit here today, do you ever recall
8    receiving a prescription from Opelika that
9    did not have a date on it?
10 A.  I don't remember.
11 Q.  Are you saying that whatever prescriptions
12    you saw without dates came from Dothan?
13 A.  I'm not saying that.
14 Q.  What are you saying?
15 A.  I'm saying that when I came across one of
16    those prescriptions that didn't have a
17    date on it, it was Mike Maddox being the
18    PT.
19 Q.  Mike Maddox was the only PT that provided
20    you with prescriptions that had no dates?
21 A.  I'm not saying that either.
22 Q.  What are you saying?
23 A.  I'm saying that is the only one that I

Page 99

1    noticed was from Mike.
2  Q.  And how many did you notice from Mike?
3  A.  Well, I talked to Mike twice.
4  Q.  Is that to say that he had two
5    prescriptions without dates?
6  A.  To say that, can you provide me a
7    prescription with a date.
8  Q.  You called Mike Maddox and said, Mike, can
9    you provide me with a prescription with a
10    date?
11 A.  Yeah. I told him I was going to the chart
12    to get it sent off to Medicaid, and I
13    noticed there was a prescription without a
14    date; can you fax me the prescription with
15    a date.
16 Q.  And that happened two times?
17 A.  I talked to him twice, yes.
18 Q.  Okay. And was it concerning two
19    prescriptions, two separate prescriptions?
20 A.  Two separate.
21 Q.  Is there anyone else that you spoke with
22    about prescriptions that did not have
23    dates?

Page 100

1  A.  I don't remember. But I've talked to
2    several of them in different clinics on
3    several different things -- dates or
4    progress notes or even estimates. There's
5    a lot of things that I talked to them
6    about, but I just know that some things
7    that didn't have a date -- only one that I
8    noticed that didn't have a date on it was
9    on two prescriptions at that time, and
10    that was Mike Maddox. I don't know of
11    anything other than that.
12 Q.  Okay. And these two prescriptions from
13    Mike Maddox, those are the ones that you
14    talked to Emily about?
15 A.  Yeah.
16 Q.  And when you spoke with Emily, what did
17    she say?
18 A.  Emily told me the first time, well, go
19    ahead and put this date on there. I said,
20    no, I'm not going to; you put the date on
21    it. The second time Emily said, don't
22    worry about it; she'll take care it; just
23    put the chart on her desk. So I never

Page 101

1    asked any other questions about it, no.
2  Q.  Okay. And as you sit here today, you do
3    not know the names of the patients that
4    these concerned?
5  A.  No.
6  Q.  Did you and Emily ever discuss dates
7    again?
8  A.  No. After Mike Maddox told me that the
9    second time --
10 Q.  I'm talking about Emily. Did you and
11    Emily ever discuss --
12 A.  Well, there was no reason for me to.
13 Q.  Okay. Now, you had a conversation with
14    Mike Maddox when you called back about one
15    of these dates; is that right?
16 A.  Yes.
17 Q.  And at that time -- do you remember -- I
18    guess it was the first prescription that
19    you called him back that didn't have a
20    date on it?
21 A.  I don't remember if it was the first or
22    second. Well, it could have been the
23    first one because --

26  (Pages 98 to 101)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 102

1  Q.  But you don't remember?
2  A.  It could have been the first one, because
3      I probably didn't even notice it until
4      Medicaid sent it back to me.  I -- I think
5      it was.  Medicaid sent it back to me, and
6      they always -- it goes to EDS, and EDS
7      sent it back and said, this is what's
8      missing.  And that's when I looked and
9      said, well, okay, there's no date on it.
10     They're the ones that informed me there
11     was no date on it.
12 Q.  And is that what caused you to call Mike
13     Maddox?
14 A.  Yes.
15 Q.  What did you and Mike discuss?
16 A.  Can you fax me a prescription of the day
17     he wrote for that child -- can you fax it
18     to me with a date on it.  Can you give me
19     the same prescription with a date on it.
20 Q.  And what can he say?
21 A.  He told me that Emily and Don said never
22     put any dates on there, that he never had
23     been putting any dates on it.

Page 103

1  Q.  What else did y'all discuss?
2  A.  Nothing else.  I said okay.
3  Q.  Did you ever talk to him again?
4  A.  No, I never talked to Mike again.
5  Q.  And you said that you reported to Danielle
6      one time about dates?
7  A.  Danielle would do progress on what's been
8      -- you know, what's -- like a report of
9      what they received from Medicaid on each
10     branch they had, how many they have
11     outstanding, how many have been approved,
12     you know, their quota, what quota they
13     have to meet for each month and all that
14     necessary stuff.  And so when there's a
15     charge that's been outstanding from there,
16     then she'll call me and say, hey, we need
17     to get this chart done.  Taking into
18     effect that I was coming in after a young
19     lady who worked there a year before me
20     permanently, so I was actually working on
21     some of her old charts.  Chasely Weeks.
22 Q.  What -- what --
23 A.  And I was hired temporary in her position

