MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 146

1    would call all day every day. And Emily
2    would be sitting there in the office, and
3    I'd say, she wants to talk to you; she
4    said, tell her I'm gone. And that lady
5    was getting angry, very angry. She said,
6    I've been through this with them again and
7    again and again. This was chaos. So I
8    didn't get involved with that at all.
9  Q.  And then the other story you said that Don
10   told you about, what was that?
11 A.  About the man involved in being sued by --
12   National Seating was being sued.
13 Q.  For not having the strap on it?
14 A.  Yes. Because Emily's birthday was in
15   June, I think, because he brought a camera
16   and said, this is what I got Emily for her
17   birthday, a camera. So now when she goes
18   out to Children's Rehab, she can take
19   pictures of everyone she fits for a
20   wheelchair so they can see the strap on
21   there in case another person tries to sue
22   them.
23 Q.  Are there any other wheelchairs that were

Page 147

1    not delivered because they were loaned out
2    to somebody else?
3  A.  See, what do you mean by not delivered?
4  Q.  Well, you talked about the one with Sister
5    Theresa that you said had been loaned out
6    to a friend. And I thought --
7  A.  That was Don saying they were loaned out.
8    I don't know were they --
9  Q.  I'm asking you was there another one that
10   you know of that was loaned out?
11 A.  Don talked of two. That's the only two I
12   heard Don talk about. I don't know
13   whether they were delivered or not; I
14   cannot tell you -- later, whatever. I'm
15   just going by what he said. But I know
16   they contacted Medicaid and Medicaid told
17   them that they were -- they showed -- they
18   had a ticket, delivery ticket, and said it
19   was delivered.
20 Q.  You know that from -- how?
21 A.  From Don.
22 Q.  Don told you that?
23 A.  And Miss Theresa on the phone said that

Page 148

1    she contacted Medicaid. Medicaid went
2    through their chart and found in the
3    system that that chair had been delivered
4    several months ago to who she had in her
5    home, this home the people live in.
6  Q.  Okay. Was there anything else that you
7    and this Mike Roeder talked about?
8  A.  Mike Roeder and I, from the time we stood
9    in line in Subway, the time we sat there
10   and talked, it was probably about 35
11   minutes. I was back in work 20 minutes to
12   12.
13 Q.  Okay. And did you ever talk to anybody
14   else from Medicaid about National Seating?
15 A.  No.
16 Q.  Did you ever talk to anybody else from the
17   attorney general's office about National
18   Seating?
19 A.  No.
20 Q.  Did you ever talk to any other
21   investigators about National Seating?
22 A.  Yeah.
23 Q.  Who?

Page 149

1  A.  Well, after I was out of jail -- I got out
2    of jail, and I called Gerry Shockley the
3    day I got out of jail -- well, that
4    Monday, because it was a Friday when I was
5    arrested. I said, why did you arrest me.
6    He said, well, if you come down to my
7    office, then, you know, we can discuss it.
8    I said, I'm not coming down there. I
9    said, I don't even know what you arrested
10   me for; I never filed a report. So after
11   that, I contacted Medicaid, and I said
12   that -- talked to Cliff Johnson -- well, I
13   left him a message. And I said, I was
14   arrested for you guys -- you know, you
15   guys calling me about y'all's
16   investigation, and they put me in jail
17   saying that I filed a false report. Then
18   later Cliff Johnson called me back and
19   said that he didn't understand why they
20   were arresting me, that people call
21   Medicaid all the time and say about people
22   -- suspecting people for doing this or
23   that. But I never called Medicaid. They

38  (Pages 146 to 149)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

---

Page 150

1   found that discrepancy on their own
2   because they said they had talked with
3   Gerry Shockley in July -- they met with
4   him in July at the Medicaid office there,
5   and there was documentation presented to
6   him of no dates on information; that was
7   in July. And that's the first time I
8   heard about them meeting with him before
9   they arrested me in August. But the first
10  thing I heard from Investigator Johnson
11  was when Gerry Shockley -- he already had
12  talked to Don Williams and Don told him
13  that Ms. Barrow and I were best friends and
14  that we hung out together and that, you
15  know, the reason why I was fired was for
16  conflict of interest with being friends
17  with her. I never knew that lady. I only
18  talked to her on the phone. And one time
19  -- she said in court -- when we went to
20  court in September -- that she was at the
21  EDS Christmas party. I never seen her. I
22  mean, she might have been there, but I
23  never talked to her. And at that time I

---

Page 151

1   was working at EDS, and I never seen her.
2   Q.  So you called Gerald Shockley on the day
3       you got out of jail?
4   A.  Well, it was on Monday. I got out of jail
5       -- I was arrested on a Friday, so the
6       following Monday. I didn't even know what
7       was going on, why was I arrested.
8   Q.  So you were arrested on Friday; you got
9       out of jail on Saturday?
10  A.  Yes.
11  Q.  And on Monday, you called Gerald Shockley?
12  A.  Yes.
13  Q.  And you said, why did you arrest me?
14  A.  I said, why did you have me arrested, for
15      what reason?
16  Q.  And he said, if you come down here, I'll
17      tell you?
18  A.  Yeah, we can talk about it. And I said,
19      I'm not coming down there now. I said, I
20      guess I'll have to get a lawyer -- because
21      he had me down for filing a false report.
22      And I said, I never filed a report; I
23      never filed anything; my name is not on

---

Page 152

1   anything; I never went and talked to
2   anybody; I never said anything to anybody;
3   I never put my name on anything, so I
4   didn't even know how I got involved.
5   Because they called me. I didn't call
6   them.
7   Q.  By they, you mean Medicaid?
8   A.  Medicaid did. They called me.
9   Q.  Okay. And was that the end of the
10      conversation?
11  A.  Yeah. He said, well, okay. And from then
12      on, we met up in court.
13  Q.  And you said after you spoke with Gerald
14      Shockley, you called Cliff?
15  A.  Cliff Johnson was the investigator there
16      at Medicaid. I didn't speak to him. I
17      left a couple of voice messages for him,
18      and he finally got back with me, and -- in
19      disbelief. He said he could not believe I
20      was arrested. That's what he said.
21  Q.  He said that?
22  A.  Yeah.
23  Q.  He said, I cannot believe you were

---

Page 153

1   arrested?
2   A.  Yes. I said, they said I filed a report;
3       that's what I got arrested for. And he
4       said, a report? I said, I never filed a
5       report. I said, you guys contacted me.
6       He said, I can't believe they arrested
7       you, because we showed Gerry Shockley in
8       July information that didn't have any
9       dates on it, discrepancies in the billing,
10      but Gerry Shockley continued to talk about
11      my friendship with Felicia Barrow. And
12      then Felicia asked me, well, do I need to
13      get an attorney, because he's asking about
14      a relationship, a friendship with
15      Elizabeth. And this didn't have anything
16      to do with that. We didn't even know each
17      other except for on the phone. And so
18      after they show him information --
19  Q.  Wait a minute. This is still Cliff
20      talking?
21  A.  Yes.
22  Q.  Okay. Cliff said they showed Gerald
23      Shockley information in July where forms

---

39 (Pages 150 to 153)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 154

1    had no dates on them or something?
2  A.  It was in a meeting.  He and Felicia and
3    Gerry Shockley were in a meeting at
4    Medicaid together.
5  Q.  Felicia, Cliff, and --
6  A.  Mr. Shockley.
7  Q.  -- Gerald.  Okay.
8  A.  And there was -- they showed him the
9    information with no dates and
10    irregularities in the billing, is all I
11    know.  So I was wondering, if you showed
12    this guy this in July, then why would he
13    come and arrest me.  So I was trying to
14    find out from them why was he arresting
15    me.  You guys started this; this is you
16    guys' mess.
17  Q.  And did you actually ask Cliff that
18    question?
19  A.  Yes.  I asked him that.  I said, what is
20    going on; I mean, why am I being arrested?
21  Q.  You said you asked them both.
22  A.  Well, Felicia and him.  Because when I
23    called --

Page 155

1  Q.  Was Felicia on the phone?
2  A.  No.
3  Q.  This was a second conversation?
4  A.  Yeah.  They both called, and it was on the
5    speaker phone -- called me back.
6  Q.  Oh, okay.  So Felicia and Cliff were on
7    the phone; is that right?
8  A.  Uh-huh.
9  Q.  You need to speak out your answer.
10  A.  Oh.  Yes, sir.
11  Q.  Okay.  You don't have to say, yes, sir,
12    just yes or no, because uh-huh comes out
13    M-M-M-M-M.  It doesn't say yes or no.  And
14    so what did Felicia and Cliff say when you
15    said this information has --
16  A.  They didn't know I was arrested until I
17    told them, so -- and they said, what.  And
18    I said, I was arrested, you know, for the
19    charge -- a misdemeanor for filing a false
20    report to a law enforcement agency.  And
21    then I said -- I didn't know -- because
22    when they came to arrest me at my home
23    that night, Friday night, I asked him, I

Page 156

1    said, I never filed a -- it was five
2    officers, and they were in three different
3    vehicles.  And they all came in, and I
4    said, I never -- what am I getting
5    arrested for?  And they said, you filed a
6    report.  I said, to who?  Who?  I never
7    filed a report; I've never been down to a
8    police station.  This is what I'm
9    thinking.  I didn't think it had anything
10    do with Medicaid.  And I said, who filed
11    this report on me?  And then he told me,
12    Gerry Shockley.  And I said, for what?
13    And then he told me, he said, well, maybe
14    you pissed him off.  That's what that cop
15    told me.  And I said, pissed who off?  I
16    never filed a report ever.  I never even
17    met Gerry Shockley.
18  Q.  Okay.  And so you said that Don told Miss
19    Barrow and --
20  A.  Don told Gerry Shockley that --
21  Q.  How do you know this, that Don told Gerry
22    Shockley --
23  A.  Because I had a report.  I had Tommy

Page 157

1    Goggins as my lawyer, and I didn't even
2    see the reply back to -- that Gerry
3    Shockley had provided him until the day of
4    court.  And I read it, and it said
5    something like Felicia and I were
6    retaliating against them because I was
7    fired from National Seating & Mobility and
8    that that's the reason why -- that we were
9    lying on them.  And that's the first time
10    I've seen Gerry Shockley reply, that we
11    were best friends and we were hanging out
12    with each other, whatever.  And that's --
13    Mr. Goggins showed me the date of court.
14  Q.  And do you know who wrote that report?
15  A.  It had Gerry Shockley's name on it.
16  Q.  Do you know who wrote the report?
17  A.  Gerry Shockley wrote the report.
18  Q.  And the report said that you and Felicia
19    were best friends and that y'all were
20    retaliating because you were fired from
21    NSM?
22  A.  It said in the paragraph, one I can quote
23    exactly, We questioned Don Williams, blah,

40  (Pages 154 to 157)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 158

1     blah, blah -- that the wheelchair --
2         THE REPORTER: Can you please
3            slow down? I can't take
4            that down.
5 A.   We met with Mr. Williams and they
6     questioned him about what Medicaid had
7     presented to them. And Don Williams told
8     him that Elizabeth and Felicia are best
9     friends; the reason why they're lying is
10     because they're best friends with each
11     other and they hang out with each other,
12     and so we fired her; that's why they're
13     retaliating. And this was said on that
14     piece of paper I read before court. And
15     this was discussed in court, because
16     Felicia was called as a witness for them,
17     and --
18         MS. NICKSON: Who is them?
19         THE WITNESS: Gerry Shockley was
20           using her as one of their
21           witnesses.
22 A.   In the midst of the conversation, we were
23     talking -- when Gerry Shockley was talking

Page 159

1     and Don Williams told the judge that I was
2     fired from being friends with Felicia, a
3     conflict of interests. And I said, you
4     did not fire me. And I said, I wasn't
5     even employed with you; I was employed
6     through Kelly Services. I said, I had
7     already told Theresa and them from Kelly
8     Services that, you know, I was leaving. I
9     never reported back to work that following
10     Monday. And then that's the first thing
11     Gerry Shockley heard, that I was not
12     employed with -- through National Seating
13     & Mobility as being an employee; I was
14     temporary. And then on top of that, he --
15     it was found out that I didn't even know
16     her. Felicia ended up telling the judge
17     that, no, we don't know each other and
18     that what was going on -- they said that I
19     said that chairs wasn't delivered.
20     Felicia said, she never told me that. I
21     asked her that, and she never said that.
22     I said, I never said that whatsoever. I
23     didn't know anything, what was going on.

Page 160

1     I said, I don't even know where this is
2     coming from. Felicia clarified it up with
3     the judge. I said, you need to talk to
4     Felicia, I said, because she called me.
5     And so my lawyer is standing there
6     looking, and I said, well, call her. And
7     the judge said, call her. And she called,
8     and she told them. I said, it started
9     from her. I don't even know where it came
10     from. They contacted me.
11 Q.   Okay. We somehow got over to the trial
12     from the phone conversation that you were
13     having with --
14 A.   Cliff Johnson and Felicia Barrow.
15 Q.   Correct.
16 A.   I asked him, why was I arrested, when they
17     called me. And they sent -- they gave
18     Mike Roeder my name to talk to me about
19     anything that I had seen -- some of the
20     stuff they had found out, which some of
21     that stuff was said by Chasely. I had no
22     idea about that, so I didn't even
23     elaborate on that at all. I couldn't even

Page 161

1     do that -- and wouldn't. I only told Mike
2     Roeder about the ones that I seen, about
3     the prescription that didn't have any on
4     there, and that it was Jerry Sanders
5     calling about the quotes all the time,
6     that he didn't have any quotes. And I
7     said, as far as anything done by Chasely,
8     I have no idea, and I said, contact
9     Chasely.
10 Q.   Anything else in that conversation?
11 A.   Well, he said, this is what Medicaid
12     provided us, and if there are some
13     discrepancies and all this -- then he got
14     away with so much money -- I said I don't
15     even know anything about that. Then
16     Mr. Roeder asked me, he said, were you an
17     employee for National Seating? I said, I
18     was working as a temporary employee there;
19     my job -- I was getting paid by Kelly
20     Services. He said, so you were never on
21     their payroll. I said, no, sir, I was
22     not; I was on an assignment there until I
23     find a permanent job. I said, I was not

41   (Pages 158 to 161)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

---

Page 162

1  getting paid by them; I was getting paid
2  by Kelly Services. My assignments -- when
3  they asked me to take this temporary
4  assignment, they said, it could be for
5  three months; it could be more than that;
6  it could be less than that.
7  Q.  This is all in this conversation with
8       Cliff and Felicia Barrow?
9  A.  No. I thought you asked me about Mike,
10      Mike Roeder.
11  Q.  No, I was asking, was there anything else
12      said in this conversation with Felicia
13      Barrow and Cliff?
14  A.  Only thing that was said between us was
15      why was I arrested --
16  Q.  Right.
17  A.  -- when you guys contacted me and asked me
18      about this and then y'all sent Mike to
19      talk with me. And then what I told Mike
20      was -- I said Mike asked me something
21      about some chairs that was --
22  Q.  You've already told me, haven't you, what
23      Mike asked you about?

---

Page 163

1  A.  And Mike asked me something about chairs
2       being undeliverable, and I said, I don't
3       know anything about that.
4  Q.  Is there anything else you discussed with
5       Mike that you haven't testified to
6       already?
7  A.  No. Just to get in contact with Chasely.
8  Q.  Just telling him to contact Chasely?
9  A.  Yes.
10  Q.  And did you ever know how to contact
11      Chasely?
12  A.  I never knew her. I only heard them talk
13      about her and that I was taking her place.
14      I only knew her from what they said about
15      her.
16  Q.  And did you ever talk to Cliff or Felicia
17      again until the day of your trial?
18  A.  I never talked to them, no, again, after
19      -- I didn't even talk to them after my
20      trial either.
21  Q.  Did you ever call Don Williams and talk to
22      him about the allegations?
23  A.  No.

