MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 290

```
 1      you working there in Marianna and living
 2      with your parents?
 3   A. Yes.
 4   Q. Did you have any children during that
 5      time?
 6   A. I had my son. He was 5.
 7   Q. For the record, Defendant's Exhibit 3 is
 8      Bates marked HMMA 0027. And let me ask
 9      you, Ms. Horton, if you can identify
10      Defendant's Exhibit 3, please.
11              (The referred-to document was
12               marked for identification as
13               Defendant's Exhibit No. 3.)
14   A. This is giving -- oh, no, no, no. This is
15      not -- this is -- this is not what the
16      copy that I have -- it wasn't even -- the
17      copy I have was signed by a team member,
18      one of our team leaders, what you call
19      almost like a --
20   Q. All right. Well, first of all --
21   A. It's not even there.
22   Q. -- what I've given you is a document --
23   A. I've never seen that one. That's not the
```

Page 291

```
 1      one I have.
 2   Q. Okay -- dated March 22, 2006. And did you
 3      receive a letter similar to this on March
 4      22, 2006?
 5   A. Yes.
 6   Q. And you received it at the gate that
 7      morning at the Hyundai plant?
 8   A. No.
 9   Q. No?
10   A. We went into the office. We went off the
11      premises.
12   Q. And somebody gave it to you?
13   A. Yes. And he wasn't even my manager.
14   Q. He, you mean Harry Chase, the name that's
15      at the bottom of this letter? Okay. If
16      you would look at the letter, please.
17      Tell me every way in which this letter
18      differs from the letter you said you
19      received.
20   A. Well, first of all, the letter I received
21      didn't even have my address on it. It
22      just was dated March the 22nd. And it
23      says that, of this day, you know, that
```

Page 292

```
 1      I've been fired for, you know, this
 2      serious misconduct.
 3   Q. All right. That first paragraph there,
 4      the one that says, it has been brought to
 5      my attention -- do you see that paragraph?
 6   A. Uh-huh.
 7   Q. Was that paragraph the same as the
 8      paragraph that you have before you now?
 9              MS. NICKSON: Answer if you know,
10              Elizabeth. Don't guess at
11              it.
12   Q. So far as you know, are those paragraphs
13      the same, one way or the other?
14   A. Well, I don't really -- like I said, I
15      don't really know but I remember this was
16      stated in there, behaved in such a manner,
17      but --
18   Q. That created a hostile work environment of
19      a sexual manner?
20   A. Yeah.
21   Q. The letter that you received said that?
22   A. That was in the letter that I received.
23   Q. Okay. And if you'll look at the second
```

Page 293

```
 1      paragraph. Did the letter that you
 2      received say the information that's in
 3      that second paragraph, the one that
 4      begins, HMMA considers your action to be a
 5      serious misconduct violation?
 6   A. No, it wasn't -- no.
 7   Q. It didn't say that?
 8   A. Well, it could have -- I don't remember.
 9   Q. It could have? You're not certain one way
10      or the other?
11   A. I have the copy at home.
12   Q. Oh, you do have that letter?
13   A. Somewhere. I mean, I moved. It's
14      somewhere -- in boxes somewhere. Well,
15      not like that -- it was not that letter.
16   Q. Okay. That's a very important letter.
17      Will you find that letter and provide it
18      to your attorney?
19   A. It wasn't that. It was written on --
20   Q. Yes, ma'am. But what I'm asking now is
21      will you find that letter and provide it
22      to your attorney so that she can provide
23      it to us?
```

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

Page 294

1  A.  Yeah.
2  Q.  Okay. Let me ask you this: Did the
3      letter that you received have the
4      information that's in the third paragraph
5      there, the one that says, based on the
6      aforementioned, I regret that I have no
7      alternative but to terminate your
8      employment effective immediately?
9  A.  I don't remember that.
10 Q.  Were you told on that morning, March 22,
11     that you were being terminated?
12 A.  I was -- no. I worked the evening shift.
13 Q.  Okay. That evening, then. Were you told
14     on that day?
15 A.  No.
16 Q.  What happened, then, when you got to the
17     gate?
18 A.  Kelly -- actually, it was Kelly -- I can't
19     think of her last name -- met me at the
20     gate.
21 Q.  And it's Kelly somebody in the HR
22     department at Hyundai?
23 A.  I never talked to anybody in the HR

Page 295

1      department.
2  Q.  Okay. Where does Kelly work?
3  A.  She works as a team group leader on my
4      floor, in a different division.
5  Q.  And you were coming in for the start of
6      your shift?
7  A.  Yeah.
8  Q.  And you were met by this Kelly person?
9  A.  Uh-huh.
10 Q.  What's her last name or his last name?
11 A.  Her. I don't remember Kelly's last name.
12 Q.  Okay. And what happened then?
13 A.  Kelly said they wanted to talk to me over
14     in the building where all of the --
15 Q.  Administrative?
16 A.  No, no, it wasn't that. It was like --
17 Q.  Training?
18 A.  No, it wasn't. It was like a guard shack.
19     We met over at the guard shack. They had
20     a little room in the guard shack over
21     there, security shack.
22 Q.  Okay. There was a little room, a
23     conference room or something like that, a

Page 296

1      little meeting room?
2  A.  Yes, sir.
3  Q.  Okay. And who wanted to meet with you
4      there? Who did you meet with?
5  A.  Kelly was there. Kelly and I walked over
6      there. Harry Chase showed up. And it was
7      --
8  Q.  Harry Chase, the same person whose name is
9      on that letter?
10 A.  Yeah. But -- Harry Chase showed up and
11     Rob from -- Rob worked -- I'm trying to
12     think how they call these. It's sort of
13     like -- they represent the employees on
14     something -- like a union person.
15 Q.  Like an ombudsman or something; is that
16     what they call them?
17 A.  They work in -- I don't know. Rob was
18     like group leader.
19 Q.  Is it Rob or Rod?
20 A.  Rod.
21 Q.  Spell it, please?
22 A.  Well, it was Rob, R-O-B.
23 Q.  R-O-B? And what's his last name?

Page 297

1  A.  I don't know.
2  Q.  Okay. So there were the four of y'all in
3      that meeting room? There was anyone else?
4  A.  It was just the four of us.
5  Q.  Okay. And did they tell you at that time
6      that you were being terminated?
7  A.  Yes.
8  Q.  And what did they tell you you were being
9      terminated for?
10 A.  For causing a hostile environment in --
11 Q.  Of a sexual nature?
12 A.  Yeah.
13 Q.  Okay. And did they tell you that you were
14     being terminated because you had been
15     arrested for filing a false report?
16 A.  Uh-huh. I asked --
17 Q.  Did they mention the false report?
18 A.  Huh-uh.
19         MR. STEWART: She needs to speak
20             her answers out.
21 A.  No.
22 Q.  Did they mention the arrest?
23 A.  No.

