# EXHIBIT B

**EXHIBIT**
tabbies*
**B**

**MERRILL LEGAL SOULTIONS**
Court Reporting*Legal Videography*Trial Services

Page 3

1   IN THE UNITED STATES DISTRICT COURT
    FOR THE MIDDLE DISTRICT OF ALABAMA
2              NORTHERN DIVISION
3
    ELIZABETH HORTON,
4
        Plaintiff,
5                     CASE NUMBER
        vs.      2:06cv-526-MHT-TFM
6
    DON WILLIAMS, individually and in his
7   capacity as the Manager of National
    Seating and Mobility, Inc., NATIONAL
8   SEATING AND MOBILITY, INC., GERALD
    SHOCKLEY, individually and in his
9   capacity of a special agent of the
    Alabama Attorney General's Office,
10
        Defendants.
11
12  * * * * * * * *
13
14      DEPOSITION OF FELECIA SALARY
15  BARROW, taken pursuant to stipulation
16  and agreement before Barbara A. Howell,
17  CCR, Commissioner for the State of
18  Alabama at Large, ACCR No. 123, in the
19  Bradley, Arant, Rose & White Conference
20  Room, 401 Adams Avenue, Room 712,
21  Montgomery, Alabama, on Wednesday,
22  January 30, 2008, commencing at
23  approximately 2:10 p.m.

Page 2

1   A P P E A R A N C E S
2
    FOR THE PLAINTIFF:
3
    Ms. Deborah M. Nickson
4   LAW OFFICE OF DEBORAH M. NICKSON
    2820 Fairlane Drive, Suite A-10
5   Montgomery, Alabama 36116
6
    FOR DEFENDANT DON WILLIAMS:
7
    Mr. Dorman Walker
8   BALCH & BINGHAM
    105 Tallapoosa Street, Suite 200
9   Montgomery, Alabama 36104
10
    FOR DEFENDANT NATIONAL SEATING &
11  MOBILITY:
12  Mr. Charles A. Stewart, III
    Ms. Quindal C. Evans
13  BRADLEY, ARANT, ROSE & WHITE
    401 Adams Avenue, Suite 780
14  Montgomery, Alabama 36104
15
    FOR DEFENDANT GERALD SHOCKLEY:
16
    Mr. Jack Wallace, Jr.
17  OFFICE OF THE ATTORNEY GENERAL
    State of Alabama
18  11 South Union Street
    Montgomery, Alabama 36130
19
20
21
22
23

Page 3

1          I N D E X
2
3   EXAMINATION BY:              PAGE
4   MS. NICKSON.....................   5
5   MR. STEWART......................  59
6   MR. WALKER....................... 109
    MR. WALLACE.....................  129
7
8   EXHIBITS                     PAGE
9   PLAINTIFF'S EXHIBIT #6...........   5
10    Memo Dated February 16, 2005,
      from Ms. Barrow to Dr. McIntyre
11    with Attachments
12  PLAINTIFF'S EXHIBIT #7...........  12
13    Medicaid Policy Section
      (Durable Medical Equipment)
14
    PLAINTIFF'S EXHIBIT #8...........  42
15
      Medicaid Complaint 8-04-0150
16
    PLAINTIFF'S EXHIBIT #9...........  48
17
      Memorandum dated July 9, 2004,
18    from Ms. Barrow to Rochelle
      Winters
19
    PLAINTIFF'S EXHIBIT #10..........  53
20
      Interview Report Form (Don
21    Williams)
22  PLAINTIFF'S EXHIBIT #10..........  56
23    Interview Report Form (Felecia
      Barrow)

Page 4

1          S T I P U L A T I O N S
2       It is hereby stipulated and agreed
3   by and between counsel representing the
4   parties that the deposition of FELECIA
5   SALARY BARROW is taken pursuant to the
6   Federal Rules of Civil Procedure and
7   that said deposition may be taken before
8   Barbara A. Howell, Court Reporter and
9   Commissioner for the State of Alabama at
10  Large, without the formality of a
11  commission; that objections to questions
12  other than objections as to the form of
13  the questions need not be made at this
14  time but may be reserved for a ruling at
15  such time as the deposition may be
16  offered in evidence or used for any
17  other purpose as provided for by the
18  Federal Rules of Civil Procedure.
19      It is further stipulated and agreed
20  by and between counsel representing the
21  parties in this case that said
22  deposition may be introduced at the
23  trial of this case or used in any manner

1 (Pages 1 to 4)

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

| Page 5 | Page 7 |
|---|---|
| 1  by either party hereto provided for by | 1  for Medicaid? |
| 2  the Federal Rules of Civil Procedure. | 2  A. From 1999 until 2005. |
| 3 | 3  Q. And what was your position there? |
| 4  *  *  *  *  *  *  *  * | 4  A. I held several positions. Do you want |
| 5 | 5  all of those in . . . |
| 6  (Plaintiff's Exhibit #6 was | 6  Q. Yes, ma'am. |
| 7  marked for identification.) | 7  A. Okay. I was a Medicaid Administrator I |
| 8  FELECIA SALARY BARROW | 8  with the medical services division in |
| 9  The witness, having first been duly | 9  1999. In 2001, I became the associate |
| 10  sworn or affirmed to speak the truth, | 10  director in the long-term care |
| 11  the whole truth, and nothing but the | 11  division. And in 2003, I moved to the |
| 12  truth, testified as follows: | 12  prior approval unit, which was within |
| 13  THE REPORTER: Usual federal | 13  the medical director's office, where I |
| 14  stipulations? | 14  was associate director. |
| 15  MS. NICKSON: Yes. | 15  Q. All right. And why did you leave the |
| 16  MR. STEWART: Sure. | 16  Medicaid Agency? |
| 17  MR. WALKER: Yes. | 17  A. Oh, I left because of a better job |
| 18  EXAMINATION | 18  opportunity. |
| 19  BY MS. NICKSON: | 19  Q. All right. More money? |
| 20  Q. Would you state your name for the | 20  A. Yes. Yes. |
| 21  record, please. | 21  Q. And during your employment with the |
| 22  A. Felecia Salary Barrow. | 22  Medicaid Agency, did you address any |
| 23  Q. Ms. Barrow, I'm Attorney Deborah | 23  concerns regarding infractions or |

| Page 6 | Page 8 |
|---|---|
| 1  Nickson and I represent Elizabeth | 1  alleged infractions by National |
| 2  Horton in this case. Elizabeth filed a | 2  Seating & Mobility? |
| 3  lawsuit and she sued three people or | 3  A. Yes. |
| 4  persons -- one is a corporation -- | 4  Q. What, if anything, can you remember? |
| 5  Gerald Shockley, Don Williams, and | 5  A. Just basically broad -- I'll generalize |
| 6  National Seating & Mobility. And it's | 6  because I don't remember a lot of |
| 7  concerning claims around what she | 7  details. But there were several |
| 8  contends is a wrongful arrest -- | 8  instances where we received prior |
| 9  A. Okay. | 9  approval requests -- and I don't know |
| 10  Q. -- that was made of her regarding some | 10  if everyone understands the process |
| 11  alleged allegations that she made | 11  that we go through -- |
| 12  against National Seating & Mobility. | 12  Q. Okay. |
| 13  Are you familiar with Elizabeth Horton? | 13  A. -- or that we would go through with a |
| 14  A. Yes. | 14  prior approval request. |
| 15  Q. And what do you do for a living? | 15  Q. Okay. If we can stop right there. |
| 16  A. I'm currently the program coordinator | 16  Would you explain the prior approval |
| 17  with the Steps to a Healthier Alabama | 17  process? |
| 18  Program, Montgomery Area Community | 18  A. Okay. With durable medical equipment |
| 19  Wellness Coalition. | 19  companies, depending on what their |
| 20  Q. And did you work for Medicaid in the | 20  requests were for, basically -- we'll |
| 21  past? | 21  just take wheelchairs, for example. If |
| 22  A. Yes. | 22  they had clients who were in need of |
| 23  Q. And what period of time did you work | 23  wheelchairs or any durable medical |

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 9

1  equipment that required a prior
2  authorization before they could
3  actually deliver that equipment to the
4  client and be reimbursed through
5  Medicaid, they would have to go through
6  a process of requesting that we review
7  justification for providing that
8  equipment to the Medicaid client. So
9  once we reviewed that information, we
10  would then put the request in a
11  conditionally approved status, and that
12  would be pending their actual delivery
13  of that equipment. They would then
14  have to get the client's signature and
15  the date. We would give them a certain
16  amount of time in order to deliver that
17  equipment and, once they delivered it,
18  submit to us a delivery ticket; and we
19  would go into the system and approve
20  the PA request. Once it's approved,
21  they can then file for reimbursement
22  from Medicaid for that equipment.
23  Q. Now, what time frame are we -- do you

Page 10

1  look at? Where does the date begin to
2  run for the approval process?
3  A. Gosh, that's been a while since I dealt
4  with policy. From the time that they
5  submit their request, we would allow
6  staff at Medicaid approximately sixty
7  days, I do believe, to review the
8  request and get some type of answer
9  back to the client or the DME company.
10  And once they got their information
11  back, they had, I believe, sixty days
12  from that time frame in order to
13  deliver that equipment. If they were
14  outside of that time frame or if they
15  discovered that something was going
16  wrong with the order, they could call
17  us and ask us to extend that time.
18     But for an extension to be
19  granted, we would have to have
20  reasonable justification for doing so.
21  If -- if maybe the client maybe missed
22  clinic, if they did not get a chance to
23  get the equipment in because of a

Page 11

1  manufacturer's error or delay, they
2  would then communicate that to us. We
3  would go in the system and note that
4  there was an extension granted; and the
5  extensions would be granted for thirty,
6  sixty, or ninety days. I think that's
7  how we did it at the time. But once
8  those were allowed, then they could
9  then go through the process and we
10  would note it to the file.
11     If they did not go through that
12  process of requesting an extension,
13  then we would send that information to
14  the medical director to get some type
15  of direction as to what we need to do.
16  Policy would dictate that we would
17  decline their request. But that's just
18  the process that we went through.
19  Q. And the process that you just
20  explained, would that process apply
21  to -- would you call National Seating &
22  Mobility, would you call them a vendor?
23  A. Or a DME provider, Medicaid provider.

Page 12

1  Q. But if someone referred to them as a
2  vendor --
3  A. Yes.
4  Q. -- that would be --
5  A. That would be accurate.
6  Q. All right. I'm going to show you what
7  we'll mark as Plaintiff's Exhibit #7.
8     (Plaintiff's Exhibit #7 was
9        marked for identification.)
10  Q. If you would, just identify that
11  document for the record.
12  A. Okay. This is the information that we
13  have in our provider manual that
14  basically outlines Medicaid's policy
15  with regard to durable medical
16  equipment.
17  Q. And it's just the policy that you were
18  just referring to?
19  A. Yes.
20  Q. And each vendor was required to comply
21  with the policy?
22  A. That's correct.
23  Q. All right. Now, let's talk about --

3 (Pages 9 to 12)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 13

1  you've explained the process for
2  approval. Now, let's direct our
3  attention on National Seating &
4  Mobility.
5  A. Yes.
6  Q. Do you remember any particular problems
7  with them?
8      MR. STEWART: Object to the
9      form.
10     MR. WALKER: Object to the
11     form.
12  A. Yes. With National Seating, they --
13  initially, when I took over the unit
14  and was applying the policy across the
15  board, we had several employees that
16  were with National Seating that every
17  time someone left, a new person would
18  come aboard and they would request
19  several extensions on equipment. And
20  we would finally get to a place where
21  we would try to get justification from
22  them. Most of the time, the
23  justification that we received was that

Page 14

1  the children did not go to clinic; Mom
2  didn't take the child to clinic. So,
3  therefore, they were not able to fit
4  the child for whatever the device was
5  and that was the delay. So we --
6  Q. Let me stop you right there.
7  A. Okay.
8  Q. Did you all investigate any of those
9  delays, excuses?
10  A. Well, their -- when they became very
11  frequent, we would send -- I would do a
12  memo and I would send it to our
13  investigations unit through our medical
14  director, always copying her on all of
15  it. Any time that we had those
16  continuous excuses -- because we just
17  thought it was unreasonable to think
18  that every time the children were
19  missing clinic.
20  Q. Did you consider it as a red flag?
21  A. Yes, we did.
22      MR. STEWART: Object to the
23      form.

Page 15

1      MR. WALKER: Object to the
2      form.
3  Q. Okay.
4  A. So we would then, any time there was a
5  call from a parent -- because the
6  parent was told that the delay was
7  always on Medicaid, that Medicaid had
8  not completed all the paperwork;
9  Medicaid, we're waiting on Medicaid.
10  They were told this by National
11  Seating, so they would in turn call us.
12  So as the parents would call in, we
13  would have that opportunity to find out
14  if they were actually missing clinic,
15  if the children were missing clinic.
16  So the -- we would ask and the parents
17  would always say, you know, no, I would
18  never miss a clinic, this child needs
19  this device to go to school so no, we
20  would not miss clinic.
21  Q. Let me stop you right there. What
22  you're saying is National Seating &
23  Mobility would tell your department --

Page 16

1  tell the parents that Medicaid --
2  A. -- was the delay.
3      MR. STEWART: Let her finish
4      the question, please,
5      ma'am, before you give
6      an answer --
7      THE WITNESS: I'm sorry.
8      MR. STEWART: -- because the
9      lawyers at this table
10     need to object to some
11     of these questions. And
12     so if you can just let
13     her finish the question,
14     we can get our
15     objections in, and then
16     you answer.
17     THE WITNESS: Okay.
18  Q. All right. The problem is, is that
19  with this, if two of us are talking at
20  the same time, she can only record one.
21  Okay?
22      Now, what I started to ask you,
23  what you're saying is that during your

4 (Pages 13 to 16)

| Page 17 | Page 19 |
|---|---|
| 1     employment with Medicaid Agency, that | 1     form. |
| 2     you had parents to call in asking about | 2   A. We had dates in the system that |
| 3     the delay in them receiving their | 3     indicated when the PA request came in, |
| 4     equipment? | 4     when it was -- if it was placed on a |
| 5   A. Yes. | 5     conditional approval status, when that |
| 6   Q. And they were told by National | 6     happened. If there was a note to the |
| 7     Seating & Mobility that the delay was | 7     file that there was a request for an |
| 8     caused by Medicaid? | 8     extension, all of that information |
| 9        MR. STEWART: Object to the | 9     always appeared in the computer system. |
| 10       form. | 10   Q. And approximately how many calls did |
| 11   A. Yes. | 11     you answer, if you can remember? |
| 12   Q. Am I correct? Was -- | 12   A. I honestly don't remember. |
| 13   A. Yes. | 13   Q. Was it less than ten or -- |
| 14   Q. -- that what you said? Okay. And the | 14       MR. STEWART: Object to the |
| 15     callers, by them calling, it would give | 15       form. |
| 16     you the opportunity to make an inquiry. | 16   Q. -- more than ten? |
| 17   A. Yes. | 17       MR. WALKER: Object to the |
| 18   Q. Am I correct? | 18       form. |
| 19   A. Yes. | 19   A. More than ten. |
| 20   Q. And your inquiry to the caller would be | 20   Q. It was more than ten people that |
| 21     concerning whether or not they had | 21     complained? |
| 22     missed what appointment? | 22       MR. STEWART: Object to the |
| 23   A. Yes. Their clinic appointment. | 23       form. |

| Page 18 | Page 20 |
|---|---|
| 1   Q. Their clinic appointment. So in fact, | 1       MR. WALKER: Object to the |
| 2     what National Seating & Mobility was | 2       form. |
| 3     telling you and your department was | 3   A. Yes. |
| 4     fraudulent. | 4   Q. And it was more than ten people that |
| 5       MR. WALKER: Object to the | 5     you noted that National Seating & |
| 6       form. | 6     Mobility was giving that caller wrong |
| 7       MR. STEWART: Object to | 7     information? |
| 8       form. | 8       MR. STEWART: Object to |
| 9   Q. Am I correct? | 9       form. |
| 10       MR. STEWART: Object to | 10       MR. WALKER: Object to the |
| 11       form. | 11       form. |
| 12       MR. WALKER: Same objection. | 12   A. That's correct. |
| 13   A. I would say that what they were telling | 13   Q. And what, if anything, did you do at |
| 14     the client was not true based on what | 14     that point? |
| 15     we had in our computer system. | 15   A. At that point, sometimes we would |
| 16   Q. Oh, okay. So what would be the | 16     contact National Seating, the employees |
| 17     difference of what you were indicating | 17     there, to find out, you know, what was |
| 18     in your computer system and what | 18     going on with that client; to inform |
| 19     National Seating & Mobility was telling | 19     that we had this client's parent to |
| 20     the caller? | 20     call; they were told that it was |
| 21       MR. STEWART: Object to | 21     Medicaid's delay; however, this is what |
| 22       form. | 22     our computer is showing. And that's |
| 23       MR. WALKER: Object to the | 23     basically what we would do, is just |

5 (Pages 17 to 20)

Page 21

1    call to let them know that it was not a
2    Medicaid delay; however, it was delay
3    on their end.
4  Q. All right. If you all would not
5    approve the request submitted to you by
6    National Seating & Mobility, it would
7    result in the loss of income for them.
8    Am I correct?
9         MR. STEWART: Object to
10        form.
11 A. That's correct.
12 Q. All right. Let me -- did you ever meet
13    Elizabeth Horton?
14 A. Yes, I did.
15 Q. Where did you meet her?
16 A. I actually went to National Seating &
17    Mobility.
18 Q. For what purpose?
19 A. I wanted to find out what their process
20    was. We -- we tried to provide
21    technical assistance whenever we can to
22    providers when there seems to be quite
23    a bit of delay in processing PA

Page 22

1    requests. So since they were in
2    Montgomery -- even though we were quite
3    understaffed and we're not able to go
4    all across the state, since they were
5    in Montgomery, I told Ms. Horton that I
6    would like to come by just to look at
7    their files, look at their system to
8    see what they had in place. And she
9    said okay.
10 Q. Is that within the job description or
11    job duties and responsibilities that
12    you had as an associate or assistant
13    director?
14 A. Yes.
15 Q. And you can proceed.
16 A. So I would -- I went to National
17    Seating & Mobility, met Ms. Horton for
18    the first time.
19 Q. Was this in 2004?
20 A. I don't remember.
21 Q. Was it during Ms. Horton's
22    employment --
23 A. Yes, it was.

