policy states 60 days, you can always contact us before that expiration date to say this going on, this is going on would you please grant an extension and in most cases, we'll grant it and in all cases we were granting those extensions. It's only when National Seating contacts us a month after the extension has run out to say can you please extend this PA because we need to get paid for it and we, we dispensed it. Of course they dispensed it after the expiration, you know the expiration date without notifying us ahead of time, that hey, we're having problems you know there are some delays so we always offer them, you know, that flexibility uh, it can't be something on an on-going basis but you know

SHOCKLEY: You're going to run into problems every once in a while.

BARROW: Exactly.

SHOCKLEY: Right.

KEESHAN: Let me, can I ask another question?

SHOCKLEY: Sure.

KEESHAN: On the parts, well I don't think that's part of the allegation, I'm curious. If they are taking parts out of inventory...

BARROW: Uhmm.

KEESHAN: They're still allowed to bill for them are they not, or is there a problem with that?

BARROW: Well...

KEESHAN: Do they ever replace them so?

BARROW: Well now they were saying there may have been parts that uh, manufacturers had sent, just sent them, you know, uh, that may not have been Medicaid related at all. It could have been some other insurer that you know, uh, that they might have billed, I'm not sure.

KEESHAN: Uhmm.

BARROW: But these were parts that were there at the company uh, I don't know that Medicaid, you know, if it were a Medicaid client or a Blue Cross client or you know whoever. Uh, might have

Page 11                                                          File #77282-001

|  |  |
|---|---|
|  | reimbursed them for that part but then you send in another request as, I mean a request to Medicaid, and if, you know, this is a brand new part that I just had to order. |
| KEESHAN: | But there still, if Blue Cross had ordered it, they still have to furnish the part for that. |
| BARROW: | Uhmm. |
| KEESHAN: | Somewhere there has got to be inventory in and out. |
| BARROW: | Somewhere, somehow that is going on. At least that was what was alleged uh that, that was going on. |
| SHOCKLEY: | You don't have any, you don't have any independent knowledge of that other than that what you were told by Elizabeth? |
| BARROW: | Exactly, I do not. |
| SHOCKLEY: | In fact you don't have any independent knowledge, you don't even have the names of recipients who did not receive wheelchairs... |
| BARROW: | No. |
| SHOCKLEY: | She never gave you that either? |
| BARROW: | No. |
| SHOCKLEY: | The only information you have is what Elizabeth gave to you? |
| BARROW: | Exactly. |
| SHOCKLEY: | Okay and basically everything you've told me this afternoon is something that Elizabeth has told you rather than something that you have detected in the documentation here at Medicaid? |
| BARROW: | With exception of... |
| SHOCKLEY: | With the exception of... |
| BARROW: | For the assessment date. |
| SHOCKLEY: | The assessment date was not put on the form. |

59

Horton v. Williams - 0099

Page 12                                                             File #77282-001

**BARROW:** As well as you know the uh information of them not having the equipment sent out in a timely manner.

**SHOCKLEY:** Okay and you know that's documented here...

**BARROW:** It is documented.

**SHOCKLEY:** Sometimes it's not uh sent out in a timely manner but you don't have any complaints though from recipients saying that uh they did not get the wheelchair even though it may have been a little late, you don't have anybody calling and saying they didn't get the wheelchair?

**BARROW:** No

**SHOCKLEY:** Well I tell you, I'm having a little difficulty with what Elizabeth has said because there's indications that uh all these wheelchairs were in fact delivered and that why she would say they were not delivered is just beyond me.

**BARROW:** I have no idea. Uh, you know the information that we received we just got it from her.

**SHOCKLEY:** Uhmm.

**BARROW:** Uhmm, and I thought that possibly you know disgruntled employees, you know, but we had had so many other problems with National Seating. Why wouldn't I believe what she had to say?

**KEESHAN:** Well, you....

**BARROW:** I didn't investigate it.

**SHOCKLEY:** Right, sure I understand that.

**BARROW:** Uhmm.

**KEESHAN:** You didn't take any actual action based on what she told you, you just watched even closer?

**BARROW:** Yeah, and I really didn't watch them all that close uh, If there was something that came up about it you know like, you know a month after an expiration date, you're asking for an

|  |  |
|---|---|
| | extension, and like I would do for anybody else, any other DME company. |
| SHOCKLEY: | Did she tell you about any personal problems that she had, uh, National Seating and Mobility or was it just that she was terminated. And I, seems like when she was terminated, the reason was that, I think the reason was I think you just said that she was terminated the following day after you had been out there and because you had come out there she was terminated. Is that what I hear you saying? |
| BARROW: | Well, well, I thought it was a coincidence that uh, you know before, we had not had any complaints or anything on, you know, oh, she's not sending in the right information, oh I've got staff here that just you know. We never received complaints of that nature. In fact, my staff was very elated uh that she was there because we could get all the information that we needed whereas before that was not happening all the time. Uh, so there were never any complaints about her. It was just coincidental to me that, you know, I go there one day and the next day she's not there. Uh... |
| SHOCKLEY: | What was her purpose for calling you and telling you that she had been terminated? |
| BARROW: | Uh, she just wanted to let me know that she would not be the one that we would dealing with on wheelchairs any longer. I didn't receive any other calls from any one else. |
| SHOCKLEY: | Did she ask you do anything for her? |
| BARROW: | No. |
| SHOCKLEY: | Okay. Alright, is there anything else? Let me just state again that we've contacted a number of people and all of them have received their wheelchairs... |
| BARROW: | Uhmm. |
| SHOCKLEY: | And uh, even though there may have been some slight delays in some of them because of maybe a part or maybe because uh, there was a delay due to if they're all prescription type wheelchairs getting them in and the process just takes a few months but, uh, nevertheless they all got their wheelchairs and... |

Page 14                                                                File #77282-001

BARROW:      Uhmm.