Page 104

1      after --
2  Q.  So Danielle would say, we've got this out
3      standing charge here?
4  A.  We've got this outstanding chart that
5      needs to be sent to Medicaid and we need
6      to get it approved so we can put it on the
7      books and do a data of how many sent out
8      in the same day, what is the estimate,
9      everything.  It calculates in the
10     computer.  So you have to go into the
11     computer and say, I sent it to Medicaid,
12     and it calculates the total of it, you
13     know, the chair and the estimates and
14     everything.  But you have to put all that
15     stuff in there.
16 Q.  Okay.  And the discussion of dates came up
17     with Danielle?
18 A.  Yeah, I told Danielle.  She asked me about
19     that chart, that one chart.  And I said,
20     well, it doesn't have a date on it, so --
21     and she said, well, you're the
22     administrative assistant; you need to tell
23     Emily and Don that, you know, to get that

Page 105

1      date on there; Emily needs to get that
2      date.  I said, I'll tell Emily.  So I left
3      it alone.
4  Q.  You said, tell Emily yourself?
5  A.  No.  I said, I told -- I've spoken to
6      Emily.  And Danielle said, then I will
7      speak to Emily.
8  Q.  Okay.  Is that the end of that
9      conversation?
10 A.  Yeah.
11 Q.  So you didn't tell Danielle in that
12     conversation that Emily had told you to
13     put a date on it?
14 A.  No.  I told -- that was the first -- I
15     never talked to Danielle until she called,
16     and she only talked to me about one first
17     thing.  Emily -- I found out from Mike
18     Maddox on the second phone call that I
19     called him and he told me that -- don't
20     put a date on it.  Danielle called me
21     about the first one -- it had been on
22     their books for about a year before I even
23     started, and then -- I didn't even know

27  (Pages 102 to 105)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 106

1     about it until she told me to pull the
2     chart, and it had on there it didn't have
3     a date on it. And when I talked to Emily
4     about it, Emily said, put a date on it.
5     And I said -- and Danielle said, tell
6     Emily that she needs to go and get a date
7     -- what date the child can was in there.
8     And I said, I told Emily, and then she
9     said she'll talk to Emily. That was the
10    very first time. I hardly ever spoke to
11    Danielle at all. When I talked to Mike
12    Maddox again, the second time about
13    another date, that's when he told me, and
14    after that, I was gone two days later. I
15    never talked to Danielle again about that.
16  Q.  Okay. You never reported to Danielle that
17    Mike Maddox said --
18  A.  I was gone two days later. I wasn't
19    getting involved in that.
20  Q.  Were there any other irregularities, as
21    you've described them, with the orders?
22  A.  As far as an order that one of them didn't
23    have a strap across a child. A child fell

Page 107

1     out of the chair and cracked his skull
2     because they didn't have a strap on him.
3   Q.  Okay. Any others?
4   A.  And -- the only one I can remember,
5     another irregularity, was a father -- this
6     father or somebody that ran some kind of a
7     home for kids --
8   Q.  A father ran a home for kids?
9   A.  It's some kind of place where --
10        MR. WALKER: St. Jude's?
11  A.  It's somewhere in Montgomery where people
12    -- kids stay there. And this one guy, all
13    I knew, his name was Robert, and he
14    weighed -- because Don told me about him.
15    He weighed about 360 pounds, and his name
16    was -- he lived in this place, and I hear
17    him talking about Father --
18        MR. WALKER: Manuel?
19        THE WITNESS: Yeah, Manuel.
20        Father Manuel.
21  A.  And the day that Don went there before I
22    left, to give him his chair, he didn't
23    have a strap on it, and he fell out of it

Page 108

1     and rolled down the hill. He weighed 360
2     pounds. And the father called -- and I
3     answered the phone call -- tell me what
4     happened. And the police had to come and
5     help get him up out of the street because
6     he was so heavy. And they had to go out
7     there and -- still had to go out there and
8     work on the chair and put a strap on it.
9   Q.  So is that two chairs that didn't have
10    straps on them?
11  A.  There were only two that were brought to
12    my attention because they called.
13  Q.  Any other irregularities?
14  A.  Don built the chairs. I wouldn't even
15    know about anything wrong with the chairs
16    unless the customer -- or their mother or
17    somebody called. And I'd have to put it
18    on a note and give it to them.
19  Q.  Were there any other issues regarding
20    paperwork that was filed with Medicaid or
21    Medicare?
22  A.  They would send it back. So all I know is
23    Jerry -- there was another Jerry Sanders

Page 109

1     before he left. He'll call and say, they
2     only sent me one estimate; I need three
3     estimates from three different companies
4     giving an estimate about a wheelchair; I
5     need another estimate. Or this
6     prescription in his account is too old; we
7     need to get a new subscription -- or
8     prescription, excuse me. Jerry Sanders
9     worked with them a lot. Jerry Rogers
10    approved National Seating. And Emily gave
11    me names that she needed extensions on and
12    told me who to call, so I have to call
13    Felicia Barrow and ask for an extension.
14    And they asked for a reason, and Emily
15    said because -- she wrote down because the
16    mother wasn't in the clinic or the child
17    didn't show up in the clinic or whatever.
18        And as I recall, I think I told
19    Danielle about Robert, the one that fell
20    out of the chair, because she called there
21    one day asking for Don. I said, well,
22    Father -- somebody called and said he
23    rolled down the hill out of his

28  (Pages 106 to 109)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 110

1    wheelchair, and Don had to go out there
2    and take care of his wheelchair. So I
3    remember mentioning that to Danielle.
4  Q.  Okay. So you said that Emily would give
5      you names of patients that National
6      Seating needed an extension on?
7  A.  Some of them, when it's been sitting there
8      for a long time that she said Chasely
9      Weeks didn't complete, she'll say, tell
10     them I need an extension on it. And she'd
11     write it on a piece of paper, and I'd have
12     to call Felicia and fax it over to her.
13     Emily would write it down on a piece of
14     paper, and then I'd fax it over to her.
15 Q.  What would Emily write on a piece of
16     paper?
17 A.  She had all the names and the reason why.
18 Q.  And do you question whether the reasons
19     were valid reasons?
20 A.  No, I -- no. There was no reason for me
21     to.
22 Q.  I mean was there anything dishonest about
23     what Emily did, asking for an extension?