---

Page 164

1  Q.  Did you ever call anyone in any other
2       office of National Seating about the
3       allegations?
4  A.  No.
5  Q.  What is it that you're claiming --
6  A.  I didn't even know about the allegations
7       until the day of court.
8  Q.  Well, what is it that you're claiming that
9       National Seating did wrong in this case?
10  A.  I never filed a report. Once again, I
11      said that the State said they found
12      information of their irregular billing. I
13      only saw two prescriptions that did not
14      have any dates on them. I never said
15      anything to National -- to Medicaid even
16      about that, at all. I left there, and I
17      never said anything whatsoever.
18  Q.  Okay. And what are you claiming they did
19      wrong in this lawsuit?
20  A.  Why was I arrested -- why did Don tell
21      them that we were best friends? Why did
22      Don say that I worked for them and I
23      didn't? Why did Don say that I just was

---

Page 165

1  retaliating against them? Why did Don say
2  that I reported that to them? I never
3  reported anything. I never said nothing.
4  Q.  But --
5  A.  So you tell me why was I arrested.
6  Q.  I'm asking you what your claim is that
7       National Seating did wrong.
8  A.  Once again --
9  Q.  Is it because of the actions of Don? Is
10      that what you're saying, what Don said?
11  A.  Don said this, and it was on paper that he
12      reported back to Mr. Shockley.
13  Q.  Okay. And my question to you is, are you
14      suing National Seating because of the
15      things that Don said and did?
16  A.  Don could have told the truth before
17      court.
18  Q.  I'm asking you --
19  A.  I didn't even want to sue them, but you
20      arrested me and caused me to lose my job;
21      you caused my character to be questioned;
22      you caused me to -- I couldn't apply for a
23      job at -- of course. Of course, I'm suing

---

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 166

1   them for what -- you were -- you lied on
2   me.
3   Q.   Wait, wait.  I didn't lie at all.
4        MS. NICKSON:  Excuse me.
5   A.   I didn't say you.  He.  He.
6        MS. NICKSON:  Excuse me.
7   Q.   Okay.  And all I'm asking is if your
8   claims against National Seating are
9   against anyone other than Don.
10       MS. NICKSON:  And again, Counsel,
11       I'm asking that we take a
12       break.
13       MR. STEWART:  And I'm asking her
14       to answer this question --
15       MS NICKSON:  You see that she's
16       upset --
17       MR. STEWART:  -- because she has
18       not finished answering it.
19       MS. NICKSON:  -- and we've been
20       going for an extended period
21       of time.
22       MR. STEWART:  I'm entitled to
23       finish this line of

Page 167

1        questioning before we take a
2        break.
3        MS. NICKSON:  Well, we took a
4        break within an hour at the
5        request of another counsel,
6        and at the request of this
7        counsel, I'm asking you to
8        do the same.
9        MR. STEWART:  The local rules say
10       that if someone wants to
11       take a break, that you
12       should finish the line of
13       questioning before, and that
14       is all I'm trying to do is
15       finish this one question
16       that I'm trying to get an
17       answer to, and when I'm
18       finished with that, I'll
19       take a break.
20       MS. NICKSON:  Okay.  And for the
21       record, the client is upset;
22       she's emotionally disturbed
23       at this time.  But answer if

Page 168

1        you can, Elizabeth.
2   Q.   Do you understand my question?
3   A.   Repeat your question.
4   Q.   The claims that you're making in this
5   lawsuit against National Seating, are
6   those claims because of the things Don
7   said and did?
8        MR. WALKER:  Excuse me.  Object
9        to the form.
10  Q.   Allegedly said and did.  Let me rephrase
11  the question.  Are the claims that you're
12  making in this lawsuit against National
13  Seating because of the things that Don
14  Williams allegedly said and did, or are
15  there other people that you are claiming
16  did or said things wrong about you?
17  A.   Don Williams, for reporting it back to his
18  main office and telling all that
19  information, and Gerry Shockley, against
20  him, for he was shown information in July,
21  documents showing that -- that they said
22  was true, because he never even got that
23  from me.  And those prescriptions, I only

Page 169

1   told about those prescriptions when Mike
2   Roeder -- he's the first person I ever
3   told that to, and they showed that to him.
4   So Gerry Shockley for not taking that
5   documentation from the State and -- to say
6   that, okay, the State's telling the truth
7   and when I mentioned about those
8   prescriptions that I was telling the
9   truth.  And Don, and with National Seating
10  for saying that, okay, they got off
11  another subject and got undeliverable
12  chairs.  They were under some kind of
13  other impression that I was saying that,
14  oh, these chairs were not undeliverable.
15  I had no -- I don't even know why Don said
16  that.  That's what I was arrested for,
17  lying.  It was all on that piece of paper.
18  I have no idea.  To this day, I'm still
19  trying to figure out how and why, I mean,
20  what's going on.  That's why I had to call
21  Cliff Johnson and Felicia to ask them --
22  you need to clarify this up to me, why I'm
23  arrested.  I didn't say anything about

43  (Pages 166 to 169)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 170

1  National Seating. I never reported
2  National Seating to you guys. I never
3  told y'all about no undeliverable chairs.
4  I never said -- I never even told you
5  about those prescriptions, so why am I
6  being arrested. I was arrested because we
7  were perpetrated as being best friends and
8  I was fired. And I was arrested for lying
9  on them because -- and retaliating because
10  I was wanting to keep that job and I was
11  fired for fraternizing.
12  Q.  Is there any --
13  A.  No.
14  Q.  -- other conduct that you claim that some
15  employee of National Seating did to you?
16  A.  Emily and Don.
17  Q.  Anyone else?
18  A.  National Seating, no. And Gerry Shockley.
19  Q.  And have you told us everything that Emily
20  and Don did to you that you're suing
21  about?
22  A.  Yeah.
23  Q.  Okay. Let's take a break.

Page 171

1          (Lunch recess.)
2          (Mr. Williams is now present.)
3  Q.  Ms. Horton, are you ready to start? I
4  need you to speak your answer out.
5  A.  Yes, I do. I'm ready.
6  Q.  Let me get some of this out of the way.
7  You weren't claiming you were ever an
8  employee of National Seating; is that
9  correct?
10  A.  I was hired through a temporary service.
11  Q.  You are not claiming in this case that you
12  were discriminated against, are you?
13  A.  I never said anything about
14  discriminating.
15  Q.  And then you're not claiming you were
16  discriminated against?
17  A.  Well, I -- yeah, I am. I'm going to say
18  that.
19  Q.  Well, your complaint doesn't say that.
20  A.  Well --
21  Q.  In what way were you discriminated
22  against?
23  A.  If I was white, would you have arrested me

Page 172

1  if I was friends with Felicia?
2  Q.  Ma'am, I didn't arrest you. Let's get
3  that straight right now.
4  A.  I'm asking the question in general.
5  Q.  I'm asking you, are you claiming in this
6  case --
7  A.  Yes, I am.
8  Q.  -- you were discriminated against? Please
9  give me --
10  A.  Yes.
11  Q.  -- each and every fact that underlies your
12  claim for discrimination.
13  A.  Discrimination is Gerry Shockley asked
14  Felicia point blank, are you and Elizabeth
15  best friends, hang out together and
16  whatever, and she said no. And still he
17  didn't believe me, after -- believe her.
18  After he interviewed her July the 11th, he
19  went on what was told to him I presume by
20  Don, that we were best friends and hanging
21  out together. So he came out to me and
22  arrested me August the 5th, stating that
23  she was lying for me and we were taking up

Page 173

1  for each other and retaliating against
2  National Seating.
3  Q.  Okay. And what kind of discrimination is
4  that?
5  A.  Well, we're two black women.
6  Q.  So are you claiming race discrimination?
7  A.  Yeah. Why -- why -- I asked the same
8  question to he, and I'll ask it right now.
9  Chasely Weeks started this thing. Why not
10  go with her? I kept saying this over and
11  over again.
12  Q.  What race is Chasely?
13  A.  Chasely's white.
14  Q.  Okay. Any other grounds underlying your
15  race discrimination case? Any other facts
16  that you rely on to say you were
17  discriminated against because of your
18  race?
19  A.  None whatsoever.
20  Q.  Okay. Are you claiming gender
21  discrimination?
22  A.  No.
23  Q.  Are you claiming you were discriminated

44  (Pages 170 to 173)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| Page 174 | Page 176 |
|---|---|
| 1 against based on your age or disability or | 1 every month? |
| 2 religion? | 2 A. Yes. |
| 3 A. No. | 3 Q. And what is your current pay? |
| 4 Q. Did you file a complaint with the EEOC? | 4 A. 12.88. |
| 5 A. No. | 5 Q. Per hour? |
| 6 Q. Have you ever claimed that you were the | 6 A. Yes. |
| 7 victim of sex harassment on the job? | 7 Q. Do you have any benefits? |
| 8 A. No. | 8 A. Yes. |
| 9 Q. Have you ever filed a workers' | 9 Q. What benefits do you enjoy? |
| 10 compensation case? | 10 A. I get medical for my medicine and for my |
| 11 A. No. | 11 daughter, who is in college. The dental |
| 12 Q. Have you ever filed for unemployment? | 12 -- well, all the medical benefits; that's |
| 13 A. Yes. | 13 including dental and vision. |
| 14 Q. How many times? | 14 Q. Okay. Retirement? |
| 15 A. The year when I got fired from Hyundai, | 15 A. They do offer that, yes. |
| 16 the one time. | 16 Q. Okay. Do you have life insurance? |
| 17 Q. Okay. At no other time? | 17 A. Yeah, I do. I've got life insurance |
| 18 A. No. | 18 through them. |
| 19 Q. Where are you currently employed? | 19 Q. Okay. Vacation? |
| 20 A. Sprint. | 20 A. You accrue that every month -- 11 hours a |
| 21 Q. And what do you do with Sprint? | 21 month. |
| 22 A. I am a tech support, advanced tech | 22 Q. Okay. And how are you doing at that job? |
| 23 support. I troubleshoot computer networks | 23 A. Well, not so good since I was put on a |

| Page 175 | Page 177 |
|---|---|
| 1 and systems and phone systems. | 1 correction action for performance. |
| 2 Q. Okay. And how long have you held that | 2 Q. Why were you put on that? |
| 3 job? | 3 A. Well, until I get myself back together and |
| 4 A. Since July 2nd. | 4 forget about this whole thing, my |
| 5 Q. Of? | 5 performance -- I had to go to the doctor |
| 6 A. 2007. | 6 for medications. And just starting there, |
| 7 Q. And how did you get that job? | 7 my doctor took me off from work because of |
| 8 A. I applied on the internet. | 8 the medication they have given me to calm |
| 9 MR. WALKER: I'm sorry. I | 9 myself down, to focus, I think, to |
| 10 couldn't hear you. | 10 sleep -- my psychiatrist, actually. So I |
| 11 THE WITNESS: I applied on the | 11 ran out of time. I used all my time. |
| 12 internet. | 12 Q. When you say you "ran out of time," you |
| 13 Q. Do you report for work at a physical | 13 mean that you used up your Family Medical Leave |
| 14 address or do you work from your home? | 14 Act time? |
| 15 A. Physical address. | 15 A. I wasn't on family medical leave with |
| 16 Q. Where is that physical address? | 16 them. I just started with them. I wasn't |
| 17 A. 1700 Mercantile Drive, Fort Worth, Texas. | 17 on family medical leave with them. You |
| 18 I think it's 76133. | 18 accrue 11 hours a month. I started in |
| 19 Q. Okay. And what are your hours of work | 19 July, and I was off seven days in a row, |
| 20 there? | 20 straight in a row. |
| 21 A. Thursday through Sunday, 10 a.m. until 9 | 21 Q. In July? |
| 22 p.m. | 22 A. No, in October. |
| 23 Q. Okay. And do you work four weeks out of | 23 Q. Until October did you miss any work? |

45 (Pages 174 to 177)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 178

1  A.  Yes. I scheduled according to my doctor's
2      orders.
3  Q.  Okay. But as far as missing days at work,
4      did you miss any until October?
5  A.  Yes.
6  Q.  How many days did you miss until October?
7  A.  I don't know. Maybe about -- I'm not
8      quite for sure.
9  Q.  How many days --
10 A.  About 11.
11 Q.  Okay. 11 days of work?
12 A.  Uh-huh.
13 Q.  Is that a yes?
14 A.  Yes.
15 Q.  And then in October, you missed seven days
16     in a row?
17 A.  That's total together.
18 Q.  So you've missed 28 days since you've been
19     to work now?
20 A.  11 total together.
21 Q.  7 of them were within the month of
22     October; is that right?
23 A.  Yes.

Page 179

1  Q.  So I misunderstood you. And what did your
2      corrective action say?
3  A.  It says that because of no more time --
4      usually, when you don't have any more
5      time -- they give you points; you're on a
6      points schedule. When you use all your
7      points, you know, and get on the third
8      level, you're terminated from the job.
9      Because of my situation, they decided to
10     keep me there and let me increase my
11     points and work out with my new schedule.
12 Q.  Okay. So they're working with you?
13 A.  Yes.
14 Q.  And how is it that they're going to work
15     with you?
16 A.  I am working now Thursday through Sunday,
17     when I was actually working Monday through
18     Friday.
19 Q.  Okay. And is that working, in terms of
20     letting you have time to see your doctors
21     or whatever medical treatment --
22 A.  It would be better because my doctors are
23     always through the week, and if I'm

Page 180

1      working during the weekend, I can always
2      see my doctors during the week.
3  Q.  How long have you been on this modified
4      schedule?
5  A.  I just started this schedule right before
6      -- right after -- I started October,
7      October the 3rd.
8  Q.  Before that, you were working Monday
9      through Friday?
10 A.  Uh-huh.
11 Q.  Is that right?
12 A.  That's correct.
13 Q.  And ever since you've been on a modified
14     schedule, have you had any problems with
15     making it to work?
16 A.  No, I haven't.
17 Q.  Do you anticipate any problems making it
18     to work?
19 A.  I can't say that. It depends on if they
20     change my medication or something like
21     that fact. You know, I always have to let
22     them know. I could get there and -- once
23     before I had an allergic reaction to some

Page 181

1      medication. I can't -- I don't
2      participate in missing any days, but I
3      don't know what might happen.
4  Q.  And are they rolling days off?
5  A.  They are not.
6  Q.  Pardon me?
7  A.  They're not.
8  Q.  Is it an annual number of months, or is it
9      -- or is it an annual number of missed
10     days or every six months, or how does that
11     work?
12 A.  No, you start there and you get 75 points,
13     meaning that your first day of work there,
14     they give you 75 points, you know, you can
15     take off and schedule your vacation and do
16     what you need to do. Other than that,
17     your PTO is 11 hours, so -- it doesn't
18     start over; you just have to earn them
19     every months and get back up to the points
20     by working overtime or something of that
21     nature.
22 Q.  Okay. Have you gained back any of the
23     points that you've lost?