Page 298

1  Q. Did anyone at Hyundai ever tell you that
2     you were being terminated because of the
3     arrest?
4  A. No.
5  Q. Okay. Either in writing or orally?
6  A. No.
7  Q. Okay. And you're going to get that letter
8     and share it with us, please?
9  A. Yes.
10 Q. Okay. Now, after you were terminated, you
11    filed a charge of discrimination with the
12    EEOC; is that correct?
13 A. Yes.
14 Q. And what did you say in your charge of
15    discrimination?
16 A. I gave them the information. As soon as I
17    started asking Tommy for my -- I was fired
18    because of this right there. And I said
19    that had the union -- had I booked with a
20    team relation -- Rob is a team relation
21    representative. I had the team relation
22    book there, and it states in the book that
23    if someone is causing someone a hostile

Page 299

1     environment and if they report that, then
2     you need to -- you have to have a
3     conversation between the two people and a
4     manager. Well, we didn't have a manager
5     on night anyway, so Harry Chase was from
6     -- our manager had quit, and Harry is from
7     another department. But if somebody
8     brings it to any other manager, then you
9     have to bring us both in there together
10    and talk about it, because -- and that
11    didn't ever happen.
12 Q. Well, I'm trying to move you on a little
13    bit, because we're running out of time. I
14    want you to tell me everything you said,
15    but let me refocus my question, make it a
16    little bit sharper. Did you allege race
17    discrimination?
18 A. Yes.
19 Q. Okay. Did you allege gender
20    discrimination?
21 A. Yes.
22 Q. Did you allege age discrimination?
23 A. I don't think so.

Page 300

1  Q. Did you allege any discrimination other
2     than race and gender discrimination?
3  A. I don't think so.
4  Q. Okay. Just those two you think?
5  A. And retaliation.
6  Q. And retaliation, okay. Retaliation for
7     what?
8  A. I wanted my money from him. He filed that
9     complaint because I wanted my money.
10 Q. Oh, okay. And did you file a statement
11    explaining the basis for your charge of
12    discrimination with the EEOC, an affidavit
13    of some sort?
14 A. Yes.
15 Q. Okay. And you set forth your statement in
16    there of all the reasons you thought you
17    had been discriminated against?
18 A. Uh-huh. Yes, I did.
19 Q. Thank you. And do you have a copy of your
20    EEOC charge and your statement and any
21    correspondence between you and the EEOC?
22 A. I do not. I knew that they called me and
23    told me that they're moving forward with

Page 301

1     the investigation.
2  Q. You didn't keep a copy of your charge
3     statement or your affidavit?
4  A. No.
5  Q. Will you look and see if you have that at
6     home and if you do, please provide it to
7     your attorney?
8  A. I can get that from them.
9  Q. Did you tell the EEOC that you thought you
10    had been fired because of the arrest and
11    because of the controversy caused at
12    Hyundai of the sheriff's coming out and
13    everything because of the arrest? Did you
14    mention any of that to the EEOC?
15 A. Yeah, I did. I mentioned that.
16 Q. What did you say to them?
17 A. I said, well, ever since, you know, the
18    arrest and me and the attorney conflict
19    about calling me a criminal, then
20    everything just went from there. Because
21    it was mentioned several times by him.
22 Q. Who is him?
23 A. Tommy Certain. And --

Page 302

1  Q. Tommy who?
2  A. Tommy Certain. Certain, who filed this
3     complaint.
4  Q. Yeah.
5  A. And Harry Chase and them, they asked me
6     about the arrest before this ever
7     happened.
8  Q. Okay. Do you know Felicia Barrow?
9  A. Only -- I was introduced to her on the
10    phone, by Don and Emily.
11 Q. And where did she work?
12 A. Director of Medicaid when I -- last thing
13    I knew.
14 Q. And that's how you knew her as?
15 A. Yes, director of the prior approval
16    department.
17 Q. And if she had told her supervisors that
18    you said that -- hang on just one second,
19    please -- that National Mobility System
20    was engaged in fraudulently billing
21    Medicaid or putting false dates on
22    prescriptions, would you have expected the
23    agency to investigate that?

Page 303

1  A. But I didn't tell her that.
2  Q. But if she did, would you expect the
3     agency to investigate it?
4  A. Yes.
5  Q. Okay. And if she said you did that, would
6     she be lying?
7  A. Yes, she would be lying.
8  Q. You did not tell her that?
9  A. No. And that cleared up in court.
10 Q. And you say under oath today that you did
11    not tell her that anyone at National
12    Mobility System was engaged in fraudulent
13    billing or in changing or using false
14    dates on prescriptions?
15 A. I told Felicia when she called and asked
16    me -- they said they discovered some
17    incorrect -- some things wrong with
18    billings by calling the --
19 Q. This is when she called you about six
20    months after your termination?
21 A. Yeah, she called me.
22 Q. Okay. Before that, did you ever tell her
23    anything like that?

Page 304

1  A. No.
2  Q. Okay. I think we've covered what you said
3     to her in that six-months-ago
4     conversation, have we not? Didn't Mr.
5     Stewart ask you all about that? If you've
6     got anything to add to that, please tell
7     me, but otherwise, I don't want to go back
8     over it.
9  A. I think so.
10 Q. Okay. Now, earlier today you said that
11    there were two instances in which there
12    were prescriptions that did not have dates
13    on them. And I'm going to tell you what I
14    understood your testimony to be, and then
15    you tell me if I got it wrong, okay; that
16    there were two instances in which
17    prescriptions did not have dates on them.
18    And on the first one you said something
19    like, Emily, this prescription doesn't
20    have a date on it, and she said, just put
21    a date on it. And you said, huh-uh, I'm
22    not doing that; if you want to put a date
23    on it, you do it. And she said, put it on

Page 305

1     my desk, and I'll take care of it. That's
2     what happened on the first one, right,
3     more or less?
4  A. Yes, sir.
5  Q. And then on the second one, you said,
6     Emily, here's another one that doesn't
7     have a date on it. She said, put it on my
8     desk and I'll take care of it; isn't that
9     correct?
10 A. I just put -- yeah, I put it on her desk.
11 Q. Okay. She told you to put it on her desk?
12 A. Well, she told me -- well, I asked her
13    about it. I said, these don't have no
14    dates. But on the second one, I had
15    called -- actually, that's when Mike --
16    Mike Maddox said that. And let's rephrase
17    this.
18 Q. Okay.
19 A. When I realized there was no dates on the
20    first prescription, I called Michael --
21    Michael Maddox, and he asked me where was
22    Emily, first of all. And I said she
23    wasn't here. And then he said -- well,

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 306

1  Mike said he'd get back with me. And I
2  asked Emily about the dates, and she said,
3  well, go ahead and put this date on it.
4  And I said, no, I'm not going to put a
5  date on there; if you want to put a date
6  on there, you put it yourself. So I put
7  that on her desk. The second time I
8  called Mike Maddox, Mike said, Emily and
9  Don told me never put any dates on my
10  prescriptions. That's what he said.
11 Q. And what did you do?
12 A. I stayed out of that.
13 Q. Did you call that matter to Emily's
14  attention the second time?
15 A. No, I did not, because he told that to Ms.
16  Barrow also.
17 Q. So the second time you had a prescription
18  with no date, you did not call that to
19  Emily's attention?
20 A. I just put it on her desk.
21 Q. You just put it with no comment or note?
22 A. No, sir.
23 Q. Okay. So the only time you actually

Page 307

1  discussed that with Emily was the first
2  time?
3 A. Yes.
4 Q. Okay. Now, Emily was the office manager;
5  is that correct?
6 A. Yeah, branch manager.
7 Q. Branch manager, office manager? She's the
8  one you reported to?
9 A. Yes.
10 Q. Now, Mr. Williams, you did not report to
11  him, did you?
12 A. No, not really.
13 Q. I mean, he was not your supervisor, was
14  he?
15 A. No.
16 Q. And did you ever ask him what to do about
17  prescriptions that didn't have a date?
18 A. No.
19 Q. Did you ever discuss that matter with him?
20 A. The only time we discussed something was
21  if he knew how to do something on the
22  system and I did not.
23 Q. You mean on the computer system?