Page 23

1  Q. -- at the company?
2  A. Yes.
3  Q. Okay.
4  A. And I went by just to meet Elizabeth
5    and to just look at the system that
6    they had in place. She did introduce
7    me to Mr. Williams. And we proceeded
8    to look in her area to see where she
9    kept her files, what types of PA
10    requests were already pending, you
11    know, what she needed help on in order
12    to get them through the process, because
13    what our main focus was, was getting
14    those requests in so that we could
15    process them and would not be behind.
16 Q. And how long did you stay at the
17    location on that date?
18 A. I don't recall, but it could not -- I
19    don't think it was over an hour or two.
20 Q. What kind of relationship did you and
21    Ms. Horton have?
22 A. Well, we had a friendly relationship.
23    It was nothing different from any other

Page 24

1    vendor that we would come in contact
2    with on a, you know, continuous basis.
3  Q. If someone told an investigator that
4    you and Ms. Horton were friends, would
5    they be lying?
6         MR. WALKER: Object to the
7         form.
8  A. I would not consider us friends.
9    Acquaintances perhaps, simply because
10    of the nature of dealing with one
11    another on a daily basis.
12 Q. So you knew her in the professional
13    capacity?
14 A. Yes.
15 Q. Did you ever attend a concert with her?
16 A. No, I didn't. She had informed me that
17    there was a concert that was happening
18    in the city. And she did not attend
19    the concert; however, I did, with a
20    friend of mine.
21 Q. What was your understanding of Don
22    Williams' position with National
23    Seating & Mobility at that time?

6 (Pages 21 to 24)

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 25

1  A. At that time, as I understood it, he
2     was basically a technician. He would
3     help to put the equipment together and
4     help fit the clients with their
5     equipment.
6  Q. So he did not have the power to hire
7     and fire, as you understand?
8         MR. WALKER: Object to the
9            form.
10        MR. STEWART: Same
11           objection.
12 A. As I understood it, no.
13 Q. All right. If Mr. Williams said he was
14    a technician, you don't have any reason
15    to doubt that, do you?
16 A. No.
17 Q. All right. Did you ever talk to a
18    young lady by the name of Chaseley
19    Weeks?
20 A. Yes.
21 Q. Who is she?
22 A. She was a former employee of National
23    Seating & Mobility. We had dealt with

Page 26

1     Chaseley prior to Elizabeth coming on
2     board, I believe.
3  Q. Did Chaseley make any complaints or
4     talk about any infractions --
5  A. Not to me.
6         MR. WALKER: Object to the
7            form.
8  Q. Have you ever been told that anybody
9     stated that Emily Williams advised one
10    of the physical therapists not to place
11    dates on prescriptions?
12        MR. STEWART: Object to the
13           form.
14        MR. WALKER: Object to the
15           form.
16 A. I believe that we did get a phone call
17    from a therapist. One of my staff
18    members, one of my nurse reviewers, had
19    received a phone call and we were
20    questioning the date. She questioned
21    the date being missing. And he
22    informed her that they were told not to
23    put dates on the forms.

Page 27

1  Q. Let me show you what I have marked as
2     Plaintiff's Exhibit #3.
3         MR. WALKER: Deborah, which
4            one is that? That's
5            the -- oh, okay. Never
6            mind. I know what it
7            is. Thanks.
8         (Brief pause while witness
9            reviews document)
10 Q. Okay. Do you remember writing that
11    memo?
12 A. Yes.
13 Q. And when you wrote this memo, what was
14    your intent?
15 A. Basically, to inform my director that
16    clinic dates were missing and inform of
17    the information that was provided by
18    the PT.
19 Q. Now I'm going to show you what I've
20    marked as Plaintiff's Exhibit #6. If
21    you would, review that document. The
22    top memo is probably the same as
23    Plaintiff's Exhibit #3, but if you

Page 28

1     would look at the attachments to
2     Plaintiff's Exhibit #6.
3         (Brief pause while witness
4            reviews document)
5  A. Okay.
6  Q. Now, in your memo -- and I'll just
7     reference Plaintiff's Exhibit #6 --
8     your first statement in paragraph 1,
9     you say, Please find attached exhibits
10    of wheelchair assessments that have
11    been submitted by National Seating &
12    Mobility-Montgomery that were missing
13    the clinic dates. And I'm going to
14    show you once again the attachments to
15    Plaintiff's Exhibit #6, which is your
16    memo dated February 16, 2005. Now, is
17    this an example --
18 A. Yes.
19 Q. -- of clinic dates missing?
20 A. Yes.
21 Q. Is this a violation of the policy?
22        MR. STEWART: Object to
23           form.

**2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com**
**1-800-888-DEPO**

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 29

1  A. Yes.
2  Q. Now, what advantage would National
3      Seating & Mobility have by not dating
4      these clinic dates?
5              MR. STEWART: Object to the
6          form.
7              MR. WALKER: Object to the
8          form.
9  A. When there is a clinic held and the
10     date that they make the assessment of
11     the client, they have a certain time
12     frame in order to get the PA request
13     in.
14 Q. Now, who are "they"?
15 A. The vendor.
16 Q. Okay. And the vendor being?
17 A. National Seating & Mobility.
18 Q. Okay.
19 A. And if there is no date listed on the
20     clinic assessment form, then we have no
21     way of judging from whatever point to
22     thirty days later when that PA request
23     should have come to the agency.

Page 30

1  Q. So by leaving this date blank, then
2      National Seating & Mobility would be in
3      position to alter the time line of
4      which they are required --
5              MR. WALKER: Object to the
6          form.
7              MR. STEWART: Object to the
8          form.
9  A. Yes.
10 Q. -- to get the information --
11 A. Yes.
12 Q. -- to you?
13             MR. WALKER: Object to the
14         form.
15             MR. STEWART: Object to the
16         form. Please, ma'am,
17         let her finish the
18         question; and once she's
19         finished, we may have an
20         objection and then --
21         THE WITNESS: I apologize.
22         MR. STEWART: That's okay.
23             And I know it's a

Page 31

1              foreign experience for
2          most people.
3          MS. NICKSON: Okay. Now,
4              what I'm going to also
5              ask is that counsel wait
6              till I finish the
7              question.
8          MR. WALKER: Fair.
9          MR. STEWART: Well, we'd
10             like to.
11 Q. (By Ms. Nickson) All right. Let me
12     restate this. By not dating this form,
13     it's an advantage to National Seating &
14     Mobility?
15             MR. STEWART: Object to the
16         form.
17             MR. WALKER: Object to the
18         form.
19 A. Yes.
20 Q. And what is that advantage?
21             MR. STEWART: Object to the
22         form.
23             MR. WALKER: Same objection.

Page 32

1  A. That the vendor, National Seating &
2      Mobility, would be able to hold a
3      request for an unlimited period of time
4      and still submit it to the Medicaid
5      Agency without us being able to verify
6      the date in which the assessment was
7      actually done.
8  Q. And is this what you all consider as
9      fraudulent activity?
10             MR. STEWART: Object to the
11         form.
12 A. We consider --
13             MR. WALKER: Object to the
14         form.
15 A. I would say that it was inappropriate
16     in order for them to leave off dates.
17     It goes against policy.
18 Q. All right. Now, Plaintiff's
19     Exhibit #6, the memo states that two of
20     the assessments were conducted by Gerry
21     Rodgers, of physical therapy, and one
22     of Michael Maddox, RPT, both of
23     Children's Rehab Services. Okay?

8 (Pages 29 to 32)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 33

1  Teresa Surles, a registered nurse,
2  questioned the assessments and was told
3  by Gerry Rodgers to get the dates from
4  Emily at National Seating. Now, is it
5  appropriate for Emily at National
6  Seating to give dates to place --
7          MR. STEWART: Object to
8          form.
9  Q. -- for clinic dates?
10         MR. WALKER: Object to the
11         form.
12         MR. STEWART: Object to
13         form.
14  A. As I understood it, Emily was the
15  person who would be working along with
16  the PT in clinic with the client. So
17  it would be appropriate for her to
18  provide a date.
19  Q. So this Children's Rehabilitation
20  Service report of visit, would Emily
21  provide a date for this visit?
22  A. Yes, it would be appropriate for her to
23  do so.

Page 34

1  Q. The next sentence: I informed Teresa
2  that the clinic dates should be kept at
3  CRS where the assessment was conducted.
4  So in this case, did they say Emily had
5  the date?
6  A. Teresa was told by Gerry Rodgers to get
7  the date from Emily.
8  Q. Then you said, Teresa, under my
9  direction, contacted CRS to get the
10  clinic date instead of Emily. Jackie,
11  parenthesis, CRS, informed Teresa that
12  the date of the clinic appointment was
13  July 20th, '04. The PA request was
14  submitted in February '05. What's
15  wrong with those dates?
16         MR. STEWART: Object to
17         form.
18  A. They would be out of date, according to
19  the policy.
20  Q. So if that clinic date was July 20th,
21  '04, and they submitted this request
22  February '05, is that against the
23  policy?

Page 35

1          MR. STEWART: Object to the
2          form.
3          MR. WALKER: Object to the
4          form.
5  A. Yes, it is.
6  Q. Was this one of the complaints that
7  Elizabeth had against the company,
8  failure for them to place dates?
9          MR. STEWART: Object to the
10         form.
11  A. I do recall her mentioning that there
12  were dates missing from forms.
13  Q. Did she ever tell you that they wanted
14  her to fill in some of these dates?
15         MR. STEWART: Object to
16         form.
17  A. I don't recall if they were clinic
18  dates that they wanted her to fill in.
19  Q. But do you recall her saying they
20  wanted her to fill in any dates --
21  A. Yes.
22  Q. -- on any of the forms?
23  A. Yes.

Page 36

1  Q. And what dates were those?
2  A. Those would be dates on delivery
3  tickets.
4  Q. And did she fill them in?
5          MR. STEWART: Object to the
6          form.
7          MR. WALKER: Same objection.
8  A. I don't recall. I can state that when
9  we received --
10         MR. STEWART: Excuse me.
11         There's no question.
12  Q. Okay. What else do you remember?
13  A. When we received the request and the
14  delivery tickets, they had dates on
15  them.
16  Q. But you're saying Elizabeth Horton had
17  said that they would have delivery
18  tickets not dated?
19         MR. STEWART: Object to the
20         form.
21  A. Yes.
22  Q. Would you not date delivery tickets
23  to -- what would be the purpose in not

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 37

1 dating the delivery tickets?
2         MR. WALKER: Object to the
3     form.
4         MR. STEWART: Object to the
5     form.
6 A. If a vendor does not put a date or have
7     the client date a delivery ticket, it
8     basically does not give the Medicaid
9     Agency any indication that the
10    equipment was delivered in the time
11    frame allowed by policy.
12 Q. And failure to deliver the equipment in
13    a timely manner, what would be the
14    adverse consequence?
15        MR. STEWART: Object to the
16    form.
17 A. It goes against policy. And that would
18    have been left up to the directors at
19    the agency as to what the consequence
20    would be.
21 Q. All right. Now, to continue reading in
22    the second paragraph for Plaintiff's
23    Exhibit #6, it says, Subsequent fax was

Page 38

1 received from Gerry Rodgers indicating
2     that the assessment was reviewed on
3     2/15/05 and was still okay. Then you
4     said, I conferred with Teresa and
5     Debbie and thought we needed to update
6     the clinic notes telling us current
7     condition of the client.
8         Then on another client, both the
9     physician's note of medical necessity
10    and the PT assessment were lacking
11    dates. So you're saying in addition to
12    the two that's attached, you found some
13    other dates --
14        MR. STEWART: Object to the
15    form.
16 Q. -- missing. Is that what you're saying
17    there?
18        MR. STEWART: Object to the
19    form.
20 A. On one other client.
21 Q. Then the next-to-last paragraph, you
22    state that Teresa came across another
23    assessment completed by M. Maddox. Is

Page 39

1     that Michael Maddox?
2 A. Yes.
3 Q. Who is he?
4 A. He's a physical therapist.
5 Q. And placed to call to the physical
6     therapist to find out why the date was
7     missing. Could you read the physical
8     therapist's response in the record?
9         MR. STEWART: Object to
10    form.
11 A. Maybe we're not supposed to do this,
12    but I never put dates on the
13    assessments or the prescriptions
14    because it messes up the vendor, like
15    we're on a time clock.
16 Q. So what is he saying there?
17 A. He's basically indicating that if they
18    put the date on the form, then they
19    would be held to the time frame allowed
20    in the Medicaid policy to get those
21    requests in.
22 Q. And is that an infraction when people
23    fail to place dates?

Page 40

1         MR. STEWART: Object to
2     form.
3         MR. WALKER: Object to the
4     form.
5 A. Yes, because it goes against policy.
6 Q. And is it misleading the --
7         MR. STEWART: Object to the
8     form.
9         MR. WALKER: Object to the
10    form. Sorry. Go ahead.
11 Q. Is it misleading the Medicaid Agency?
12        MR. WALKER: Object to the
13    form.
14        MR. STEWART: Object to the
15    form.
16 A. Yes.
17 Q. And, actually, is it fair to say that
18    it's fraud?
19        MR. WALKER: Object to the
20    form.
21        MR. STEWART: Object to the
22    form.
23 A. Yes.

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

| Page 41 |
|---|
| 1   Q.  It is odd that on the assessments -- |
| 2        reading from Plaintiff's Exhibit #6 |
| 3        again, continuing in paragraph 3.  It |
| 4        is odd that on the assessments that |
| 5        Mr. Maddox has done for other vendors |
| 6        have a date on them but the ones done |
| 7        for National Seating do not have dates. |
| 8        What was odd about that? |
| 9   A.  Because he put the dates in with other |
| 10       vendors, clients. |
| 11  Q.  Did Mr. Maddox know, if you know, Don |
| 12       and Emily Williams? |
| 13  A.  I'm sorry.  Could you -- |
| 14  Q.  Did they have a personal relationship |
| 15       with Mr. Maddox? |
| 16  A.  No, not Mr. Maddox. |
| 17  Q.  How about Mr. Rodgers? |
| 18  A.  Yes. |
| 19  Q.  They knew each other outside the |
| 20       workplace? |
| 21  A.  Yes. |
| 22  Q.  They were friends? |
| 23  A.  Yes.  That's what we were told. |

| Page 42 |
|---|
| 1   Q.  Who told you that? |
| 2   A.  Mr. Rodgers. |
| 3   Q.  Now, this last sentence in paragraph -- |
| 4        in the third paragraph, Plaintiff's |
| 5        Exhibit #6, you said, This was the same |
| 6        information that was reported by former |
| 7        National Seating employee, Elizabeth |
| 8        Horton. |
| 9   A.  Yes. |
| 10  Q.  So Elizabeth Horton had reported the |
| 11       same information that you witnessed |
| 12       firsthand. |
| 13  A.  Yes. |
| 14  Q.  So based on what Ms. Horton had |
| 15       reported and what you had reviewed, did |
| 16       you request an investigation? |
| 17  A.  Yes, I did. |
| 18  Q.  Now, I'm going to show you what we'll |
| 19       mark as Plaintiff's Exhibit #8. |
| 20            (Plaintiff's Exhibit #8 was |
| 21            marked for identification.) |
| 22       MR. WALKER:  I'm sorry, |
| 23            Deborah.  Which exhibit |

| Page 43 |
|---|
| 1           is this? |
| 2        MS. NICKSON:  This is |
| 3           Plaintiff's Exhibit #8. |
| 4        MR. WALKER:  Thank you. |
| 5        MS. NICKSON:  Bates Drab 13, |
| 6           page 13. |
| 7   Q.  The complaint made by Ms. Horton was |
| 8        made when, if you know? |
| 9   A.  I don't remember. |
| 10  Q.  All right.  Look at the date on that |
| 11       form, top right-hand corner, I think. |
| 12       Would you state the date for the |
| 13       record? |
| 14  A.  This is August 2nd, '04. |
| 15  Q.  And your memo in Plaintiff's Exhibit #6 |
| 16       is dated what date? |
| 17  A.  February 16th of '05. |
| 18  Q.  So, now, this form, assuming that this |
| 19       is Ms. Horton's complaint, what was the |
| 20       alleged complaint by Ms. Horton? |
| 21       MR. STEWART:  Object to |
| 22           form. |
| 23  A.  The allegation here is for fraudulent |

| Page 44 |
|---|
| 1        billing activities. |
| 2   Q.  And failure to put in dates, would that |
| 3        be connected to the billings? |
| 4        MR. STEWART:  Object to the |
| 5           form. |
| 6   A.  That would be connected to billing. |
| 7   Q.  All right.  So if they manipulate |
| 8        dates -- if National Seating & |
| 9        Mobility, Don Williams, Emily Williams, |
| 10       were manipulating dates on these clinic |
| 11       dates and the delivery dates, that |
| 12       affects billing -- |
| 13  A.  Yes. |
| 14       MR. STEWART:  Object to the |
| 15           form. |
| 16       MR. WALKER:  Object to the |
| 17           form. |
| 18  Q.  -- and would amount to fraudulent |
| 19       billing practices? |
| 20       MR. WALKER:  Object to the |
| 21           form. |
| 22       MR. STEWART:  Object to the |
| 23           form. |