SHOCKLEY:    All of them are satisfied with what happened and uh, I, my purpose for wanting to talk with you is do you have some additional information that would support the allegation that Elizabeth Horton made?

BARROW:      No.

SHOCKLEY:    Okay.

BARROW:      All I had was her information.

JOHNSON:     (unintelligible) —— other former employees that worked there at National Seating that were either fired or left and may have a problem with National Seating.

SHOCKLEY:    Who now, these are notes that Elizabeth gave to you?

JOHNSON:     No, no those are my notes that I took when I talked to her.

SHOCKLEY:    Oh, I see.

BARROW:      Uhmm, yeah, this…

SHOCKLEY:    Your notes from talking to Felecia?

BARROW:      Yes. Uh, Chasly Weeks was the employee who we dealt with before Elizabeth got there, uh, Karen was another person. Karen was there after Elizabeth and now they have, uh, I believe, uh, I can't think of her name right now but I, uh, I've got her email, Lynn, uh, Constantino or something like that but Lynn is the new person. Lynn is the one that was sending in all the emails requesting extensions after the expiration dates.

SHOCKLEY:    Was some of that due to change of employees out there, getting backlogged on it?

BARROW:      I don't think so because, uh you know, with a DME company you've always got to have somebody there, uh, the clients are being referred to you so you've got to accommodate the client. If you can't accommodate the client, you need to send them to another DME company. Uh, so there was still an employee there. There were still an employee there, there were two there; Emily and her husband so uh, both of them were capable of getting the information we needed. They knew the

62                                                    Horton v. Williams - 0102

|  |  |
|---|---|
|  | process so we didn't understand why there would be that lag time. |
| KEESHAN: | So Lynn, who followed Elizabeth, was submitting a lot of these late approvals? |
| BARROW: | She followed Karen actually. Karen followed Elizabeth and then Lynn came after Karen. |
| KEESHAN: | Okay, wondering if... |
| BARROW: | But when Elizabeth got there... |
| KEESHAN: | (Unintelligible) --- the predecessor didn't do the processing. |
| BARROW: | Well, I mean will before, uh, or when Elizabeth got there, she was asking me for extensions everyday. |
| KEESHAN: | Okay. |
| BARROW: | Uh, you know every time it was, oh, they didn't make clinic, you know. Uh, the parents didn't show up for their appointments. We've been trying to get up with the parents and she later told me that, that was not true, uh, with Lynn, she had stated that, you know, all the parents didn't make clinic and then I would call Clinic find out if the parents were missing clinic and they would tell us no. Uh, so you know, I knew I couldn't believe everything Lynn was telling me either, uh, because she was just trying to get it processed, you know to get, get the payment. |
| SHOCKLEY: | Okay, is there anything else that you think is important that, uh, I should know that I just failed to formulate the question to get the answer. |
| BARROW: | No, nothing at all. |
| SHOCKLEY: | Regarding National Seating and Mobility? |
| BARROW: | Nothing that I can think of at this point. |
| SHOCKLEY: | Richard, do you have anything else you could ask? |
| KEESHAN: | No, I don't. |
| SHOCKLEY: | Okay, Cliff, do you have questions? |

Page 16                                                                File #77282-001

JOHNSON:     No.

SHOCKLEY:    All right then I'm going to turn the tape recorder off right now and I thank you for your time.

BARROW:      Okay.

**11 Page**                                                          File #77282-001

Officials at National Seating and Mobility Headquarters, Franklin, TN furnished the following comments as to the voice mail left by Felecia Barrow on the voice mail of Daniele Perkle 6/28/04.

Felecia Barrow was leaving the impression in this voice mail that it would be in the best interest for National Seating and Mobility to rehire Elizabeth Horton. At the very least it was believed that who ever the replacement would be for Elizabeth Horton reimbursements to National Seating and Mobility could be delayed or, National Seating and Mobility could expect to come under greater scrutiny. The worst case scenario of the interpretation of the voice mail left by Felecia Barrow was that there was a veiled threat that unless Elizabeth Horton was rehired, payments from Medicaid would be delayed or denied.

In any event, officials of National Seating and Mobility believed the call from Felecia Barrow was inappropriate; that the decision the terminate Elizabeth Horton employment is solely the discretion of National Seating and Mobility and should not be a concern of Felecia Barrow or of anyone with the Alabama Medicaid Agency.

12 Page

File #77282-001

Assistant Attorney General Bruce Lieberman after hearing the facts of this case, advised that he would authorize prosecution of Elizabeth Horton for furnishing a false report to a law enforcement in violation of Alabama Code 13A-10-9.

On August 1, 2005, Special Agent Gerald Shockley filed a complaint with District Court Montgomery County, Montgomery, AL after which Magistrate Holley Faems issued a warrant for the arrest of Elizabeth Horton charging, furnishing a false report to law enforcement in violation of Alabama Code 13A-10-9. Magistrate Faems placed a $1500 bond on Elizabeth Horton.

On August 5, 2005, Montgomery County Sheriff's Office arrested Elizabeth Horton and she was thereafter released on bond.