Page 111

1        MS. NICKSON: Object to the form.
2  A.  Repeat that.
3  Q.  Is there anything wrong with asking for an
4      extension?
5  A.  No, there's nothing wrong with asking for
6      an extension, not that I know of. That's
7      the Medicaid policy, so...
8  Q.  You have to ask for an extension if the 60
9      days has come and the wheelchair has not
10     been delivered; is that correct?
11 A.  Yes, but what is the reason for them not
12     to have a wheelchair in 60 days?
13 Q.  I don't know. I'm asking you.
14 A.  See, those were charts that Chasely Weeks
15     had. The charts that I actually worked on
16     were some old that Chasely had. One old
17     one I noticed there was no prescription
18     date on that. The new ones that came in,
19     there was no valid reason for that.
20 Q.  No valid reason for what?
21 A.  Asking for an extension.
22 Q.  Why do you say there was no valid reason?
23 A.  Because there was on two occasions where

Page 112

1    the wheelchairs were there; they were
2    loaned out to some of their friends.
3  Q.  Who were they loaned out to?
4  A.  Don told me one lady that's been a
5      customer of theirs -- I can't remember her
6      name, but her husband owns so much stuff
7      here in Montgomery, and he had a special
8      wheelchair that he needed. And another
9      place, this Mother Theresa -- some Theresa
10     lady kept calling about a wheelchair, and
11     they had a big discrepancy about that, Don
12     and Emily and she did. The wheelchair was
13     actually -- it was loaned out to somebody
14     else and that child needed that wheelchair
15     that was in that home. Because I can
16     remember Mother -- I guess Sister Theresa
17     called and checked on the information they
18     gave her and it wasn't -- that Emily and
19     Don provided to her, and it wasn't
20     correct. So they had a big discrepancy
21     and then Emily said that she was not going
22     to deal with any of her patients anymore;
23     she just wasn't going to do it.

Page 113

1  Q.  The process of asking for an extension,
2      it's a process that's built into the whole
3      procedure for getting Medicaid to pay for
4      things, isn't it, if you haven't delivered
5      a wheelchair in time?
6  A.  Well, Medicaid -- it's in their policy;
7      they want to know the reason. It's
8      Medicaid's responsibility to check up on
9      the reasons if they want to do so.
10 Q.  Is it true that when an order or a
11     prescription is placed for a wheelchair,
12     that that wheelchair is supposed to be
13     delivered within 60 days?
14 A.  Yes.
15 Q.  And if it's delivered within --
16 A.  Approved or delivered within 60 days.
17 Q.  Okay. Approved by Medicaid and delivered
18     within 60 days, correct?
19 A.  Yes. They can give a pre-approval so they
20     can go ahead and order their equipment.
21     And all that just takes place within 60
22     days.
23 Q.  Okay. If the wheelchair is not delivered

29  (Pages 110 to 113)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 114

1    within 60 days, National Seating has to
2    seek an extension on the original order or
3    they've got to go out and get a whole new
4    prescription; is that correct?
5  A.   They have to go back and -- period.  If
6    they're not even -- if -- only way they
7    can get an extension, if the wheelchair is
8    there and she says that, you know, the
9    mother wasn't in the clinic, whatever.
10   That's the only way they can get an
11   extension.  Now, as far as the other way
12   --
13 Q.   Is it the wheelchair there but has not
14   been delivered?
15 A.   And they tried to make several attempts to
16   deliver it, to the mother, at the clinic,
17   for the child.
18 Q.   Okay.  So it's in the shop but can't --
19   for some reason can't be delivered?
20 A.   The mother doesn't show up at the clinic
21   with the child in order to place it, or
22   there's been other incidents where I know
23   that maybe one of the providers who

Page 115

1    provided parts for the wheelchair had it
2    on back delay.
3  Q.   Okay.  Give me some other examples for why
4    an extension might be necessary.
5  A.   Those are ones that I came across.  Now,
6    as far as having the wheelchair there and
7    you just don't deliver it, then that's
8    when Medicaid asks why did they get
9    delivery tickets themselves.
10 Q.   I'm sorry.  I'm not following.  What?
11 A.   Now, as far as having the wheelchair there
12   and the reason why they have not delivered
13   and Emily hasn't provided them with any
14   information as far as the mother was not
15   there or the child was not there, then
16   Medicaid will show that -- they get a
17   delivery ticket showing that it was
18   delivered, and sometimes it wasn't
19   delivered at that time.  So they start
20   questioning them.  I was out of the loop
21   on that.
22 Q.   Okay.  So when an extension was sought,
23   the request for an extension would be