46  (Pages 178 to 181)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 182

1  A.  Any time you work a week that's called
2      perfect attendance, you gain back two
3      points, so I've gained back four points.
4  Q.  What is your current balance?
5  A.  Four points.
6  Q.  So you've gotten down to zero?
7  A.  Yes.
8  Q.  When you get out to July 2, 2008, will you
9      get 75 points again?
10 A.  No.  That's a one-time thing.  You're
11     supposed to accumulate them from then on.
12 Q.  Gotcha.  Before you took this job at
13     Sprint, was your most immediate job before
14     that at Hyundai?
15 A.  No.
16 Q.  So you worked somewhere between Hyundai
17     and Sprint?
18 A.  Uh-huh.
19 Q.  Is that a yes?
20 A.  I'm sorry.  Yes.
21 Q.  Okay.  Where did you work after Hyundai?
22 A.  Well, I left here after -- I was trying to
23     get -- I left here in July.  I was hired

Page 183

1      by Baptist in June, and because of my
2      criminal background check and this arrest
3      showing up --
4  Q.  Wait, stop.  You left Alabama in July of
5      what year?
6  A.  2006.
7  Q.  2006.  And where did you go?
8  A.  I went to Texas.
9  Q.  Why Texas?
10 A.  Because I went on the internet and I was
11     dealing with investments before, with
12     Signa and Prudential -- Signa, Prudential,
13     the same company -- and Fidelity
14     Investments was hiring licensed retirement
15     reps.  So at the point, I was already
16     licensed.  I did everything over line, and
17     they hired me.
18 Q.  And where are they located?
19 A.  Westlake, Texas.
20 Q.  Then had you moved yet to Texas?
21 A.  No.  I got hired in June and moved in
22     July.
23 Q.  Okay.  Hired in June of --

Page 184

1  A.  2006.  And I moved there July the 22nd,
2      2006.
3  Q.  Okay.  I thought you went to work for
4      Sprint July 2, 2006?
5  A.  I worked both jobs.  I was hired -- I
6      moved here after my divorce, and that was
7      in 2006.
8  Q.  When you say "here," we're in Montgomery.
9  A.  Yeah.  I left Montgomery after my divorce,
10     and that was 2005 -- or -- 5 -- 6 -- it
11     was -- June of 2006 is when I left here.
12 Q.  And you went to Texas?
13 A.  That's right.
14 Q.  But you didn't have a job at the time?
15 A.  No.
16 Q.  Why did you go to Texas?
17 A.  Because I couldn't find a job here.
18     Baptist decided not to give me a job
19     because of my criminal background check.
20     So I couldn't find a job making the kind
21     of money I was making at Hyundai, and I
22     needed to get a job with insurance because
23     I still had my daughters in college --

Page 185

1      health insurance, benefits.  So I searched
2      here; couldn't get a job; that's why I was
3      drawing unemployment.
4  Q.  That's why what?
5  A.  That's why I was drawing unemployment
6      before I left here.
7  Q.  All right.  So you applied at Baptist
8      Hospital in Montgomery?
9  A.  Yes.
10 Q.  The one on the by-pass?
11 A.  Prattville.
12 Q.  And they would not hire you because of a
13     criminal background check?
14 A.  They hired me.
15 Q.  How long did you work there?
16 A.  When I started there, they called me out
17     and said they couldn't hire me -- had to
18     let me go because of -- because of this.
19 Q.  We'll mark this Defendant's Exhibit 1 to
20     your deposition.  I'm not even sure I know
21     what that means.  Did you talk to Ms.
22     Turpen?
23      (The referred-to document was

47  (Pages 182 to 185)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 186

1         marked for identification as
2         Defendant's Exhibit No. 1.)
3   A.   Ms. Turpen gave me that gentleman's name
4      who actually did the risk mitigation,
5      because of my arrest. Yes, I did. I
6      talked to her, Joann Turpen. My arrest in
7      August; that's why they rescinded their
8      offer. And I called him, and he told me
9      they only do felony background checks. I
10     said, well, it wasn't a felony -- felony
11     misdemeanor. I said, it wasn't a felony,
12     and that's what I told Baptist, it wasn't
13     a felony. And I was acquitted. It was a
14     misdemeanor at all times. But they said
15     because of that, they couldn't hire me.
16   Q.   So that was the arrest for the check?
17   A.   No. That was the arrest here.
18   Q.   What in that document says that? Where in
19     that document says that, please, ma'am?
20   A.   (As read:) "Thank you for your recent
21     application for employment with Baptist
22     Medical Center of Prattville. We
23     carefully considered your application, and

Page 187

1     we regret that we are unable to offer you
2     employment at this time. The reasons for
3     our decision was based in part on
4     information obtained from the consumer
5     reporting agency identified below, which
6     is Risk Mitigation Service, Incorporation,
7     P.O. Box 294, Moulton, Alabama, 35650,
8     phone number, 866-383-1180. In accordance
9     with the Credit Fair Reporting Act, you
10    have previously received a copy of this
11    information and a copy of your rights
12    under the act. You have the right to
13    obtain an additional free copy of this
14    report within 60 days of your receipt of
15    this letter by contacting Risk Mitigation
16    Service Incorporation. The consumer
17    reporting agency did not make the adverse
18    employment decision and therefore cannot
19    explain how and why the adverse decision
20    was made, sincerely, Joann Turpen,
21    employment recruiter.
22   Q.   Where in that document does it say
23     anything about an arrest?

Page 188

1   A.   She told me on the phone, and she told me
2     to call this gentleman. And I called this
3     gentleman, by his name, and he told me.
4   Q.   You're saying Ms. Turpen told you because
5     of an arrest?
6   A.   Yeah. Shy told me because of my arrest in
7     August. And I said, but I was acquitted;
8     that was a misdemeanor. She told me.
9   Q.   Okay. And who is the guy that you called,
10    this person at Risk Mitigation?
11   A.   Yes.
12   Q.   Or someone at Risk Mitigation?
13   A.   She gave me his member.
14   Q.   And do you have that information with you?
15   A.   I gave that information to my attorney,
16     his number.
17   Q.   I don't think I've got that number. Maybe
18     I'm wrong.
19   A.   It's on that piece of paper. That's his
20     number.
21   Q.   Okay. The number that's on -- I gotcha.
22     And do you remember the guy's name there?
23   A.   I can't remember off hand, but I spoke

Page 189

1     with him, and I said, Ms. Turpen said that
2     I needed to call you for my background
3     check you did on me, and he said yes. I
4     told him it was a misdemeanor; you were
5     acquitted. And I said, yes, it was a
6     misdemeanor. And so I called Ms. Turpen
7     back and told her what he said, and she
8     said, well, because of the arrest, I
9     wasn't able to apply -- I was not able to
10    apply with Baptist for a year or however
11    long it stays on my record. And I kept
12    saying, it's a misdemeanor, and the
13    application didn't mention anything about
14    a misdemeanor; it talked about a felony --
15    have you ever been convicted of a felony;
16    have you ever been convicted of a
17    misdemeanor. And I was not.
18   Q.   Okay. And so the next place that you
19    applied for was where, after Baptist
20    Hospital?
21   A.   Fidelity Investments in Westlake, Texas.
22   Q.   And what happened there?
23   A.   They hired me.

48   (Pages 186 to 189)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 190

1  Q.  And what did they hire you at?
2  A.  Westlake, Texas.  I moved there.
3  Q.  Okay.  And did they pay you?
4  A.  Yes, they did.
5  Q.  What was the rate of pay?
6  A.  $16.22 an hour.
7  Q.  Okay.  And how much did you make at
8     Hyundai?
9  A.  At Hyundai I made -- I started off with
10    31,500 a year.  And that one year I made
11    almost 45 or something that year.
12 Q.  Is that with overtime?
13 A.  Yeah.  Yes.
14 Q.  Okay.  And how long did you work at
15    Fidelity Investments?
16 A.  Just -- October was my last -- September
17    26th.
18 Q.  Of?
19 A.  This year.
20 Q.  So for three months you worked both at
21    Fidelity Investments and Sprint?
22 A.  I did.
23 Q.  And how did you arrange that?

Page 191

1  A.  Well, Fidelity was during the daytime, and
2     Sprint was in the evening time.
3  Q.  Were you working 40 hours at Fidelity and
4     40 hours at Sprint?
5  A.  No, I wasn't working 40 hours at Sprint
6     that moment.  I was working 40 hours at
7     Fidelity before I became ill.  See, I
8     started with Fidelity in July of 2006.
9  Q.  Right.
10 A.  I didn't get hired at Sprint until July of
11    this year, 2007.
12 Q.  Oh, I'm sorry.  But you did work at
13    Fidelity until September 26th of 2007?
14 A.  Yes.
15 Q.  And you were also working at Sprint at the
16    same time?
17 A.  Yes.
18 Q.  So there was a three-month overlap; is
19    that right?
20 A.  Yes.
21 Q.  Okay.  And were you working 80 hours a
22    week during that three-month overlap?
23 A.  No.

Page 192

1  Q.  How did that work?
2  A.  I was part-time starting off at Sprint.
3     And because I had been off from work for a
4     long time at Fidelity from being in the --
5     being placed in the hospital and then
6     being under a psychiatrist's care for a
7     while.  So I was off -- off from work for
8     them for a while.
9  Q.  Did Fidelity terminate you?
10 A.  No, they did not.
11 Q.  Did you resign, then, of your own
12    volition?
13 A.  No, not really.  There's no way I could do
14    the work when it was discovered that --
15 Q.  There was no way you could do the work?
16 A.  I wasn't capable of doing that kind of
17    work under my condition on that
18    medication, so that's -- that's what my
19    doctor said.
20 Q.  Explain that to me.
21 A.  Well, you're actually working with
22    people's money all day and their mutual
23    funds, and you're transferring money to

Page 193

1     other -- you're seeing a psychiatrist
2     three times a week, on different types of
3     medication, trying to get balanced.  I had
4     perfect credit before I left here, and
5     then I had to go back to working two jobs
6     to try to get everything straightened out.
7     It just overwhelmed me.
8  Q.  Are you saying that you did not have
9     perfect credit --
10 A.  I did have perfect credit when I left
11    here.
12 Q.  What caused you not to have perfect
13    credit?
14 A.  I lost my job here.  I was making money.
15    I had a daughter who was still in college,
16    and my divorce -- you know, always -- in
17    my divorce, Chris took care of his stuff
18    and I took care of mine.  I was able to
19    take care of myself.  But at that point in
20    time -- and my daughters.  So when I had
21    to move here and I had to find a job, I
22    had to pay my way to move down there.  I
23    had to get money to get an apartment and

49 (Pages 190 to 193)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 194

1  all that kind of stuff, so I never really
2  got back caught up with anything.
3  Q.  But you didn't declare bankruptcy?
4  A.  And I never will.
5  Q.  Did you have to borrow money from anyone?
6  A.  My family helped me out.
7  Q.  Are you saying that your credit rating was
8  affected?
9  A.  Yes.
10 Q.  And what was it that affected your credit
11 rating?
12 A.  Well, I paid all my credit cards. I have
13 always paid them on time; I always had the
14 money to do that. And then I had to make
15 arrangements for my credit cards. And
16 they offer a payment plan, but I said no,
17 I'd rather not do that because my credit
18 was bad anyway at that point. So I had to
19 get my car note payment lowered. I
20 refinanced with the credit union to get a
21 lower payment in order to accommodate my
22 credit card. And the vehicle that I
23 bought my daughter in college, I had to

Page 195

1  have them to actually refinance that too,
2  to get a lower payment.
3  Q.  Do you know what your credit score was?
4  A.  It was 565, 566, something like that.
5  Q.  At its lowest or highest?
6  A.  That's at its lowest, and lower than that
7  now.
8  Q.  What is it now?
9  A.  I haven't checked.
10 Q.  Last time you checked?
11 A.  Well, last time I checked was actually in
12 September, and it was 4 -- 485.
13 Q.  What had it been when you --
14 A.  Highest my credit rating had ever been was
15 785, 786, something of that sort.
16 Q.  When was that?
17 A.  Here in Montgomery, before I ever moved to
18 Montgomery.
19 Q.  Do you have copies of your credit ratings?
20 A.  No, but that shouldn't be a problem.
21 Q.  What kind of car did you have to have the
22 note lowered on for yourself?
23 A.  A Mitsubishi.

Page 196

1  Q.  Mitsubishi what?
2  A.  2000LX Montero.
3  Q.  And your daughter?
4  A.  My daughter's is a Santa Fe, Hyundai Santa
5  Fe 2000. I had to refinance it for a
6  longer term.
7  Q.  Where do you bank?
8  A.  I bank at Bank of America.
9  Q.  How long have you banked at Bank of
10 America?
11 A.  Since September of 2006.
12 Q.  Before that where did you bank?
13 A.  Community Bank & Trust here in Montgomery.
14 Q.  Where else?
15 A.  That's it.
16 Q.  Before you moved to Montgomery where did
17 you bank?
18 A.  Chris and I banked -- had a joint account
19 in Iowa. I think it was Dubuque Bank --
20 Bank and -- Community Bank. It was
21 Dubuque Bank. I can't think of the...
22 Q.  Did you have a mortgage on a home here in
23 Montgomery?

Page 197

1  A.  No.
2  Q.  Do you now?
3  A.  No.
4  Q.  At the current time, is your only source
5  of income the money you earn at Sprint?
6  A.  Yes.
7  Q.  No one's helping you?
8  A.  No, not right now.
9  Q.  Have you ever been deposed before?
10 A.  What do you mean?
11 Q.  Where you've been sworn under oath as a
12 witness? I know about your trial, but as
13 a witness where you sat in a room like
14 this and lawyers asked you questions?
15 A.  No.
16 Q.  Other than the time you testified at your
17 own lawsuit, have you testified before?
18 A.  No.
19 Q.  While you were assigned to work at NSM as
20 an employee of Kelly Services, did anyone
21 talk to you about your performance?
22 A.  No.
23 Q.  Did anyone talk to you about the way you

50  (Pages 194 to 197)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 198

1  dealt with customers?
2  A.  No.
3  Q.  Did anyone talk with you about the way you
4      dressed?
5  A.  No.
6  Q.  Did anyone have any complaints about you
7      at all?
8  A.  No.
9  Q.  Never had any type of formal or informal
10     counseling with you --
11 A.  No.
12 Q.  -- while you were at NSM?  Did anyone
13     report back to Kelly Services any
14     complaints they had with your performance?
15 A.  No.  Theresa was my point of contact.
16 Q.  Why had you decided that you wanted to
17     leave NSM and go somewhere else?
18 A.  I was already looking for permanent
19     positions when I moved there.  That was
20     the first temporary position that I've
21     taken, was there.  And there at that job,
22     you can wear jeans and a tee shirt and
23     shorts.  And most of the time, Don and

Page 199

1  them wore shorts, but I always wore jeans
2  and a shirt and tennis shoes -- never wore
3  shorts at all.  I always wore a -- mostly
4  a white tee shirt with another one
5  underneath it, and I wore a jacket over it
6  -- a sweater, because they kept it so cold
7  in there.  So on that note, nobody never
8  talked to me about that.  So it wasn't
9  like a formal place; you can wear anything
10 you want to wear.
11 Q.  My question is, why is it that you wanted
12     to leave NSM and go somewhere else?
13 A.  Because I wanted a job with permanent -- I
14     didn't have no benefits there.  I was
15     making $10 an hour -- $10.50 an hour, had
16     no benefits, nothing whatsoever, no
17     insurance or anything.  I had no room for
18     advancements there.
19 Q.  Any other reason you wanted to leave NSM
20     and work somewhere else?
21 A.  It was under my understanding when I got
22     hired at NSM that it was going to be
23     temporary anyway.  And during the time

Page 200

1  that I was working there, I was
2  interviewing at other places all the time.
3  Q.  So you just wanted a permanent job that
4      had better pay and better benefits?
5  A.  Yes.  And that's what was on my
6      application at Kelly Services.
7  Q.  Okay.  And you said you interviewed at
8      other places while you were working at
9      NSM?
10 A.  Yes.
11 Q.  Can you tell me where?
12 A.  I interviewed with EDS; that's during the
13     time I was working there.  And I
14     interviewed at Walker -- well, it was
15     another temporary agency I was working
16     through too, was Walker Personnel there.
17     They had temporary positions for -- in
18     hospitals, for respiratory or medical
19     billing, so I was interviewing there too,
20     trying to get a permanent position
21     somewhere with insurance.  And then at
22     that time when I would go on my lunch
23     break, I would go interview and come back,

Page 201

1  and that's when I got hired at EDS.
2  Q.  Any other places you interviewed?
3  A.  No.  I submitted applications -- my resume
4      all the time.  Hyundai, at their
5      suppliers.
6  Q.  Did you ever keep copies of your resumes
7      or your applications?
8  A.  No, I never kept copies of my
9      applications.
10 Q.  Did you store any applications on your
11     computer?
12 A.  No, I did not.  You fill them out online.
13     I never kept them.
14 Q.  Did you keep a diary during 2004 or 2005?
15 A.  A diary?
16 Q.  Uh-huh.
17 A.  Personal diary?
18 Q.  Yeah.
19 A.  No.
20 Q.  All right.  Have you since kept a personal
21     diary?
22 A.  No.
23 Q.  Is there any place that you record the

51  (Pages 198 to 201)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 202

1     events that you're suing about in this
2     case?
3  A.  Yes.
4  Q.  What is that?
5  A.  I didn't record it. It was being recorded
6     by Anthony Green. After I was arrested
7     and I was out, maybe a month later they
8     were still investigating -- they said they
9     had been investigating for almost a year.
10     Anthony Green, who worked with Cliff
11     Johnson, called me. He recorded the same
12     thing I told -- said in court, and he got
13     it on tape, so it's in his possession with
14     Medicaid.
15  Q.  Okay. And do you mind if we have a copy
16     of that tape?
17  A.  He has it, so you have to ask Medicaid.
18  Q.  Do you consent --
19  A.  I don't mind at all.
20  Q.  -- to it if we make a copy for your
21     lawyer?
22  A.  I don't mind.
23  Q.  And have you, yourself attempted to record

Page 203

1     the events that you're suing about in this
2     case in writing anywhere?
3  A.  No.
4  Q.  In typing anywhere?
5  A.  No.
6  Q.  Okay. Did you ever call National Seating
7     or any employee of National Seating and
8     leave a message on someone's voicemail?
9  A.  Yes.
10  Q.  Tell me about that.
11  A.  Well, after I started with EDS -- and
12     Theresa and I was pretty good friends at
13     Kelly Services. That's when Theresa told
14     me -- because I was referring another
15     young lady there from EDS who was part
16     time, to go to Kelly Services, because
17     they can find her, you know -- she said
18     she was looking for part time work. At
19     EDS, she was part time, and her job was
20     about to end. So when I called Theresa
21     and we were talking, and Theresa told me
22     what Don had said. Somebody had said that
23     about -- that I was too friendly with Ms.