Page 308

1 A. Yes.
2 Q. Did he ever tell you or did you ever ask
3  him what to do if you got a prescription
4  without a date?
5 A. No. Don didn't even deal with that kind
6  of stuff.
7 Q. Okay. The amended complaint states in
8  Paragraph 15 -- and I'll read it to you.
9  (As read:) "Plaintiff avers that
10  Defendant Williams -- and that's Mr. Don
11  Williams -- was questioned, and he -- by
12  an investigator for the Medicaid agency --
13  and he accused her of lying because her
14  employment with National Seating &
15  Mobility, Inc., was terminated." What's
16  the basis for that statement?
17 A. You see, that's what I'm -- that's the
18  first time I ever read that, was the day
19  of the court.
20 Q. Okay. And what did you read that in?
21 A. Tommy Goggins showed that to me.
22 Q. He showed you a piece of paper?
23 A. Yeah. He showed me the reply that Gerry

Page 309

1  Shockley sent him.
2 Q. Okay. And this was then a -- it was a
3  document from Gerald Shockley that --
4 A. To my attorney, Tommy Goggins.
5 Q. And in that, it had -- did it have a
6  statement or a signed affidavit, or did it
7  just recite what it said that Mr. Williams
8  had said or what? What did it say?
9 A. It had that all in that letter. I just
10  remember that was said and we discussed
11  that in court.
12 Q. How thick was that document that he showed
13  you?
14 A. I don't know.
15 Q. One, two, three, ten pages?
16 A. I don't think it -- no, it wasn't no ten
17  pages or so.
18 Q. Okay. Was it signed by Mr. Williams?
19 A. Yeah.
20 Q. It was signed by Mr. Williams, the
21  document that he showed you?
22 A. Gerry Shockley and -- well, I don't know.
23 Q. You don't know if it was?

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 310

1  A. I don't know.
2  Q. Okay. Do you know if Mr. Williams had
3     ever seen it before either?
4  A. I don't know. I never talked to him.
5  Q. Do you know if Mr. Shockley -- scratch
6     that. Do you know if Mr. Shockley ever
7     asked Mr. Williams if you should be
8     arrested?
9  A. I don't know. No, I don't know.
10 Q. You don't know one way or the other?
11 A. I don't know.
12 Q. In your amended complaint, it alleges that
13    Mr. Williams was under some sort of a
14    monthly quota. What does the complaint
15    mean by that?
16 A. That is -- Danielle calls me -- and this
17    is discussed openly, that they've got so
18    much -- this is the numbers they've got to
19    reach for this month, you know, on their
20    books. You've got to get this out; you've
21    got to get this much -- we need this much
22    amount -- we need this much amount for
23    this month. So that was discussed through

Page 311

1     Danielle all over the -- you know, you
2     just have to get those numbers in, get
3     that money in for Medicaid. So that's
4     what you call -- you have to get so much
5     in for the month, because they set the
6     quota in Nashville.
7  Q. And who was responsible for meeting that
8     quota? The whole office, Emily, Don, you,
9     who?
10 A. I was responsible for filing them. So
11    Emily was responsible for getting the
12    material -- or going out and getting the
13    patients; Don was responsible for building
14    the wheelchairs and getting the materials.
15 Q. And if that quota was not -- did Don ever
16    tell you that he had a quota of some sort?
17    Did Mr. Williams ever tell you that?
18 A. Yes.
19 Q. He did?
20 A. He told me; Emily told me --
21 Q. What did Mr. Williams tell you?
22 A. I mean, every month, you have -- they said
23    you have -- Danielle would send them a

Page 312

1     sheet about how much they have to get out
2     for that month, what's the goal for that
3     month, put it that way.
4  Q. And what did they say would be the
5     consequence if they did not meet their
6     goal?
7  A. Well, I don't know.
8  Q. You don't know?
9  A. I don't know what happened to them.
10 Q. Did they ever not meet the goal?
11 A. I don't know. I was only there -- I have
12    no idea.
13 Q. You don't know one way or the other?
14 A. No.
15 Q. And you don't know if there were any
16    consequences if they did not meet the
17    goal?
18 A. No.
19 Q. Okay. Did I ask you if there were only
20    two files that you saw that didn't have
21    the date on them? Did we cover that
22    earlier? We did, didn't we?
23 A. It was prescriptions.

Page 313

1  Q. Two prescriptions, okay. And there were
2     only two that you saw, and you told me
3     about that, right?
4  A. Yes, sir.
5  Q. Okay. In Paragraph 35 of your second --
6     of your amended complaint, it says, quote
7     (as read:) "Plaintiff avers that
8     Defendant Williams acted out of malice or
9     under such circumstances, including lack
10    of probable cause, as would imply malice."
11    Do you know what that sentence means?
12 A. Yeah.
13 Q. What does that mean?
14 A. Well, to the best of my ability.
15 Q. Sure.
16 A. Well, I feel like, you know, if he got
17    questioned by somebody about that, it
18    wasn't because of me. And so he turned
19    the tables back on me and actually lied
20    intentionally and maliciously and got me
21    arrested for something.
22 Q. And what lie is it you're referring to?
23 A. I never said they -- never, ever -- never

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 314

1  reported anything to Medicaid. I never
2  told Medicaid that.
3  Q. So the lie being referred to here is that
4     he told -- he told Medicaid that you had
5     reported something?
6  A. That me and Felicia was actually
7     retaliating against him because he fired
8     me, that I reported --
9  Q. So what this refers to is that, when
10    Medicaid went to him, he said --
11 A. When Gerald Shockley went to him.
12 Q. When Gerald Shockley went to him, he said,
13    she's trying to get back at me because I
14    fired her.
15 A. Yes.
16 Q. That's what this Paragraph 35 is referring
17    to?
18 A. That's what I think it is.
19 Q. Why did Medicaid go to him at that time;
20    do you know?
21 A. Once again, Felicia and them said that
22    they had -- my understanding was, when
23    they contacted me, was that they --