11 (Pages 41 to 44)

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 45

1   A. Yes.
2   Q. All right. I'm just going to ask you
3       about this because I don't know myself
4       what that means. You may recognize
5       that screen. I'm not even sure if I'm
6       going to admit that as an exhibit. Is
7       that some kind of computer screen or
8       something maybe?
9   A. Yes.
10  Q. If you don't recognize it, that's fine.
11      Do you recognize that?
12  A. Yes.
13  Q. Well, what is this document?
14  A. This is their provider eligibility
15      screen, which allows us to put in a
16      provider number and bring up the
17      information, basically, on the
18      provider. It should give the effective
19      date of enrollment as a Medicaid
20      provider as well as their specialty
21      type, if there is one.
22  Q. Would it also allow you to print out a
23      list of the recipients --

Page 46

1   A. Based on --
2   Q. -- that --
3   A. Based on this screen, we would have to
4       go to another screen that would allow
5       us to pull up every --
6   Q. I understand.
7   A. Yes.
8   Q. So this is not a preliminary screen to
9       accessing a screen where you can pull
10      up the recipients?
11  A. I think you could use this screen if
12      you had a provider number but did not
13      have basic information on the provider
14      or if you had information and did not
15      have the number.
16  Q. In that physical address, contact, it
17      said a William Ballard. Is that name
18      familiar to you?
19  A. No.
20  Q. Well, could that possibly be a
21      recipient?
22  A. No.
23  Q. Or parent client?

Page 47

1   A. It would have to be a staff person of
2       National Seating & Mobility.
3   Q. Did you ever deal with a William
4       Ballard?
5   A. No.
6   Q. All right.
7           MR. WALKER: Did you mark
8       that, Deborah?
9           MS. NICKSON: No.
10          (Brief pause)
11  Q. In your communications with Elizabeth
12      Horton, did she ever say that Emily and
13      Don did not deliver wheelchairs?
14  A. She did indicate that, as I recall,
15      wheelchairs were not delivered in a
16      timely manner.
17  Q. But not that they were not delivered?
18  A. I don't recall.
19  Q. Best you could remember, was her
20      complaint surrounding just no delivery
21      in a timely manner?
22          MR. STEWART: Object to the
23      form.

Page 48

1   A. Yes.
2           MS. NICKSON: This is Bates
3       Drab 0007. We'll mark
4       this as Plaintiff's
5       Exhibit #9.
6           (Plaintiff's Exhibit #9 was
7       marked for identification.)
8   Q. If you would, review that document and
9       identify it for the record, please.
10          MS. NICKSON: Let's go off
11      the record.
12          (Off-the-record discussion)
13          (Brief pause while witness
14      reviews document)
15  Q. Ms. Barrow, now that you've referred
16      the --
17          MR. WALKER: Jack's not
18      back. I don't know if
19      you want to wait.
20          MS. NICKSON: Yeah, I want
21      to wait.
22          (Brief pause)
23  Q. Ms. Barrow, you've reviewed what we

**2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com**
**1-800-888-DEPO**

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 49

1    marked as Plaintiff's Exhibit #9, Bates
2    Page No. 7. If you can, identify this
3    document for the record, please.
4    A. This is a memo that I drafted based on
5    information received from Elizabeth
6    Horton about allegations of fraudulent
7    activity.
8    Q. And in the body of this memo, you set
9    out four things apparently Ms. Horton
10    reported to you. And if you could,
11    just cite those for the record, please.
12    A. Okay. The first is forgery of
13    recipients' signatures on delivery
14    tickets for durable medical equipment;
15    improper billing practices, such as
16    submitting requests for reimbursement
17    of repair items that are already in
18    their stock, ordering the wrong part
19    for wheelchair repairs, and
20    subsequently submitting additional PA
21    requests for the same client where the
22    item had already been requested and
23    paid; instructing clients to

Page 50

1    deliberately leave the date section
2    blank on the delivery ticket so that
3    they may manipulate the date based on
4    the PA conditional approval received
5    from Medicaid; holding requests with
6    outdated prescriptions and when
7    Medicaid informs that they must submit
8    a current prescription, they indicate a
9    current date on the old prescription.
10    Q. Now, let's start off with the forgery
11    of recipients' signatures on delivery
12    tickets. Do you know whether or not
13    that complaint was sustained?
14         MR. STEWART: Object to the
15         form.
16    A. I'm not sure.
17    Q. Do you know whether anybody contacted a
18    recipient to compare any signatures
19    with the files at National Seating &
20    Mobility?
21    A. I thought I recalled when the
22    investigation was taking place that the
23    investigator at the attorney general's

Page 51

1    office, or perhaps Medicaid, had
2    compared signatures in their process.
3    Q. Did you see a report of any kind?
4    A. No.
5    Q. Improper billing practices, did you --
6    did Ms. Horton present any particulars
7    concerning that?
8    A. Not to our unit.
9    Q. How about instructing clients to leave
10    the date section blank on the delivery
11    ticket?
12    A. That's what --
13         MR. STEWART: Object to the
14         form.
15    A. -- we were told. And the investigation
16    unit would have been the ones to
17    investigate that.
18    Q. Now, did you ever witness any delivery
19    tickets blank, with blank date?
20         MR. STEWART: Object to
21         form.
22    A. No.
23    Q. Yours was the clinic dates --

Page 52

1    A. Yes.
2    Q. -- blank. Okay. And how about
3    prescription dates, did --
4         MR. STEWART: Object to the
5         form.
6    Q. -- you ever witness any of those being
7    blank?
8    A. Yes. Oh, I'm sorry. Not blank. We
9    did receive old prescriptions, and we
10    would have to inquire as to whether
11    another assessment was done for a new
12    prescription.
13    Q. All right. Now, your next-to-your-last
14    paragraph says that this ex-employee
15    has filed a qui tam lawsuit with the
16    attorney general's office. Did you
17    ever see a copy of that?
18    A. No.
19    Q. Who told you that?
20    A. Ms. Horton, I believe. I don't recall
21    right now.
22    Q. But you were under the impression that
23    one had been filed by Ms. Horton?

13 (Pages 49 to 52)

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 53

1  A. Yes.
2  Q. And that's why you stated it in the
3     memo?
4  A. Yes.
5  Q. I'm going to show you what I have
6     marked as Plaintiff's Exhibit #10.
7        (Plaintiff's Exhibit #10 was
8        marked for identification.)
9  Q. If you would, review that document and
10    then we'll identify it for the record.
11       (Brief pause while witness
12       reviews document)
13 Q. Okay. Would you identify Plaintiff's
14    Exhibit #10 for the record, please.
15 A. This is an interview report from the
16    attorney general's office.
17 Q. What's the date on that?
18 A. May 9th of 2005.
19 Q. And it's an interview of Don Williams;
20    correct?
21 A. Yes.
22 Q. Let me call your attention down to the
23    last paragraph on page 1 of Plaintiff's

Page 54

1     Exhibit #10, your fourth sentence up
2     from the bottom. Don Williams told the
3     investigator that he said one of the
4     reasons he had to discontinue her
5     services, meaning Elizabeth Horton, was
6     that she was associating a lot of time
7     with Felecia Barrows [sic] of the
8     Medicaid Agency. Did you associate a
9     lot of time with Elizabeth Horton?
10 A. No.
11 Q. Did you associate with her at all
12    outside of the workplace?
13 A. Just that concert that we were to go
14    to, and she had also invited me to a
15    party at her home. And I did go to the
16    party and then left.
17 Q. And was that during her employment with
18    National Seating & Mobility?
19 A. I think it was after her employment,
20    the party.
21 Q. All right. Did you all go to the
22    concert together?
23 A. No, we didn't.

Page 55

1  Q. She just gave you the invitation?
2  A. Yes.
3        MR. STEWART: Object to the
4        form.
5  Q. So did you associate a lot of time with
6     Elizabeth Horton?
7  A. Not that I would say, no.
8  Q. Who did Elizabeth work for? Who was
9     her actual employer? Do you know?
10 A. As I --
11       MR. WALKER: Object to the
12       form.
13 A. -- recall, it was Kelly Services, a
14    temporary agency.
15 Q. How did you find out about
16    Ms. Horton's -- that she no longer
17    worked for National Seating & Mobility?
18 A. She had called and left a message with
19    the agency on my phone, that she was
20    quite upset, and indicated that she had
21    been terminated because she was told
22    that she was too close with Medicaid.
23 Q. And who told you that?

Page 56

1  A. That was the message that was left on
2     my phone by Elizabeth Horton.
3  Q. All right. Ms. Barrow, let me call
4     your attention to an interview that you
5     had with Investigator Gerald Shockley.
6     And I'll hand you what we'll mark as
7     Plaintiff's Exhibit #11.
8        (Plaintiff's Exhibit #11 was
9        marked for identification.)
10 Q. Do you remember meeting with
11    Investigator Shockley around June 23rd,
12    2005?
13 A. Yes.
14 Q. And do you remember doing a tape-
15    recorded interview?
16 A. Yes.
17 Q. And you stated to Mr. Shockley that
18    Elizabeth contacted the agency once she
19    had been terminated from employment?
20 A. Yes.
21 Q. Did Elizabeth talk about any
22    infractions of National Seating &
23    Mobility before she left?

14 (Pages 53 to 56)

Page 57

1    MR. STEWART: Object to the
2        form.
3    A. No, not that I recall.
4        (Brief pause)
5    Q. Do you remember telling Investigator
6        Shockley about Teresa, your — the
7        nurse, the registered nurse,
8        conversation with the physical
9        therapist in reference to no dates --
10    A. Yes.
11    Q. -- being on the clinic --
12    A. Yes.
13    Q. -- forms? Okay. All right. Do you
14        know whether or not Mr. Shockley talked
15        to the physical therapist?
16    A. I'm not sure.
17    Q. Do you know whether or not Mr. Shockley
18        investigated whether or not there was a
19        relationship between Mr. Rodgers, Don
20        Williams, and Emily Williams?
21    A. I'm not sure.
22    Q. Did you tell them that he knew them
23        personally?

Page 58

1    A. I don't recall.
2    Q. Did you make them aware that you had
3        also found documentation with no dates
4        on them?
5    A. As I recall, the clinic date incident.
6        MR. STEWART: The what
7            incident? I'm sorry.
8        THE WITNESS: The clinic
9            dates.
10    Q. Now, with Ms. Horton, did she name
11        specific people to you, or recipient,
12        that she contended was violated by
13        National Seating & Mobility?
14    A. She did.
15    Q. Do you know approximately how many?
16    A. I don't remember.
17    Q. Would she give you names or . . .
18    A. She provided names.
19    Q. Did you look at those particular
20        recipients' files?
21    A. Yes. I'm sorry. I'm just trying to go
22        back to that time. I believe that we
23        did pull those files in order to look

Page 59

1        at the delivery tickets and the dates
2        and -- that were on the delivery
3        tickets.
4    Q. And what, if anything, did you find?
5    A. We did not find any discrepancies as,
6        if we had found something, we would
7        have caught it in the beginning.
8    Q. All right. But it's your position
9        today that you did find infractions on
10        your own. Am I correct?
11    A. Yes.
12        MR. STEWART: Object to the
13            form.
14        MR. WALKER: Object to the
15            form.
16    Q. And you did bring those to the
17        attention of the investigator?
18    A. Yes.
19        MS. NICKSON: All right. No
20            further questions.
21        EXAMINATION
22    BY MR. STEWART:
23    Q. We met before we began, Ms. Barrow.

Page 60

1        And I know that giving a deposition is
2        sort of an awkward thing because it's
3        not the way we normally deal with
4        people, so I apologize for pointing out
5        a couple of times that you needed to
6        wait till the question gets asked
7        before you answer. But I just want to
8        remind you, please let me get my
9        question fully out before you answer.
10        Okay? These people may have an
11        objection. Ms. Nickson may have an
12        objection. And I just want to make
13        sure that everybody gets to state their
14        objection. All right?
15    A. (Witness nodded.)
16    Q. And you need to speak out your answer,
17        too. Nodding your head -- she can't
18        take down a nod. Okay?
19    A. Yes.
20    Q. Did you understand what I just finished
21        saying?
22    A. Yes.
23    Q. Do you understand that your deposition

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 61

1  is being given under oath?
2  A. Yes.
3  Q. Do you know that that means that your
4     deposition testimony is subject to the
5     laws of perjury?
6  A. Yes.
7  Q. And that you can be fined or imprisoned
8     for violating those laws?
9  A. Yes.
10 Q. Have you ever given your deposition
11    before?
12 A. Not that I recall.
13 Q. You testified in Ms. Horton's trial.
14    Is that the only other trial you've
15    testified in before?
16 A. Yes, that's the only . . .
17 Q. To your knowledge, is this the only
18    time that some type of criminal
19    activity -- I mean, not criminal
20    activity -- but criminal trial resulted
21    from an investigation that y'all
22    performed?
23 A. Yes.

Page 62

1  Q. To your knowledge, is this the first
2     time that anyone who submitted
3     allegations of wrongdoing to Alabama
4     Medicaid were prosecuted?
5  A. Yes.
6  Q. You have testified that you put
7     together this memorandum.
8        MR. STEWART: And I
9            apologize. Can you
10           slide those exhibits
11           just so I can have the
12           numbers in front of me?
13       MS. NICKSON: Okay.
14 Q. This item here, which is marked #9, let
15    me show you that one. That is a
16    memorandum that Ms. Nickson asked you
17    about a little bit. And it has four
18    bullet points down in the body of the
19    memorandum; is that right?
20 A. Yes.
21 Q. Did you actually type this document?
22 A. Yes.
23 Q. And if I understand your testimony,

Page 63

1     Bullet Point No. 1 is something that
2     Ms. Horton told you about?
3  A. Yes.
4  Q. That's not something that you had
5     personal knowledge of; correct?
6  A. No.
7  Q. Is that correct, though?
8  A. That's correct.
9  Q. Just want to make sure we're saying the
10    same thing. The second bullet there,
11    that's something that Ms. Horton told
12    you about; correct?
13 A. Yes.
14 Q. And that's not something you had
15    personal knowledge of; correct?
16 A. No.
17 Q. Is that correct? I mean --
18 A. That's correct.
19 Q. I'm asking a bad question. I'll try to
20    do it better next time. No. 3, the
21    third bullet point, that's something
22    Ms. Horton told you about?
23 A. Yes.

Page 64

1  Q. Do you have personal knowledge of
2     anyone being asked to do that?
3  A. No.
4  Q. And the fourth one, is that something
5     Ms. Horton told you about?
6  A. Yes.
7  Q. And do you have any personal knowledge
8     of that occurring?
9  A. Yes.
10 Q. Now, you have personal knowledge that
11    someone held a request with an outdated
12    prescription and when Medicaid informs
13    that they must submit a current
14    prescription, they indicate a current
15    date on the old prescription?
16 A. No, not of holding.
17 Q. What did you mean to say? Is that what
18    Ms. Horton told you there about holding
19    requests with outdated prescriptions?
20 A. Yes.
21 Q. But you didn't see that occurring;
22    correct?
23 A. No.