Page 116

1    faxed to Medicaid --
2  A.   To -- yeah, to the prior approval
3    department.
4  Q.   And the prior approval department was run
5    by Felicia Brown?
6  A.   Felicia Barrow.  She was the director.
7  Q.   I'm sorry, Barrow.  So it wouldn't go to
8    her, then?
9  A.   Yeah, she'd get some extensions that were
10   very, very crucial, because Emily said,
11   fax it directly to her and tell her, you
12   know, this is very crucial.  Only crucial
13   stuff that she needed an immediate
14   extension on, she told me to fax it
15   directly to Felicia.  And Felicia would
16   give it to whoever was working on that
17   patient or had that patient in Medicaid,
18   their social rep, whatever, like Jerry
19   Sanders or Jerry Rogers.
20 Q.   Are those two different people?
21 A.   They are.
22 Q.   Okay.  Felicia Barrow would consider the
23   extension and grant it or deny it, and if

Page 117

1    she granted it, she would send it on?
2  A.   She has to go to the Medicaid person who
3    is working with that child and look
4    through all the documents or they'd have
5    to provide her with something before she
6    would grant it.
7  Q.   Who is they?
8  A.   Jerry Sanders or Jerry Rogers.
9  Q.   So Jerry Sanders or Rogers --
10 A.   There were others too that worked out --
11   those two names are the ones that come to
12   -- because I worked with them -- Jerry
13   Sanders a lot.  I worked with him in
14   Medicaid.
15 Q.   So Jerry Sanders and Jerry Rogers would be
16   the ones who would have to give Felicia
17   Barrow the information necessary to grant
18   the extension?
19 A.   Sometimes; sometimes not.
20 Q.   Well, who else would give --
21 A.   Sometimes Felicia would go off of what
22   Emily would write on that piece of paper.
23 Q.   Okay.  And I'm still trying to find out

30  (Pages 114 to 117)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

Page 118

1    what you're saying. Are you saying that
2    Emily knowingly gave false information to
3    Medicaid about why deliveries hadn't taken
4    place?
5    A.   I'm not saying that.
6    Q.   Are you saying that Don Williams knowingly
7    gave false information to Medicaid about
8    why chairs hadn't been delivered?
9    A.   I'm not saying that either.
10   Q.   I don't understand what you're saying
11   then.
12   A.   I'm saying that I only faxed what they
13   told me to. I didn't even know any of
14   this stuff until after -- they contacted
15   me six months after I had left there.
16   Q.   Who contacted you six months after you
17   left?
18   A.   Medicaid contacted me.
19   Q.   Why?
20   A.   Because they found some discrepancy in
21   their billing, so they contacted me and
22   they tried to get ahold of Chasely Weeks
23   who worked there before me. I was only a

Page 119

1    temporary assignment.
2    Q.   Well, who had started the investigation
3    with Medicaid?
4    A.   I have no idea. I was gone.
5    Q.   Didn't you actually start the Medicaid
6    investigation?
7    A.   No, sir, I did not.
8    Q.   Didn't you report to Medicaid that there
9    were some discrepancies going on?
10   A.   I never told Medicaid nothing. I left
11   there and didn't tell them anything. And
12   that was stated in court, when we went to
13   court in September. I never said
14   anything.
15   Q.   Well, how is it that Medicaid came to
16   contact you?
17   A.   Because some of the things -- Felicia
18   talked to me during the time I worked
19   there on my temporary assignment. A lot
20   of things I faxed over to her, she would
21   call and say she received them or
22   whatever, and she got my name. Chasely
23   Weeks worked there a year before I did.

Page 120

1    So they went back and looked at some of
2    their paperwork that was submitted,
3    because you have to write your name on
4    there. So they know -- my name was on
5    some of the documents that they approved I
6    had worked with, and Chasely Weeks' name
7    was on some. So they contacted me and
8    found me six months later. So I never
9    started an investigation. I didn't even
10   know it was going on.
11   Q.   Do you remember when it was that you were
12   first contacted? You're saying six
13   months, but do you remember --
14   A.   Maybe six months. Because I went -- I
15   left EDS; I started Hyundai in February of
16   2005. I was working at EDS. I started
17   EDS in July, because I left -- they hired
18   me permanently. That's when I left them
19   -- well, that's when I quit my temporary
20   job. So --
21   Q.   So you were working at EDS in July of
22   2004?
23   A.   2000 --

Page 121

1    Q.   5?
2    A.   -- 4. Yeah, because I started -- I moved
3    here in 2004. Yeah. So I went to EDS in
4    July of that same -- yeah, I did.
5    Q.   Okay. And did you --
6    A.   So I can remember -- I'm not quite for
7    sure, but the first time I was ever
8    contact about someone like that was about
9    -- and from my understanding was -- it was
10   Cliff Johnson. And they had had an
11   ongoing investigation on them because
12   Chasely Weeks had called them about some
13   -- Chasely Weeks started it. She called
14   them about something, and then she got
15   fired or whatever. So they were trying to
16   locate Chasely Weeks, and then they
17   noticed that I took the temporary position
18   after she was gone, and so they located me
19   through Kelly Services, actually. And --
20   Q.   So they never could find Chasely?
21   A.   From my understanding, they -- it was
22   another investigator who found her later.
23   Q.   In the meantime, Cliff Johnson had found