Page 204

1     Barrow. I said, well, they never told me
2     anything like that, because I never went
3     back there anyway because I got that job
4     at EDS. That was the first time I'd heard
5     of it.
6  Q.  Too friendly with who?
7  A.  Felicia Barrow. And then the second time
8     I heard that I was too friendly with
9     Felicia Barrow. If there was anything
10     that had to do with me dressing or
11     anything like that, then I wonder why Don
12     didn't tell that when we went to court.
13     He told the judge it was because me and
14     Felicia Barrow were fraternizing after
15     work.
16  Q.  I think my question, ma'am, was, did you
17     ever leave a voicemail for anyone --
18  A.  So no. And that's what I told Danielle.
19     I called Danielle, and I said, you know, I
20     never told y'all what Don told me about
21     Robert falling out of that chair and
22     rolling down that -- the interstate and
23     stuff like that. And Danielle wanted to

Page 205

1     know more about that. I said, you know,
2     he told Kelly Services a lie on me. So at
3     this point in time, Theresa took up for me
4     at Kelly Services. But he told it to the
5     head woman at Kelly Services, so to this
6     day, I can't even get a job through Kelly
7     Services. At this time, I am unhirable.
8     When I moved to Texas trying to get a
9     temporary job at Kelly Services when I was
10     at Fidelity, they told me I was not
11     eligible for rehire.
12  Q.  Why did they tell you that?
13  A.  Because I was fraternizing -- they said I
14     was too close, too personal with customers
15     and employees, is what they told me.
16  Q.  And was it the Kelly Services in Texas
17     that told you that?
18  A.  Yeah. Well, Theresa told me that -- what
19     Don had told them.
20  Q.  When you said that you tried to get a job
21     with Kelly Services --
22  A.  In Texas.
23  Q.  -- and they said you couldn't because you

52  (Pages 202 to 205)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 206

1   were fraternizing too closely with
2   customers and employees, I'm trying to
3   find out who --
4  A.   Yeah. That's what they put on -- it's in
5   the system every Kelly Services you go.
6   So I had no idea that this Kelly Services
7   in Texas knew about something that Don
8   said to Kelly Services in Montgomery. I
9   had no idea. I've always used Kelly
10   Services.
11  Q.   And was it Kelly Services in that town you
12   live in now?
13  A.   Yes, it's a Kelly Services there.
14  Q.   There was --
15  A.   There is one in Texas.
16  Q.   Where is the one in Texas? That's what
17   I'm trying to find out.
18  A.   Bedford. There's one in Fort Worth, one
19   in Dallas.
20  Q.   And which one is it that told you that you
21   were not eligible for hire because of
22   fraternizing?
23  A.   When I was in Tarrant County; that was in

Page 207

1   Fort Worth, Texas.
2  Q.   And have you ever seen anything in writing
3   from them?
4  A.   No.
5  Q.   Do you know the name of the person who
6   told you that?
7  A.   No.
8  Q.   What is it that Theresa told you when you
9   talked to her? Did she say that you were
10   fraternizing too closely with customers --
11  A.   No. What happened was, my last day I
12   worked there was a Friday, and it was a
13   day after my birthday. So I didn't come
14   back to work -- I called there on Friday
15   evening after I left and told them about
16   me going to -- accepting another position.
17   So I talked to them -- I didn't show up at
18   National Seating on Monday, and so when I
19   finally talked to Theresa and told them,
20   you know, that I wasn't going back, that's
21   when Theresa had told me that Don and them
22   called and told them that, in case I
23   wanted to come back there, this is the

Page 208

1   reason why he would not let me come back.
2   And I thought, I hadn't left there anyway,
3   so why would I come back there. But that
4   wasn't true.
5  Q.   So you got a job at Hyundai --
6  A.   I got a job at EDS.
7  Q.   I'm sorry, EDS. And that job started on
8   the following Monday?
9  A.   That job started like two weeks later.
10  Q.   Okay. And the last day of work at Kelly
11   Services before going to EDS, was that the
12   Friday before the Monday you reported to
13   work?
14  A.   No.
15  Q.   Did you give two weeks' notice?
16  A.   With Kelly Services?
17  Q.   Uh-huh.
18  A.   No. Because me and Theresa had already
19   been talking -- she was my point of
20   contact -- had been talking -- we talked
21   all the time.
22  Q.   So she knew that you were --
23  A.   She knew I was leaving.

Page 209

1  Q.   And she knew when you were leaving?
2  A.   She knew when I was leaving because I
3   called her and told her.
4  Q.   And did she tell National Seating that you
5   were leaving?
6  A.   No.
7  Q.   Did you tell National Seating you were
8   leaving?
9  A.   No, I never did -- never did tell them.
10  Q.   Did your job end that Friday, your
11   temporary position with --
12  A.   No, it didn't.
13  Q.   So you just walked out and never came
14   back?
15  A.   Well, see, I had told -- I report to Kelly
16   Services, and Kelly Services tells them.
17   I reported to them to get a replacement,
18   and they told them.
19  Q.   Okay. Did you ever tell Kelly Services or
20   National Seating that you were not going
21   to go back after that Friday, or did you
22   just not show up?
23  A.   No. That Friday Don wasn't even there.

53 (Pages 206 to 209)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 210

1  Emily was in Nashville the Thursday
2  before, so she wasn't in the office. When
3  I left that Friday with the keys, I
4  returned them to Kelly Services that
5  Friday evening, dropped them in the box,
6  because that's what me and Theresa had
7  talked about.
8  Q.  And then you took two weeks off before
9  starting your next job?
10 A.  Yes, I went home.
11 Q.  Went home where?
12 A.  I went to visit my children in Marianna.
13 Q.  I mean, do you think that was the correct
14 way to leave the job there at NSM?
15 A.  Well, that's the way Theresa told me to do
16 it. I report to them, and then they tell
17 them of their new replacement.
18 Q.  So Theresa told you just to leave the job
19 without notice?
20 A.  Well, like I said, we had been talking two
21 weeks prior about me leaving. It was only
22 a temporary position. Only reason why
23 they asked me to take that position was

Page 211

1  because -- I was looking for a permanent
2  position. They asked me to take that
3  temporary position while they was looking
4  for me a permanent position -- a permanent
5  one. So I was working there while until
6  they found me one, but they didn't find me
7  one; I found my own permanent position.
8  Q.  Do you think that had anything to do with
9  your being blacklisted from Kelly
10 Services?
11 A.  Me being blacklisted from Kelly Services?
12 No. That's not what they told me.
13 Theresa told me what Don said.
14 Q.  And when did this conversation with Don
15 supposedly take place?
16 A.  I don't know when Don talked to Kelly
17 Services; I just heard about on Monday,
18 that Monday, following Monday, after I
19 left on that Friday.
20 Q.  And had the conversation with Don taken
21 place weeks before, months before; do you
22 know?
23 A.  No. Theresa told me that Don told them

Page 212

1  that Monday -- I didn't show up that
2  Monday morning.
3  Q.  Okay. What did Theresa tell you the
4  conversation with Don -- just tell me what
5  she told you.
6  A.  Don had told the lady who was running
7  Kelly Services that I was too close to
8  people, you know, very friendly with
9  people or something of that nature. But
10 she said he couldn't really explain what.
11 And I said, well, what did he mean by
12 that, you know. And she said, he really
13 couldn't go into details about it. I
14 said, well, I don't understand that;
15 that's not true. Because, first of all,
16 if he was indicating something else,
17 that's totally off base. So Theresa
18 really didn't understand what Don was
19 talking about. And I said, well, what did
20 he say. So that's what I was listening
21 for him to say in court. Well, he told
22 the -- he didn't say that. I wanted to
23 hear the reason why he said he let me go,

Page 213

1  because I was not let go by him; I left
2  myself. And he told the judge that
3  because me and Felicia Barrow was best
4  friends; that's what he said. I wanted to
5  know too, myself. So if you tell Kelly
6  Services one thing, then why would you
7  tell the judge another thing.
8  Q.  Did you leave a message on an answering
9  machine of anyone that worked at National
10 Seating about your leaving?
11 A.  Danielle.
12 Q.  Tell me what you said on Danielle's
13 answering machine.
14 A.  I said, Danielle, I said, I was leaving --
15 Don had called Kelly Services. And I
16 said, but I was leaving anyway and I had
17 left anyway. And I said, he told them --
18 I don't know whatever he said, I said, but
19 I never called y'all and told y'all that
20 Don said that Robert fell out of that
21 chair with no strap on, so Don was not
22 telling the truth.
23 Q.  Anything else that you said on that call?

54  (Pages 210 to 213)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 214

1  A.  And I said that, you know, but I'm okay
2      with it; I'm at EDS. And I said that --
3      Felicia Barrow had called looking for me
4      or something like that. And I said,
5      Felicia, all that time I was working
6      there, I had asked people for contacts of
7      places to go for medical provider. So I
8      had told her that I had been getting in
9      contact with State employees. Felicia
10     referred me to somebody else who worked in
11     EDS and all that kind of -- places like
12     that, because she knew everybody around
13     there. I talked to Jerry Sanders; he gave
14     me some contacts of people, because I
15     wanted to stay in the medical profession.
16 Q.  Did you say that you understood that
17     complaints were made that you were overly
18     flirtatious with customers and that you
19     dressed too modestly at work?
20 A.  Well, see, flirting with somebody, that's
21     not even my character.
22 Q.  My question was simply this: Did you say
23     that on the voicemail machine?

Page 215

1  A.  In my interpretation, what Theresa was
2      trying to say, Theresa told me what her
3      manager said. And then we elaborated on
4      that, and I said, excuse me? I mean, to
5      flirt -- I told Danielle, I said --
6      something of that nature. I can't
7      remember about flirtatious or something
8      like that, but I -- I don't remember. It
9      was something of that nature.
10 Q.  Did you also say in that voicemail message
11     that you left for her that you weren't
12     going to change the way you were for
13     anybody?
14 A.  Oh, yes. That's right. The way I -- this
15     was mentioned, about when the phone rang
16     and I said, thank you for calling National
17     Seating & Mobility, and when I'd been
18     talking to one of the providers on the
19     phone like Jerry Sanders or someone and
20     we'd start laughing and having -- you
21     know, talking about stuff, he was -- I
22     guess that's his point, saying I was too
23     flirtatious with Jerry Sanders. He was

Page 216

1      the provider at Medicaid who actually
2      called me for quotes and stuff. And Jerry
3      Sanders, he was funny, talks about stuff,
4      and I enjoyed talking with him.
5      Flirtatious, that's not in my character.
6      And when people would call there, they
7      would call for me and ask for me to help
8      them. So nobody ever came by there but my
9      husband, and as far as that goes, being
10     flirtatious, being nice.
11 Q.  All I asked is what you left on the
12     voicemail.
13 A.  Yes. That's when Don said, I was being
14     flirtatious. I've never been flirtatious
15     with anybody in my whole life.
16 Q.  Did you say on that same message that you
17     had no hard feelings toward NSM?
18 A.  I sure did. If Don said those things,
19     that's how he felt, and that was okay with
20     me. I have no hard feelings towards that.
21 Q.  And did you say that you had a job with
22     Medicaid that you were going to be taking?
23 A.  EDS. Medicaid, EDS. That is Medicaid.

Page 217

1      It's a Medicaid division of the State.
2  Q.  And is that, in fact, where you were?
3  A.  That's, in fact, where I was at.
4  Q.  And once you went to EDS, did you have any
5      further contact with NSM?
6  A.  No, never did.
7  Q.  While you lived in Montgomery, did you
8      ever socialize with Felicia Barrow?
9  A.  No. I have never socialized with her,
10     ever.
11 Q.  No lunches, no dinners?
12 A.  Me and Felicia never went out to lunch,
13     dinner, anywhere together.
14 Q.  Did you ask her to call National Seating?
15 A.  I didn't even know she had called National
16     Seating till the day I was in court.
17 Q.  And what did you find out the day you were
18     in court?
19 A.  See, Felicia didn't even know I was a
20     temporary person there either. See,
21     that's how -- if we were such good
22     friends, then she would have known that I
23     was a temporary employee of National

55 (Pages 214 to 217)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 218

1   Seating working through Kelly Services,
2   but she didn't even know that.  It wasn't
3   her -- she wasn't that type of friend.
4   She thought that I was permanent there.
5   And she thought that -- when she called
6   there for me that Monday, because I had
7   faxed her some stuff on Friday, she asked
8   for me, and she talked to Don's wife,
9   Emily.  And Emily told Felicia that there
10  was a cutback because of, you know,
11  business was slow, so I decided to go to
12  EDS and then it was going to be just Don
13  and her working in the office.  So that's
14  what she told Felicia, and Felicia quoted
15  that back to me.
16 Q.   When?
17 A.   When?  They called me six months later at
18      the most, asking me about some stuff that
19      they -- what happened to -- what's going
20      on at National Seating.  And she said,
21      well, why did you leave there.  I said,
22      that was temporary.  She said, I didn't
23      know you were temporary.  Yes, I was

Page 219

1   temporary there.
2 Q.   So the very first time you talked to
3      Felicia Barrow after leaving NSM was six
4      months later?
5 A.   When they called me, her and Cliff
6      Johnson.
7 Q.   And you didn't talk to her in the
8      meantime?
9 A.   Never talked to her.  Never talked to her.
10     Don't even know where she lived.  Never
11     talked to her.
12 Q.   Who is it that made the decision to --
13     strike that.  To your knowledge, did
14     National Seating do anything to encourage
15     your arrest?
16 A.   Yeah.
17 Q.   I'm asking, to your knowledge, are you
18     aware of any facts --
19 A.   Yes.
20 Q.   -- that NSM did something to have you
21     arrested?
22 A.   Yes.
23 Q.   Okay.  Tell me what the fact are, not your

Page 220

1   suspicions.
2 A.   Well, I read it from my attorney, who gave
3      it to me, that the reason why I was being
4      arrested was because I personally went to
5      Medicaid and filed a complaint about them
6      doing some false -- doing something --
7      irregularity, billing and stuff like that.
8      They're assuming that I went and made the
9      complaint, and I did not.  I never filed a
10     complaint whatsoever.  So Don had in the
11     response that I was retaliating because he
12     fired me and that's my reason for
13     reporting it to Medicaid, that they were
14     doing something wrong in their office,
15     because they fired me.  And the point is
16     that I never told Medicaid nothing when I
17     left there.  I never even had any contact
18     with them -- never did.  They called me.
19     So yes, I read Don's statement.  He told
20     that to Gerry Shockley, and then Gerry
21     Shockley arrested me because he was
22     assuming that it was me who went to
23     Medicaid, and I never did.