Page 315

1  National Seating has been under an
2  investigation for over a year because of
3  Chasely Weeks. I didn't even know that.
4  But they were going back through some
5  stuff and researching or auditing or
6  something and found some things. And some
7  back in 2004 -- I mean 2002 and some in
8  the early part of 2004 that I had no idea
9  about. And so when she said that they had
10 already talked to Gerry Shockley and sent
11 it -- they sent that over to Gerry
12 Shockley's office and asked Gerry Shockley
13 and them to go in there and investigate
14 and pull their records. So I didn't even
15 know that either. So -- and then when
16 Gerry Shockley went in there to talk to
17 Don and he told him whatever, whatever,
18 and Don told him about the reason why it's
19 been done -- the investigation is going
20 on, is because me and Felicia --
21 Q. And is that the allegation that you have
22    against Mr. Williams, that when the
23    Medicaid people or the investigators came

Page 316

1     to talk with him, he said, she's trying to
2     get back at me because I fired her, and
3     that was, you say, a lie?
4  A. Yeah.
5  Q. Okay. Do you have any other claim against
6     Mr. Williams?
7  A. No.
8  Q. Okay. Thank you. I think you just
9     shortened your deposition a lot. If
10    you'll just give me just a second to look
11    over my notes.
12         Ms. Horton, assume we agree
13 that Mr. Williams did, in fact, tell the
14 investigators a lie and said that you
15 weren't telling the truth, that you were
16 just trying to get back at him for
17 terminating your employment. I think
18 you've already testified that he did not
19 actually terminate your employment, did
20 he?
21 A. No.
22 Q. Okay. You had already quit?
23 A. Yes.

Page 317

1  Q. Okay. And --
2  A. He might have terminated it with Kelly
3     Services, but Theresa already knew that I
4     had quit.
5  Q. Okay. And did anyone ever tell you that
6     you were arrested because of what Don
7     Williams said?
8  A. Yes, my lawyer, Tommy Goggins.
9  Q. Okay. What did -- now, be very careful
10    here.
11         MS. NICKSON: Let me object.
12              Whatever was said between
13              you and Tommy is privileged.
14 Q. Now, you have -- whatever your attorney
15    Tommy told you is privileged. You have
16    the right to waive that privilege if you
17    want to -- and I'm not asking you to do
18    that one way or the other. I'll warn you
19    that if you do waive the privilege, we'll
20    ask Mr. Goggins to come in here and we'll
21    depose him. Okay? Let me ask that
22    question again. Did anyone other than
23    your former attorney, Mr. Goggins, ever

Page 318

```
 1      tell you that you were arrested because of
 2      what Don Williams allegedly said to the
 3      investigators?
 4  A.  Yes, sir.
 5  Q.  And who would that have been?
 6  A.  Cliff Johnson and Felicia Barrow.
 7  Q.  Okay. And at the time you and Don
 8      Williams -- I mean you and Tommy Goggins
 9      may have discussed this matter, was he
10      representing you as your lawyer?
11  A.  Yes.
12  Q.  And who else was present?
13  A.  Just he and I, the day of the court.
14  Q.  Okay. I see, the day of the court. Okay.
15      And -- all right. Let's skip over that.
16      So who else did you say told you this?
17  A.  Well, Felicia Barrow and Cliff Johnson,
18      when I called and asked them why was I
19      being arrested for them calling me and
20      asking me questions.
21  Q.  Now, what authority did Felicia Barrow
22      have over your arrest; do you know?
23  A.  Authority?
```

Page 319

```
 1  Q.  Uh-huh.
 2  A.  She had no authority over my arrest.
 3  Q.  Okay. So how would she know what was the
 4      cause of your arrest; do you know?
 5  A.  Well, when I asked the officer why was I
 6      being arrested -- they told me what I was
 7      being arrested for and who filed the
 8      charge.
 9  Q.  That who filed the charge?
10  A.  That Gerry Shockley -- the attorney
11      general had filed the charge. And I said
12      -- I called them and asked them why.
13  Q.  Who, Gerald Shockley?
14  A.  Yeah. I called him and asked him why.
15  Q.  And he said what?
16  A.  I asked him why did he file that charge on
17      me saying that I filed a false report with
18      a law enforcement agency, he said come
19      down to his office and we can talk about
20      it. I said, I'm not coming down to your
21      office. I called Felicia -- I left --
22  Q.  Wait, wait, before you move on. Did you
23      ever have any other conversation with
```

Page 320

```
 1      Mr. Shockley?
 2  A.  Not after that, no, sir.
 3  Q.  Have you told us everything that you said
 4      in that one conversation with
 5      Mr. Shockley?
 6  A.  Yes, sir.
 7  Q.  And everything he said to you?
 8  A.  Yes.
 9  Q.  Okay. Let's move on. Then after you
10      talked with Mr. Shockley, you were going
11      to tell me about talking to Felicia.
12  A.  I called Cliff --
13  Q.  Oh, okay, Cliff.
14  A.  -- and left him a message on his
15      voicemail, Cliff Johnson, that Monday
16      also.
17  Q.  And how did you know Mr. Johnson?
18  A.  Well, they called me.
19  Q.  He had called you in his capacity as an
20      investigator, hadn't he?
21  A.  Yes, yes.
22  Q.  All right. And did you ever call you
23      back?
```

Page 321

```
 1  A.  Yes.
 2  Q.  Okay. And what did he say to you?
 3  A.  He said, what happened. I said, I got
 4      arrested, and I'd like to know why did I
 5      get arrested; why did Gerry Shockley
 6      arrest me saying I filed a false report.
 7      And he didn't even know that Gerry
 8      Shockley had arrested me. He had no
 9      knowledge of it. But they did call him
10      and talk to -- I have no idea. That's
11      what they told me. I have no idea.
12  Q.  They did call who?
13  A.  Mr. Shockley.
14  Q.  Oh, okay.
15  A.  Now, this is hearsay.
16  Q.  Okay. Now, when you talked to Mr. Cliff
17      Johnson this time that you're talking
18      about, did he say anything about Don
19      Williams?
20  A.  They said that -- afterwards, they called
21      me back. He and Felicia called back, and
22      they were on speaker phone. And after
23      they talked to Gerry Shockley and Gerry
```

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 322

1   Shockley told them what Don said was the
2   reason why I got arrested.
3 Q. And you're saying that Mr. Shockley said
4   to them and they said to you that the
5   reason you got arrested was that
6   Mr. Williams said that you had not told
7   the truth but were trying to get back at
8   him for terminating your employment?
9 A. Yes. Because Gerry Shockley, my
10  understanding, Cliff said works for them.
11 Q. Okay. So they told you they had been told
12  that by Mr. Shockley, correct?
13 A. Yes.
14 Q. And then they were telling you that?
15 A. Yes.
16 Q. Okay. Did they know anything about that
17  firsthand or the other? Did y'all have
18  any -- go ahead and answer that question.
19 A. Did they know about me being arrested
20  firsthand?
21 Q. Did they know anything about -- let me
22  strike that and ask it again.
23      Did they tell you they had any

Page 323

1   personal knowledge about the role that
2   Mr. Williams may have played in your
3   getting arrested, or were they simply
4   relaying to you what they said
5   Mr. Shockley said to you?
6 A. They told me what Mr. Shockley said to me.
7   But --
8 Q. Did they tell you -- I'm sorry. Go ahead.
9 A. Felicia got a subpoena and Gerry Shockley
10  showed her that stuff.
11 Q. Whatever that document is that you saw?
12 A. By my lawyer that day.
13 Q. Uh-huh. When did Mr. Shockley show that
14  to Felicia?
15 A. I have no idea. They mentioned that in
16  the courtroom.
17 Q. Oh, okay. Oh, you know that from the
18  courtroom testimony?
19 A. Uh-huh.
20 Q. Okay. In that conversation with Felicia,
21  when Felicia and Cliff Johnson called you
22  back, did they say anything about
23  Mr. Williams other than the fact that you