16 (Pages 61 to 64)

Page 65

1    Q. That's a correct statement; correct?
2    A. Yes.
3    Q. What you had found, you had in your
4       memorandum dated -- which is
5       Plaintiff's Exhibits #3 and #6, I
6       believe, which are sort of the same
7       thing, just a different version. Is
8       that right; that's your memorandum?
9    A. Yes, it is.
10   Q. And in your memorandum, you had,
11      according to the first paragraph, two
12      examples where wheelchair assessments
13      were missing clinic dates?
14   A. Yes.
15   Q. And when you say a "clinic date," is
16      that the date on the document attached
17      to Exhibit #6? I've lost my copy of
18      that now. Here it is. This second
19      page of Exhibit #6, is that the clinic
20      record?
21   A. Yes.
22   Q. And when you say "clinic date," are you
23      talking about this date, like, up in

Page 66

1       the upper right-hand corner of that
2       exhibit?
3    A. Yes.
4    Q. And this clinic date is supposed to be
5       put in by the physical therapist?
6    A. Yes.
7    Q. And according to the first paragraph of
8       this exhibit, the physical therapists
9       that Teresa contacted are this Gerry
10      Rodgers and Mike Maddox?
11   A. Could you repeat that question?
12   Q. Yes. These assessments that are
13      attached to Exhibit #6, they were
14      conducted by Gerry Rodgers and Mike
15      Maddox?
16   A. Yes.
17   Q. And they are employed by Children's
18      Rehab Services; is that right?
19   A. That's correct.
20   Q. They're not employed by NSM, are they?
21   A. No.
22   Q. NSM would take a document and that
23      clinic note, put it together, and

Page 67

1       submit it for prior approval?
2    A. Yes.
3    Q. And what you had observed is that there
4       were some clinic dates missing from
5       those documents?
6    A. Yes.
7    Q. And did you attach the ones that you
8       were aware of to Exhibit #6?
9    A. Yes.
10   Q. Now, did you actually make any of these
11      phone calls to Gerry Rodgers?
12   A. No. I don't recall calling Gerry.
13   Q. Did you make a phone call to this
14      Michael Maddox person?
15   A. No, I did not.
16   Q. You instructed Teresa Surles, an RN in
17      your department, to make those phone
18      calls?
19   A. Yes.
20   Q. Were you present when the phone calls
21      were made?
22   A. No.
23   Q. So Teresa made the phone calls and then

Page 68

1       reported back to you what was said?
2    A. Yes.
3    Q. And did you -- did she provide you any
4       written notes from her conversations to
5       you?
6    A. I don't recall.
7    Q. So as we sit here today, this just may
8       be your recollection of what Teresa
9       told you back in 2005, I guess; is that
10      right?
11   A. Yes.
12              (Brief pause)
13   Q. In the third paragraph, there is a --
14      Teresa came across another assessment
15      completed by M. Maddox. Is that
16      assessment attached to this memorandum,
17      this exhibit?
18   A. I don't recall the assessment, which
19      assessment that was.
20   Q. You've got some language in here
21      when -- again, I know this is Teresa
22      talking to Michael Maddox. But Michael
23      Maddox replied to Teresa's question,

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 69

1    quote, Maybe we're not supposed to do
2    this, paren, pause, close paren, comma,
3    but I never put dates on the
4    assessments or the prescriptions
5    because it messes up the vendor, end
6    quote; then there are three periods,
7    quote, like, comma, we're on a time
8    clock, three periods, end quote.
9    Did -- well, you never talked to
10   Mr. Maddox, did you?
11 A. No. .
12 Q. So you don't know who told Mr. Maddox
13   not to put dates on these assessments;
14   correct?
15 A. No.
16 Q. Is that right? You don't know who told
17   him that?
18 A. I'm not sure.
19 Q. And his employer was Children's Rehab
20   Services?
21 A. Yes.
22 Q. And you referred this to Clifford
23   Johnson and he performed an

Page 70

1    investigation?
2  A. This particular memo?
3  Q. Yes, ma'am.
4  A. This was sent to my director, my
5    medical director.
6  Q. And do you know that Cliff Johnson, I
7    believe is what he told me his name
8    was, he subsequently performed an
9    investigation --
10 A. Yes.
11 Q. -- of the allegations that you have in
12   your memorandum?
13 A. Yes.
14 Q. Do you consider him to be a competent
15   and honest investigator?
16 A. Yes.
17 Q. And did he refer it to someone else to
18   do the actual investigation?
19 A. I'm not sure of their process, but
20   eventually it was in the attorney
21   general's office.
22 Q. The attorney general's office told you
23   that their investigation revealed that

Page 71

1    all of these allegations made by
2    Ms. Horton were not true, did they not?
3  A. The attorney general's office did not
4    communicate with us.
5  Q. How did you learn that the AG's office
6    investigation found that there was no
7    evidence of any wrongdoing by National
8    Seating?
9  A. Through Mr. Johnson.
10 Q. Through Cliff Johnson?
11 A. Yes.
12 Q. Once you learned of the AG's
13   conclusion, did you protest?
14 A. No.
15 Q. Did you tell anybody above you in the
16   chain of command that there must be
17   something wrong here, they did
18   something wrong, they didn't do it
19   right?
20 A. No. I couldn't just question what
21   their process was.
22 Q. And were you kept apprised step by step
23   and day by day of the investigation

Page 72

1    that they undertook?
2  A. No.
3  Q. Did you receive or review any memoranda
4    of the statements that they took or the
5    interviews that they had?
6  A. No.
7  Q. You're not saying that there's
8    something that the AG's office did
9    wrong, are you?
10 A. I don't know.
11 Q. And you're not saying that the AG's
12   office and Don Williams or NSM are in a
13   conspiracy to hurt Ms. Horton, are you?
14 A. I don't know that, either.
15 Q. Ms. Horton told you that she had filed
16   a qui tam action?
17 A. Yes.
18 Q. And did she tell you that she had
19   reported NSM to the AG's office before
20   she reported to you?
21 A. I don't recall.
22 Q. While she was employed with NSM, she
23   never brought to your attention

18 (Pages 69 to 72)

Page 73

1  anything that she considered to be
2  wrongdoing.
3  A. No.
4  Q. Is that correct?
5  A. No. I don't recall any wrongdoing.
6  Q. So that would be a correct statement?
7  A. Yes.
8  Q. Had you ever done a memorandum like
9     Exhibit #6 before, against any other
10    durable medical equipment provider?
11 A. I don't recall.
12 Q. Had you ever done any type of
13    memorandum like that against any
14    Medicaid provider, to your knowledge?
15 A. Yes. I think I have.
16 Q. How many times?
17 A. I don't recall.
18 Q. Is it a common thing?
19 A. For me or --
20 Q. Yes, first for you.
21 A. If there are continuous problems, I
22    would submit a memo.
23 Q. All right. And what do you consider to

Page 74

1  be continuous?
2  A. Happening possibly on a biweekly basis
3     or several times during a month.
4  Q. Can you recall anybody that you've done
5     this on before?
6  A. I don't recall.
7  Q. And is that the only memorandum that
8     you put together while you were with
9     Alabama Medicaid on National Seating?
10 A. I don't think so. I'm not sure. I'd
11    have to pull the file.
12 Q. Where would we go to find it?
13 A. At the Medicaid Agency.
14 Q. Would it be under National Seating's
15    name?
16 A. Possibly.
17 Q. Could it be anywhere else?
18 A. In a computer.
19 Q. Where in the computer would it be
20    stored?
21 A. I don't remember what folder.
22 Q. All right. Was there a folder on each
23    provider?

Page 75

1  A. There would have been a physical file
2     folder.
3  Q. On the computer, would there have been
4     a folder on each provider?
5  A. No. It would have just been --
6     probably listed complaints.
7  Q. So there would be a way to search
8     complaints, say, at Alabama Medicaid on
9     a given provider?
10 A. Yes.
11 Q. But as you sit here today, this is the
12    only memorandum you remember concerning
13    National Seating?
14 A. That I remember right now. There may
15    have been others. I just don't
16    remember.
17 Q. You don't recall. Okay. Once
18    Elizabeth Horton complained to you, did
19    you sort of keep an eye on National
20    Seating?
21 A. Not particularly.
22       (Brief pause)
23 Q. You said that there was a computer at

Page 76

1  Alabama Medicaid that when you received
2  a complaint -- let me strike that.
3     You said that sometimes
4  customers would call NSM and say that
5  they haven't received their wheelchair.
6  Do you recall that?
7  A. Yes.
8  Q. And that they were -- you said they
9  were told by NSM that the delay was
10 caused by Medicaid?
11 A. Yes.
12 Q. Did you actually speak to those people?
13 A. Yes, I have.
14 Q. How many times?
15 A. I don't remember. I would say more
16    than five.
17 Q. Is that the best guess you can give us
18    today?
19 A. That's the best guess I can give today.
20 Q. And on all five of those occasions, the
21    parents were told by NSM that the delay
22    was caused by Medicaid?
23 A. Yes.

19 (Pages 73 to 76)

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

| Page 77 | Page 79 |
|---|---|

Page 77

1  Q. Now, you said you would do an inquiry
2     on whether or not they had missed a
3     clinic appointment or something like
4     that?
5  A. Yes.
6  Q. Of those five people that you recall,
7     do you recall whether any of them said
8     that they had missed a clinic
9     appointment?
10  A. No.
11  Q. Did any of them say -- I mean, I guess
12     my question was bad. I said do you
13     remember. Did any of them specifically
14     say, to your recollection today, that
15     they had actually missed a clinic
16     appointment?
17  A. No.
18  Q. Did any of them give any other excuse?
19  A. No.
20  Q. You said that you would then -- you
21     could go into the computer and you
22     would have in the computer the date
23     that the prior approval was received;

Page 78

1     is that right?
2  A. Yes.
3  Q. You would have the -- whether the order
4     had been placed on a conditional
5     approval; is that correct?
6  A. Yes.
7  Q. Whether there had been a request for an
8     extension; is that correct?
9  A. Yes.
10  Q. What other type of information would be
11     on that computer?
12  A. The type of equipment, the quantity,
13     the expected delivery date. And that's
14     all I can recall right now.
15  Q. In every case, was this a wheelchair?
16  A. As far as a delivery ticket being
17     required, it would have to be a
18     wheelchair or it could be some other
19     equipment, like a walker or a car seat.
20  Q. But on these five complaints, they were
21     about wheelchairs?
22  A. Most of the calls that we did receive
23     were about wheelchairs, but there could

Page 79

1     have been some that could have been
2     about a car seat.
3  Q. You just don't recall?
4  A. I don' remember.
5  Q. Is it true that National Seating
6     specializes in custom-made wheelchairs?
7  A. Yes.
8  Q. They're not just the run-of-the-mill,
9     everyday wheelchair that you can get at
10     the airport, for example, or at CVS; is
11     that correct?
12  A. That's correct.
13  Q. Does it indicate on your computer if
14     Medicaid is behind in getting the
15     paperwork completed?
16  A. Yes.
17  Q. It would have been on your computer?
18  A. It would show when the actual request
19     came in, and it would show when it was
20     reviewed.
21  Q. And were there times when Medicaid,
22     because of the understaffing at the
23     time and the being behind in work, was

Page 80

1     late in getting approvals out?
2  A. Yes.
3  Q. I want to make sure I understand your
4     testimony. Elizabeth Horton filed a
5     complaint with Alabama Medicaid; is
6     that correct?
7  A. She filed a verbal complaint with me,
8     that I know of.
9  Q. And do you know whether she made an
10     anonymous phone call at any time?
11  A. I do not know.
12  Q. The verbal complaint that she made to
13     you, we've marked as that exhibit; is
14     that right?
15  A. That's correct.
16  Q. And that's the one dated July 2004?
17  A. Yes.
18  Q. When would you have prepared that
19     memorandum in terms of how soon after
20     the verbal complaint was made to you --
21     within hours, days?
22  A. I'm not sure. I don't recall. It
23     could have been a day or two because of

20 (Pages 77 to 80)

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

| Page 81 |
|---|
| 1    the workload. |
| 2    Q. I mean, would it be a month? |
| 3    A. No. |
| 4    Q. And she testified in this case that she |
| 5      never once initiated a complaint about |
| 6      NSM. Is that true? |
| 7    A. Not as far as I'm concerned. |
| 8    Q. Have you reviewed this document that's |
| 9      been marked Exhibit #11 to your |
| 10    deposition, your statement given to |
| 11    Mr. Shockley? |
| 12    A. Not thoroughly. |
| 13    Q. You've met with Ms. Nickson before? |
| 14    A. Yes. |
| 15    Q. Did you review the statement during |
| 16    your meeting with her? |
| 17    A. No. |
| 18    Q. Did you listen to the audiotape? |
| 19    A. No. |
| 20    Q. What did she tell you about the |
| 21    statement? |
| 22    A. I don't know anything of this. |
| 23    Q. So you can't vouch for the accuracy of |

| Page 82 |
|---|
| 1    that statement as you sit here today? |
| 2    A. Not without really . . . |
| 3    Q. I'm not going to ask you to go through |
| 4      that. That would be too painful for |
| 5      everybody. |
| 6    A. Okay. |
| 7    Q. At the time that your statement was |
| 8      taken by Gerald Shockley, did you tell |
| 9      the truth? |
| 10    A. Yes. |
| 11    Q. Is there anything you would have |
| 12    changed about your statement if you'd |
| 13    had the opportunity? |
| 14    A. Not that -- no. |
| 15    Q. Do you remember at the end of the |
| 16    statement you were asked if you had any |
| 17    other information that y'all hadn't |
| 18    discussed that you'd like to add in? |
| 19    Do you remember that question? |
| 20    A. I don't remember it. |
| 21    Q. The question was, Okay. Is there |
| 22    anything else that you think is |
| 23    important that I should know that I |

| Page 83 |
|---|
| 1    failed to formulate the question to get |
| 2      the answer about National Seating & |
| 3      Mobility. Do you remember a question |
| 4      like that being asked? |
| 5    A. I don't recall. |
| 6    Q. I know it's been a while. Can you |
| 7      think of a business interest that NSM |
| 8      would have in delaying the delivery of |
| 9      a wheelchair? They don't get paid |
| 10    until it's delivered, do they? |
| 11    A. Exactly. |
| 12    Q. Back in March to June of 2004, can you |
| 13    tell us where you were living? |
| 14    A. 6460 Sandy Ridge Curve. |
| 15    Q. Is that where you currently live? |
| 16    A. Yes. |
| 17    Q. What's your phone number? |
| 18    A. I use a cellular phone. It's |
| 19      (334)318-5409. |
| 20    Q. Back in March to June of 2004, did you |
| 21    have what I call a hardline phone there |
| 22    at Sandy Ridge Curve? |
| 23    A. Yes, I did. |

| Page 84 |
|---|
| 1    Q. What was that number? |
| 2    A. (334)244-4916. |
| 3    Q. And did you also have a cell phone at |
| 4      that time? |
| 5    A. Yes. |
| 6    Q. And what number was it? |
| 7    A. The (334)318-5409. |
| 8    Q. So you had that phone number at the |
| 9      same time? |
| 10    A. Yes. |
| 11    Q. Did you make any calls to Elizabeth |
| 12    Horton on your cell phone? |
| 13    A. I don't recall. I could have. I don't |
| 14    recall. |
| 15    Q. Did you make any phone calls to |
| 16    Elizabeth Horton on your home phone? |
| 17    A. I could have. |
| 18    Q. And why is it that you would make phone |
| 19    calls from your personal cell phone or |
| 20    your home phone to Elizabeth Horton |
| 21    back in that time frame? |
| 22    A. I think that I had called possibly |
| 23    regarding the concert, just to find out |

**2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com**
**1-800-888-DEPO**

| Page 85 |
|---|

1    location.
2    Q. And what concert was it?
3    A. I think it was Ron Isley.
4    Q. Any other concerts?
5    A. No.
6    Q. And as I understand your testimony,
7      initially y'all were going to go
8      together, but you ended up going with
9      another friend instead?
10   A. Well, she had asked me to attend the
11     concert. And I told her that it would
12     be great to meet her and we would -- I
13     would meet her there. And I took
14     another friend.
15   Q. And how is it that she knew you might
16     be interested in the Ron Isley concert?
17   A. We were talking about some PA requests
18     over the phone, and she just happened
19     to mention that, as we do with other
20     providers.
21   Q. Did you ever eat lunch with Elizabeth?
22   A. No.
23   Q. Did you ever have lunch out there at

| Page 86 |
|---|

1      National Seating?
2    A. No.
3    Q. Did you ever have dinner with Elizabeth
4      Horton?
5    A. Not that I recall.
6    Q. Tell me about the party that you went
7      to at her house.
8    A. I don't remember what type. I think it
9      was something -- it was around -- I
10     don't know if it was a holiday. I
11     don't remember. But it was a party at
12     her home, and it -- I just don't
13     remember what type. But it was a party
14     at her home, and she asked if I would
15     come to the party.
16   Q. How many people were there?
17   A. I don't remember. More than ten.
18   Q. So it was a smallish kind of party?
19   A. Yes.
20   Q. And you said earlier that it was after
21     she left National Seating?
22   A. As I recall, I -- it was after her
23     employment.

| Page 87 |
|---|

1    Q. Other than the phone call that led to
2      the memorandum that you typed up in
3      July and the call to you to invite you
4      to the party, about how often would
5      y'all talk?
6    A. About PA requests, almost daily.
7    Q. After she left NSM.
8    A. Oh, after she left. We did not speak
9      very much.
10   Q. How often?
11   A. I would say maybe -- I know once a
12     month, she would leave messages on my
13     phone.
14   Q. What kind of messages?
15   A. Just to say hello. That was all.
16   Q. And did you call her back?
17   A. Most occasions, I did not.
18   Q. Why?
19   A. I just didn't have time.
20   Q. Did you think it was inappropriate that
21     she call you at home?
22   A. No, not necessarily.
23   Q. Did you think it was inappropriate that

| Page 88 |
|---|

1      she'd invite you to a concert?
2    A. No.
3    Q. Is Ron Isley a rap singer?
4    A. No.
5    Q. Did you ever talk about going to a rap
6      concert with her?
7    A. No.
8    Q. Did she ever invite you to a rap
9      concert?
10   A. No.
11   Q. Can you think of any reason that
12     Elizabeth Horton would tell someone at
13     National Seating that y'all were
14     friends?
15   A. No. I -- I -- maybe it was her
16     perception.
17   Q. Can you think of any reason that she
18     would tell anyone at NSM that y'all had
19     lunch together?
20   A. No.
21   Q. Can you think of any reason that she
22     would tell anyone at NSM that y'all had
23     gone to a rap concert together?