31 (Pages 118 to 121)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 122

1    you?
2  A.   Yeah, they called me.
3  Q.   And were you still at EDS at the time, or
4       had you already started at Hyundai?
5  A.   I was working at Hyundai.
6  Q.   And what did Cliff Johnson tell you?
7  A.   Well, he just said that -- it was Cliff
8       Johnson and Felicia Barrow. They had run
9       up on some paperwork that was not -- that
10      didn't have any dates on it or whatever
11      and they had talked to Mike Maddox and
12      Mike Maddox had told them -- they were
13      doing their own investigation, so -- and
14      they asked me did I know of anything, you
15      know, while I was working there, why was
16      there never any dates on there. And, you
17      know, so that's how I became involved;
18      they contacted me.
19 Q.   And so you gave them an interview?
20 A.   I only talked to them on the telephone.
21 Q.   Did they ask to meet with you in person?
22 A.   No.
23 Q.   Never?

Page 123

1  A.   No. They just told -- my understanding
2       is, is that later, I had a message from
3       Mike Roeder, leaving a message on my -- at
4       home for me to contact him regarding some
5       information that the State of Alabama had
6       turned over to them. So --
7  Q.   Mike Roeder?
8  A.   He was an assistant to Gerry Shockley. I
9       never met him. He worked in the attorney
10      general's office. All I know, he was
11      retiring in a couple of days after I met
12      him and talked with him.
13 Q.   So you met with Mike Roeder?
14 A.   Uh-huh, because Mike went my job. Felicia
15      gave him my name to contact and gave
16      Chasely Weeks to contact. Well, he
17      contacted me at Hyundai. He went through
18      General Affairs and he talked to Larry --
19      one of the guys used to be chief of police
20      here, who has actually worked -- who is
21      actually over General Affairs at Hyundai.
22      And in order to get to me, you have to go
23      through General Affairs on any kind of

Page 124

1       issues like that. So they knew each other
2       from working in law enforcement, so he
3       asked him was there anything I was
4       involved in that Hyundai had to be
5       concerned, and Mike Reeder (phonetic) said
6       no, it's just some information that was --
7       you know, just getting some clarification
8       on some information that was turned over
9       to us by Medicaid. No, she has nothing to
10      do with it; it was just she worked there
11      on a temporary assignment and we need to
12      ask her some questions. And I was
13      contacted by General Affairs.
14 Q.   Okay. And so they got you to go meet with
15      Mike -- is it Reeder or Roeder?
16 A.   I think it was -- I thought his name was
17      Mike Roeder or -- Roeder, R-O-E-D-E-R,
18      something like that.
19 Q.   Okay. And did you meet with him there at
20      Hyundai?
21 A.   He called me on the phone after I got
22      through talking to General Affairs, and
23      they told me that he had explained to them

Page 125

1       that, no, there was nothing that I was
2       involved in or anything like that and he
3       just had some questions about my previous
4       employment. So I spoke to him that night.
5       And I said, well, I go to lunch at 11
6       o'clock, you know; I'd be more than happy
7       to meet you at the gate at 11 o'clock.
8       The day we met -- which I don't
9       remember -- which all the information was
10      given to Hyundai General Affairs. So he
11      and I -- I met him at the gate. We went
12      to Subway, and we were there for like 30,
13      35 minutes. He pulled out this long
14      sheet. He told me that Medicaid has found
15      -- Mike said found something with a
16      discrepancy; there wasn't no dates. And
17      it was dated back in 2002. And I said, I
18      wasn't there in 2002 at all. I said, I
19      know nothing about this. It's a whole
20      long sheet of paper with a whole lot of
21      names on it, several pages. And I said, I
22      don't know anything about that. And I
23      said, I just moved here in March of 2004,

32 (Pages 122 to 125)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 126

1    and I started working temporary with them
2    in 2004. And I said, the only thing I can
3    remember is lately -- in May and June, it
4    was just, you know, some prescriptions
5    didn't have any dates on them --
6  Q.  Referring to the two we've talked about?
7  A.  Yeah. And I said, as there was some
8    discrepancy in the quotes, because Jerry
9    Sanders kept calling saying that they keep
10   sending him the same quotes for the
11   wheelchair. He needed three, and he kept
12   calling me and asking me, we need another
13   quote; we need another quote. And I said,
14   as far as before I got there -- when I
15   first started there, there was a stack of
16   charts that was on the desk. And Emily
17   said, well, these were the charts that we
18   caught Chasely trying to take out to give
19   to Medicaid because she was trying to get
20   them in trouble. So they were sitting
21   there, and I never worked on those.
22  Q.  You just lost me on that one.
23  A.  Mike Reeder said that -- or Roeder said

Page 127

1    that Medicaid turned over an investigation
2    to their office to look into and that they
3    had been having National Seating under an
4    investigation for about a year. That was
5    told to me. So he asked me do I know of
6    any people on this -- he had a list of
7    people several pages -- four or five, I
8    don't know, maybe eight pages -- a whole
9    lot of people dating back to 2002. I
10   said, I was not here in 2002; I just moved
11   here in 2004, so I know nothing about
12   anything. So he showed an amount on a
13   piece of paper that they had billed, what
14   they had billed from 2002 up until 2004
15   that Medicaid had paid out to National
16   Seating. I said, I don't know anything
17   about that or these people back during
18   this date. I said, I just started working
19   there in 2004. And I said, only thing I
20   know I can recall is -- we discussed
21   prescriptions; we discussed some quotes
22   not being provided by three different
23   people who do the wheelchairs. And I said