Page 221

1 Q.   So Don told Medicaid --
2 A.   Told Gerry Shockley.
3 Q.   Okay.  Let me get this straight.
4 A.   District attorney general, told him, in
5      his statement that I read.
6 Q.   Okay.  Don told Gerald Shockley that you,
7      Elizabeth Horton --
8 A.   The reason why --
9 Q.   Let me ask the question -- went to
10     Medicaid with complaints, and it's for
11     that reason that they arrested you?
12 A.   Yeah, that I filed a report and it was
13     false.  Yes, sir.
14 Q.   So Don Williams --
15 A.   Told Gerry Shockley that in his report,
16     and it was given to me by Thomas Goggins.
17 Q.   And do you have a copy of that report?
18 A.   No.  I got it the day of trial, because
19     Goggins had it and showed it to me.  I
20     read the whole thing.
21 Q.   Okay.  What else did NSM --
22 A.   But I think my attorney has a copy of that
23     report.

56  (Pages 218 to 221)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| Page 222 | Page 224 |
|---|---|
| 1       MR. STEWART: Do you? Do you<br>2       have it here, I mean?<br>3       MS. NICKSON: No, I don't.<br>4 Q.  I think I asked in my deposition notice<br>5     for all evidence that you had in support<br>6     of the claim to be brought to the<br>7     deposition.<br>8 A.  See, I don't have that information. It<br>9     was made available. She could have gotten<br>10    it out of the courts. It's an open case<br>11    here. I never got anything.<br>12 Q.  Let me mark as Defendant's 2 to your<br>13    deposition -- and I've got a copy for you<br>14    and a copy for your counsel. Have you<br>15    seen the notice of deposition for your<br>16    deposition in this case?<br>17       (The referred-to document was<br>18        marked for identification as<br>19        Defendant's Exhibit No. 2.)<br>20 A.  Yes, I've seen this.<br>21 Q.  And did you see where on Page 4 it asks<br>22    you to bring documents to the deposition?<br>23 A.  Yes. | 1 A.  I have nothing.<br>2 Q.  You don't have any documents or any kind<br>3    of tangible stuff that you've gathered?<br>4 A.  I have not gathered anything on it. I<br>5    have not --<br>6 Q.  Or copies you've made while you were at<br>7    NSM that you kept?<br>8 A.  No.<br>9 Q.  No listing of damages that you claim in<br>10   this case?<br>11 A.  No.<br>12 Q.  No expert reports?<br>13 A.  No.<br>14 Q.  Any letters back and forth between any of<br>15   the defendants and you?<br>16 A.  No. I never talked to them. The last<br>17   time I talked to one of the defendants is<br>18   before I left Alabama, which I thought<br>19   that whole thing was over after I got<br>20   arrested and I got acquitted, but they<br>21   came back again -- Cliff Johnson and<br>22   Anthony Green, another investigator, he<br>23   took over the case and was still |

| Page 223 | Page 225 |
|---|---|
| 1 Q.  And have you made an effort to bring those<br>2    documents to your deposition?<br>3 A.  I don't have these documents. I never had<br>4    them in my possession.<br>5 Q.  You never had any of these documents?<br>6 A.  I never had any of these documents in my<br>7    possession.<br>8 Q.  When you say in your possession --<br>9 A.  I never had --<br>10 Q.  Whose possession were they in?<br>11 A.  In the State of -- Medicaid's possession.<br>12 Q.  Okay. Well, you've mentioned a couple of<br>13    things that your attorney has.<br>14 A.  Well, Tommy Goggins was my attorney who<br>15    defended me in my criminal trial, but I<br>16    never got anything from him. He let me<br>17    read that the day of court, and that was<br>18    it. I left there empty-handed, without<br>19    nothing. I read that sitting there in<br>20    court before we went to trial, but I never<br>21    -- he never gave it to me.<br>22 Q.  So you don't have any statements from<br>23    anybody? | 1    investigating, and he came back several<br>2    months later asking me the same thing<br>3    about the same stuff, and I told him the<br>4    same thing.<br>5 Q.  Do you have any federal and state income<br>6    tax returns for the last five years?<br>7 A.  Last five years, my divorce lawyer --<br>8    judge ruled for Chris to get those, so<br>9    Chris got those.<br>10 Q.  You don't have any?<br>11 A.  No. Chris owes some taxes, responsible<br>12   for taxes, so he has them. They're here<br>13   in Alabama; Chris still lives here. But I<br>14   do have -- excuse me. I have the one from<br>15   Hyundai.<br>16 Q.  And where is that?<br>17 A.  Actually, it's in my -- my car downstairs.<br>18   From January to March of that year, at<br>19   Hyundai.<br>20 Q.  Have you tape-recorded anybody?<br>21 A.  Never. No, sir.<br>22 Q.  Any photographs or videotape of anybody?<br>23 A.  No. |

57 (Pages 222 to 225)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 226

1       MS. NICKSON: Could I ask --
2           what's the year on that tax
3           return?
4       THE WITNESS: That year that
5           Hyundai fired me. It was in
6           2006, so it was that -- from
7           January 2nd to March -- when
8           I got fired. It was only
9           three months.
10      MS. NICKSON: Can I fax that over
11          to you?
12      MR. STEWART: Yes.
13  Q.  You were asked to produce a copy of all
14      prescriptions or the front label off all
15      prescription containers. Did you do that?
16  A.  Yes.
17  Q.  Huh?
18  A.  I e-mailed them I thought. Maybe I did
19      not. I pulled them off the internet, so
20      --
21      MS. NICKSON: Just for the
22          record, I think those are
23          the ones that I produced in

Page 227

1           this case.
2       MR. STEWART: I got those. Thank
3           you.
4       MS. NICKSON: Okay.
5   Q.  So there are no other documents that
6       respond to this that you have --
7   A.  I have no documents.
8   Q.  -- or that you've given to your lawyer?
9   A.  I don't have anything.
10  Q.  Who testified at your trial? Felicia
11      Barrow, Don Williams, Gerald Shockley?
12  A.  Mike and Mike Roeder, and I don't know the
13      other gentleman, the prosecutor.
14  Q.  Okay. Who was your judge?
15  A.  I don't know her name.
16  Q.  What did she say?
17  A.  After we went through the discussion of it
18      wasn't me who contacted Medicaid and
19      Felicia verified that it was that they
20      contacted me and we got to talking about
21      -- she told Gerry Shockley that it was
22      anybody's right -- they were wrong for
23      arresting me on no cause, and she said

Page 228

1       that it's anybody's right if they have any
2       suspicions to report anything about
3       Medicaid. And she found -- she had no
4       probable cause of finding me guilty.
5   Q.  But you did report to Medicaid?
6   A.  I did not report to Medicaid. I didn't
7       tell Medicaid nothing. They called me. I
8       left there, EDS -- I left there, National
9       Seating, went to work at EDS; worked at
10      EDS nine months and went to Hyundai. I
11      never, ever said anything about National
12      Seating to Medicaid, ever. I never talked
13      to Felicia, never talked to -- Felicia
14      Barrow; I never talked to Cliff Johnson; I
15      never talked to Anthony Green; I never
16      talked to any of them.
17  Q.  And Medicaid took no action against
18      National Seating, did they?
19  A.  I have no idea. All I know, after I
20      thought this was over, another
21      investigator came, Anthony Green. He's
22      the one who found Chasely Weeks. So when
23      he came to talk to me at my home and he

Page 229

1       recorded that conversation, he found
2       Chasely Weeks. I don't know what went on
3       from there, and from there, I was gone; I
4       left and moved. All I know is it was
5       reported, so Medicaid has that.
6   Q.  What information did National Seating give
7       the attorney general's office that
8       resulted in your arrest?
9   A.  I don't know what National Seating gave
10      them. I have no idea. There was no
11      evidence produced. All I know is what
12      Medicaid gave Mike Roeder in court.
13      That's all I've seen.
14  Q.  What information did Don Williams give to
15      Alabama Medicaid that resulted in your
16      arrest?
17  A.  He gave nothing to them.
18      MR. WALKER: I'm sorry. Would
19          you say that again, please?
20      THE WITNESS: Nothing to them
21          that I -- nothing to them.
22  Q.  Do you claim in this case that there's
23      some type of conspiracy between National

58  (Pages 226 to 229)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 230

1  Seating and Don Williams and the State of
2  Alabama against you?
3  A.  Wait a minute. First of all, no, I don't
4  think there's any conspiracy, because if
5  it was, then Felicia wouldn't have told
6  the judge in court that it was she and
7  Cliff who called me; I never came to them.
8  I don't think that at all. So -- but Don
9  and them's testimony to Gerry Shockley by
10  stating that we were friends had a lot to
11  do with it, because that was the first
12  thing that Gerry Shockley asked Felicia,
13  about our relationship, in front of Cliff
14  Johnson.
15  Q.  But you weren't prosecuted for being
16  friends with Felicia Barrow.
17  A.  I was prosecuted based on that and filing
18  a false report. Somebody said I filed a
19  report, and I never filed anything.
20  Q.  Who is it that said you filed a report?
21  A.  Gerald Shockley said I filed a report.
22  Don Williams said I filed a report.
23  Q.  Don Williams said you filed a report?

Page 231

1  A.  Yes.
2  Q.  When did he say that?
3  A.  He said I filed a report with Medicaid and
4  made those allegations saying they were
5  doing something wrong because he fired me.
6  Q.  That doesn't have anything to do with your
7  arrest.
8  A.  If they're saying that I'm making the
9  report and it comes out, you know, they
10  think I lied on him for being fired and I
11  filed a report, then why was I arrested,
12  then, if I didn't do that -- if that
13  didn't result in my arrest. Why was I
14  arrested, then? This states I filed a
15  false report with a law enforcement
16  agency. If the judge asks where did I go
17  to file a report -- I didn't file a report
18  anywhere. No report was produced at all.
19  So in other words, what I'm saying is,
20  when I left National Seating and went to
21  work at EDS, I had no contact with
22  National Seating or Felicia Barrow ever
23  again until they contacted me.

Page 232

1  Q.  They being?
2  A.  Cliff Johnson and Felicia Barrow. And at
3  that time, I was working at Hyundai.
4  Q.  And to your knowledge, National Seating
5  never went to the State or the Medicaid
6  agency and said, investigate Elizabeth
7  Horton, did they?
8  A.  I never knew. No, sir.
9  Q.  And did you give names to the attorney
10  general's office of people to investigate?
11  A.  No.
12  Q.  Did you give names to the attorney
13  general's office of people who allegedly
14  did not receive wheelchairs or anything
15  like that?
16  A.  No, I didn't. I cannot tell you who did
17  not receive a wheelchair or not. I wasn't
18  even there long enough to even know. Like
19  I said, they came to me and they told me
20  this stuff, Felicia and Cliff.
21  Q.  And you're not claiming that National
22  Seating swore out a warrant against you,
23  are you?

Page 233

1  A.  I don't know who had the -- all I know is
2  that I was arrested. I don't know why.
3  Q.  Let me rephrase the question this way,
4  then: Do you have any evidence that
5  National Seating swore out a warrant
6  against you?
7  A.  I don't.
8  Q.  Do you have evidence that National Seating
9  did anything other than respond to the
10  attorney general's investigation's
11  questions?
12  A.  I don't.
13  Q.  And do you have any evidence that Don
14  Williams swore out a warrant against you
15  for your arrest?
16  A.  I don't have any evidence at all.
17  Q.  Okay. Are you aware of any type of
18  agreement between the State and National
19  Seating and Don Williams to have you
20  arrested?
21  A.  No.
22  Q.  Are you aware of any official policy that
23  National Seating has that resulted in your

59  (Pages 230 to 233)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 234

1    arrest?
2 A.  No.
3 Q.  Have you thought of any other jobs that
4    you've had that we haven't discussed?
5 A.  No.
6 Q.  You're claiming damages in this case. Can
7    you tell us what the damages are that
8    you're seeking?
9 A.  The damages in this case that I'm seeking
10    is, you know, first of all, I was arrested
11    and I was in jail overnight. I had nobody
12    here. Only person I knew here was my
13    ex-husband and his family, so I didn't
14    have no family here, so I had to stay in
15    jail until my family came and got me
16    because he and I were separated. Then I
17    come to find out that, you know, later to
18    learn that, you know, I get to work, and
19    they start asking me about this false
20    reporting to a law enforcement --
21    questioning me about that in General
22    Affairs. And between -- I didn't even
23    know what was going on. But I got called

Page 235

1    up on that several times.
2 Q.  Anything else?
3 A.  So then, you know, eventually assignments
4    were not given to me anymore. You know,
5    if there was -- if my manager had anything
6    to say to me, he'd just put it on my desk
7    and keep going, because they truly thought
8    I was lying because those officers came
9    out there. And it was pretty much -- in
10    detail, they really want to know why they
11    come out there to Hyundai. So I was let
12    go in March, applied for Baptist. And I
13    go there -- there was no reason for me to
14    stay here. I need to get somewhere that I
15    can forget about this mess. And before I
16    left here, like I said, it was Anthony
17    Green -- one day I came home from the
18    doctor -- Dr. Adams and seeing Dr. Wool,
19    and there was a note and little card in my
20    door from Medicaid, and it was Anthony
21    Green, and he wanted me to give him a
22    call. I gave him a call asking why he was
23    leaving a note in my door, and he said,

Page 236

1    well, the investigation with National
2    Seating had been going on a year prior to
3    my working there and had been initiated by
4    Chasely Weeks and that he wanted to go
5    over everything that happened -- you know,
6    happened between me and Don and everything
7    again. And he asked me did I mind him
8    recording us, and I said, sure don't, not
9    at all. And he's the last person I've
10    seen before I left here. I never talked
11    to him ever again. The only thing I know
12    is I never seen him or talked to him
13    again.
14 Q.  We were talking about your money damages
15    in the case. Are there any other --
16 A.  So money damages is that -- you know, I
17    had to find another job. I had
18    responsibility, you know, to myself, my
19    credit, my kids, a responsibility. I
20    always worked two jobs all my life, and to
21    be without a job because of stuff like
22    this -- and my character and you're
23    questioning me about it, yeah, that's

Page 237

1    damaging right there. Being in jail was
2    insulting enough and having people reading
3    it, saying they saw it in the newspaper.
4 Q.  Was it in the newspaper?
5 A.  I never picked up the newspaper, but I was
6    told by my ex-husband it was in the
7    newspaper; he brought it to work. I
8    glanced over it, and to tell you the
9    truth, I just looked at it.
10 Q.  And so if I understand you correctly,
11    you're claiming that your job at Hyundai
12    was lost as a direct result of this arrest
13    that occurred?
14 A.  They questioned me about that up until the
15    point I left there.
16 Q.  Do you claim that Hyundai just came up
17    with an excuse for letting you go once
18    they found out that you had been arrested?
19 A.  Well, you know, my performance was very,
20    very good. I had never been written up on
21    anything, never missed a day of work. I
22    mean, my performance was the best. I had
23    gotten three raises in one year. Then all