Page 324

1   say that they said that Mr. Shockley said
2   that the reason you got arrested was
3   because of what Don Williams said?
4 A. Yes.
5 Q. What else did they say?
6 A. And that -- after that conversation with
7   them, they told me what Don had said. And
8   I said -- well, I was pretty much shocked.
9   Because I said, I don't believe it. I
10  didn't -- for some reason, I don't know, I
11  didn't think that would come out -- I
12  didn't think he said that. So -- but when
13  I read that -- because I was still trying
14  to figure out how did I get arrested when
15  they were the ones who were doing the
16  investigation and they called me. So I
17  was trying to figure out how did I get
18  tied in. And when they told me initially
19  that it's been under investigation for a
20  year by Chasely Weeks, I was still trying
21  to figure out why -- how do I play into
22  this. So I didn't think that Don had said
23  anything like that.

Page 325

1 Q. Did anyone ever tell you that Mr. Williams
2   asked that you be arrested or swore out a
3   warrant for your arrest or anything like
4   that?
5 A. Nobody told me that.
6 Q. Okay. Do you have any reason to believe
7   that he did?
8 A. No, I don't.
9 Q. Okay. In the document that you got from
10  Ms. Joann Turpen -- do you recall that
11  earlier?
12 A. Yes.
13 Q. Okay. It says that you have a right to
14  obtain an additional free copy of the
15  report that the Risk Mitigation Services
16  provided to Baptist Healthcare. Did you
17  obtain a copy of that report?
18 A. That is it right there. What she sent to
19  me in the mail was an adverse -- there's
20  something on there.
21 Q. But let me show you this right here. It
22  says (as read:) "You have the right to
23  obtain an additional free copy of the

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 326

1  report within 60 days of your receipt of
2  this letter by contacting Risk Mitigation
3  Services, Inc." Do you see that?
4  A. Yes.
5  Q. Did you ever contact them and get a free
6     copy of that report?
7  A. I contacted them and talked with them.
8  Q. Did you ever get a free copy of the
9     report?
10 A. They told me they sent me one out -- she
11    told -- yeah. He told me they sent me one
12    out in the mail.
13 Q. Did you ever receive it?
14 A. No, not that I -- not to my knowledge.
15 Q. So you don't have a copy of that report?
16 A. No, sir.
17 Q. Okay. Thank you.
18       MS. NICKSON: I'll provide you
19          with a copy of it.
20       MR. WALKER: Oh, do you have a
21          copy of it? Okay. Thank
22          you very much.
23       MS. NICKSON: It does reference

Page 327

1       the false --
2       MR. WALKER: Okay. Do you have
3          that now? Did you bring it
4          to the deposition with you?
5       MS. NICKSON: Huh-uh.
6       MR. WALKER: Any reason why not?
7       MS. NICKSON: Huh-uh.
8  Q. Can you get copies of your credit rating,
9     those past credit ratings that you
10    referred to, for us?
11 A. Yes.
12 Q. Okay. Will you do that and give them to
13    your attorney, please?
14 A. Yes.
15 Q. Thank you. Remember that I said my goal
16    when we started was that you would tell me
17    everything you have that's the basis for
18    your claim against Mr. Williams? So now I
19    will ask you before I pass you on to
20    Mr. Wallace, have you told me all of your
21    claims about Mr. Williams and all of the
22    bases for those claims?
23 A. Yes. And this I want to say: I still

Page 328

1     didn't believe that Don -- I just could
2     not believe that Don said that. I did not
3     -- until somebody had to show me that in
4     that paper there. And then when we were
5     in court, Don said that the reason why
6     they terminated me was because I was
7     friends with Felicia. But he didn't
8     terminate me. I was never working for
9     National Seating on a permanent -- I
10    wasn't even on their payroll; I was
11    working through a temporary service. So
12    when he said -- told the judge that our
13    friendship -- but I wasn't friends with
14    her. So until Tommy Goggins showed me
15    that, I didn't believe -- I not believe
16    it.
17 Q. Do you know whether or not he actually
18    thought you were friends with Felicia
19    Barrow?
20 A. I don't know.
21 Q. You don't know one way or the other?
22 A. Apparently he must have thought it if he
23    said it in court.

Page 329

1  Q. He must have thought that, right?
2  A. Uh-huh.
3  Q. Okay. I don't think I have any more
4     questions for you right now.
5           EXAMINATION
6  BY MR. WALLACE:
7  Q. Ma'am, I'm Jack Wallace, and I represent
8     Gerald Shockley. I'm going to state some
9     things that I think I've heard you testify
10    to, and if I'm wrong, please correct me.
11    I think I've understood you to testify
12    that your relationship with Felicia Barrow
13    was simply a professional acquaintance?
14 A. I only talked to her on the phone when I
15    was at National Seating.
16 Q. Did you ever go to lunch with her?
17 A. I never went to lunch with her.
18 Q. Did you ever go to dinner with her?
19 A. I never went to dinner with her.
20 Q. Did you ever have a drink after work with
21    her?
22 A. No, I never had a drink with her after
23    work.

Page 330

1  Q.  So it was strictly a telephone work
2      relationship?
3  A.  That was it.
4  Q.  And based on that kind of relationship,
5      would she have any reason to want to hurt
6      you in any way?
7  A.  No. I don't know. You tell me. They
8      called me. I have no idea. I don't know.
9  Q.  Okay. And so if it's a neutral
10     professional acquaintance, would she have
11     any reason to want to help you in any way?
12 A.  No.
13 Q.  Well, can you explain to me why she made
14     two telephone calls to National Seating &
15     Mobility, one to Danielle Percal
16     (phonetic) in Franklin, Tennessee, and one
17     to a lady in Birmingham, Ms. Lois Bodiford
18     (phonetic), after you were fired, urging
19     them to hire you back or telling them it
20     would be a mistake to fire you?
21 A.  No. I didn't even know that until I heard
22     that in court, at all. See, she didn't
23     even know that I was temporary. She

Page 331

1      didn't even know I was a temporary
2      employee until she found that out in
3      court. She didn't even know, and they
4      didn't even tell her. When she called
5      Emily and asked her, oh, where's Elizabeth
6      today -- because they were so used to
7      hearing me call them every day asking for
8      information, and when they didn't hear my
9      voice anymore, she asked what was going on
10     with me. And Emily said that they had
11     cuts -- you know, they had to cut down
12     because they wouldn't meet their -- so
13     they had to lay people off; I was laid
14     off; they were going to do it by
15     themselves. And I said, no, I was
16     temporary; I quit. She didn't even know.
17     She had no idea I was a temporary
18     employee.
19 Q.  And so it's your testimony that she made
20     those calls after you were arrested and
21     prosecuted for filing a false claim?
22 A.  No, no, no. Those were made -- that right
23     there was told in court before -- the day