22 (Pages 85 to 88)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 89

1  A.  No.
2  Q.  As I look through your statement, it
3      says that you would get phone calls on
4      almost a daily basis to get an
5      extension request for a PA?
6  A.  Yes.
7  Q.  From Elizabeth Horton herself?
8  A.  Yes.  And prior to that, another staff
9      person.
10 Q.  She would call you?
11 A.  Yes.
12 Q.  Is that who she's supposed to call if
13     she wants an extension?
14 A.  I was the only one who could approve
15     extensions.
16 Q.  Did you ever not approve an extension
17     for National Seating?
18 A.  I think I recall one.
19 Q.  And why did you not approve it?
20 A.  The only way that I would not approve
21     one is that the justification was just
22     not according to what we would accept.
23 Q.  And what's the justification you recall

Page 90

1      on the one you recall?
2  A.  I don't remember.
3  Q.  And I take it that on these phone calls
4      that she would make to you asking for
5      extensions, y'all eventually got to
6      where you were talking about things
7      other than just the extension?
8  A.  Most times, it was just the extensions.
9      And — because I don't — I didn't have
10     time to just chat on the phone.
11 Q.  But on some of the occasions, you did
12     do some chatting?
13 A.  Sure.
14         (Brief pause)
15 Q.  How often did you go out to National
16     Seating?
17 A.  Just once.
18 Q.  Just that one time you described?
19 A.  As I recall.  Uh-huh.
20 Q.  And as I understand your testimony, you
21     said that you had never been out there
22     before and they were in Montgomery, so
23     you thought you would drop in and visit

Page 91

1      them?
2  A.  Yes.
3  Q.  What other companies did you do that
4      for here in Montgomery?
5  A.  I don't recall any other DME companies.
6  Q.  What other Medicaid provider companies
7      did you visit here in Montgomery?
8  A.  I think possibly a provider -- a
9      physician's office during my employment
10     with Medicaid.
11 Q.  So just the two?
12 A.  I don't remember, but that's all I can
13     recall right now.
14 Q.  And on the day that you decided to go
15     out there, you informed Elizabeth that
16     you would be coming?
17 A.  Yes.
18 Q.  So on the day you went out there, you
19     knew Elizabeth by name before you went
20     out there?
21 A.  Yes.
22 Q.  Had you not met any of the other NSM
23     employees before that date?

Page 92

1  A.  No.
2  Q.  Had you talked to any of them on the
3      telephone?
4  A.  Yes, I do believe so.
5  Q.  As a result of your visit to NSM, did
6      you file any complaints with Alabama
7      Medicaid on what you found out there?
8  A.  No.
9  Q.  Did you find anything out there out of
10     line?
11 A.  No.
12 Q.  How many other companies would there be
13     located in Montgomery who had a
14     contractual relationship with a
15     Medicaid Agency?
16 A.  I have no idea.  There is a vendor file
17     where that information could be
18     obtained.
19 Q.  How many were there in the state?
20 A.  I don't recall that —
21 Q.  What's your best estimate?
22 A.  I couldn't even guess at the number of
23     vendors.

23 (Pages 89 to 92)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 93

1  Q. How many durable medical equipment
2     companies are there in Montgomery?
3  A. There are several in Montgomery.
4  Q. And by "several," as many as five?
5  A. At least five, if not more.
6  Q. Back in 2004, spring of 2004, were
7     there less?
8  A. I don't recall.
9  Q. Was NSM one of the bigger ones?
10 A. When you say "bigger," do you mean -- I
11    don't know --
12 Q. Volume.
13 A. As far as children's customized, yes.
14 Q. They're still the leader in that area,
15    aren't they?
16 A. I don't know.
17 Q. At the time, they were, when you were
18    there?
19 A. I would say possibly.
20 Q. How many phone calls did you make on
21    behalf of Elizabeth Horton after you
22    learned she had left?
23 A. I think it was, as I recall, one.

Page 94

1  Q. Could it have been two?
2  A. I don't remember. It may have been.
3  Q. Do you recall placing a phone call to a
4     Danielle Pirkle?
5  A. Yes, I do recall.
6  Q. And she is an actual employee of NSM in
7     Nashville, Tennessee?
8  A. Yes.
9  Q. And why did you call Danielle Pirkle?
10 A. She and I had had some discussions
11    prior, and I knew that she was handling
12    some of the accounts with the
13    Montgomery office. And we were, the
14    staff and I, were just a little bit
15    puzzled as to the termination and we
16    just wanted to have some explanation of
17    that.
18 Q. How many times did you make phone calls
19    on behalf of terminated employees or
20    temporary employees?
21 A. I've never been involved in any other
22    company that had temporary employees or
23    terminated employees.

Page 95

1  Q. So this would be the first time?
2  A. Yes.
3  Q. And how did you get in touch with
4     Danielle Pirkle?
5  A. I had her number because we had spoken
6     prior to that.
7  Q. And what did you say to her when you
8     spoke with her?
9  A. I don't remember. And I may have left
10    a message. I think it was something to
11    the effect that we were a little
12    concerned about the termination. We
13    had spent quite a bit of time with this
14    particular employee, providing training
15    and technical assistance, and we
16    thought that we were at a place where
17    we were getting the information that we
18    needed timely. So that's basically
19    what the call was surrounding.
20 Q. Were you seeking an explanation?
21 A. Well, we just wanted to know what could
22    have been the problem, because she was
23    working out well with us. We --

Page 96

1  Q. Is that something that Alabama Medicaid
2     is charged with the responsibility of
3     doing?
4  A. I can't speak for the Medicaid Agency.
5     Just as an associate director in that
6     division, we were concerned with the
7     turnover of the staff and spending a
8     lot of staff time with a person and we
9     just wanted, you know, just to --
10 Q. You wanted an explanation?
11 A. Uh-huh.
12 Q. Is that right?
13 A. We didn't demand an explanation. We
14    were just indicating our concerns.
15 Q. You could understand how that might
16    have concerned NSM to have Alabama
17    Medicaid calling and wondering why
18    they'd let someone go, can't you?
19 A. I don't know. I know that we had spent
20    a lot of staff time training and --
21 Q. That's not my question. My question
22    was, can you understand why NSM would
23    be concerned that the approval

24 (Pages 93 to 96)

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

| Page 97 | Page 99 |
|---|---|
| 1    director -- assistant director of the | 1    A. Yes. |
| 2    prior approval unit was calling them, | 2    Q. Would you agree with me that any |
| 3    asking them why an employee was no | 3    efforts to influence the agency by a |
| 4    longer there? | 4    Medicare provider or Medicaid provider |
| 5    A. Perhaps. | 5    might be seen as unethical conduct? |
| 6    Q. Now, did you also make a phone call to | 6        MS. NICKSON: Object to the |
| 7    an individual by the name of Lois | 7    form. |
| 8    Bodiford? | 8    A. If that's what the intent was, to |
| 9    A. I don't recall. | 9    influence. |
| 10    Q. Lois Bodiford is in Birmingham. | 10    Q. Would you agree with me that it's not a |
| 11    A. Okay. | 11    good idea to have too close a |
| 12    Q. Did you make any calls to Birmingham? | 12    relationship between someone who works |
| 13    A. I spoke with her on several occasions, | 13    for one of the companies and the |
| 14    as I recall. | 14    Medicaid Agency? |
| 15    Q. I'm talking specifically about | 15    A. I would agree. |
| 16    Elizabeth Horton was no longer there. | 16    Q. You testified at Elizabeth Horton's |
| 17    A. I may have. I don't know. I don't | 17    trial. We've already established that. |
| 18    recall. | 18    Can you tell me whether you were |
| 19    Q. Was this a room you were calling from | 19    subpoenaed? |
| 20    or were you calling from your office? | 20    A. Yes, I was. |
| 21    A. From my office. | 21    Q. And who issued the subpoena to you? |
| 22    Q. Did the call get placed on your office | 22    A. I don't remember. I don't recall at |
| 23    phone or on cell phone? | 23    the time. |

| Page 98 | Page 100 |
|---|---|
| 1    A. Office phone. | 1    Q. Who called you to testify? |
| 2    Q. Did you have anyone in the office with | 2    A. I believe it was the attorney general's |
| 3    you when you placed the call? | 3    office. |
| 4    A. No. | 4    Q. Wouldn't have been Elizabeth Horton? |
| 5    Q. Did you report to anyone that you had | 5    A. No. |
| 6    placed the calls? | 6    Q. Did you talk to her before her trial |
| 7    A. I talked with my staff. | 7    about the trial? |
| 8    Q. The folks that work under you? | 8    A. No. |
| 9    A. Yes. | 9    Q. About what you would testify to? |
| 10    Q. Did you tell anybody who worked over | 10    A. No. |
| 11    you that you'd placed the calls? | 11    Q. Did she ask you? |
| 12    A. I don't recall doing that. | 12    A. No, not that I recall. |
| 13    Q. During the investigation that was | 13    Q. When did you leave Alabama Medicaid? |
| 14    performed, did you inform the attorney | 14    A. In 2005. |
| 15    general's office that you had placed | 15    Q. When in 2005? |
| 16    the calls? | 16    A. I think it was November. |
| 17    A. I was asked and -- and provided that | 17    Q. And what were the circumstances around |
| 18    information. | 18    your leaving? |
| 19    Q. Would you agree with me that it is | 19    A. A better employment opportunity. |
| 20    wrongful for a company that has a | 20    Q. Were you doing well at Alabama |
| 21    contractual relationship with Medicaid | 21    Medicaid? |
| 22    Agency to attempt to influence the | 22    A. Yes. |
| 23    agency? | 23    Q. Getting good reviews and everything? |

25 (Pages 97 to 100)

Page 101

1   A. Yes.
2   Q. It was just to make more money?
3   A. And to lessen my workload.
4   Q. Where all did you go to school?
5   A. You mean high school?
6   Q. Yes.
7   A. High school at Robert E. Lee High
8       School here in Montgomery.
9   Q. So you were born and bred here in
10      Montgomery?
11  A. Yes.
12  Q. And where did you go after high school?
13  A. On to Jackson State University in
14      Jackson, Mississippi.
15  Q. And after that?
16  A. Auburn University-Montgomery.
17  Q. After that, anywhere?
18  A. No.
19  Q. Did you graduate from AUM?
20  A. Yes.
21  Q. What year?
22  A. 2001.
23  Q. Do you have any relatives that live in

Page 102

1       Montgomery?
2   A. Yes. My parents.
3   Q. And what are your parents' names?
4   A. Jasper and Ruth Salary.
5   Q. Like --
6   A. Money.
7   Q. -- money/salary?
8   A. Uh-huh.
9   Q. Any other relatives you have in
10      Montgomery?
11  A. Cousins. That's about it.
12  Q. I'm not prying in your -- it may sound
13      like it. Let me tell you why I'm
14      asking. If this case goes to trial,
15      then it will be tried to a jury here in
16      this area. By "this area," I mean not
17      only Montgomery County but sort of the
18      surrounding counties. Can you just
19      give me the last names of your
20      relatives so I can make sure that your
21      cousins aren't on the jury?
22  A. Oh. Salary.
23  Q. That's it?

Page 103

1   A. (Witness nodded.) Oh, possibly
2       Hendricks.
3   Q. Anyone else?
4   A. Dunn.
5   Q. D-U-N-N?
6   A. D-U-N-N.
7   Q. Okay.
8   A. Gray.
9   Q. G-R-A-Y?
10  A. Yes.
11          MR. WALKER: And how do you
12          spell Hendricks, please?
13          THE WITNESS: H-E-N-D-R-I-C-
14          K-S.
15  Q. When did you meet with Ms. Nickson?
16  A. I don't remember. It was last year, I
17      think, sometime.
18  Q. Did she turn on a tape recorder and
19      record your conversation?
20  A. I don't recall.
21  Q. Have you seen any type recording like
22      that?
23  A. Have I seen it?

Page 104

1   Q. Yes. Or any type transcript of y'all's
2       conversation, have you seen one like
3       that?
4   A. No.
5   Q. If there was a recording of your
6       conversation, would that be something
7       you would want to have?
8   A. Possibly.
9   Q. Would you mind if I had a copy of any
10      recording of your conversation with
11      Ms. Nickson, if it exists?
12  A. No.
13  Q. When you say "last year," does that
14      mean last month, since we're in
15      January, or --
16  A. No. I guess it would have been earlier
17      in the year, earlier in 2007.
18  Q. And where did y'all meet?
19  A. In her office.
20  Q. And had you been there before?
21  A. Yes.
22  Q. Why had you been there before?
23  A. On a personal case.

26 (Pages 101 to 104)

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

|  | Page 105 |
|---|---|
| 1 | Q. Personal injury case or -- |
| 2 | A. No. Divorce. |
| 3 | Q. And is that resolved now? |
| 4 | A. Yes. |
| 5 | Q. Were you divorced from your most recent |
| 6 | husband? |
| 7 | A. Yes. |
| 8 | Q. Was that your only -- |
| 9 | A. That's the only -- |
| 10 | Q. I realized after it came out that |
| 11 | didn't sound right. And that would be |
| 12 | Mr. Barrow then? |
| 13 | A. LeRoy Barrow, yes. |
| 14 | Q. And when did that take place? |
| 15 | A. The final? |
| 16 | Q. Yes. |
| 17 | A. Was in February. |
| 18 | Q. Of? |
| 19 | A. '07. |
| 20 | Q. And can you tell me when you first saw |
| 21 | Ms. Nickson? |
| 22 | A. I think it was in 2005, October- |
| 23 | November. |

|  | Page 106 |
|---|---|
| 1 | Q. So had you known her before? |
| 2 | A. No. Just known of her. |
| 3 | Q. Through? |
| 4 | A. Church. |
| 5 | Q. Do y'all go to the same church? |
| 6 | A. No. |
| 7 | Q. Well, then, how did you know her |
| 8 | through church? |
| 9 | A. Oh, i've seen she and her husband in |
| 10 | the Baptist arena. I did visit their |
| 11 | church and I'd seen them. |
| 12 | Q. Well, before you hired her in October |
| 13 | or November of 2005, you had only seen |
| 14 | her in church? |
| 15 | A. Yes. |
| 16 | Q. Are you the one who referred Ms. Horton |
| 17 | to Ms. Nickson? |
| 18 | A. She had asked me for several attorneys, |
| 19 | and I gave her several and told her to |
| 20 | look in the phone book for some. But |
| 21 | I -- |
| 22 | Q. When did that conversation take place? |
| 23 | A. I don't recall. I don't remember. |

|  | Page 107 |
|---|---|
| 1 | Q. Was it after her employment with NSM? |
| 2 | A. Yes. |
| 3 | Q. Was it after the trial? |
| 4 | A. I don't remember. I don't remember. |
| 5 | Q. Well, let me help you out, if I can. |
| 6 | The trial took place in September of |
| 7 | 2005. |
| 8 | A. Okay. |
| 9 | Q. Your divorce took place in October or |
| 10 | November of 2005. |
| 11 | A. No. That was the initial meeting. |
| 12 | Q. I'm sorry. The initial meeting took |
| 13 | place in October-November of 2005. |
| 14 | A. Uh-huh. |
| 15 | Q. So a month after the trial was your |
| 16 | first meeting with Ms. Nickson about |
| 17 | the divorce? |
| 18 | A. Yes. |
| 19 | Q. Did you tell Elizabeth Horton |
| 20 | Ms. Nickson's name before you had the |
| 21 | initial meeting with her -- |
| 22 | MS. NICKSON: Object to the |
| 23 | form. |

|  | Page 108 |
|---|---|
| 1 | Q. -- before the initial meeting with |
| 2 | Ms. Nickson in October or November of |
| 3 | 2005? |
| 4 | A. I don't -- I just don't remember. I |
| 5 | don't remember. |
| 6 | Q. Did you know Ms. Nickson before |
| 7 | September of 2005? |
| 8 | A. Yes. |
| 9 | Q. How long have you known her? |
| 10 | A. I've known of her probably since |
| 11 | 1995-96. |
| 12 | Q. And what was the reason for your |
| 13 | getting to know her then? |
| 14 | A. I didn't -- I knew of her. And at the |
| 15 | time that I was dating my ex-husband, |
| 16 | he knew her husband. I just knew of |
| 17 | them because they were well known in |
| 18 | the Montgomery area. |
| 19 | Q. Have you ever been to her house, |
| 20 | Ms. Nickson's house? |
| 21 | A. No. |
| 22 | Q. Y'all ever been out to dinner? |
| 23 | A. No. |

27 (Pages 105 to 108)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 109

1  Q. Ever been to a social event where
2     they've been, other than church?
3  A. No.
4  Q. Have you ever used Ms. Nickson for an
5     attorney other than for your divorce?
6  A. No.
7  Q. Thank you.
8        MR. STEWART: I have no
9        other questions.
10       (Off-the-record discussion)
11       (Brief recess)
12       EXAMINATION
13  BY MR. WALKER:
14  Q. My name is Dorman Walker, Ms. Barrow,
15     and I represent Don Williams. Have you
16     ever talked with Don Williams?
17  A. I did meet him when I went out to
18     National Seating.
19  Q. Tell me about that, please.
20  A. I was there at the location and
21     Elizabeth and I were going through some
22     of their PAs, and he walked in and she
23     introduced us.