Page 128

1    -- I think we discussed the one about the
2    strap that was not on Robert -- his name
3    was Robert -- and then the one that they
4    were being sued with Jerry Sanders -- I
5    mean Jerry Rogers was involved in that,
6    about -- the one that National Seating was
7    being sued and that child didn't have a
8    strap on him. And then -- like I said,
9    Jerry Rogers was involved in that because
10   -- and Don -- this was coming out of Don's
11   mouth, because I -- the sheriff's
12   department delivered me the papers to sign
13   for the -- that they were suing them, and
14   I had to sign for them. It was a
15   subpoena, whatever it was, and I had to
16   sign for them; Emily wasn't in the office.
17   Don came in later and I handed it to him.
18   He opened it up, and he said -- I'm
19   standing there with him and we were
20   reading it together. It was -- I think
21   the child's name was Coby. I can remember
22   his first name being Coby. And his
23   parents were suing them because he fell

Page 129

1    out of his wheelchair. He didn't have a
2    strap on it, and I think he cracked his
3    skull or something of that nature. And
4    Emily said that there was a strap that was
5    put on him when she delivered his chair in
6    Children's Rehab Center and that Jerry
7    Rogers was there, and Jerry Rogers was not
8    there.
9  Q.  You don't have any personal knowledge
10   about this strap issue, do you? Just
11   receiving the suit papers, that's it?
12  A.  And Don opening it up and we both were
13   reading it.
14  Q.  And you said that you said to Roeder or
15   Reeder or however you pronounce his name,
16   I don't know anything; the only thing I
17   can recall are those prescriptions that
18   didn't have the dates, which are those two
19   we've already talked about?
20  A.  Yes.
21  Q.  And then those things where you needed
22   three quotes but you didn't have three
23   quotes?

33 (Pages 126 to 129)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 130

1    A.  And I was -- several times that happened.
2        And like I said, just -- and then there
3        were some progress notes that were out of
4        date, so they needed new progress notes,
5        so I sent them like they were. When I
6        asked about the information and I couldn't
7        get it, I sent them like they were before
8        it would get to EDS and they would send
9        them back.
10   Q.  And then what happened?
11   A.  Either you get that information or you --
12       you either have to write it off or you
13       have to do whatever. I don't know what
14       they did.
15   Q.  You don't know what happened after that?
16   A.  No.
17   Q.  And you told all this to Roeder?
18   A.  He asked me how the format went. I said,
19       you have 60 days; after 60 days, if you
20       don't get that stuff in, then you have to
21       go back and assess that child. But you
22       have to have the correct dates on it.
23   Q.  Okay. And did you tell him that you had

Page 131

1        information about National Seating being
2        involved in any type of Medicare fraud?
3    A.  Mike?
4    Q.  Yeah.
5    A.  I didn't even know they were involved in
6        any kind of Medicaid fraud. They
7        contacted me.
8    Q.  I understand. I mean, but did you say, I
9        know that National Seating did things that
10       are considered to be Medicare fraud or
11       Medicaid fraud or anything like that?
12           MS. NICKSON: Object to the form.
13   Q.  Can you answer the question?
14   A.  Mike showed me papers and told me what --
15       I know -- I just listened to Mike and told
16       Mike.
17   Q.  Okay. And that's what I'm asking you.
18       Mike was telling you what their
19       investigation showed. But you never said,
20       Mike, I know some things they did that
21       were wrong; let me tell you about them.
22       Did you ever?
23   A.  I just told him about those prescriptions,

Page 132

1        and that was no dates. And then I did say
2        this to Mike, I remember, because some --
3        you know, without even clarifying the
4        dates on there, there were a couple of
5        times when the date was not correct on
6        there and -- which I didn't even know
7        about it. Medicaid came back and said the
8        dates are not correct; you need to correct
9        the dates. And I had no idea; this was
10       stuff that Chasely had sent in. I said,
11       it all comes from Chasely; you need to
12       talk with Chasely.
13   Q.  And do you know whether Chasely was doing
14       this intentionally or if she was making
15       mistakes or --
16   A.  I have no idea.
17   Q.  Okay. And have you ever talked to
18       Chasely?
19   A.  I never met her before in my life.
20   Q.  You said that someone said that there was
21       a stack of files that you called the
22       Chasely files?
23   A.  Yeah. Emily called them the Chasely

Page 133

1        files.
2    Q.  What were the Chasely files? Just orders
3        that had never been filled?
4    A.  She said Chasely was trying to get out of
5        National Seating with those files to take
6        them to Medicaid because Chasely -- she
7        said Chasely called Medicaid and told them
8        that there were billing errors on that and
9        she had evidence and she was going to take
10       it to them. Emily said that when I first
11       started there.
12   Q.  Emily pointed to a stack of files there at
13       the office?
14   A.  There was a stack of files in one corner
15       of the office.
16   Q.  How many files were there?
17   A.  It was a lot of files. I don't know.
18       They were just sitting there. And when I
19       first came there, I had to clean up the
20       office, file everybody's name into their
21       cabinet by the last names. So when I got
22       to those files, she said, don't touch
23       those files; those are Chasely's files.