60  (Pages 234 to 237)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 238

1  of a sudden, you know, you go through a --
2  if you screw up on anything, you go
3  through a process of your first corrective
4  action, second corrective action, third
5  corrective action. I had never been on
6  anything at all, nothing at all. And the
7  day that I was fired, it wasn't even -- HR
8  never fired me; it was some other manager
9  that wasn't even my manager that -- still
10  to this day, they say they never fired me,
11  but somehow I'm not there anymore.
12  Q.   Hyundai says they never fired you?
13  A.   My paper was never signed by HR.
14  Q.   Did they tell you that you were terminated
15      for sexual harassment of a co-employee?
16  A.   They said that I caused -- I read that
17      piece of paper saying that I harassed a --
18      one of the employees said that I sexually
19      harassed him, asked him out for a date,
20      asked him if -- oh, asked him if he wanted
21      to go out on a date, that I showed my -- I
22      had on a skirt at work and he showed like
23      -- and he saw my legs. See, I never wore

Page 239

1  a skirt at work. And first of all, it was
2  the same guy that I lent out my money to,
3  you know, over the whole year that I
4  worked there. And, of course, I was
5  asking him for my money. I was definitely
6  asking him every day for my $300 that he
7  bounced the check. Yeah, I harassed him
8  for it. Sexual harassment? No.
9  Q.   Did Hyundai tell you they were letting you
10      go for sexual harassment?
11  A.   They said they let me go for sexual --
12      something in that nature. They never said
13      that -- sexual harassment, they didn't say
14      that. Acting in a sexual nature,
15      something like that. I forgot how they --
16      I turned it over to the employment office.
17  Q.   You're not saying that you left Hyundai
18      voluntarily, are you?
19  A.   I'm saying that they wouldn't let me back
20      in the gates.
21  Q.   And you're blaming your loss of your job
22      at Hyundai on this arrest?
23  A.   Yeah, I pretty much do, because they

Page 240

1  wouldn't have kept questioning me about
2  them five officers coming out there on the
3  job and questioning General Affairs, is
4  she here; is she not here; does she still
5  work here? You know, it caused them an
6  inconvenience, so -- and then later, when
7  Tommy recanted his story, saying it wasn't
8  true what he said, then I was already gone
9  by then.
10  Q.   Okay. Any other element of your damage
11      claim that we haven't discussed?
12  A.   I had to move away from here to get a job.
13  Q.   We talked about that.
14  A.   Yeah.
15  Q.   Anything else?
16  A.   It even hurt my kids. My kids had to come
17      here to get me out of jail, worrying about
18      what was going to happen to me, almost
19      quit college. You know, my family was
20      terrified by this. We're good people. We
21      don't do stuff like that. Hurt my kids.
22      Hurt my family.
23  Q.   Anything else?

Page 241

1  A.   Anything else you can think of?
2  Q.   That's what I'm asking you, ma'am.
3  A.   No.
4  Q.   When did you first see a doctor for any
5      kind of problems that arose out of your
6      being arrested?
7  A.   November 26th of 2006, when I moved to
8      Texas. Before then, I saw Dr. Adams in
9      Montgomery.
10  Q.   Dr. Kynard Adams?
11  A.   Yes, Dr. Kynard Adams.
12  Q.   What kind of doctor is he?
13  A.   He's a family doctor, family practice.
14  Q.   Had you been going to him before you were
15      arrested?
16  A.   Yes.
17  Q.   Why did you see him before you were
18      arrested?
19  A.   Zyrtec -- you know, I moved here and
20      allergies -- Zyrtec. High blood pressure.
21      I'd gained weight and had high blood
22      pressure, and he prescribed me that. And
23      then when Chris and I were going

61 (Pages 238 to 241)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 242

1  through -- you know, when I asked Chris to
2  move, I was a little bit -- a little bit
3  worried about that, you know, so I asked
4  him to prescribe me something to sleep.
5  Q.  Okay.  So he prescribed Ambien?
6  A.  Yeah.  It was Ambien and something else
7  after Ambien wouldn't work anymore.
8       MR. STEWART:  Do y'all want to
9       take a break?
10      MR. WALKER:  Okay.
11      (Brief recess.)
12 Q.  So did you start seeing Dr. Kynard Adams
13     once you moved to Montgomery?
14 A.  Yeah, later on.
15 Q.  And did you see him before or after the
16     arrest?
17 A.  I saw him before the arrest, for Zyrtec.
18 Q.  And did Chris and your divorce happen
19     before or after the arrest?
20 A.  Our divorce happened after the arrest.
21 Q.  After the arrest.  And I thought you said
22     that you were in jail and that the only
23     person that --

Page 243

1  A.  We were separated; we weren't divorced.
2  Q.  Okay.  Which would explain why you didn't
3      feel like you could call your husband you
4      were separated from to get you out of
5      jail?
6       MR. WALKER:  Object to the form.
7       THE WITNESS:  Excuse me?
8       MS. NICKSON:  He just objected.
9  Q.  You were still married at the time of your
10     arrest?
11 A.  Yes.
12 Q.  You were separated?
13 A.  Yes.  We separated in August -- actually,
14     we separated June 16th.
15 Q.  Of?
16 A.  2005.
17 Q.  Did you call Chris to get you out of jail?
18 A.  See, Chris and I was on the phone when the
19     --
20 Q.  It would make this deposition go a lot
21     faster if you just answered the question.
22     I know you've got a lot you want to say,
23     but my simple question was, did you call

Page 244

1  Chris from jail.
2  A.  Yes.
3  Q.  Did you ask him to get you out?
4  A.  Yes.  My money was at home.
5  Q.  Okay.  And why didn't he get you out?
6  A.  Well, Chris and I were on the phone when
7      they -- the night they came and arrested
8      me, so Chris was -- we had a discussion
9      about him wanting to come back home, and I
10     said no.  So when the police came to go
11     arrest me, I put down the phone and Chris
12     heard them.  So the sheriff's department,
13     one of the guys told me to tell Chris
14     where they were taking me, and I did and
15     told Chris that the money was in my purse
16     and he can come bail me out.  So Chris --
17     I thought he was coming, and they let me
18     make a phone call to him, and he said no
19     because, you know, we weren't getting back
20     together.
21 Q.  Okay.  And so how did you get out of jail?
22 A.  My family came and got me out of jail.
23 Q.  Had you seen Dr. Verna Wool before you

Page 245

1  were arrested?
2  A.  Yes, because -- yeah.  Dr. Kynard gave her
3      name to Chris and I.
4  Q.  And what kind of doctor is she?
5  A.  Clinical psychologist or marriage
6      counselor.  She has several different
7      titles.  She's worked in several different
8      divisions.  We went to see her for
9      marriage problems.
10 Q.  Is that all you saw her for?
11 A.  At that time.
12 Q.  And then you later saw her for what?
13 A.  Chris quit seeing her three
14     visits.  Because we weren't getting back
15     together, and so he went three times, but
16     I continued to see her after the arrest
17     and to talk to her about the arrest.  I
18     talked to her about, you know, moving on
19     in life, about the marriage.  We talked
20     about everything.
21 Q.  Okay.
22 A.  And let me just say this.  Because
23     Dr. Kynard and -- Dr. Kynard and I and

62  (Pages 242 to 245)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| Page 246 |
|---|

1  Chris, all of us, we bowled together. So
2  I knew Dr. Kynard before I even moved to
3  Alabama. He was at my wedding. So we all
4  bowled together. Even while I was
5  separated from my husband, we still bowled
6  together. So he was the only doctor that
7  I would have seen, because he's the one I
8  knew through my in-laws.
9  Q.  Okay. Dr. Ken Looney, what kind of doctor
10  is he?
11  A.  He's a family practitioner -- a family
12  doctor in Texas.
13  Q.  And did you start seeing him after you
14  moved to Texas?
15  A.  No, I -- not right -- well, in November I
16  started seeing him, because I thought I
17  was pretty much okay. I had moved away
18  from Montgomery, and I was okay.
19  Q.  And we're talking about November of '06;
20  is that right?
21  A.  Yes.
22  Q.  Dr. Tajani? When did you start seeing
23  him?

| Page 247 |
|---|

1  A.  Dr. Looney referred me to him in November.
2  Q.  Of '06?
3  A.  '06.
4  Q.  Okay. And Dr. Cheryl Bowie?
5  A.  She's a counselor who I've seen after I
6  got out of the partial hospital patient
7  program.
8  Q.  Before your -- see, I'm bad with dates. I
9  apologize. Before your arrest in August
10  of '05, had you ever been treated by a
11  psychiatrist or a psychologist?
12  A.  No.
13  Q.  Are there any doctors that have treated
14  you in Montgomery other than Dr. Wool or
15  Dr. Adams for any reason?
16  A.  No.
17  Q.  Any reason whatsoever?
18  A.  For -- like I said, not for any other
19  reason -- them are the only two I've seen.
20  Q.  Okay. And before you moved to Montgomery,
21  did you have a doctor that you saw on a
22  regular basis?
23  A.  No, I didn't.

| Page 248 |
|---|

1  Q.  Did you ever have annual physicals?
2  A.  I can't say I have had them every year,
3  no.
4  Q.  Okay. I'm sorry. You were arrested
5  August 5 of '06. I said '05, didn't I? I
6  meant August '06. Before August 5, '06,
7  had any doctor treated you in Montgomery
8  other than Dr. Kynard Adams?
9  A.  I was in the hospital.
10  Q.  What for?
11  A.  Well, I had a -- just whenever everything
12  went on, I think it was the -- it wasn't
13  -- I went to the hospital and told them,
14  you know, I felt like, you know, I just --
15  I couldn't sleep anymore; I couldn't eat;
16  and I just needed to go somewhere before I
17  do some harm to myself. And they sent me
18  to somewhere -- some place they keep you
19  in, in Alabama, and Dr. Kynard came to see
20  me in there.
21  Q.  And when was that?
22  A.  It was after my arrest. It was in -- it
23  could have been in September, October, one

| Page 249 |
|---|

1  of the -- I don't know. It was one of
2  those places, suicide -- when people have
3  suicide, they send you there.
4  Q.  What town was it in?
5  A.  Montgomery.
6  Q.  How long did you stay there?
7  A.  I stayed there overnight. And Dr. Kynard
8  came the next morning and, you know, and
9  -- Lexapro, I think, and we talked. And I
10  went home at that point in time when I
11  felt like it was -- when I really just sat
12  and thought about it, you know, what
13  happened, I was in a state that I wasn't
14  good at, so I went to the hospital to get
15  some help.
16  Q.  Had you ever been to a hospital before for
17  any type of suicidal thoughts?
18  A.  No.
19  Q.  Had you ever been to a hospital before for
20  any type of mental condition?
21  A.  No.
22  Q.  Had you ever been prescribed medication
23  before your arrest in August of '06 for

63  (Pages 246 to 249)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 250

1    stress-related conditions?
2  A.  No.
3  Q.  Had you ever been prescribed medication
4      before your arrest for sleep problems?
5  A.  No.
6  Q.  Had you ever been placed on medication for
7      any type of anxiety?
8  A.  No.
9  Q.  Or any type of mental problem at all?
10  A.  No.
11  Q.  Okay.  And if I'm understanding you
12      correctly, from August 5, '06 until
13      November 2006, you did not seek any
14      treatment from a doctor?
15  A.  Repeat that, please.
16  Q.  Between the date of the arrest, 8/5/06 and
17      November of '06, you did not seek
18      treatment from a doctor, correct?
19  A.  August '06, did you say?  I'm sorry.  I
20      couldn't hear you correctly.
21  Q.  Well, you were arrested on August 5, 2006?
22  A.  Yes.
23  Q.  The very first time you saw a doctor after

Page 251

1      that date was in November of 2006?
2  A.  No.  I've seen Dr. Kynard -- not for that
3      -- Dr. Kynard for Zyrtec, allergy
4      problems.  And I saw Dr. Kynard for -- I
5      realized I was anemic.  My first initial
6      contact, I was anemic; he prescribed me
7      iron pills; and then for -- realized I had
8      high blood pressure.  I realized that when
9      I did my physical for Hyundai; my blood
10      pressure was high.
11  Q.  Okay.
12  A.  So Dr. Kynard prescribed me those things.
13  Q.  Okay.  Is that in between August 5, 2006
14      and November of 2006?
15  A.  It was before -- I saw Dr. Kynard around
16      April or May '04 for Zyrtec, when I found
17      out I had sinus problems.  That's the only
18      thing I've seen him for.
19  Q.  Okay.  I'm going to ask the question
20      again, because we obviously didn't
21      understand each other.  I'm asking you
22      between two dates, and the dates I'm using
23      are August 5, 2006 and November 2006.  Did

Page 252

1      you see a doctor during those three
2      months?
3  A.  Uh-huh.
4        MR. WALLACE:  Let me say
5            interrupt and say I think we
6            have the date of the arrest
7            wrong.  It's 2005, which is
8            what you were originally
9            saying, and now you've
10            flipped over to August 2006.
11        MR. STEWART:  Because I've
12            written down in my notes
13            here August 5, '06 and
14            underlined it.
15        MR. WALLACE:  Regardless, it's
16            the wrong date.
17        MR. STEWART:  Thank you.
18        MR. WALLACE:  It's just going to
19            create more confusion in the
20            record.
21  Q.  I want you to assume the arrest was on
22      August 5, 2005 and not 2006 as we have
23      been saying.  When was the very first time

Page 253

1      you sought medical treatment after August
2      5, 2005?
3  A.  September.
4  Q.  Of?
5  A.  September '05.
6  Q.  So it would have been within a month or
7      after a month or at a month?
8  A.  Within that month.  Within that two-week
9      span after I got out of jail.  That's when
10      I got put on some Lexapro or Prozac or
11      something like that.
12  Q.  Okay.  You said within a two-week span.
13      That two-week span is still in August.
14  A.  Well, I'm assuming -- it could be longer
15      than that, because actually, I was already
16      seeing Dr. Wool, and she had to call him
17      to get me the medicine.
18  Q.  You had already been seeing Dr. Wool for
19      your marital problems?
20  A.  Yes.
21  Q.  Okay.  And when was the first time you
22      actually saw a psychiatrist after August
23      5, 2005?

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 254

1  A.  November.
2  Q.  Of 2006?
3  A.  Yes.
4  Q.  And when was it that you were sent to the
5      hospital because you felt like you
6      couldn't rest or sleep and you were
7      feeling suicidal?
8  A.  September of 2005.
9  Q.  You're sure that was the month after the
10     arrest?
11 A.  Maybe -- more or less. I know I was there
12     during that time. It was in '05.
13 Q.  And just so the record is clear, before --
14 A.  I can't say for sure.
15 Q.  Before August 5, 2005, had you ever been
16     treated by a psychiatrist?
17 A.  No.
18 Q.  And the only psychologist that you had
19     ever treated with was a marriage
20     counselor?
21 A.  Well, see, she's a clinical psychologist
22     and she deals in marriage problems also,
23     so on her door it's got clinical

Page 255

1      psychologist and psychiatrist in medical
2      problems, so she was within one. That's
3      who Dr. Kynard sent us to.
4  Q.  Right. But the --
5  A.  But she didn't treat me for psychiatry;
6      she treated me for marriage problems.
7  Q.  Solely; is that correct?
8  A.  Well, in the beginning.
9  Q.  Right.
10 A.  And then after I got arrested, so she --
11     we went through that phase.
12 Q.  That's all I'm talking about, is before
13     the arrest. She had never treated you for
14     anything other than marriage counseling?
15 A.  That's it.
16 Q.  That's it, okay.
17 A.  And that was in May of 2005, the first
18     time I ever saw her -- Chris and I
19     together.
20 Q.  Okay. You're on a number of medications.
21     Are you familiar with what each of them
22     does?
23 A.  Yes.