Page 332

1      -- she was calling there the week after I
2      was gone. And so I didn't find out in
3      court until she had called Emily and asked
4      Emily why I wasn't there. Because we
5      didn't have that kind of relationship. I
6      never told her any of my business, you
7      know, we just talked about EDS; we talked
8      about other places. I talked about that
9      with Jerry Sanders, you know, because I'm
10     new in town; I'm trying to find places to
11     look for a job that was permanent. So
12     when I left there, I never told Felicia
13     anything. And so when she called there
14     and -- when Emily was calling and getting
15     information, she was wondering where I
16     was. And so Emily said they had a layoff,
17     that, you know, it was just going to be
18     her and Don in the office, that corporate
19     -- that Franklin, Tennessee decided that.
20     That's what I was told. That's what I
21     heard in court. But when I said that I
22     was not a permanent employee, I was a
23     temporary employee, she had no idea until

Page 333

1      I was in court. And when I told the
2      judge, I said, I was not a permanent
3      employee; I was not on National Seating's
4      payroll; I was being paid by Kelly
5      Services on a temporary assignment, that's
6      when she found that out. Now, before then
7      -- and this is what was mentioned in
8      court. Because they were so used to
9      talking to Chasely Weeks -- now, the
10     lawyers and the lady in Birmingham talked
11     all the time -- whatever her name,
12     Felicia, and that lady in Birmingham
13     talked all the time. This was mentioned.
14     They talked about several things when they
15     called there to get some orders done --
16     she called Felicia too down there. So
17     Felicia said to the judge that she had
18     called and asked that lady about me.
19     Because when Chasely got fired, she asked
20     the same thing about Chasely. So she
21     thought the same thing happened to me, but
22     I was just temporary.
23 Q.  And so as you've previously testified,

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 334

1  though, there would be no reason for her
2  to want to hurt you either?
3  A. No.
4  Q. And I believe it's your testimony that you
5     did not contact her at the time that you
6     left National Seating & Mobility to report
7     any irregularities with the Medicaid
8     finances that you saw being processed by
9     National Seating & Mobility?
10 A. I never contacted her; they contacted me.
11 Q. Well, then why would Felicia Barrow sign
12    an affidavit -- or excuse me, not an
13    affidavit, a memorandum on the 12th of
14    July, 2004, in which she says, a former
15    employee of the company is willing to
16    provide information necessary to assist in
17    any investigation conducted. And it's
18    concerning forgery of recipient
19    signatures, improper billing practices,
20    such as submitting requests for
21    reimbursement of repair items already in
22    their stock, instructing clients to
23    deliberately leave the date section blank

Page 335

1     on the delivery ticket so they may
2     manipulate the date based on the PA
3     conditional approval receipt from
4     Medicaid, holding request with outdated
5     prescriptions, RX, and when Medicaid
6     informs they must submit a current RX,
7     they indicate a current date on another
8     RX. So why would she say that a former
9     employee is willing to give evidence about
10    these concerns?
11       MS. NICKSON: Excuse me. What
12          was the date of that
13          memoranda?
14       MR. WALLACE: It's the 12th of
15          July 2004.
16 Q. So if she wouldn't want to hurt you, and
17    you say you hadn't contacted them, then
18    for her to write that would be a lie,
19    wouldn't it?
20 A. Sir, that's the day Gerry Shockley saw
21    her, that same day. That's the day she
22    told me Gerry Shockley came to her office
23    and Cliff Johnson was sitting in there

Page 336

1     with her.
2  Q. Oh, no, ma'am; that's another day.
3  A. Then she didn't tell me that, then.
4  Q. No, ma'am. That date is June the 15th,
5     2005, in which she testified -- in which
6     she stated to Shockley on tape -- and we
7     have a tape recording of it we'll be glad
8     to play for you at trial --
9  A. Oh, please.
10 Q. -- that says that Elizabeth Horton gave me
11    this information. And you didn't give it
12    to her, did you?
13 A. She called me and asked me. She said,
14    we've got some problems here; we've been
15    looking over National Seating stuff. And
16    she said, can you tell me some of the
17    things that, you know, that you've
18    probably seen, because this goes back, way
19    back. And I said, I wasn't there way
20    back. I said, only thing I seen -- and
21    you know what? Putting false dates --
22    putting false dates on a prescription is
23    fraudulent. Now, I don't know if Emily

Page 337

1     sent that stuff in that way, but it is
2     fraudulent. So when Mike Maddox -- Mike
3     Maddox --
4  Q. But Felicia Barrow's testimony is going to
5     be that you called her contemporaneously
6     with your leaving National Seating &
7     Mobility and gave her this information.
8     Is she lying?
9  A. Felicia called me. I never called her.
10    She called me.
11 Q. Well, let me ask you this question: On
12    Paragraph 13 of your amended complaint --
13    I'll read it for you and ask you if this
14    is a true statement. (As read:)
15    "Plaintiff avers that she became aware
16    that the dates on the application were
17    being falsified, whereupon she reported
18    this fact to the director of prior
19    approval department within the Alabama
20    Medicaid agency, and to the best of her
21    knowledge, this information was reported
22    to Gerald Shockley." Well, that says, I
23    called her and reported it.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 338

1  A. No, I did not.
2     MS. NICKSON: I object to the
3        form of that.
4  Q. Now you may answer.
5  A. Oh, I didn't call her.
6  Q. Well, how did you report it if you didn't
7     call her?
8  A. She called me at my home. She and Cliff
9     Johnson called me.
10 Q. Well, basically, when I read your
11    complaint, it appears that the paragraphs
12    are set out in chronological order. And
13    I'll just point out to you that the next
14    paragraph, Paragraph 14, speaks of the
15    meeting between you and Michael Roeder on
16    April the 15th, 2005. Is that the only
17    time you ever met with Michael Roeder --
18 A. Yes.
19 Q. -- the investigator from the attorney
20    general's office?
21 A. The only time.
22 Q. You're not even really a professional
23    acquaintance of his; you just met him one

Page 339

1     time?
2  A. One time.
3  Q. Would he have any motivation to try to
4     misrepresent what you told him?
5  A. No. We talked -- he asked me questions,
6     do I remember some names --
7  Q. Ma'am, excuse me.
8  A. Asked me some names. Do I remember -- he
9     said this went back to before. I said, I
10    don't know about it. He said, can you
11    look on here and tell me anybody that you
12    probably know that you probably worked on.
13    And I said, I don't know -- I said -- then
14    I said to him, I said, I worked on them,
15    but I can't say the wheelchairs were never
16    delivered to them; I have no idea; that's
17    what you're asking me. So he said, just
18    -- do you think of any names that, you
19    know, you might have seen come across the
20    desk or whatever. So, yeah, I remember
21    April at that -- you know, Alexander, but
22    I can't tell you if there's anything wrong
23    with her thing.