Page 110

1  Q. And y'all said hello?
2  A. Yes.
3  Q. And that was about it?
4  A. That was about it.
5  Q. And was he polite?
6  A. Yes.
7  Q. Had you ever talked with him at any
8     other time?
9  A. No.
10  Q. And did you talk with him at any time
11     since then?
12  A. No.
13  Q. Do you have any reason to believe or
14     any evidence to support the belief that
15     he is part of a conspiracy to somehow
16     get or prosecute wrongfully Elizabeth
17     Horton?
18  A. No. No. No.
19  Q. When you were interviewed by the AG's
20     office -- and I believe the transcript
21     of that is sitting there right before
22     you, marked as Exhibit #11 -- at one
23     point, you appear to refer to a

Page 111

1     memorandum. And I wondered did you
2     have before you at that time either of
3     the two memorandums we've talked about
4     today, the July 9, 2004, memorandum or
5     the February 16, 2005, memorandum?
6  A. Yes.
7  Q. You had both of them with you?
8  A. I think I had all memos.
9  Q. I just wanted to know what they were.
10     The parents that you talked to about
11     wheelchairs, was it five or six parents
12     you said you talked to?
13  A. I didn't recall but I -- you know,
14     about five, I guess.
15  Q. And those would have been parents of
16     Medicaid-eligible children?
17  A. Yes.
18  Q. Do Medicaid-eligible patients, because
19     of income level or transportation
20     problems, frequently or -- is getting
21     them to clinics a problem?
22  A. I'm not sure.
23  Q. You don't know one way or the other?

Page 112

1  A. No.
2  Q. How interchangeable are the types of
3     wheelchairs that NSM would be providing
4     to patients? Are they individualized
5     for each patient?
6  A. Yes, they are.
7  Q. So the wheelchair for one patient would
8     not fit other patients, typically?
9  A. Not necessarily.
10  Q. And how individualized are they? Do
11     you know?
12  A. I don't know the process for fitting,
13     but it -- it's deemed a custom -- a
14     customized wheelchair.
15  Q. For each of the limbs and the body and
16     the head, it's all customized for each
17     person?
18  A. Yes.
19  Q. So unless two people had the same body
20     size and the same disabilities, then
21     you would not expect them to be able to
22     share the same wheelchair?
23  A. I'm not sure. I don't know.

28 (Pages 109 to 112)

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 113

1   Q. Don't know one way or the other?
2   A. No.
3   Q. Mr. Stewart asked you about this
4       July 9, 2004, memorandum. And what
5       number is that? It's 007. Is that #9?
6   A. Yes.
7   Q. And he asked you about the four bullets
8       here. And you testified that you had
9       no personal knowledge as to Bullets 1
10      through 4, but I think you said you had
11      some personal knowledge as to Bullet 4;
12      is that correct?
13  A. Regarding the Bullet 4, not necessarily
14      holding the requests but just receiving
15      outdated prescriptions.
16  Q. And you indicated that was contained in
17      Plaintiff's Exhibit #6, the other
18      memorandum by you?
19  A. I think that this memo is regarding
20      clinic dates. I don't see where we
21,     addressed an outdated prescription with
22      this particular instance.
23  Q. All right. When parents called and

Page 114

1       said that they had not missed a clinic,
2       did you take them at their word?
3   A. Of the ones that I had spoken with, I
4       had not received any information that
5       they had not missed a -- I mean that
6       they had missed a clinic.
7   Q. Well, hadn't National Seating told you
8       they had missed a clinic or am I
9       confusing --
10  A. National Seating would tell us that the
11      children had missed clinic.
12  Q. And the parents would call and say, No,
13      we didn't miss a clinic?
14  A. Of some of those we would ask, we would
15      inquiry, you know, make an inquiry, and
16      they would indicate that they had not
17      missed clinic.
18  Q. And how did you make a determination
19      which side was being truthful there?
20  A. I did not know.
21  Q. So you don't know to this day which
22      side was being accurate?
23  A. No.

Page 115

1   Q. Did you call the clinic and ask for the
2       records?
3   A. I don't recall at this point. I know
4       that that would be something that we
5       could possibly do.
6   Q. You had the authority to do that.
7   A. Yes.
8   Q. And that would have been the most
9       correct way or accurate way to
10      determine whether or not they'd
11      attended the clinic?
12  A. Yes.
13  Q. But y'all did not do that?
14  A. Well, I won't say that we didn't.
15  Q. Did you record anywhere that y'all did
16      that, that you can think of?
17  A. Not that I can recall.
18  Q. Would you have recorded it if y'all had
19      found information that National Seating
20      was lying to you?
21  A. I think we would record it one --
22      either way.
23  Q. And you did not record it? There's no

Page 116

1       records as far as you know?
2   A. It may have been listed on the computer
3       screen in the notes, the comments
4       section.
5   Q. But so far as you know, it's not; is
6       that correct?
7   A. It may be.
8   Q. But you don't know one way or the
9       other?
10  A. I don't know.
11  Q. Well, wouldn't that be important, I
12      mean, in your view of things? Wouldn't
13      you be able to tell us here that you
14      had found out by looking at the clinic
15      rolls that either the parents were
16      lying to you or National Mobility had
17      lied to you?
18  A. If this was regarding a delivery and
19      the reason for delay of a delivery and
20      the request for an extension, if we
21      found out that the justification that
22      was provided to us checked out with the
23      clinic, we would have noted that on the

29 (Pages 113 to 116)

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 117

1    file as to approve the extension.
2    Q. And do you have any recollection as to
3        whether y'all ever did that?
4    A. I don't recall. There may have been
5        nurse reviewers that may have done
6        that.
7    Q. How many patients over this period of
8        time or PAs, I guess, would y'all
9        receive on the average in a week from
10       all providers during the time when you
11       were working at Medicaid?
12   A. We would always refer to monthly PAs --
13   Q. Monthly is fine.
14   A. -- received. And we would receive
15       anywhere from six hundred to two
16       thousand PA requests.
17   Q. And were there PA requests from other
18       providers that also had mistakes in
19       them, errors or omissions of
20       information?
21   A. Yes.
22   Q. Including dates?
23   A. Well, we -- I had not recalled running

Page 118

1        across any others with missing dates.
2    Q. Could there have been others with
3        missing dates or you're saying you just
4        don't recall one --
5    A. It could.
6    Q. -- way or the other?
7    A. I have not been made aware of that.
8    Q. But you received others that had
9        missing information in them?
10   A. Sure. Yes.
11   Q. And you didn't necessarily think that
12       was an attempt to defraud Medicare, did
13       you?
14   A. No, because it didn't refer to a date.
15   Q. But if there's a date missing -- how
16       did you make a determination or did you
17       make a determination whether or not it
18       was just a mistake on the part of
19       someone or an attempt to mislead
20       Medicare?
21   A. We -- I didn't naturally assume that it
22       was an attempt to mislead. It is just
23       missing, so we would try to get that

Page 119

1        information.
2    Q. I mean, if I wanted to mislead
3        Medicare, wouldn't I fill in a false
4        date before I gave it to you, rather
5        than leave it blank?
6    A. I don't know.
7    Q. But can we agree that the absence to
8        put in a date could be accidental?
9    A. Yes, could be.
10   Q. At the time that your staff -- in
11       Plaintiff's Exhibit #6, the
12       February 16, 2005, memorandum, at the
13       time your staff was calling CRS and the
14       PTs about errors or perceived errors or
15       omissions in the PA requests, did you
16       ever call Emily or any of the people at
17       National System and ask them if they
18       had an explanation for that?
19   A. During this particular instance, Gerry
20       Rodgers had indicated to Teresa that
21       she could get the dates from Emily.
22   Q. But my question was, if y'all believed
23       there was something wrong here, did you

Page 120

1        ever call National Seating to get their
2        side of the story?
3    A. Well, we -- I think the nurses would
4        have called the PT that actually headed
5        up the assessment in that clinic.
6    Q. But the PAs were coming from National
7        Seating; is that correct?
8    A. Yes.
9    Q. Did you ever call National Seating to
10       get their version of the story to find
11       out if they could explain the apparent
12       error or omission?
13   A. I don't recall.
14   Q. If you did, you didn't put it in this
15       memorandum, did you?
16   A. That's correct.
17   Q. What does that -- if you would please
18       look at the February 16, '05,
19       memorandum. And in -- oh, well, never
20       mind. Scrap that. That's okay.
21           In your memorandum, in the third
22       paragraph here -- and I'll read it --
23       you state: It is odd that on the

30 (Pages 117 to 120)

Page 121

1  assessments that Mr. Maddox has done
2  for other vendors have a date on them,
3  comma, but the ones done for National
4  Seating do not have dates. Did y'all
5  review all of the assessments done by
6  Mr. Maddox before you made that
7  statement?
8  A. We had pulled some of the assessments
9  that were done by him.
10 Q. Some or all?
11 A. I'm not sure if they were all. I
12 instructed staff to just pull --
13 Q. What exactly did you tell staff to do?
14 A. Just pull the -- all of the PT
15 assessments that were done by
16 Mr. Maddox.
17 Q. For what period of time?
18 A. I don't recall.
19 Q. And you don't --
20 A. We would have had some way of knowing;
21 and in the requests that were already
22 pending, they could go through those
23 that were pending as well.

Page 122

1  Q. So did they just look at the ones in
2  pending or did they look back to the
3  ones that had already been completed or
4  do you know?
5  A. I think they looked at all the ones
6  that had been done before as well as
7  the ones that were in their baskets to
8  be completed.
9  Q. But you told me earlier you weren't
10 certain that they had looked at all of
11 them.
12 A. It would not -- I don't know if they
13 looked at all of them.
14 Q. Do you know what percentage of the ones
15 he did they looked at?
16 A. No, I don't know.
17 Q. Ms. Barrow, do you have that provider
18 eligibility screen — oh, here we go.
19 You can just look at mine. This is a
20 document that you were asked about but
21 it wasn't marked as an exhibit. And it
22 has some dates across the top
23 handwritten in, and I just wondered --

Page 123

1  first it looks like it's 10/1 something
2  through 12/31/04; is that correct?
3  A. Yes.
4  Q. And you can't make out what year it is
5  because it looks like a hole was
6  punched in the original?
7  A. Yes.
8  Q. Do those dates have any particular
9  meaning?
10 A. No.
11 Q. The July 9, 2004, memo, which is
12 Plaintiff's Exhibit #9, I believe you
13 told Mr. Stewart that you would have
14 done this memorandum within a day or
15 two after Ms. Horton called you?
16 A. It might have been. It wouldn't have
17 been a month.
18 Q. All right. The same day or reasonably
19 close to that?
20 A. Possibly.
21 Q. And this was a call that Ms. Horton
22 made to you personally?
23 A. Yes.

Page 124

1  Q. And did anyone else listen in to that
2  call?
3  A. No.
4  Q. Just the two of you? Did you make a
5  tape of it or anything?
6  A. No, I didn't.
7  Q. How long did that call last?
8  A. I don't recall.
9  Q. Did you take any steps to confirm or
10 try to verify the accuracy of the
11 information that she gave you before
12 you wrote this memorandum and sent it
13 to Ms. Winters?
14 A. No. I just indicated alleged
15 fraudulent activity and forwarded it
16 through my supervisor.
17 Q. So you were not vouching for it one way
18 or the other. You're saying we
19 received this report, here it is?
20 A. Yes.
21    (Brief pause)
22 Q. Who sent PAs to your office from
23 National Seating?

31 (Pages 121 to 124)

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 125

1 A. They would come through EDS, our fiscal
2 agent, and they would send them to us.
3 Q. So do you know what person at National
4 Seating sent those forward to you?
5 A. No.
6 Q. Did you come out to the National
7 Seating office one time with children
8 in your car?
9 A. No.
10 Q. And more specifically, did you come out
11 with children in your car and did
12 Elizabeth Horton come out and talk to
13 you while you stayed in your car?
14 A. I don't recall that.
15 Q. Who were the people on your staff at
16 the time you wrote the July 9, 2004,
17 memorandum? There was you.
18 A. Yes. There was Teresa Surles, Debbie
19 Flournoy.
20 Q. Can you spell her last name, please?
21 A. F-L-O-U-R-N-O-Y.
22 Q. Okay.
23 A. Sheila McDaniel. Hazel -- I can't

Page 126

1 think of Hazel's last name right now.
2 Kathy --
3 Q. Is that Kathy with a C or a K?
4 A. With a K. Kathy Hardwick.
5 Q. H-A-R-D-W-I-C-K?
6 A. Yes. Janet Moore.
7 Q. M-O-O-R-E?
8 A. Yes. Jerry Sanders.
9 Q. Is that G-E-R-R-Y?
10 A. J.
11 Q. J-E --
12 A. -- R-R-Y.
13 Q. S-A-N-D-E-R-S?
14 A. Yes.
15 Q. Is that a male or female?
16 A. Male.
17 Q. And all the others are female so far?
18 A. Yes.
19 Q. Okay.
20 A. I think Angela Arrington, Carolyn
21 Thompson.
22 Q. L-Y-N?
23 A. Yes.

Page 127

1 Q. T-H-O-M-P-S-O-N?
2 A. Yes. And Carolyn Thomas.
3 Q. C-A-R-O-L-Y-N, Thomas, T-H-O-M-A-S?
4 A. Yes.
5 Q. And were -- I'm sorry, ma'am. I didn't
6 mean to cut you off.
7 A. Sheryl Yelder.
8 Q. C-H-E-R-Y-L?
9 A. S-H-E-R-Y-L.
10 Q. S-H-E-R-Y-L. How do you spell that
11 last name?
12 A. Yelder, Y-E-L-D-E-R.
13 Q. Okay.
14 A. Janice --
15 Q. You had a big staff.
16 A. Uh-huh. Oh, what's Janice's last name?
17 I can't think of Janice's last name.
18 And I think that was it.
19 Q. Now, did all of these people have more
20 or less the same job?
21 A. No. Some of them are nurses and some
22 of them are clerical.
23 Q. Which ones are nurses?

Page 128

1 A. Teresa Surles, Debbie Flournoy, Sheila
2 McDaniel, Hazel -- let me see --
3 Carolyn Thompson. And I'm missing a
4 nurse.
5 Q. And one other anonymous, can't think of
6 her name right now?
7 A. I can't think right now. I'm sorry.
8 Q. That's okay. That happens to me, too.
9 A. Janet Moore was an accounting
10 technician. Jerry Sanders was a
11 Medicaid administrator.
12 Q. What was his job?
13 A. He was the former associate director in
14 the division.
15 Q. And did he verify PAs too and that sort
16 of thing?
17 A. Yes, sometimes.
18 Q. Essentially the same job as the nurses?
19 A. Somewhat.
20 Q. All right.
21 A. Angela Arrington was clerical; Carolyn
22 Thomas, clerical. Sheryl Yelder was a
23 benefits specialist. Janice was a

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

| Page 129 | Page 131 |
|---|---|
| 1    benefits specialist. | 1    known one to be arrested. So that |
| 2  Q. And that other nurse was also -- | 2    was -- that was the first for me in |
| 3  A. Jean Luther. | 3    that type of situation. |
| 4  Q. Jean Luther? | 4  Q. But, then, you've not really been |
| 5  A. Yes. | 5    involved in any other investigations, |
| 6  Q. J-E-A-N? | 6    though? |
| 7  A. Yes. | 7  A. No. No. |
| 8  Q. L-U-T-H-E-R? | 8  Q. And would you say that it was -- strike |
| 9  A. Yes. | 9    that thought that wasn't going |
| 10  Q. A female? | 10    anywhere. |
| 11  A. Yes. | 11        MR. WALLACE: That's all I |
| 12  Q. Thank you. I think that might be it | 12        have. Thank you. |
| 13    for me. That is it for me. Thank you | 13        MR. WALKER: Chuck, you have |
| 14    very much. | 14        something else? |
| 15        MR. WALKER: You got | 15        MR. STEWART: No. |
| 16        anything? | 16        MR. WALKER: We're done. |
| 17        MR. WALLACE: I do. | 17        MS. NICKSON: Yeah, we are |
| 18        EXAMINATION | 18        done. |
| 19  BY MR. WALLACE: | 19        MR. STEWART: Ms. Barrow, |
| 20  Q. I'm Jack Wallace. I represent Gerald | 20        thank you for coming in. |
| 21    Shockley, who interviewed you from the | 21   *   *   *   *   *   *   * |
| 22    attorney general's office. Have you | 22        FURTHER DEPONENT SAITH NOT |
| 23    been involved in many investigations | 23   *   *   *   *   *   *   * |

| Page 130 | Page 132 |
|---|---|
| 1    before? | 1        REPORTER'S CERTIFICATE |
| 2  A. No. | 2   |
| 3  Q. And in fact, do I remember perhaps | 3  STATE OF ALABAMA ) |
| 4    you've only been involved in these two | )|
| 5    investigations? | 4  ELMORE COUNTY   ) |
| 6  A. Yes. | 5   |
| 7  Q. But Medicaid Agency has seven, eight, | 6        I do hereby certify that the above |
| 8    nine investigators and they investigate | 7  and foregoing transcript was taken down |
| 9    people fairly frequently. | 8  by me in stenotype, and the questions |
| 10  A. Yes. | 9  and answers thereto were transcribed by |
| 11  Q. And it's a matter of routine, just | 10  means of computer-aided transcription, |
| 12    doing business with the state, is it? | 11  and that the foregoing represents a true |
| 13  A. I would imagine. | 12  and correct transcript of the testimony |
| 14  Q. Was there anything that would make you | 13  given by said witness. |
| 15    think that Gerald Shockley was doing | 14        I further certify that I am neither |
| 16    anything other than his job and just | 15  of counsel, nor of any relation to the |
| 17    routinely investigating the allegations | 16  parties to the action, nor am I anywise |
| 18    that he had before him? | 17  interested in the result of said cause. |
| 19  A. I'm not sure. | 18   |
| 20  Q. Okay. | 19   |
| 21  A. Just from my experience at Medicaid | 20        Barbara A. Howell, Certified |
| 22    from people who have called to make | Court Reporter and Commissioner |
| 23    complaints against vendors, I've never | 21    for the State of Alabama at Large |
| | ACCR NO. 123 - Expires 9/30/08 |
| | 22    MY COMMISSION EXPIRES: 12/27/08 |
| | 23 |

33 (Pages 129 to 132)

ALABAMA MEDICAID AGENCY

February 16, 2005

**MEMORANDUM**

To:           Mary G. McIntyre, M.D., M.P.H.
              Medical Director
              Office of the Commissioner

From:         Felecia S. Barrow, M.P.A.
              Associate Director
              Prior Approval Unit

Re:           Issues with Wheelchair Assessments Received

Please find attached examples of wheelchair assessments that have been submitted by National Seating and Mobility – Montgomery, that were missing the clinic dates. Two of the assessments were conducted by Gerry Rodgers, P.T. and one by Michael Maddox, R.P.T., both of Children's Rehab Services.