34   (Pages 130 to 133)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 134

1   Q.   Why were they being kept?
2   A.   Why were they being kept?
3   Q.   Yeah. Did she ever tell you that?
4   A.   Only thing Emily told me, those were the
5        files that Chasely was trying to take over
6        to Medicaid and that's why she was no
7        longer working there. It wasn't for me to
8        know. I had no idea.
9   Q.   Emily told you that she was let go because
10       she tried to take files over to Medicaid?
11  A.   Yeah. She was stealing.
12  Q.   She was stealing?
13  A.   Uh-huh.
14  Q.   Is that a yes?
15  A.   Yes.
16  Q.   Did you ever look in those files?
17  A.   Yes, I did.
18  Q.   What did you see?
19  A.   I just seen paperwork in them. I never --
20       she told me don't worry about working on
21       them, so I just looked in them so I can
22       just put them in -- and just put them back
23       in the corner. I had just started there

Page 135

1        when it happened, so I didn't know exactly
2        --
3   Q.   So you looked in them, you saw paperwork
4        in them, but you didn't look at them in
5        any kind of depth?
6   A.   No. I didn't know what she meant by those
7        were files Chasely was trying to send over
8        to Medicaid. You know, she never -- she
9        just told me Chasely tried to get them in
10       trouble with those files.
11  Q.   Do you know how Chasely tried to get them
12       in trouble with those files?
13  A.   Chasely had had Medicaid, she said, and
14       told them that they were doing irregular,
15       like, billing, and they had been
16       questioned about that before. Yeah.
17  Q.   Emily had told you that Chasely had called
18       Medicare?
19  A.   Had called Medicaid on them and tried to
20       report and get them in trouble and
21       they had been questioned about that
22       before. They had been under investigation
23       with Medicaid because she called them.

Page 136

1   Q.   Okay. What else did Emily tell you about
2        Chasely?
3   A.   That Chasely was a smoker, that she was
4        stealing money out of their little box
5        that -- you know, that little box; they
6        kept money in there so when people come in
7        and you have to pay Fed Ex or pay
8        something like that, that little box, that
9        she was taking the money out of there.
10       They keep $100 in there, but she was
11       stealing their money; that she had
12       collection people calling her all the time
13       at work. They went on and on.
14  Q.   Did you tell all this to Roeder or Reeder?
15  A.   I just said, you need to start with
16       Chasely.
17  Q.   Did you tell Roeder about the Chasely
18       files?
19  A.   No, because he had a whole list himself of
20       things. I said he needs to start with
21       Chasely. Those files -- those dates were
22       dated way back before I even came to
23       Alabama.

Page 137

1   Q.   This failure to have three quotes, are you
2        saying that if --
3   A.   You have to have three estimates for a
4        wheelchair.
5   Q.   For every wheelchair that goes through --
6   A.   For every wheelchair.
7   Q.   And sometimes there would not be three
8        quotations there or three estimates?
9   A.   That's right.
10  Q.   How often did that happen?
11  A.   I don't know. Jerry Sanders called me.
12  Q.   Did you ever see it happen?
13  A.   Yeah, I saw it happen. In the chart there
14       would not be -- sometimes there would be
15       one estimate and it had been submitted,
16       because they have to keep up with the
17       first date it had ever been submitted.
18       And so -- and they said we need --
19       Medicaid would send them back and say, we
20       need these quotes. You can look from the
21       date it had been submitted before and see
22       how long that file has been sitting out
23       there.

35  (Pages 134 to 137)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 138

1  Q.  Okay. And would someone get two more
2      quotes and submit it again?
3  A.  I didn't. Emily would have to get those
4      -- Don was responsible for working with
5      those -- getting those quotes.
6  Q.  So what Don did, you don't know?
7  A.  Don was supposed to get the quotes and
8      build those little chairs and have them
9      fixed before 60 days.
10 Q.  But on those cases where you didn't have
11     the three quotes, do you know what Don did
12     -- did he get the three quotes, is what
13     I'm asking you.
14 A.  I don't know.
15 Q.  Okay. You just know that they came back
16     from Medicaid with a complaint that there
17     were not three quotes there?
18 A.  Yeah.
19 Q.  You would then hand those to Don, and what
20     he did with them, you don't know?
21 A.  I would hand them to Emily. Emily would
22     say, give it to Don.
23 Q.  And Emily was the branch manager, right?

Page 139

1  A.  And Don was her husband.
2  Q.  And Don was the technician?
3  A.  Yeah.
4  Q.  Was technician a management position there
5      at the company or just an hourly position?
6  A.  I don't know how they got paid.
7  Q.  Okay. And your actual title while you
8      were working there was --
9  A.  Administrative assistant.
10 Q.  What was the chain of command, then?
11     Emily was the branch manager.
12 A.  Danielle --
13 Q.  Of course, Danielle was in Nashville,
14     right?
15 A.  Yes. She comes down and she tells them,
16     okay, why is this still here, why is this
17     still here, what's going on with this and
18     that and that, blah, blah, blah.
19 Q.  She'll do like an audit kind of thing?
20 A.  Yeah. Danielle was the one who trained me
21     on the system, telling me what to look for
22     and everything like that. Emily, she goes
23     out to the rehab center, and she's the one