Page 256

1  Q.  Let's start with -- I think I've got a
2      list here somewhere. Well, Alprazolam.
3      What's that for?
4  A.  That's a form of anxiety.
5  Q.  Are you still on it?
6  A.  I'm still on it. Called Clonazepam right
7      now; that's a generic type that I
8      regularly take.
9  Q.  Okay. Avalide?
10 A.  That's blood pressure medicine.
11 Q.  You were on that before the arrest?
12 A.  Yes.
13 Q.  Were you on Alprazolam before the arrest?
14 A.  Was I on it before the arrest?
15 Q.  Uh-huh.
16 A.  Yes.
17 Q.  How long had you been on Alprazolam?
18 A.  Let me rephrase. I started at Hyundai the
19     February -- I got on it in February of
20     2004, the Avalide, and -- actually, I came
21     off of it, because he put me on it for
22     three months. I was on it February,
23     March, April, and May -- that's 2004 --

Page 257

1      because my blood pressure was fine, so he
2      -- and he put me on some potassium
3      tablets. So I came back on it right
4      before the marriage counselor.
5  Q.  Right before March of 2005?
6  A.  Yeah.
7  Q.  Okay. The Alprazolam, the anxiety
8      medicine, were you on that before the
9      arrest?
10 A.  No.
11 Q.  The Effexor, what is that?
12 A.  That's depression.
13 Q.  How long have you been on it?
14 A.  Since the arrest.
15 Q.  Never before?
16 A.  No.
17 Q.  Lexapro?
18 A.  That's depression.
19 Q.  Are you still on it?
20 A.  No. I've got another -- different type
21     I'm on.
22 Q.  Are you still on the Effexor?
23 A.  No, the medicine's been switched now.

65 (Pages 254 to 257)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| Page 258 | Page 260 |
|---|---|
| 1  Q. Had you ever been on Lexapro before the | 1    arrest? |
| 2     arrest? | 2  A. I wasn't on the Lotrel. I was on the |
| 3  A. No. | 3     blood pressure medicine, and it stopped |
| 4  Q. Azithromycin, what is that? Or | 4     working to keep my blood pressure down, so |
| 5     Azithromycin? | 5     after the arrest, Dr. Kynard had to give |
| 6  A. Can I see that, please? | 6     me Lotrel to keep it -- because I was at |
| 7  Q. A-Z-I-T-H-O-R-M-Y-C-I-N. | 7     the stroke point. |
| 8  A. That's a form of anxiety medicine. | 8  Q. Okay. And so that was all after the |
| 9  Q. Are you still on it? | 9     arrest? You never had it before the |
| 10 A. Clonazepam, yes. Same family, but not | 10    arrest? |
| 11    that brand, a different brand of anxiety | 11 A. I was on Avalide before the arrest. |
| 12    medicine. And I'm not on that. | 12 Q. But the Lotrel was after the arrest only; |
| 13 Q. Had you been on that before the arrest? | 13    is that right? |
| 14 A. No. | 14 A. That's correct. |
| 15 Q. Vigamox eye drops? | 15 Q. Biaxin? |
| 16 A. Yes. When I was working for National | 16 A. Biaxin? |
| 17    Seating, I got an eye infection, so -- | 17 Q. B-I-A-X-I-N? |
| 18    from my contact lens, so I've been on some | 18 A. That's a depression thing. |
| 19    eye drops for that. | 19 Q. Still on it? |
| 20 Q. Do you still take that? | 20 A. No, another kind. |
| 21 A. No. | 21 Q. Ever on it before the arrest? |
| 22 Q. Glutofac MX? | 22 A. No. |
| 23 A. That is for -- it's a form of mineral with | 23 Q. Pseudo chlorpheniramine? |

| Page 259 | Page 261 |
|---|---|
| 1     iron and potassium, all that together. | 1  A. That is an iron tablet. |
| 2  Q. Are you still on that? | 2  Q. Still on it? |
| 3  A. No. | 3  A. I take them every day. |
| 4  Q. That's when you were anemic? | 4  Q. To prevent anemia? |
| 5  A. Yes. | 5  A. Yes. |
| 6  Q. Trazodone? | 6  Q. Metronidazole? |
| 7  A. Trazodone, that is a depression medicine. | 7  A. I don't know -- I think that was for -- I |
| 8  Q. Are you still on that? | 8     was experiencing some dizzy spells, so it |
| 9  A. No. | 9     was -- I know that's for dizziness, and I |
| 10 Q. Were you ever on it before the arrest? | 10    had experienced some dizzy spells |
| 11 A. No. | 11    afterwards. |
| 12 Q. Ciproheptadine? | 12 Q. Was that after the arrest only? |
| 13 A. That is a form of depression. | 13 A. It was -- when he put me on the -- well, |
| 14 Q. Still on it? | 14    when I get a little excited and upset, |
| 15 A. No, different kind. | 15    then I get dizzy, so it was after the |
| 16 Q. Never before the arrest? | 16    arrest when I got on that. |
| 17 A. No. | 17 Q. You never took it before the arrest? |
| 18 Q. Lotrel? | 18 A. No. |
| 19 A. That is a -- a pill that you take with | 19 Q. Terconazole cream? |
| 20    your blood pressure medicine to keep your | 20 A. That is -- I broke out from being allergic |
| 21    blood pressure from escalating -- well, | 21    to some medicine, and that was a cream to |
| 22    elevating. It helps keep it down faster. | 22    prevent me from hives. |
| 23 Q. Okay. And you were on that before the | 23 Q. Was that after the arrest? |

66 (Pages 258 to 261)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 262

1  A.  Yeah.
2  Q.  Ever before?
3  A.  Never.
4  Q.  Propoxy-N/APAP?
5  A.  That is some medicine for -- depression
6      medicine.
7  Q.  Are you still on it?
8  A.  It depends on if, you know, my other
9      dosage, because -- I still have some, and
10     they tell me, you know, to kind of monitor
11     it, so I haven't taken it in about a month
12     and a half.
13 Q.  Okay.  When are you supposed to take it?
14 A.  You know, when I get to the point where I
15     can't, you know, concentrate or sit still.
16     I'm just feeling like I'm just totally out
17     of whack, you know, feeling angry and
18     everything.  It helps me to stop
19     stuttering, helps me to calm down along
20     with the other depression medicine.
21 Q.  Okay.  So you take it as needed?
22 A.  Yes.
23 Q.  And about how often does that mean?

Page 263

1  A.  Well, in the beginning, it was like every
2      day.  As I got better, controlling my
3      hands shaking and my stuttering, and then
4      she lowered the dosage.  And right now I
5      take it as needed because I'm more stable.
6      I wasn't stable in the beginning.
7  Q.  Okay.  And so how often do you take it
8      now?
9  A.  I haven't taken it in a month and a half,
10     almost six weeks.
11 Q.  Symbyax, S-Y-M-B-Y-A-X?
12 A.  Yes.
13 Q.  What's that?
14 A.  Depression.  A form of depression -- manic
15     depression.
16 Q.  Are you still taking that?
17 A.  No.  I still have it.  Depends.  I have to
18     monitor that.
19 Q.  When was the last time you took that?
20 A.  About two months ago.
21 Q.  Ambien I know is a sleeping pill.  Are you
22     still taking that?
23 A.  No, I take Lunesta now.

Page 264

1  Q.  And how often are you taking that?
2  A.  Every night.
3  Q.  Propranolol?  Am I pronouncing that right?
4  A.  For hands shaking.
5  Q.  Do you still take that?
6  A.  As needed.
7  Q.  Last time you took it?  About two months
8      ago?
9  A.  Over three months ago.
10 Q.  Okay.  Are these the only doctors that
11     you've seen in the last, say, ten years,
12     that we've identified?
13 A.  Last ten years?
14 Q.  Uh-huh.
15 A.  Back home, Dr. -- in Marianna Arkansas,
16     Dr. Leon Walden.  He's a family doctor.
17 Q.  So if we take Wool, Adams, Looney, Tajani,
18     Bowie, and Walden, are there any other
19     doctors that you've treated with in the
20     last ten years?
21 A.  Yeah, but -- no, no.  I'm thinking about
22     -- I moved to Iowa in 2001, and up until
23     this point -- so Dr. Walden was way before

Page 265

1      -- he was older than ten years.
2  Q.  Okay.  In Iowa did you treat with any
3      physicians?
4  A.  No.
5  Q.  Did you ever go see a doctor at all in
6      Iowa?
7  A.  I only got a physical for my job.
8  Q.  And who was that, that gave that to you?
9  A.  Signa.  Like a drug test.
10 Q.  Did you actually go see a doctor?
11 A.  No.
12 Q.  Did you go to the hospital?
13 A.  No.
14 Q.  Just a laboratory or something, is that
15     it, that you got your drug test at?
16 A.  Yes, at LabCorp.
17 Q.  Okay.  Where is LabCorp?
18 A.  In Iowa, Dubuque Iowa, for that job.  It
19     was Signa.
20 Q.  Okay.  And any other doctors in Iowa?
21 A.  No.
22 Q.  Before your arrest, had you ever been
23     hospitalized other than to give birth to

67  (Pages 262 to 265)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| Page 266 |
|---|
| 1    children? |
| 2  A.  Yeah, for my knee.  I had an operation on |
| 3    my knee. |
| 4  Q.  When was that? |
| 5  A.  Back when I had the accident in '95 -- '4, |
| 6    whatever. |
| 7  Q.  The car accident? |
| 8  A.  Uh-huh. |
| 9  Q.  Any other hospitalizations? |
| 10  A.  No. |
| 11  Q.  Is it Harris Methodist Springwood?  Is |
| 12    that the Texas hospital? |
| 13  A.  Yes, it is. |
| 14  Q.  Is that the only hospital you've been to |
| 15    in Texas? |
| 16  A.  Yes. |
| 17  Q.  And then you were hospitalized here at |
| 18    Jackson Hospital? |
| 19  A.  Jackson?  I've never been hospitalized |
| 20    there. |
| 21  Q.  Or Baptist South? |
| 22  A.  Oh, I went there -- they sent me over to |
| 23    the place. |

| Page 267 |
|---|
| 1  Q.  The Justin Medical Center? |
| 2  A.  Baptist on Eastern Boulevard sent me to |
| 3    the place where I felt suicidal. |
| 4  Q.  And is that place Justin Medical Center? |
| 5  A.  It wasn't -- it was a behavior place for |
| 6    suicidal people. |
| 7  Q.  Okay.  Have you ever been to Justin |
| 8    Medical Center? |
| 9  A.  No. |
| 10  Q.  Have you ever been to a place called the |
| 11    Griel, G-R-I -- |
| 12  A.  That's where I was at. |
| 13  Q.  What's that? |
| 14  A.  Griel. |
| 15  Q.  Where? |
| 16  A.  In Montgomery. |
| 17  Q.  Okay.  Is that the behavioral -- |
| 18  A.  Yes. |
| 19  Q.  Okay.  You're currently insured with Blue |
| 20    Cross Blue Shield? |
| 21  A.  No, not anymore. |
| 22  Q.  Who are you insured with now? |
| 23  A.  I'm insured with Etna. |

| Page 268 |
|---|
| 1  Q.  They provide your health coverage? |
| 2  A.  Let me pull my card.  Let me make sure. |
| 3  Q.  While you're doing that, you have been |
| 4    insured with Blue Cross Blue Shield? |
| 5  A.  At Hyundai. |
| 6  Q.  Okay.  And other than Etna and Blue Cross |
| 7    Blue Shield, have you had health insurance |
| 8    with any other insurance carrier? |
| 9  A.  No.  This is with Etna and my Sprint card |
| 10    is with Walgreens.  It's through Sprint. |
| 11  Q.  What's the Etna contract number? |
| 12  A.  9786063380. |
| 13  Q.  And is there a policy number? |
| 14  A.  603286. |
| 15  Q.  Okay.  And the Walgreens is also -- you |
| 16    have like a Walgreens Sprint card or |
| 17    something?  Is that right? |
| 18  A.  Uh-huh.  That's where you can choose the |
| 19    drugstore you would like to get your |
| 20    medicine from, and so I chose Walgreens. |
| 21  Q.  What number is that? |
| 22  A.  It's -- all of them have the same number. |
| 23  Q.  Okay.  And before you left for Texas, what |

| Page 269 |
|---|
| 1    drugstores did you use in Alabama? |
| 2  A.  I used one off Eastern Boulevard, which |
| 3    was over in Winn Dixie.  I forgot their |
| 4    name, but they're in Winn Dixie over there |
| 5    on Eastern Boulevard. |
| 6  Q.  Okay.  Any other place? |
| 7  A.  I've used Walgreens here. |
| 8  Q.  Located where? |
| 9  A.  Here in Montgomery. |
| 10  Q.  Where in Montgomery? |
| 11  A.  Eastern Boulevard -- I mean Atlanta |
| 12    Highway. |
| 13  Q.  Okay.  Any others? |
| 14  A.  No. |
| 15  Q.  Are there any other mental injuries that |
| 16    we haven't discussed that you're claiming |
| 17    in this lawsuit?  I don't want you to |
| 18    rehash ones we've already gone over, but |
| 19    any that we have left off? |
| 20  A.  Mental injuries? |
| 21  Q.  Uh-huh, other than what we've already |
| 22    discussed? |
| 23  A.  No. |

68  (Pages 266 to 269)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 270

1  Q.  Ma'am?
2  A.  No.
3  Q.  Okay.  Have we talked about all the areas
4      of damages you're seeking in this case?
5      Again, I'm not asking you to repeat them,
6      but are there any others we haven't
7      discussed?
8  A.  No.
9  Q.  Are there any other complaints that you
10     have against National Seating, other than
11     what we've already discussed?
12 A.  That's correct.
13 Q.  Are you a member of a church?
14 A.  Oh, yes, definitely.
15 Q.  What church were you a member of when you
16     were here?
17 A.  I went to Antioch Baptist Church.
18 Q.  And were you a member of that church?
19 A.  No.  I didn't join that church, but I went
20     there.
21 Q.  Any other churches that you attended while
22     you were here?
23 A.  Yes, I have.  I attended another church

Page 271

1      right off the Eastern Boulevard with a
2      friend, Church of Christ -- Church of Life
3      in Montgomery off the Eastern Boulevard.
4  Q.  Any others?
5  A.  No.
6  Q.  Were you a member of any clubs or
7      organizations when you lived here?
8  A.  Clubs?  No.  Organizations?  No.
9  Q.  Do you understand what malicious means?
10 A.  To me, that means something intentionally
11     to harm somebody.
12 Q.  Do you have any facts that National
13     Seating set out to harm you maliciously?
14 A.  Well, yes.  When you said -- I mean, the
15     state that they ever talked to me about
16     the way I dressed and then the way I
17     talked with -- National Seating is no
18     bigger than here to there, and no people
19     ever came in there.  Everything was done
20     by the phone almost.  If they did, it was
21     me and Don and Emily in there, so -- and
22     people delivering stuff, so who -- that's
23     malicious.  That's a lie, saying you

Page 272

1      talked to me about the way I dressed.  I
2      mean...
3  Q.  Any other acts of maliciousness that you
4      claim?
5  A.  Telling a lie, saying I filed a report and
6      I did not.  That's it.
7  Q.  Well, now, you already testified that NSM
8      --
9  A.  That still bothers me.
10 Q.  But you testified you don't have any facts
11     that NSM said you filed a report.
12 A.  Well, I only read what was Gerry -- what I
13     was given to by my attorney.  But I never
14     took possession of it.  I only saw it the
15     day of that court date when we were there.
16     And I read Don's statement.  Gerry
17     Shockley wrote what Don said to him, all
18     that stuff, so I -- I didn't take
19     possession of it.
20 Q.  Have you received any payments for
21     disability?
22 A.  Oh, no.  You mean from the State?
23 Q.  Any kind of disability insurance or