Page 340

1  Q. And for the record, the plaintiff is
2     examining Defendant's Exhibit 4, which is
3     a table of -- I think it would be
4     recipients, people who received
5     wheelchairs. And the investigator said
6     that he asked you to look at that
7     Defendants' Exhibit 4 and that you did,
8     and that you placed those checkmarks in
9     the margins by the names of people who had
10    called and complained --
11       (The referred-to document was
12        marked for identification as
13        Defendants' Exhibit No. 4.)
14 A. No, they didn't call and complain.
15 Q. -- that they did not receive their
16    wheelchairs?
17 A. No, that's not true.
18 Q. That's not true?
19 A. That is not --
20 Q. Why would he lie?
21 A. They didn't call me and complain. These
22    are the people that I had worked up their
23    chart. They did not call and complain to

Page 341

1     me. They always called Medicaid and
2     complain.
3  Q. That's not what he said when you talked
4     with Mr. Shockley.
5  A. Oh, I can't even -- Mr. Shockley? Mr.
6     Shockley? I never talked to Mr. Shockley.
7  Q. No, I'm saying Investigator Roeder talked
8     with Mr. Shockley and gave him a
9     statement. And we have that on tape
10    too --
11 A. Well, you have -- you've got a tape?
12 Q. -- that describes what you said --
13 A. Well, then, let me listen to the tape.
14    That's not true. Have these people -- I
15    don't even know them by name. These are
16    kids. I don't even know their mothers.
17    These are kids' charts here, that I --
18 Q. Why would the investigator just make up
19    what you are characterizing really is a
20    lie?
21 A. Well, then why did it get straightened out
22    in court when Felicia corrected -- I
23    never, ever, ever said these people never

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 342

```
 1     got their wheelchairs.  These are kids
 2     that I remember working on their chart.
 3           MS. NICKSON:  Counselor, did you
 4              say that there was a tape
 5              recording of a interview of
 6              --
 7           MR. WALLACE:  Not of your client.
 8              Not of your client and
 9              Mr. Roeder; it's what
10              Mr. Roeder told Shockley.
11           MS. NICKSON:  Okay.  All right.
12           MR. STEWART:  Before we move off
13              of 4, do social security
14              numbers appear on there?  We
15              may need to redact --
16           MR. WALLACE:  I haven't even
17              thought about it.
18           THE WITNESS:  There's some in the
19              back from 2003.  I don't
20              even know those people.
21           MR. WALLACE:  It has a number
22              that possibly is.  Look on
23              the recipient base IC, that
```

Page 343

```
 1              may be --
 2           THE WITNESS:  Those are Medicaid
 3              numbers or their social
 4              maybe.  I don't know.  I
 5              think Medicaid is their
 6              social security number.
 7           MR. STEWART:  We might need the
 8              court reporter just to
 9              redact that before she makes
10              copies?
11           MR. WALLACE:  Yes.
12           MR. STEWART:  I don't tell to get
13              in trouble with any court.
14  Q.  What motivation would Gerald Shockley have
15     to tell a lie about you, ma'am?
16  A.  I never met him, so I don't know.  So he
17     went by -- off what Don said.  Me and
18     Mr. Roeder talked about -- he showed me a
19     whole list with people's names on it.
20     Some of these are dated back in 2003.  I
21     said, I don't know anything about that.  I
22     said, I don't even know anything -- I just
23     started there March of 2004.  I can only
```

Page 344

```
 1     remember these children that I sent to
 2     Medicaid that I worked up; anything else,
 3     if it came back after I was gone, I had no
 4     idea.  I just remember their names, so --
 5     the parents, I never --
 6  Q.  That's just not credible, that people who
 7     don't know you, don't have business
 8     dealings with you, would sit around and
 9     accuse you of a crime falsely.  That's
10     just not credible.
11  A.  Then what is credible?
12           MS. NICKSON:  Wait a minute.
13              Hold on.  I object to that,
14              Counselor.  It's not a
15              question.
16           MR. WALLACE:  You're correct.
17              You're correct.  Thank you,
18              ma'am.  I think that's all I
19              have.  Thank you.
20           MR. STEWART:  Do you just want to
21              go ahead, or do you want me
22              to ask questions?  I had
23              some more questions I was
```

Page 345

```
 1              going to ask, but I didn't
 2              know if you were going to or
 3              not.
 4           MS. NICKSON:  You all go ahead
 5              and get finished.
 6           MR. STEWART:  Okay.
 7                EXAMINATION
 8  BY MR. STEWART:
 9  Q.  Ms. Horton, Mr. Walker asked you about the
10     allegations that were set forth in your
11     complaint against Don Williams that he,
12     quote, was questioned, comma, and he
13     accused her of lying because her
14     employment with National Seating &
15     Mobility was terminated, period, end
16     quote.  Do you remember those questions?
17  A.  Yes.
18  Q.  Do you have any evidence that anyone at
19     National Seating knew that, if it's true,
20     Mr. Williams accused you of lying because
21     your employment was terminated, other than
22     Mr. Williams?
23  A.  Did anyone else -- like I said, Felicia
```

87 (Pages 342 to 345)

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

7c1fb636-d67b-46ee-8c04-6b9830e35e5d

Page 346

```
 1      and Cliff told me that Gerry Shockley told
 2      them that.
 3   Q. No, no, no. Anyone at National Seating
 4      knew that Mr. Williams had testified to
 5      that, if he did?
 6   A. I don't know.
 7   Q. Okay. Or that he told anybody that?
 8   A. I don't know. No, I don't, have no idea.
 9   Q. Do you have any evidence that National
10      Seating played any role in what Don
11      Williams said or did not say to any
12      investigator?
13   A. I do not, no.
14   Q. In your employment application to Hyundai,
15      which I'll mark as Defendants' 5, do you
16      recall being asked to list your employment
17      history when you applied for them?
18           (The referred-to document was
19             marked for identification as
20             Defendants' Exhibit No. 5.)
21   A. Yes, I can, some of them.
22   Q. And did you put in your employment history
23      that you had worked for a period of time
```

Page 347

```
 1      for National Seating?
 2   A. I don't know. I probably did. It was a
 3      temporary job with Kelly Services.
 4   Q. Okay. So you would have put Kelly
 5      Services instead?
 6   A. I don't know what I would -- I don't know.
 7      I haven't --
 8   Q. Let me show you Exhibit 5 and ask you if
 9      anywhere in there Kelly Services or
10      National Seating appears.
11   A. Oh, okay. I remember this now. Temporary
12      positions, they wanted -- this lady called
13      me several times about my application.
14   Q. What lady?
15   A. In HR. I can't remember her name, the one
16      who did the screening on everything. She
17      wanted to know the full-time positions
18      that I held. I had to do my application
19      over twice, because I had Kelly Services,
20      temporary positions. They want to see a
21      longer span of how you work.
22   Q. So you were told to leave Kelly Services
23      off?
```

Page 348

```
 1   A. Well, I had to fill in what I had worked
 2      in a full-time position, any job that I
 3      was hired on -- they were temporary, so I
 4      put it down as I was told.
 5   Q. Did you tell her that you had worked at
 6      National Seating?
 7   A. I did that application twice. It's on my
 8      very first application.
 9   Q. I'm just asking you a simple question.
10   A. Well, I filled it out online. And
11      actually, it wasn't -- it was not a her;
12      it was a guy who actually called me, and
13      that gentleman's name was -- when I filled
14      it out online, he said you have to fill in
15      the -- not temporary jobs, permanent jobs.
16      It was a gentleman. Anthony. Anthony
17      Johnson.
18   Q. And did you tell Mr. Johnson about
19      National Seating?
20   A. It was on my first application, and
21      Mr. Johnson sent it back to me and told me
22      how to go -- the guidelines of sending it
23      back because it was corresponding through
```