Teresa Surles, R.N. questioned the assessments and was told (by Gerry Rodgers) to get the dates from Emily, National Seating. I informed Teresa that the clinic dates should be kept at CRS where the assessment was conducted. Teresa, under my direction, contacted CRS to get the clinic date instead of Emily. Jackie (CRS) informed Teresa that the date of the clinic appointment was July 20, 2004. The PA request was submitted in February 2005. A subsequent fax was received from Gerry Rodgers indicating that the assessment was reviewed on 2/15/05 and thought "still o.k." I conferred with Teresa and Debbie and thought that we needed updated clinic notes telling us the current condition of the client. On another client, both the physician's note of medical necessity and the P.T. assessment were lacking dates.

Teresa came across another assessment completed by M. Maddox and placed a call to the P.T. to find out why the date was missing. The P.T. replied, "...maybe we're not supposed to do this (pause), but I never put dates on the assessments or the prescriptions because it messes up the vendor"..."like, we're on a time clock...". It is odd that on the assessments that Mr. Maddox has done for other vendors have a date on them, but the ones done for National Seating do not have dates. This was the same information that was reported by former National Seating employee, Elizabeth Horton.

I would like to refer this information to Clifford Johnson, Chief Investigator, Program Integrity Division. If it is too premature at this point, I will wait.

**PLAINTIFF'S EXHIBIT**

6 – Barrow

## CHILDREN'S REHABILITATION SERVICE
## REPORT OF VISIT

SSN:        PATIENT: KATIE LYNN SMITH        DATE:

Katie Lynn is a cute little 4-year-old. She is very premature. She had hydrocephalus and CP. Mary
has followed her and is concerned with her left hip and her tight heelcords. On exam, there are
problems with the left leg and left tendo-achilles. There are definitely tight, and I cannot get it quite to
neutral. Right side is passively correctable, but she does have increased tone, and she likes to hold it
in equinos. On my exam, the hips feel steady and leg lengths appear to be equal. I really think an AP
and frog lateral hip x-rays would be appropriate. We are going to do serial casting on the left leg. She
will need a set of fixed AFOs. I will see her back in this clinic in three months.

(Joseph Curtis, M.D.)/sl

## CHILDREN'S REHABILITATION SERVICE
## REPORT OF VISIT

SSN:        PATIENT: KATIE LYNN SMITH

PHYSICAL THERAPY:

Katie Lynn is unable to ambulate and needs a chair for mobility. She is getting too long to be carried
and she has good use of her upper extremities so we would like for her to be able to push when
she is in a seated position. She goes to daycare at school, and they need a way to get her around in
these areas also. I feel that at this point due to the family situation, we may need to get a stroller that
can be transported in many different vehicles that is easy to fold up and easy to get around. We can
also get some large wheels where she can push herself on it sometimes. Katie Lynn can sit up with
hand supports so I feel like with a five-point harness, she could sit up in the stroller very well. A
prescription for this was given to Don from National Seating and Mobility today. She does not have a
current EPSDT, and once this is done, we need to get a copy and forward it over to National Seating
along with a copy of this clinic dictation so that they can submit it to Medicaid. Once it is approved, it
will be ordered. When it comes in, we will schedule a time for delivery. She had a wheelchair
recommended a couple of years ago through Seating Clinic. It was approved and ordered, but we
were never able to get a hold of the family for delivery, so the chair had to be sent back. Katie Lynn
much larger than she was then, so what we ordered then would not be appropriate, and we need a
new seating system this time.

(Gerry Rodgers, PT, PCS)/sl

## CHILDREN'S REHABILITATION SERVICE
## REPORT OF VISIT

(7/20/04 per Jackie(?))

SSN: 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    PATIENT: JASMINE WILLIAMS

**PHYSICAL THERAPY:**

Jasmine's seating system has been wearing out. Foam is visible through most of the different pads and seating systems. In addition, her scoliosis has worsened, and her spine is actually shortened, so the back is too tall. In addition, the back posts get out of whack according to the mom. They were uneven today, and I evened them back up. I described the rigidizing bar that would go in-between there, but it would be one more step in folding the chair. Mom would like to go ahead and do this. We need to repair the brake on the left side of the chair. Otherwise, the frame is in pretty good shape. I do think that we need to get her new seating to continue to support her in her wheelchair. She needs a solid seat and back, thoracic pads and hip guides to keep her trunk and hips in the midline. She needs an abductor to keep her hips apart. Her right leg tends to adduct excessively. She needs a three-piece headrest for posterior and lateral head support. She needs a rigidizer bar to keep the frame from getting out of line and brake repair on the left. EPSDT and prescription were given to family from National Seating and Mobility. We need to send a copy of this clinic dictation to her so that she can submit it to Medicaid. Once the approval is received from Medicaid, the chair will be ordered. When it comes in, we will schedule a time for delivery.

(Gerry Rodgers, PT, PCS)/sl

*[3771_001.pdf]*

# 14

# 14  Durable Medical Equipment (DME)

Medicaid authorizes supplies, appliances, and durable medical equipment (DME) to Medicaid recipients of any age living at home. A provider of these benefits must ensure the following:

- The supplies, appliances, and DME are for medical therapeutic purposes.

- The items will minimize the necessity for hospitalization, nursing facility, or other institutional care.

The attending physician is responsible for ordering the items in connection with his or her plan of treatment. The attending physician must be a licensed, active, Alabama Medicaid provider. The DME provider is responsible for delivering and setting up the equipment as well as educating the recipient in the use of the equipment.

Request for coverage of durable medical equipment must be received by EDS within thirty days after the equipment is dispensed. When the request is not received within the thirty day time frame for ongoing rental equipment ( such as apnea monitors, pulse oximeters, oxygen, cpap machines, ventilators, bipap machines, compressors ) the thirty days will be calculated from the date the prior authorization request is received by EDS. All prior authorization requests received with a date greater than thirty days from dispensed date will be assigned an effective date based on actual date received by EDS if the recipient continues to meet medical criteria. No payment will be made for the days between the dispensed date and the date assigned by the Prior Authorization Unit.

> **NOTE:**
>
> A recipient does not have to be a Home Health Care recipient in order to receive services of this program.

The policy provisions for DME providers can be found in the *Alabama Medicaid Agency Administrative Code*, Chapter 13.

## 14.1  Enrollment

EDS enrolls supply, appliance, and durable medical equipment providers and issues provider contracts to applicants who meet the licensure and/or certification requirements of the state of Alabama, the Code of Federal Regulations, the *Alabama Medicaid Agency Administrative Code*, and the *Alabama Medicaid Provider Manual*. A copy of your approved Medicare enrollment application is required.

Refer to Chapter 2, Becoming a Medicaid Provider, for general enrollment instructions and information. Failure to provide accurate and truthful information or intentional misrepresentation might result in action ranging from denial of application to permanent exclusion.

### Provider Number, Type, and Specialty

A provider who contracts with Medicaid as a DME provider is issued a nine-digit Alabama Medicaid provider number that enables the provider to submit requests and receive reimbursements for DME-related claims.



PLAINTIFF'S EXHIBIT

7-Barrow

Horton V. Williams-0015

*[3771_001.pdf]*

Durable Medical Equipment (DME)



**NOTE:**

All nine digits are required when filing a claim.

DME providers are assigned a provider type of 91 (DME). The valid specialty for DME providers is Durable Medical Equipment/Oxygen (V4).

**Enrollment Policy for DME Providers**

To participate in the Alabama Medicaid Program, DME providers must meet the following requirements:

- The provider's business must have a physical location in the state of Alabama or within a 30-mile radius of the Alabama state line. This requirement does not apply to Medicare crossover providers.

- There must be at least one person present to conduct business at the physical location. Answering machines and/or answering services are not acceptable as personal coverage during normal business hours (8:00 a.m. – 5:00 p.m.) The provider may serve all counties adjoining the county in which he has a business license and is physically located. Satellite businesses affiliated with a provider are not covered under the provider contract; therefore, no reimbursement will be made to a provider doing business at a satellite location, however the satellite could enroll with a separate provider number.

- Medicaid will enroll manufacturers of augmentative/alternative communication devices (ACDs) regardless of location.

- The provider shall have no felony convictions and no record of willful or grossly negligent noncompliance with Medicaid or Medicare regulations.

## 14.2    Benefits and Limitations

This section defines durable medical equipment, discusses Medicaid policy for supplying medical supplies and appliances as a DME provider, discusses prior authorization for DME, provides a listing of non-covered services, and describes reimbursement policy. Refer to Chapter 3, Verifying Recipient Eligibility, for general benefit information and limitations.

### 14.2.1    Supplies, Appliances, and DME

A written order or a signed prescription from the attending physician to a participating supplier determines medical necessity for covered items of supplies and appliances. A prescription is considered to be outdated by Medicaid when it is presented to a provider to be filled past sixty days from the date it was written. Prior authorization by Medicaid is not required for supplies and appliances except for when more than the Medicaid allowed units are required (i.e. blood glucose test strips and lancets).

The recipient or their authorized representative is responsible for obtaining the prescription from the attending physician for Medicaid-covered items and taking it to a participating Alabama Medicaid DME provider.

Upon receipt of the prescription, the DME provider must:

- Verify Medicaid eligibility by checking the RID number and verifying that number using AVRS, AEVCS or the Provider Assistance Center at EDS

**Deleted:** Supplies and Appliances

**Added:** Supplies, appliances, and DME

Horton V. Williams-0016

[3771_001.pdf]

- Obtain necessary managed care referrals and prior authorization
- Collect the appropriate copayment amount
- Furnish the covered item(s) as prescribed
- Retain the prescription on file
- Submit the proper claim form to EDS

Upon furnishing durable medical equipment/supplies, the supplier should obtain a signature on any form he/she desires indicating that the equipment/supplies have been received by the recipient. If the recipient is unable to sign for the equipment/supply items the supplier should verify the identity of the person signing for the items, i.e. relative, homehealth worker, neighbor.

## 14.2.2    Durable Medical Equipment

Medicaid covers new durable medical equipment items for long-term use, long term use is defined as the use of durable medical equipment that exceeds six months. New durable medical equipment items for EPSDT related services may be rented for six months or less.

Durable medical equipment is necessary when it is expected to make a significant contribution to the treatment of the recipient's injury or illness or for the improvement of physical condition.

As defined by Medicaid, durable medical equipment is equipment that meets the following conditions:

- Can stand repeated use
- Serves a purpose for medical reasons
- Is appropriate and suitable for use in the home

The cost of the item must not be disproportionate to the therapeutic benefits or more costly than a reasonable alternative. The item must not serve the same purpose as equipment already available to the recipient.

Providers should be aware of Medicaid policy regulating medical necessity for durable medical equipment. The policy is described below for DME covered by Medicaid.

*Warranty, Maintenance, Replacement, and Delivery*

All standard durable medical equipment must have a manufacturer's warranty of a minimum of one year. If the provider supplies equipment that is not covered under a warranty, the provider is responsible for repairs, replacements and maintenance for the first year. The warranty begins on the date of delivery (date of service) to the recipient. The original warranty must be given to the recipient and the provider must keep a copy of the original warranty for audit review by Medicaid. Medicaid may request a copy of the warranty.

Medicaid covers repair of standard durable medical equipment. These services must be prior approved by Medicaid. Medical documentation submitted must support the need for servicing of the equipment. Providers should submit their usual and customary charges for the service.

Requests for items that are covered by Medicaid which are outside the normal benefit limits, due to damage beyond repair or other extenuating circumstances must be submitted to the Long Term Care Division for review and consideration. Request for repair/replacement due to extenuating circumstances should be mailed to, Alabama Medicaid Agency, 501 Dexter Ave., LTC Division, Montgomery AL, 36103.

Horton V. Williams-0017

[3771_001.pdf]

 **Alabama Medicaid Agency**

**CONFIDENTIAL**
**MEDICAID**
—
**COMPLAINT**

CASE NBR: 8-04-0150
DATE ASSIGNED: 8/2/04
ASSIGNED TO: _____

| COMPLAINANT | SUBJECT |
|---|---|
| Prior Approval Unit & Provider Review Unit | National Seating & Mobility #0098143550 |

COMPLAINT RECEIVED BY: C.J.

DATE RECEIVED: 7-12-2004

REFERRED BY:
[ ] P & S        [ ] Telephone
[ ] Intra-Agency  [X] Memo/Letter
[ ] Interagency   [ ] Other

ALLEGATION: Fraudulent billing activities

SUMMARY: See attached memo dated 7-9-2004 in case # 8-3-0144 done on the subjected provider for alleged allegations.

INVESTIGATOR: _____

DISPOSITION: _____

CASE REFERRED TO: _____

**PLAINTIFF'S EXHIBIT**

8-Barrow

APPROVED _____

Horton V. Williams–0013

[3771_001.pdf]

## ALABAMA MEDICAID AGENCY

July 9, 2004

### MEMORANDUM

| | |
|---|---|
| To: | Rochelle Winters, Associate Director<br>Recipient Review Unit<br>Program Integrity Division |
| Thru: | Lee Maddox, Deputy Commissioner<br>Administrative Services |
| Thru: | Mary G. McIntyre, M.D., M.P.H.<br>Medical Director |
| From: | Felecia S. Barrow, M.P.A.<br>Associate Director<br>Prior Approval Unit |
| Re: | Utilization Review Committee Referral – National Seating and Mobility<br>Provider # : 009814350 |

*Received 7/12/04*

This memo serves as a referral of the above-referenced provider for alleged fraudulent activity.

Our Unit has been made aware of the following potential issues...

- Forgery of recipients' signatures on delivery tickets for durable medical equipment;
- Improper billing practices such as submitting requests for reimbursement of repair items that are already in their stock, ordering the wrong part for wheelchair repairs and subsequently submitting additional PA requests for the same client where the item had already been requested and paid;
- Instructing clients to deliberately leave the date section blank on the delivery ticket so that they may manipulate the date based on the PA conditional approval received from Medicaid;
- Holding requests with outdated prescriptions (Rx) and when Medicaid informs that they must submit a current Rx, they indicate a current date on the old Rx.

More detailed information and specific examples will be provided to you if requested.

A former employee of the company is willing to provide information necessary to assist in any investigation conducted. This ex-employee has filed a Quai Tam lawsuit with the Attorney General's Office.

Should you need additional information, please do not hesitate to contact me at 2-5233 or Debbie Flournoy, RN, Nurse Supervisor, at 3-5949. Thanks.

**PLAINTIFF'S EXHIBIT**

9 - Barrow

## ALABAMA ATTORNEY GENERAL'S OFFICE
## MEDICAID FRAUD DIVISION
## INTERVIEW REPORT FORM

**May 9, 2005**
**TRANSCRIPTION DATE**

### Interview of Don Williams
### Matter ID #77282-001

Mr. Don Williams, Office Manager, National Seating and Mobility, 646 Oliver Road Montgomery, AL 36117, telephone phone #334-273-1112. After being advised of the identity of the interviewing investigator, and that the nature of the interview was to verify that certain Medicaid recipients had received wheelchairs which had been billed to Medicaid by National Seating and Mobility, Mr. Williams furnished the following information. Mr. Williams stated empathically that he nor any of his staff has ever billed anyone for wheelchairs not delivered.