Page 140

1      who, you know, conducts -- you know, and
2      gets the business for them, go and check
3      out the child or whatever. And Don -- she
4      brings him back, you know, all these
5      orders, and then she gives them to me.
6      You've got to have -- Medicaid has a
7      formal sheet -- several formal sheets you
8      have to fill out because you have to use
9      modifiers for every billing -- it's like
10     billing codes you have to use for
11     miscellaneous, for the wheelchairs, for
12     like a part and whatever. And then -- I
13     would do it, but then she'll tell Don --
14     first of all, she'll say, Don, we've got
15     this chair, blah, blah, blah, they go over
16     the chair business and stuff. I think I
17     was the last person to get it because Don
18     would look at all the information that was
19     wrote up about who did the assessment, the
20     social worker, and all that kind of stuff,
21     and then Emily would give it to me and
22     say, we need this and that and that and
23     that to be sent to Medicaid.

Page 141

1  Q.  Are you claiming that Danielle did
2      anything wrong?
3  A.  Did Danielle do anything wrong?
4  Q.  Uh-huh.
5  A.  I didn't ever say she did anything wrong.
6      I only spoke to Danielle maybe three times
7      since I've been there. She trained me the
8      first week I was there. She'll call every
9      now and then and say -- because she sees
10     everything in the system, and sometimes
11     she calls Medicaid and finds out what's
12     going on with this chart or why haven't
13     they gotten paid for this and that.
14 Q.  And you said that Emily goes out to the
15     rehab centers; she meets with everybody's.
16     The orders would come back to you, but
17     before they came back to you, Emily and
18     Don would get together and sort of look at
19     the assessment and decide what kind of
20     wheelchair was needed or --
21 A.  The wheelchair was decided before they
22     left the Children Rehab Services.
23 Q.  Okay. So they would talk about what they

36  (Pages 138 to 141)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 142

1     needed in order to build that wheelchair?
2  A.  Exactly.
3  Q.  Okay.  And then you would be given the
4     actual paperwork to fill out and submit to
5     Medicaid?
6  A.  Yeah.
7  Q.  Okay.  And if you saw discrepancies in the
8     paperwork, you would talk to someone about
9     it?
10 A.  The first time I ever noticed a
11    discrepancy of anything was when they
12    didn't have any dates on the prescription.
13 Q.  Okay.  And --
14 A.  Other than that, there was other stuff
15    that was coming back to them that Chasely
16    had sent or -- I had no idea.
17 Q.  So as far as you know, you had two come
18    back without dates on them, and then
19    during the three months that you were
20    there or less than three months that you
21    were there, some came back from Medicaid
22    that Chasely had filled out?
23 A.  Yes.  Because when it comes back and I

Page 143

1     asked Emily -- because sometimes Medicaid
2     might not send those things back until two
3     weeks later or something at the most --
4     that depends on how they work them
5     up.  And then I would get it in the mail
6     and I would see it.  Emily would say, can
7     you work on this; this is what Chasely had
8     sent before.  And that's how I would come
9     involved.
10 Q.  Fixing the problems that existed in
11    Chasely's orders?
12 A.  Yeah.  Because, I mean, Emily had to tell
13    everybody else that -- you know, to
14    contact me for any information.  That's
15    how I was contacted by Jerry Sanders from
16    Medicaid or anything of that nature.  I
17    mean, he called constantly needing this
18    and needing that and that and that, which
19    I had no idea at first where you get these
20    things from.  So all my information came
21    from -- Danielle trained me on the system;
22    Emily trained me on who -- you know, where
23    all the stuff was at in their office.

Page 144

1  Q.  Did you consider Don to be your boss?
2  A.  Don was not my boss.
3  Q.  He was a coworker?
4  A.  Emily is who I report to.
5  Q.  Okay.  So your boss was Emily.  Was --
6  A.  And our boss was Danielle.
7  Q.  And did Don also report to Emily?
8  A.  I don't know.  They were husband and wife.
9     I think they kind of worked together.
10 Q.  I mean in the normal structure of the
11    company, does the technician report to the
12    branch manager?
13 A.  If it was a different situation -- if he
14    wasn't her husband -- that's the way it's
15    supposed to go.
16 Q.  You talked about these two wheelchairs
17    that you said were there at National
18    Seating but that Don had loaned out to
19    friends?
20 A.  Don told me that.  It was one that Sister
21    -- some Sister --
22 Q.  Theresa?
23 A.  I don't know.  -- kept calling about.  And

Page 145

1     actually, she was the one who actually --
2     from what I understand and from what they
3     told me, Don had told her that the
4     wheelchair was there, and she called and
5     did an investigation.  She called
6     Medicaid; Medicaid said that the chair had
7     been delivered -- showed it had been
8     delivered so many months ago, and it
9     turned out that it was loaned to someone
10    else, Don said -- in general, just
11    talking.  And Sister had called down to
12    Nashville, and -- it was just a big
13    discussion between them, and in the end,
14    they didn't want to do business with each
15    other.
16 Q.  Okay.  Were there any others that you said
17    were loaned out?
18 A.  I only know two that Don said.
19 Q.  Okay.  And did you ever see those
20    wheelchairs, or was it just -- these were
21    conversations you overheard?
22 A.  It was conversation that Don told me.  And
23    the sister kept coming.  And the sister

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

7c1fb636-d67b-46ee-8c04-6b9830e35e5d