Page 273

1      payments.
2  A.  Yes.
3  Q.  What from?
4  A.  Family medical leave, when I left Sprint
5      -- not Sprint, Fidelity, when the doctor
6      took me off work and put me in the
7      hospital.
8  Q.  What type of disability payment did you
9      receive then?
10 A.  FMLA for my job.  Short-term -- it's not
11     short-term disability, one and the same,
12     so -- that's what it was.
13 Q.  You're not claiming in this case that all
14     of the mental problems that you've had are
15     solely because of this arrest, are you?
16 A.  What I'm claiming is -- you know, I had my
17     problems with my marriage before this
18     arrest; I was okay with that.  I was
19     accepting the fact that I wanted that to
20     end; I was okay with that.  When I got
21     arrested and things started going as --
22     you know, I lost my job, and I had to
23     move, and getting behind on my bills, and

69  (Pages 270 to 273)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

---

Page 274

1    couldn't help pay tuition -- then it kind
2    of made me more angrier and angrier.  And
3    when I went to court and found out all
4    this stuff that I didn't know about and
5    Ms. Barrow had to clear it up, of course,
6    it made me more angrier and more angrier,
7    especially at Gerry Shockley, because he
8    could have asked me.  Because he called me
9    at work, left me a message at work on my
10   desk phone at Hyundai.  I called him back,
11   and I said, well, we're getting ready to
12   launch these new Santa Fes, and I'm on the
13   team that actually inspects those cars and
14   actually troubleshoots any problems with
15   the electrical portion of it, but I get
16   off at 5:30.  And I said, if you can meet
17   me at my home at 5:30 or after 5:30, or if
18   you'll let me come to your office, I can
19   do it when I get off from work, but I
20   can't get off from work -- I already met
21   with one of your guys.  I'd be more than
22   happy to meet with you.  Gerry Shockley
23   never called me back, so I never saw him

---

Page 275

1    until court.
2    Q.   I think my question was, you're not
3         claiming that all the mental problems that
4         you have experienced over these couple of
5         years are solely because of this arrest?
6    A.   Couple of years?  The last year and a half
7         is because of this arrest.
8    Q.   But there are other things that have
9         caused you to have mental problems as
10        well; do you agree with that?
11   A.   Like what?
12   Q.   Like your marital situation?
13   A.   I'm afraid not.
14   Q.   Breast cancer?
15   A.   I've been through breast cancer.  I've
16        been through cancer through my whole
17        family, and it hasn't phased me.
18   Q.   So that's not causing you any kind of
19        mental --
20   A.   That was when I was a young child.
21   Q.   That's not causing you any kind of stress?
22   A.   Not at all.
23   Q.   Being a single parent isn't causing you

---

Page 276

1    any stress?
2    A.   No, not being a single parent.  Actually,
3         I enjoy it.  I enjoy being a single
4         parent.  I am very close to my kids, and
5         I'd rather be close to my kids than have
6         someone else to not.
7    Q.   Okay.  Your medical problems like high
8         blood pressure and anemia, are they
9         causing you any stress?
10   A.   No.  High blood pressure, I'm not even
11        taking -- I take that every now and then,
12        so -- my mother has that.  That didn't
13        cause me -- I never had any -- never knew
14        about it until I did a physical for
15        Hyundai.  So I'm not saying that's the
16        cause of this.  But anemia, I don't know
17        how long I've been anemic at all.  Until
18        Dr. Adams did a test on me...
19   Q.   Your financial problems caused you stress,
20        didn't they?
21   A.   When I wasn't able to pay my bills, yes,
22        of course.
23   Q.   And you're not blaming all your financial

---

Page 277

1    problems on the arrest, are you?
2    A.   You know, before I got arrested, I was
3         working every day and had about $7,000 in
4         my account, you know.  Then I had to pay
5         out legal fees and everything, and having
6         no job and paying out tuition, yeah, that
7         caused me -- that arrest caused me not to
8         have a job and to have to deplete my
9         account.
10   Q.   While working at Fidelity, didn't you have
11        some stress caused by a supervisor who you
12        were afraid wanted to terminate you?
13   A.   She didn't want to terminate me.
14   Q.   Did you tell anybody that you had that
15        stress?
16   A.   She -- Susan Hunter actually was her name.
17        She actually sent me home for one thing
18        that the next representative did because I
19        wouldn't say that she did it -- well, she
20        didn't know -- what happened was, young
21        lady who sits right next to me like this
22        here hung up on a customer, and the
23        customer rolled back to me.  And I got the

---

70  (Pages 274 to 277)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| | Page 278 |
|---|---|
| 1 | phone call, and he was still angry about |
| 2 | it. Well, she thought it was me who hung |
| 3 | up on the customer, so I never told her it |
| 4 | was the girl beside me. But when she |
| 5 | found out later through HR solution, they |
| 6 | reprimanded her, and I returned back to |
| 7 | work. |
| 8 | Q. My question was -- |
| 9 | A. So that didn't cause me no stress. It |
| 10 | just... |
| 11 | Q. Was there ever any stress that you had |
| 12 | while working at Fidelity about a |
| 13 | supervisor that wanted to fire you? That |
| 14 | was my question. |
| 15 | A. No. That was no stress for me. |
| 16 | Q. Okay. And have you ever told anybody that |
| 17 | you had a fear of breast cancer relapse? |
| 18 | A. That was one of my fears when I was 18, as |
| 19 | I said. |
| 20 | Q. But you haven't had that fear within the |
| 21 | last couple of years? |
| 22 | A. No. |
| 23 | Q. Was one of the things that caused you |

| | Page 279 |
|---|---|
| 1 | stress the fact that your husband didn't |
| 2 | support you when you had cancer? |
| 3 | A. Chris didn't support me when I had cancer? |
| 4 | Q. Uh-huh. |
| 5 | A. Well, I wasn't with Chris when I had |
| 6 | cancer. |
| 7 | Q. Didn't you have cancer in June of 2006? |
| 8 | A. That was a lump they thought was cancer; |
| 9 | turned out that it was not. |
| 10 | Q. Didn't you think that you had cancer at |
| 11 | the time? |
| 12 | A. Yes. |
| 13 | Q. Didn't you have fear and stress because of |
| 14 | the fear that you had cancer? |
| 15 | A. No, I didn't. |
| 16 | Q. And did you ever tell anybody that your |
| 17 | husband was not supportive of you while |
| 18 | you had cancer in 2006? |
| 19 | A. He was not supportive of me when I was |
| 20 | going through the process of finding out |
| 21 | what that lump was. We thought it was |
| 22 | cancer. No, we weren't even -- Chris and |
| 23 | I weren't even together. We separated in |

| | Page 280 |
|---|---|
| 1 | June. |
| 2 | Q. So that didn't cause you any stress? |
| 3 | A. If it's going to happen -- right now I |
| 4 | have breast implants, so it didn't cause |
| 5 | me no stress. |
| 6 | Q. Your divorce in June of 2006, did that |
| 7 | cause you any stress? |
| 8 | A. No. |
| 9 | Q. Did loneliness cause you any stress after |
| 10 | your divorce? |
| 11 | A. No. |
| 12 | Q. Was your marriage abusive? |
| 13 | A. Chris was not abusive. |
| 14 | Q. Did you ever tell anybody that he was |
| 15 | abusive? |
| 16 | A. Abusive? No, I never told anybody Chris |
| 17 | was abusive. Chris was pretty much |
| 18 | introverted, so -- and I, extroverted -- |
| 19 | we were totally the opposite, so we were |
| 20 | pretty much comfortable with that. |
| 21 | Q. Did you ever tell anyone that you suffered |
| 22 | stress from your divorce in September of |
| 23 | '94 from Mr. Butler? |

| | Page 281 |
|---|---|
| 1 | A. Mr. Butler? |
| 2 | Q. Yeah. |
| 3 | A. My kids' father and I separated when my |
| 4 | daughter was actually nine months old, so |
| 5 | -- we remained friends for years and years |
| 6 | after that. |
| 7 | Q. Who is we, you and Mr. Butler? |
| 8 | A. Yes. |
| 9 | Q. I thought he was physically and |
| 10 | emotionally abusive to you. |
| 11 | A. My reason for -- when we were married, he |
| 12 | used to -- he was on drugs. He used to |
| 13 | come home and try to fight and stuff like |
| 14 | that. Well, you know, I divorced him -- |
| 15 | well, I left him after two years -- two |
| 16 | years of marriage, but we weren't |
| 17 | divorced. I left him and we weren't |
| 18 | divorced. |
| 19 | Q. So you've not told anyone, medical |
| 20 | provider or otherwise, that you suffered |
| 21 | stress because of an abusive marriage? |
| 22 | A. They ask me about things that goes on in |
| 23 | your life, ask you about, have you been |

71 (Pages 278 to 281)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 282

1     married before -- go through a sequence of
2     questions. Levester was very abusive. I
3     was 22 years old. Yeah, he was very
4     abusive. That bothered me. That really
5     did bother me and my family, my kids. I
6     had to protect my kids at that point in
7     time. But when it came boiling down to
8     me, you know, wondering when he was coming
9     to the door being on drugs again, yeah,
10    that was stressful at 22 and 24 and 25,
11    yes.
12  Q.  Did you ever seek treatment for that?
13  A.  No.
14  Q.  And did you ever claim that Chris Horton
15    was abusive to you?
16  A.  Chris was emotionally abusive. As far as
17    physically, no.
18  Q.  Did that cause you stress?
19  A.  No, because I learned to deal with that.
20    In the beginning, when I found out there
21    was someone else, that was shocking.
22  Q.  When did you first find out there was
23    someone else?

Page 283

1   A.  Well, let's see. Well, it had to have
2     been March, March of 2005.
3   Q.  And that caused you stress, didn't it?
4   A.  Well, she happened to be a friend of mine,
5     so yeah.
6   Q.  Did you also tell someone that you had
7     stress from the recent death of relatives?
8   A.  You mean my sister? No. I haven't seen
9     her in almost 20 years. But when they
10    called me and told me that she had passed
11    from an aneurysm and didn't have
12    insurance, Ross and I paid for her
13    funeral. But that didn't cause me stress,
14    just made me wonder why nobody helped pay
15    for it besides me.
16  Q.  Did you ever tell anybody that stress was
17    brought on by the recent death of an
18    uncle?
19  A.  My uncle?
20  Q.  Did you ever tell anybody that?
21  A.  All my uncles are gone except for one, so
22    -- and they've been dead ever since I was
23    about 20 years old.

Page 284

1   Q.  Did you ever tell anybody you were
2     suffering stress because of a recent death
3     of a cousin?
4   A.  My cousin just got buried last Sunday.
5   Q.  Did you ever tell anybody that --
6   A.  So I never -- I haven't seen a
7     psychiatrist in about a month now, so I
8     couldn't have.
9   Q.  Couldn't have said that; is that right?
10  A.  No, he just died last Sunday, the one I
11    know. If there's any other cousins...
12  Q.  Did you ever tell anybody that you
13    suffered stress because of the recent
14    death of a grandfather?
15  A.  My grandfather died in 2004, the only
16    grandfather that I knew. No. Actually,
17    I'm wrong. I was working at Yale and
18    Chris and I moved to Iowa. My grandfather
19    died in the later part of 1999 or 2000 --
20    he was my mother's father -- while I was
21    working at Yale.
22  Q.  So you never told anybody that?
23  A.  No. That's the only grandfather I knew.

Page 285

1     But I did say my mother.
2   Q.  When did your mother pass away?
3   A.  My mother passed away right before I moved
4     to Iowa. She passed away in 2000, June of
5     2000.
6   Q.  On Father's Day?
7   A.  Yes, she did. No, the day after Father's
8     Day. My birthday fell on Father's Day,
9     the 18th, and she died on the 19th, that
10    Monday.
11  Q.  Did you ever tell someone that you were
12    trying to forgive yourself for being
13    married to a hurtful and abusive spouse?
14  A.  Yeah.
15  Q.  And were you referring to Chris at the
16    time?
17  A.  No -- because I married Chris right after
18    my mother died. I left and went away.
19    But he's -- as far as hurtful, like I
20    said, he's introverted, so that's -- we
21    were pretty comfortable with that. But
22    when I consider cheating -- to forgive
23    myself for allowing -- I felt like I was

72  (Pages 282 to 285)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 286

1    -- she was my best friend; he was my
2    husband. So I felt like it was --
3    somewhere in the middle I missed
4    something, so I was trying to forgive
5    Chris for that, and I did, and forgive her
6    too.
7  Q.  And did you feel any stress for being
8    fired at Hyundai for creating a hostile
9    environment of a sexual nature?
10 A.  I thought that was a joke. That didn't --
11   that was funny. When I actually went to
12   the lawyer's office, I was laughing about
13   that, because that was mediocre stuff.
14   That's crazy.
15 Q.  Did you ever tell anybody that you had
16   been scratching yourself with a steak
17   knife?
18 A.  Yes.
19 Q.  When was that?
20 A.  I can't remember, but I told them that in
21   the PHP, the partial hospital patient --
22   Dr. Wool, I told her that.
23 Q.  You were taking sleeping pills before you

Page 287

1    were arrested, weren't you?
2  A.  For marriage our problem, Ambien.
3        MR. STEWART: Let me pass the
4          witness for now. I'll try
5          to organize my notes a
6          little.
7        EXAMINATION
8  BY MR. WALKER:
9  Q.  Ms. Horton, I'm Dorman Walker, and I
10   represent Don Williams, who also is a
11   defendant in the lawsuit. And I'll just
12   ask you some questions too, and I'll try
13   not to go back over what we've already
14   covered today. I know it's been a long
15   day. Same rules as those that Mr. Stewart
16   stated. If you answer a question, I will
17   assume that you understood the question.
18   If you have any questions about what I'm
19   asking you -- if it's unclear in some way;
20   if I've misstated a question or perhaps
21   misstated what you've said earlier, please
22   stop me and let me know, okay?
23 A.  Yes, sir.

Page 288

1  Q.  Okay. And please, don't answer a question
2    unless you understand what I'm asking you,
3    okay?
4  A.  Yes, sir.
5  Q.  My goal, at the end of asking you
6    questions, is to make sure that I know
7    everything that you have to say about your
8    claims against my client, Mr. Williams, so
9    that's what I'm looking for in your
10   answers, okay?
11 A.  Yes, sir.
12 Q.  Okay. One question about your marriage.
13   You said you got married out of high
14   school, or did I write that down wrong?
15 A.  No, not right after high school. I
16   graduated in '81; I didn't get married
17   until '82.
18 Q.  Okay. And how old were you when you got
19   married?
20 A.  22.
21 Q.  Okay. And how old were you when you
22   graduated from high school?
23 A.  I was 16.

Page 289

1  Q.  16. So what happens between -- that's
2    more than one year. What happened between
3    your 16th year and your 22nd year?
4  A.  Well -- what happened between? Well, I
5    was -- we were living together -- well, I
6    wasn't living with him; I was with my
7    parents. I graduated when I was 16; I
8    turned 17 that June of that same year,
9    June of '81. I had been dating him since
10   high school. So I was working two jobs,
11   like I said, all the time, living in
12   Marianna.
13 Q.  Which jobs were you working after you
14   graduated from high school and before you
15   married him in your 22nd year?
16 A.  Well, I was working a job while I went to
17   high school. I was working in a
18   restaurant cooking, and I was working at
19   -- this is in Marianna -- and I worked at
20   Number 1 food store.
21 Q.  What were you doing between the time you
22   graduated from high school at 16 and the
23   time of your first marriage at 22? Were

73  (Pages 286 to 289)

7c1fb636-d67b-46ee-8c04-6b9830e35e5d