Page 349

```
 1      him and my husband. He said give it to my
 2      husband, and my husband was supposed to
 3      give it to me through EDS. It was Anthony
 4      Johnson.
 5   Q. And did you discuss with Mr. Johnson the
 6      fact that you had worked with Kelly
 7      Services?
 8   A. Yes.
 9   Q. And did he tell you to leave it off the
10      resume or your application?
11   A. He said, don't show -- they don't want to
12      know if you bounced around from jobs.
13      It's not a permanent job; it's a temporary
14      job. Anthony told me that. Anthony sent
15      the e-mail to Chris; Chris sent it to me
16      at EDS.
17   Q. And do you still have that e-mail?
18   A. No. EDS was a long time ago. That's how
19      I got my job at Hyundai, through Anthony
20      Johnson.
21   Q. And do you recall certifying your
22      application, stating that, I hereby
23      certify that the entries on this form and
```

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 350

1  any other statements may by me to Hyundai
2  Motor Manufacturing, Alabama, LLC, are, in
3  connection with my application for
4  employment, true and correct. Do you
5  remember signing that?
6  A.  Yes. They need people who I worked for
7     permanently so they can call and do a
8     background check on me. Kelly Services
9     doesn't list my name; they list Kelly
10    Services.
11 Q.  Were you terminated from Kelly Services?
12 A.  No, I was not.
13 Q.  Were you terminated from Kelly Services on
14    the same day as your last day at National
15    Seating?
16 A.  No, I was not. Kelly Services never even
17    told me to this day I was terminated,
18    because I was gone. I had another job.
19 Q.  Were you terminated from Kelly Services on
20    June 25, 2004?
21 A.  June 25?
22 Q.  2004?
23 A.  My last day working for Don and them was

Page 351

1  the day after my birthday. It was the
2  20th -- 19th.
3  Q.  So is that a no, you weren't?
4  A.  No, I was not.
5  Q.  Were you terminated at any other time by
6     them?
7  A.  No.
8  Q.  And let me show you Defendants' Exhibit 6,
9     which is a copy of your resume. And this
10    was the one that you submitted to Hyundai?
11         (The referred-to document was
12         marked for identification as
13         Defendants' Exhibit No. 6.)
14 A.  Yeah.
15 Q.  Do you remember submitting that
16    application?
17 A.  I remember submitting this resume -- went
18    through Anthony Johnson and Stacy -- Stacy
19    was actually a recruiter -- she was
20    working part-time. Stacy Jones was a
21    recruiter, and they first hired me on as a
22    temporary through their service, a
23    one-year contract. But then I got a

Page 352

1     permanent position.
2  Q.  On Page 37 of that document -- see how on
3     the bottom it has little bitty page
4     numbers? Do you see that?
5  A.  Yeah.
6  Q.  Well, up there, what does it say -- where
7     it says dates of employment from 7/2004 to
8     present? What are they referring to
9     there?
10 A.  July 2004 is when I started at EDS.
11 Q.  Okay. So that would be accurate?
12 A.  Yes.
13 Q.  That you worked at EDS until the date of
14    this interview?
15 A.  That's correct.
16 Q.  Okay. And the resume itself, does it
17    mention anywhere on there working at Kelly
18    Services?
19 A.  No. You have to submit your -- once
20    again, you have to mention your jobs you
21    held for over -- permanent jobs for over a
22    year.
23 Q.  And so your resume was developed with that

Page 353

1  instruction in mind?
2  A.  Yes. You never fill a resume out with all
3     the temp jobs you had, unless they're over
4     a year.
5  Q.  Okay. That's all I have. Thank you.
6         MR. WALKER: Just one or two
7         things real quick. Where
8         are we in terms of the
9         exhibits?
10        THE REPORTER: Number 7.
11        MR. STEWART: Can I --
12        MR. WALKER: Do you want to go
13        ahead and ask? Just go
14        ahead and ask.
15 Q.  (By Mr. Stewart:) Did you ever work for
16    EDS in Plano, Texas?
17 A.  Plano, Texas? The first time -- no. The
18    first time I've been to Texas was in July.
19    That's their home office in Plano, Texas.
20 Q.  And you're being represented by Catherine
21    Dickie (phonetic) in your case against
22    Hyundai? Were you at some time being
23    represented by her in your case against

Page 354

```
 1      Hyundai?
 2  A.  Yes.
 3  Q.  And have you terminated her?
 4  A.  Yes.
 5  Q.  And have you hired another counsel in your
 6      case against Hyundai?
 7  A.  Yes.
 8  Q.  And who is that counsel?
 9          THE WITNESS: Well, will you
10          represent me in Hyundai?
11  Q.  I take it that you don't have counsel
12      right now; is that right?
13  A.  That's right.
14  Q.  So is it your present intent to sue
15      Hyundai?
16  A.  I just want Hyundai to make it right.
17      Like I said -- this thing with Catherine
18      Dickie -- let me just point this out.
19      See, EEOC, they had to -- Catherine was my
20      initial attorney, and they had closed it,
21      but then after they found out evidence was
22      produced that Tommy had lied, they opened
23      it back up.  And when they opened it back
```

Page 355

```
 1      up, you know, I didn't want Catherine as
 2      my lawyer anymore.
 3  Q.  Is it your present intent to sue Hyundai?
 4  A.  Well, yeah.
 5  Q.  Okay.  Thank you.
 6              EXAMINATION
 7  BY MR. WALKER:
 8  Q.  All right.  Let me just put in a few
 9      documents, if you don't mind.  Let me show
10      you what I've marked as Defendants'
11      Exhibit 7, and I'll represent to you that
12      it's plaintiff's initial disclosures and
13      ask you if you have ever seen that
14      document before.  I'll tell you what.
15      I'll withdraw that.  It's filed.  All
16      right.
17          MR. WALKER: Do you want me to
18          make a new Exhibit Number 7?
19          (Off-the-record discussion.)
20  Q.  What I'm showing you are Plaintiff's
21      Response to Defendant Don Williams
22      Interrogatories and Request For Production
23      and ask you if, in fact, that is your
```

Page 356

```
 1      response to Don Williams' interrogatories
 2      and request for production.  I just want
 3      you to validate that for the record.
 4          (The referred-to document was
 5          marked for identification as
 6          Defendants' Exhibit No. 7.)
 7  A.  Yeah.
 8  Q.  Okay.  And let me just have it back for a
 9      second, please.  I'll ask you, is -- on
10      the third page of this document, is that
11      your signature there?
12  A.  Yes.
13  Q.  Okay.  And that's Exhibit 7.  Thank you
14      very much.
15          (The deposition of ELIZABETH
16          HORTON concluded at
17          approximately 4:45 p.m. on
18          November 20, 2007.)
```