At random, I selected four Medicaid recipients who had, according to documentation, received wheelchairs from National Seating and Mobility. Those four names are as follows: Travis Smith, Candace Dix, Tyler Balles, and Austin Dennis.

After a review of his records, Mr. Williams made available delivery tickets bearing the name of the sponsor signature acknowledging receipt of the wheelchairs in each of the above four named cases. There is a delivery ticket signed by the sponsor to the recipient.

Mr. Williams was very adamant that National Seating and Mobility has never submitted a false document claiming delivery of a wheelchair; that on each document submitted to Medicaid for payment, there was the delivery of a wheelchair. Mr. Williams speculated that a previous employee of National Seating and Mobility had falsely made allegations against him and his business. He advised he suspects Elizabeth Horton had made the allegation that he had fraudulently billed medicaid for wheelchairs not delivered. He advised that the reason he suspects Elizabeth Horton is because it was necessary for him to terminate her from National Seating and Mobility. He advised that she worked at National Seating and Mobility for a short period of time, approximately two to three months during 2004. He said one of the reasons he had to discontinue her services was that she was associating a lot of time with a Felicia Barrows of the Medicaid Agency. He advised that he cautioned her on a number of occasions that a contractor such as National Seating and Mobility had to be very careful when dealing

---

DATE OF INTERVIEW  May 5, 2005  AT  Montgomery, AL

BY  Gerald G. Shockley  SPECIAL AGENT

FILE #77282-001

PLAINTIFF'S EXHIBIT

10-Barrow

Horton v. Williams - 0083

**Page 2**                                                           File #77282-001

with the contracting state agency so as not to violate the ethics laws.  He advised that due to her work ethics and the uncomfortable relationship she had with Felicia Barrows, he called Kelly Services, Elizabeth Horton's employer, and requested Mrs. Horton not be sent back to National Seating and Mobility.  It is his understanding that Kelly Services thereafter terminated Elizabeth Horton.

Richard Keeshan, Alabama Attorney General's Office, was present during the above interview.

Horton v. Williams - 0084

## ALABAMA ATTORNEY GENERAL'S OFFICE
## MEDICAID FRAUD DIVISION
## INTERVIEW REPORT FORM

June 23, 2005
TRANSCRIPTION DATE

Interview with Felecia Barrow
Employee of the Medicaid Agency

**SHOCKLEY:** This is Gerald Shockley, I'm with the Alabama Attorney General's Office. Today's date is June 15, 2005. It's approximately 2:05 p.m. and I'm in the office of Mr. Cliff Johnson, Investigator with Medicaid Agency. Also present is Felecia Barrow and Mr. Richard Keeshan of the Alabama Attorney General's Office. I'm here for the purpose of talking with Felecia concerning....(phone rings) OK , I just turned the tape recorder off briefly for Mr. Johnson to take a phone call. We are back on tape now. As I was stating, we're here to talk with Ms. Barrow concerning the case that has been referred to us concerning National Seating and Mobility of a durable medical equipment supplier of wheelchairs for Medicaid recipients and we've been talking for the past few minutes and Felecia what I would like to do at this point is just ask you what information you have concerning an allegation that was made that National Seating and Mobility was billing for wheelchairs not delivered. Did you receive the initial complaint or how did it come to you?

**BARROW:** Well, the complaint came to me, as a result of, a former employee, the person who was employed with the company at the time, Elizabeth had contacted the agency once she had been terminated from employment. The termination came about as a result of a visit that I made to the fielding, since they were in Montgomery, I thought that it would be wise for us to kind of go out there and see what their operations looked like. We don't get an opportunity to do that much, so I went ahead and took the liberty of going out there and, informed Elizabeth that I would be coming, she introduced me to one of the employees there, I think his name was Don, I believe at the

---

DATE OF INTERVIEW  June 15, 2005  AT Montgomery, AL

BY Gerald G. Shockley  SPECIAL AGENT

FILE #77282-002

**PLAINTIFF'S EXHIBIT**

11 - Barrow

Horton v. Williams -- 0089

**Page 2**                                        File #77282-001

time when I met him, he just went about his way, I told him that I was from Medicaid and after I left I just noticed the things in the building and their files, how they kept their files, once I left, I understand that they had told her the very next day that she, her services were no longer required and because she was too friendly with Medicaid and they could not have that so I didn't understand any of that. I didn't understand their hiring practices one way or another. She was a temporary employee so it really, you know, didn't there was no reason that I should even get involved in any of that. However, she did call us to tell us at Medicaid that there had been several requests that she had been privy to that were submitted to Medicaid requesting parts for repairs to wheelchairs, things of that nature where they had parts already they would get parts from some other store, repair the wheelchair, send the client on their way but they would bill Medicaid as if they were purchasing brand new parts. Uh, she also informed that there were several requests that we had received on clients where the date, the prescription date, because we require that physicians prescribe the equipment before we can even review it. Uh, the prescription date, uh, were missing from the prescription and they would write in or either white it out and write it in, you know, write in a more recent date, uh, because we consider a request to be outdated if the prescription exceeds 60 days.

SHOCKLEY:    Let me slow you down just a minute.

BARROW:      Sure.

SHOCKLEY:    Let me go back and make sure I understand....

BARROW:      Uhmm.

SHOCKLEY:    What you're saying. The Elizabeth that you're talking about is Elizabeth Horton?

BARROW:      Elizabeth Horton.

SHOCKLEY:    And, and you say the prescription dates had been whited out? Was that part of the allegation or is that part of the evidence that you saw?

BARROW:      Well now that was part of the allegation.

SHOCKLEY:    Okay so you didn't....

Page 3                                                          File #77282-001

**BARROW:**       This is what she was telling us.

**SHOCKLEY:**     Okay so she didn't show you any documentation. She was just telling you about it?

**BARROW:**       Exactly.

**SHOCKLEY:**     Have you seen any documentation that would support that?

**BARROW:**       No, I haven't seen any documentation; however, there was, uh, an assessment uh, a wheelchair assessment that was completed by one of the physical therapists and he informed one of my staff, Teresa Sorrells, that they do not date the assessment. And they, she asked why, they don't date them.

**SHOCKLEY:**     You say they don't date them. Who?

**BARROW:**       The PT, the physical therapists when they complete an assessment on a client for a wheelchair or for any specialized equipment, uh, they conduct an assessment, they come to clinic, the client will come to clinic on a certain day and they're supposed to document the date that client showed up at clinic because we need to know when the assessment was done and make sure that the DME Company in turn will order that equipment timely send in a prior approval request before that condition changes for that client.

**SHOCKLEY:**     Okay, let me slow you down one more time.

**BARROW:**       Uhmm.

**SHOCKLEY:**     You say a clinic, uh, explain to me what a clinic is. They come to a clinic, who sets this clinic up, who establishes and what happens at a clinic?

**BARROW:**       Well, uh, the primary care doctor for the client will normally refer them to a physical therapist, uh, the clinic that we deal with most of the time with Medicaid is Children's Rehab Services, uh, they have clinics in several different parts of the state but there all under one umbrella of Alabama Department of Rehab Services.

**SHOCKLEY:**     Uhmm.

Horton v. Williams - 0091

5 / 1

Page 4                    ○                    ○ File #77282-001

BARROW:         Uh, we call it the CRS Clinic. The client wherever they are
                located will be referred to, let's say CRS Clinic. Uh, physical
                therapist there will do an evaluation of the child. They
                normally see the child quite often because of other things, uh,
                that the child would need. So they would go to the clinic, they
                would have an assessment done. They would say okay this is
                the type wheelchair you need and these are the accessories
                you need on the wheelchair. They will write up their
                assessment and 9 times out of 10, sign it, you know with their
                name and they put a date on it. That, uh, client or the
                caregiver for that client will take that assessment and
                sometimes CRS will even fax it. (phone ringing)

SHOCKLEY:       Okay, we just turned the tape recorder off one more time for a
                phone call and we're back on tape now. And Felicia forgive me
                for where we were but I think we were into the prior approval
                and the assessments that a clinic, on a certain day, and that
                you had some people that were doing assessments and/or
                therapists not putting an assessment date on there and that
                was being used and you do that. You need an assessment
                date because you want it in close proximity to the time the
                wheelchairs are ordered so the child doesn't change I guess
                by growth and have different needs and if it's out of date then
                the wheelchair may not be very good for a very long period of
                time.

BARROW:         Exactly.

SHOCKLEY:       And that's the reason you need that kind of date.
                Is that correct?

BARROW:         That's correct.

SHOCKLEY:       Okay go ahead with what the problem is then.

BARROW:         Okay. Uh, on this particular assessment that we received on a
                child there was no date and uh, we, one of my staff contacted
                the physical therapist. She brought the information to me and
                thought that it was a little strange and I said well, let's go
                ahead and call. Let's contact the physical therapist and find
                out, you know, what happened and why they didn't date it. Uh,
                she was told by that physical therapist who sends in several
                requests on behalf of National Seating, uh, and he informed
                her that he was told not put a date on it, ever because it would
                mess up the vendor and she asked him what do you mean by

                                                        5 2

Page 5                                                       File #77282-001

mess up the vendor? And he said, oh, I think I may have said too much. Uh, we just are told, we're told not to put dates.

SHOCKLEY:   Who is this receiving this conversation?

BARROW:     This was uh, Teresa Sorrells in the office who works for me.

SHOCKLEY:   Okay.

BARROW:     She's one of my nurse reviewers and she was speaking with an M. Maddox. I don't know his first name. It might be Michael, I think.

SHOCKLEY:   He's a therapist?

BARROW:     He's a physical therapist.

SHOCKLEY:   Where is he located?

BARROW:     Ohh, let's see where he is because this is the memo that I had done indicating that uh, there was a visit done where he didn't put a date on here. CRS Dothan, he's in the Dothan office, Dothan, AL.

SHOCKLEY:   Okay.

BARROW:     And uh, he said he didn't want to say much more but that you know if he needed to be dating them then just let him know. It's just that what he was told was never to put a date on them.

SHOCKLEY:   Who told, you did he say told him to say that?

BARROW:     National Seating and Mobility

SHOCKLEY:   Okay, all right.

BARROW:     In Montgomery.

SHOCKLEY:   Okay, let me go on the allegation that there were recipients that did not receive the wheelchairs and I understand all of this other is important but I want to just get right down to the fraud portion of it though where wheelchairs were paid for that was not delivered.

BARROW:     Uhmm.

53                    Horton v. Williams - 0093

**Page 6**

**File #77282-001**

SHOCKLEY:    Do you have any information concerning or were you given any information names of recipients that allegedly did not receive the wheelchairs and if so, who gave it to you?

BARROW:    Well Elizabeth Horton again, uh, provided this information uh, once she was terminated that uh, there she had a file, or had the names of the clients, uh, where there were wheelchair repairs uh, done and the parts were received from other places or that, CR, uh, National Seating, I'm sorry had the part, uh, on site, did not have to order these parts but they would go ahead and repair the wheelchair but submit a prior authorization request to us in order to pay for the part to be reimbursed for a part, but they really weren't being reimbursed for a new part it was just a part that they had.

SHOCKLEY:    This is what Elizabeth was telling you?

BARROW:    Yes.

SHOCKLEY:    Okay, did she give you any names of recipients that would be affected by this?

BARROW:    Hmm, I think she did provide me with a few names and I think I had, uh, put all that information together to send uh here to Investigations, uh, and I would have my copy of, you know, of what I had uh submitted.

SHOCKLEY:    She was interviewed by Mike Roeder, who has since retired from the Medicaid Fraud Control Unit, the Attorney General's Office.

BARROW:    Yes.

SHOCKLEY:    And she was saying there were a lot of chairs that were not delivered.

BARROW:    Hmm.

SHOCKLEY:    I hear you talking about parts. Are you familiar with the allegation that there was chairs not delivered?

BARROW:    I think that she had mentioned something like that to me but there was nothing that I witnessed in the office from the request that we received that would indicate or calls from recipients that, hey I didn't get my chair from National Seating.

54

**Page 7**

File #77282-001

| | |
|---|---|
| SHOCKLEY: | That's what she was telling you, that she got calls from recipients and responses? |
| BARROW: | No, she was telling me that there were, she knew that there were cases where the chairs had not been delivered to clients and even cases where they would order a chair for a client but let another client borrow the chair and use it for a period of time and then turn it back in and then they would get it to another recipient as a new chair. |
| SHOCKLEY: | Uhmm. |
| BARROW: | But I never saw anything that would, you know, show as documented proof. |
| SHOCKLEY: | How well do you know Elizabeth? |
| BARROW: | Hmm, not very well. Uhmm, we did discuss a lot of things over the phone because she would call me almost on a daily basis to get an extension request for a PA so she called me quite a bit and we did, you know, discuss other things other than business when she did call me we may talk about a concert that may have come to town or something like that. |
| SHOCKLEY: | Did you go to concerts with her? |
| BARROW: | No. |
| SHOCKLEY: | No. Did you, let me ask you this, did you socialize with her at all or was it strictly professional? |
| BARROW: | It was professional. |
| SHOCKLEY: | Strictly professional, okay. |
| BARROW: | Yeah. |
| SHOCKLEY: | Okay, uh, I know that she was only employed there for 2-3 months.... |
| BARROW: | Uhmm. |
| SHOCKLEY: | And u h, what she's done is look over a list of, of various recipients that we provided a list for, Mike Roeder did. |
| BARROW: | Uhmm. |

55

Horton v. Williams - 0095

○                    ○ File #77282-001

SHOCKLEY:    And she's checked off thirty something names of people who did not receive wheelchairs. Did she ever give you those names?

BARROW:    No, she just told me to look out for certain requests. She didn't say anything about them. She just told me, you know, look out for this request and I think that what she was trying to get at was the fact that they had sent in a request for an extension on a delivery because they said that the client didn't come to clinic and they couldn't get up with the client's parents and they never showed up and all of this, so I was taking that as, okay, this is legitimate, you know, the client sometimes will miss clinic or they'll miss an appointment and I can understand their frustration and they need an extension so I would grant it, uh, but later found out from Elizabeth that these were not true reasons, you know, that they were providing me, uh, that they just held onto requests. They just sat on a desk and the client is in need of the equipment; however, they can't get it because National Seating has not either ordered it or they haven't sent it for whatever reason.

SHOCKLEY:    Wouldn't it be in their best interest though to uh, cause that's their, that is their purpose for being in business, is to go ahead and order immediately and uh, supply and then bill for it because that's the only way they get paid is that correct?

BARROW:    Yeah, uhmm.

SHOCKLEY:    Did you ever get the feeling that Elizabeth may not have had as much information as what she was alleging to have.

BARROW:    No, I never had any reason to doubt what she was saying and, and the reason I say that is because we ran into several problems with them recently, uh they had another staff turnover and when that new staff person came in it was everyday, asking for extensions on requests. They were telling parents that it's Medicaid's fault that you don't have what you need because they're sitting on your request. Parents would call us and when those parents started calling I would question the parents as to, you know, when did you first start this process? Uh, when, when did you go to uh clinic for your assessment? When did they tell you they submitted the PA request? And in every case, the parents were saying, you know, they're telling me that, you know, I can't get my equipment because it's outdated. The time limit has expired and you know, I explained to the parent every time we give

56                                    Horton v. Williams - 0096

Page 9                 ( )                      ( ) File #77282-001

them 60 days to dispense the equipment. Once it's approved, you have two months to get that equipment out, get it ordered and get it out to them, uh, the parents were being notified a week before an expiration date that we impose upon them. We give them 60 days and on that expiration date, we say if you don't have this equipment dispensed by this date, we're not going to pay you for it, uh, so the parents were getting a call a week before the expiration date to say, hey, you know we got this authorization from Medicaid, we need to get in here to clinic and sometimes it wasn't convenient for the parents to get in there within that week. If it expired they would tell the parents we can't give you the equipment so now my question to National Seating was, you need to dispense this equipment in order to get reimbursed for it, why don't you do that, uh, so I never knew what the problem was.

KEESHAN:    Okay, uh, National Seating, they, these are specialized wheelchairs, right?

BARROW:     Yes they are.

KEESHAN:    Where the way the child has to sit in the chair or uses their arms, legs, what not so they don't custom make them on-site I don't think.

BARROW:     No.

KEESHAN:    But they order them.

BARROW:     They have to order them.

KEESHAN:    Is 60 days, and I'm just wondering how much of this might have run into the manufacturer of the special part...

BARROW:     Uhmm.

KEESHAN:    Would possibly outrun the 60 days verses how many of the incidences you think may be the result of the manufacturer and how many, uh, as a result of National Seating maybe not processing in time?

BARROW:     Well, uh, every other vendor, we have several DME suppliers who deal with specialized medical equipment of high-end rehab and 60 days they are always able to make the 60 days. The only problems that we've had have come from National Seating. Now, we always let providers know even though our

57