# EXHIBIT C

EXHIBIT

C

**MERRILL LEGAL SOULTIONS**
Court Reporting*Legal Videography*Trial Services

Page 3

1  IN THE UNITED STATES DISTRICT COURT
   FOR THE MIDDLE DISTRICT OF ALABAMA
2          NORTHERN DIVISION
3
   ELIZABETH HORTON,
4
       Plaintiff,
5          CASE NUMBER
       vs.    2:06cv-526-MHT-TFM
6
   DON WILLIAMS, Individually and in his
7  capacity as the Manager of National
   Seating and Mobility, Inc., NATIONAL
8  SEATING AND MOBILITY, INC., GERALD
   SHOCKLEY, individually and in his
9  capacity of a special agent of the
   Alabama Attorney General's Office,
10
       Defendants.
11
12   *   *   *   *   *   *   *
13
14      DEPOSITION OF CLIFFORD JOHNSON,
15  taken pursuant to stipulation and
16  agreement before Barbara A. Howell, CCR,
17  Commissioner for the State of Alabama at
18  Large, ACCR No. 123, in the Bradley,
19  Arant, Rose & White Conference Room,
20  401 Adams Avenue, Room 712, Montgomery,
21  Alabama, on Wednesday, January 30, 2008,
22  commencing at approximately 11:20 a.m.
23

1          I N D E X
2
   EXAMINATION BY:          PAGE
3
   MS. NICKSON......................   5
4
   MR. WALLACE......................   63
5
   MR. STEWART......................   64
6
   MR. WALKER.......................   74
7
   MR. STEWART......................   79
8
   MS. NICKSON......................   81
9
   MR. WALKER.......................   83
10
   MR. STEWART......................   83
11
12   EXHIBITS                    PAGE
13   PLAINTIFF'S EXHIBIT #5............  13
14     Memo Dated June 14, 2005, from
       Cliff Johnson to File
15
16
17
18
19
20
21
22
23

Page 2

1    A P P E A R A N C E S
2
3  FOR THE PLAINTIFF:
4    Ms. Deborah M. Nickson
     LAW OFFICE OF DEBORAH M. NICKSON
     2820 Fairlane Drive, Suite A-10
5    Montgomery, Alabama 36116
6
7  FOR DEFENDANT DON WILLIAMS:
     Mr. Dorman Walker
8    BALCH & BINGHAM
     105 Tallapoosa Street, Suite 200
9    Montgomery, Alabama 36104
10
   FOR DEFENDANT NATIONAL SEATING &
11 MOBILITY:
12   Mr. Charles A. Stewart, III
     BRADLEY, ARANT, ROSE & WHITE
13   401 Adams Avenue, Suite 780
     Montgomery, Alabama 36104
14
15 FOR DEFENDANT GERALD SHOCKLEY:
16   Mr. Jack Wallace, Jr.
     OFFICE OF THE ATTORNEY GENERAL
17   State of Alabama
     11 South Union Street
18   Montgomery, Alabama 36130
19
   FOR THE ALABAMA MEDICAID AGENCY:
20
     Ms. Tammy Hudson
21   ALABAMA MEDICAID AGENCY
     501 Dexter Avenue
22   Montgomery, Alabama 36104
23

Page 4

1      S T I P U L A T I O N S
2      It is hereby stipulated and agreed
3  by and between counsel representing the
4  parties that the deposition of CLIFFORD
5  JOHNSON is taken pursuant to the Federal
6  Rules of Civil Procedure and that said
7  deposition may be taken before
8  Barbara A. Howell, Court Reporter and
9  Commissioner for the State of Alabama at
10 Large, without the formality of a
11 commission; that objections to questions
12 other than objections as to the form of
13 the questions need not be made at this
14 time but may be reserved for a ruling at
15 such time as the deposition may be
16 offered in evidence or used for any
17 other purpose as provided for by the
18 Federal Rules of Civil Procedure.
19     It is further stipulated and agreed
20 by and between counsel representing the
21 parties in this case that said
22 deposition may be introduced at the
23 trial of this case or used in any manner

1 (Pages 1 to 4)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 5

1   by either party hereto provided for by
2   the Federal Rules of Civil Procedure.
3
4   *   *   *   *   *   *   *   *
5
6          CLIFFORD JOHNSON
7   The witness, having first been duly
8   sworn or affirmed to speak the truth,
9   the whole truth, and nothing but the
10  truth, testified as follows:
11          EXAMINATION
12  BY MS. NICKSON:
13  Q. Mr. Johnson, would you state your name
14  for the record, please.
15  A. Clifford Johnson.
16  Q. Mr. Johnson, I am Deborah Nickson and I
17  am the attorney for Elizabeth Horton.
18  And have you heard the name Elizabeth
19  Horton before?
20  A. Yes, ma'am.
21  Q. Have you met Ms. Horton?
22  A. Yes, ma'am.
23  Q. All right. And you do know that this

Page 6

1   is involving a federal lawsuit that
2   Ms. Horton has filed, a lawsuit against
3   three defendants; that's National
4   Seating & Mobility, Don Williams, and
5   Gerald Shockley.
6   A. I do know, yes.
7   Q. And this is all concerning she's
8   alleging that she was wrongfully
9   arrested and they are responsible for
10  injury to her. That's her contention.
11  Okay?
12  A. Yes, ma'am.
13  Q. So this action is not directed against
14  you. You're here today because your
15  name is one of the investigators that
16  was in the file --
17  A. Yes, ma'am.
18  Q. -- in the discovery that we got from
19  the Medicaid Agency.
20  A. Yes, ma'am.
21  Q. All right. I just want to ask you some
22  questions first just about you
23  personally. What do you do for the

Page 7

1   Medicaid Agency?
2   A. I'm the chief investigator for the
3   investigation unit.
4   Q. And how long, Mr. Johnson, have you
5   been with them?
6   A. With Medicaid?
7   Q. Yes, sir.
8   A. Since 1993. So what's that?
9   Q. Okay. Well, what, about sixteen years
10  or thirteen, fourteen years?
11  A. Yeah.
12  Q. Yes.
13  A. That sounds right.
14          MR. STEWART: Lawyers aren't
15          good at math.
16  Q. So you've been with the Medicaid Agency
17  for approximately fifteen years?
18  A. Yes.
19  Q. And you're the chief?
20  A. Yes, ma'am.
21  Q. Excellent. And Mr. Anthony Green, does
22  he work under your supervision?
23  A. Yes, he does.

Page 8

1   Q. What is your educational background?
2   A. High school graduate, B.S. degree in
3   criminal justice, and a minor in
4   psychology and recreation at Alabama
5   State University. Graduated in 1983.
6   Q. And let me just direct your attention,
7   please, to the situation concerning
8   Ms. Horton.
9   A. Okay.
10  Q. You got a complaint on your desk for
11  investigation. Am I correct?
12  A. Yes.
13  Q. Who filed the complaint?
14  A. It came through my office from Felecia
15  Barrow of the prior approval unit. A
16  letter came in through the prior
17  approval unit with the fact --
18  regarding some information about
19  National Seating & Mobility not
20  providing services to Medicaid
21  recipients.
22  Q. And was the letter directed to you
23  or -- if you remember?

2 (Pages 5 to 8)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 9

1   A. I don't recall offhand. But if you
2      have it on hand -- I don't recall if it
3      was directed to me exactly, no.
4   Q. But all you know, you got a
5      complaint --
6   A. Yeah.
7   Q. -- from Ms. Barrow?
8   A. Yes.
9   Q. And what, if anything, did the
10     complaint state?
11  A. I don't have it on hand. But the
12     letter came in to the fact that -- it
13     was a letter that was sent to the
14     Medicaid Agency and to the attorney
15     general's office regarding the
16     complaint about National Seating &
17     Mobility not providing services to
18     Medicaid recipients. And once the
19     complaint came in, we in turn put that
20     complaint on our own official complaint
21     form as to company not providing
22     services rendered or something of that
23     magnitude.

Page 10

1   Q. And who was the complainant that was
2      identified?
3   A. Ms. Horton.
4   Q. All right. And then what, if anything,
5      happened after that?
6   A. After the complaint came in, again --
7      here's one of the exhibits here, if I
8      can use this.
9   Q. Yeah, sure.
10         MS. NICKSON: Witness is
11             referring to Plaintiff's
12             Exhibit #1.
13  A. Yes. This would be the complaint form.
14     Once the complaint comes into our
15     agency, we in turn write it down on
16     this complaint form here saying that
17     who called in the complaint or if it's
18     anonymous, or information. And in
19     turn, we'll put it down as billing for
20     services not rendered to recipient. It
21     says here, Also forging recipient names
22     on delivery tickets for durable medical
23     equipment.

Page 11

1          And after this complaint comes
2      in, we in turn look up the provider
3      information, their name, to make sure
4      they are a Medicaid provider. And once
5      we determine they are a Medicaid
6      provider, we in turn have the complaint
7      assigned to one of the investigators to
8      do further investigative work.
9   Q. Do you remember the approximate time
10     frame when you received the first
11     complaint?
12  A. No, ma'am.
13  Q. Let me show you what I have marked as
14     Plaintiff's Exhibit #3. If you would
15     review that for me, please.
16         (Brief pause while witness
17             reviews document)
18  A. Okay. Yes, ma'am. Okay. And your
19     question regarding this --
20  Q. Are you familiar with this document?
21  A. Yes, ma'am.
22  Q. Have you seen this?
23  A. Yes, ma'am.

Page 12

1   Q. Now, when you say that a complaint came
2      in from the Medicaid area, is this what
3      you --
4   A. Yes, ma'am.
5   Q. -- were referring to?
6          MS. NICKSON: And the
7              witness has referred to
8              Plaintiff's Exhibit #3.
9   Q. And is this the document that you use
10     to draft your complaint form to begin
11     an investigation?
12  A. I will say yes. I'm going to say yes,
13     but there might have been some other --
14  Q. Documentation?
15  A. -- documents that came in also. But
16     yes, that looks familiar also.
17  Q. All right. And we subpoenaed these
18     records, and this letter from Felecia
19     to Dr. McIntyre just cited some
20     infractions with National Mobility.
21     She begins this memo by saying, Please
22     find attached examples of wheelchair
23     assessments that have been submitted.

3 (Pages 9 to 12)

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 13

1  Do you remember reviewing any
2  assessments that were submitted that
3  did not bear dates on them, clinic
4  dates?
5       MR. STEWART: Object to the
6       form.
7  A. I did not review it, no, because,
8  again, once the letter comes in, I
9  would have the case file assigned to
10  one of the investigators.
11  Q. Yes, sir. And you just write it up and
12  assign it out?
13  A. Yes.
14  Q. I'm going to show you what we'll mark
15  as Plaintiff's Exhibit #5, and it's
16  Bates Drab Page 11-12, 11 and 12. If
17  you would review that for me, please,
18  Mr. Johnson.
19       (Plaintiff's Exhibit #5 was
20       marked for identification.)
21       MR. STEWART: I've got two
22       documents. One is,
23       like, a memo of June 14

Page 14

1       and another is July 12.
2       Do you mean to mark
3       those together?
4       MS. NICKSON: Yes.
5  A. Yeah, it's two dates here, July 12 and
6  July 14.
7  Q. All right. Now, on the Bates Drab 11,
8  page 11, Plaintiff's Exhibit #5, would
9  you identify this document for the
10  record, please.
11  A. Okay. This here is a memo that was
12  generated by myself after I received
13  information regarding National
14  Seating -- National Seating & Mobility.
15  And after this information was
16  received -- again, the letter came out
17  to Medicaid and to the attorney
18  general's office. And we have a
19  memorandum of understanding that if we
20  get a complaint against a provider, we
21  are to refer that information over to
22  the attorney general's office. Since
23  the complaint came in to both agencies

Page 15

1  basically at the same time, I contacted
2  Investigator Mike Roeder and asked him
3  did he receive the complaint regarding
4  National Seating & Mobility, and he in
5  turn said yes. And this letter here
6  let him know that, you know, we also
7  received the letter and if they had any
8  kind of information and they wanted,
9  like, a joint investigation with my
10  investigator and their investigators,
11  to contact me at a later date to assist
12  in the allegation, I guess, against
13  National Seating & Mobility.
14  Q. And this complaint was filed as an
15  anonymous complainant?
16       MR. STEWART: Object to
17       form.
18  A. Yes, ma'am.
19  Q. So this is a different complainant than
20  Elizabeth Horton?
21       MR. STEWART: Object to
22       form.
23       MR. WALKER: Object to form.

Page 16

1  A. I'm going to say it's an anonymous
2  complaint. So based on that, yeah, it
3  would be different than the one from
4  Elizabeth Horton, yes.
5  Q. Now, let's talk about the contents of
6  the complaint by this anonymous
7  complainant. If we can, just -- if you
8  can review the document, refresh your
9  memory as to what was the complaint by
10  this caller --
11       MR. STEWART: Object to the
12       form.
13  Q. -- against National Seating & Mobility.
14       MR. STEWART: Same
15       objection.
16  A. Okay. And again, I say we have a
17  fraud-reporting hotline. When the call
18  comes in, a person comes in -- calls in
19  saying that we have a complaint against
20  a provider and the caller indicates
21  this company has several forged
22  documents regarding recipient
23  signatures and delivery tickets for

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| Page 17 |
|---|
| 1    durable medical equipments and |
| 2    supplies, improper billing, using |
| 3    update -- outdated prescriptions |
| 4    submitted for surgical supplies. The |
| 5    caller also stated that the -- an |
| 6    ex-employee of this company and that |
| 7    she has reported this fraudulent |
| 8    complaint to the district attorney's |
| 9    office -- attorney general's office and |
| 10   to the Medicaid office, also. |
| 11  Q. And then the latter part of that |
| 12    sentence -- |
| 13  A. That's -- |
| 14  Q. -- the complainant said what? |
| 15  A. No.  The latter part of the sentence -- |
| 16    this the part where I was saying |
| 17    earlier where once we get a complaint |
| 18    about a provider, once the letter says |
| 19    the complaint went to the attorney |
| 20    general's office, again, we have an |
| 21    understanding with the AG's office that |
| 22    we -- they work provider fraud cases. |
| 23    And if we show cause that a provider |

| Page 18 |
|---|
| 1    has committed Medicaid fraud abuse, we |
| 2    in turn have to have that case pulled |
| 3    over to the attorney general's office |
| 4    for prosecution. |
| 5  Q. Prosecution. |
| 6  A. Further prosecution, yes. |
| 7  Q. Yes, sir.  Right there in the last |
| 8    sentence in that first paragraph, the |
| 9    caller said, according to this memo, |
| 10    that she has filed a qui tam -- |
| 11  A. Qui tam. |
| 12  Q. -- lawsuit with the attorney general's |
| 13    office? |
| 14  A. Yes, ma'am. |
| 15  Q. Did you ever see that lawsuit? |
| 16  A. No, ma'am. |
| 17  Q. Did Elizabeth file one? |
| 18  A. I will have -- I don't know. |
| 19  Q. So you've not seen one filed by |
| 20    Elizabeth Horton? |
| 21  A. No. |
| 22  Q. All right.  So as far as you know, this |
| 23    is a different complainant -- |

| Page 19 |
|---|
| 1  A. Yes, ma'am. |
| 2      MR. STEWART:  Object to the |
| 3      form. |
| 4  Q. -- than Elizabeth? |
| 5      MR. STEWART:  Same |
| 6      objection. |
| 7      MR. WALKER:  Object to the |
| 8      form. |
| 9  Q. Did your office join in a joint |
| 10    investigation with this complaint? |
| 11  A. No, ma'am. |
| 12  Q. So you don't know what came of this |
| 13    complaint, this anonymous complainant's |
| 14    complaint? |
| 15  A. I want -- yes, I do, but . . . |
| 16  Q. What happened it? |
| 17  A. Well, later on, we -- after months down |
| 18    the line, it was determined, after |
| 19    talking with the investigators |
| 20    afterwards, where they had said they |
| 21    had Ms. -- someone arrested for |
| 22    providing false information to a law |
| 23    enforcement officer.  And, therefore, |

| Page 20 |
|---|
| 1    from talking with Investigator Mike |
| 2    Roeder -- I know him personally.  So in |
| 3    turn, they are the ones investigated |
| 4    the complaint against National |
| 5    Seating & Mobility.  And that's when |
| 6    Ms. Horton's name surmises [sic]. |
| 7  Q. Oh, okay.  So he told you they had her |
| 8    arrested? |
| 9  A. No. |
| 10  Q. Oh, I'm sorry.  What were you saying? |
| 11    Restate that. |
| 12  A. After the case was assigned to my |
| 13    investigator, he in turn asked the |
| 14    attorney general's office had they |
| 15    performed any kind of investigation on |
| 16    this complaint.  And they had did the |
| 17    investigation work.  So he in turn |
| 18    asked them could he get a copy of their |
| 19    report as to what they had found or |
| 20    discovered.  And once he got a copy of |
| 21    their report, that's when Ms. Horton's |
| 22    name was mentioned and Investigator |
| 23    Roeder, where they had did their |

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 21

1   investigative work regarding the
2   complaint against National Seating &
3   Mobility, and that's where I learned of
4   the name Elizabeth Horton.
5   Q. Oh, okay. Did you speak with her
6   directly?
7   A. No.
8   Q. So she didn't make any statements to
9   you regarding any alleged fraudulent
10  activity going on at National Seating &
11  Mobility?
12  A. No. No, ma'am. I'm sorry.
13  Q. You assigned this case to Investigator
14  Green?
15  A. Yes, ma'am.
16  Q. And you read his results from his
17  investigation?
18  A. Yes, I did.
19  Q. Let me show you Plaintiff's Exhibit #1,
20  Bates Drab 001 through 006. If you
21  would review that document for me,
22  please, Mr. Johnson.
23  A. Yes, I am familiar with this report,

Page 22

1   yes.
2   Q. Yes, sir. And if you would, just turn
3   over to the front page of the report
4   for me, please, the cover.
5        (Witness complied.)
6   Q. Okay. And this is a continuation of
7   Case No. 8-04-0150. Am I correct?
8   A. Yes, ma'am.
9   Q. Now, what was going on before this
10  complaint?
11       MR. STEWART: Object to
12       form.
13  A. I don't have the case file on hand, but
14  there was another case file involving
15  National Seating & Mobility --
16  Q. Yes, sir.
17  A. -- regarding some Medicaid issues. And
18  after this complaint -- the anonymous
19  complaint came in, that's when we put
20  in the continuing of 8-04-105. So --
21  Q. Okay.
22  A. -- we had -- I want to say we had just
23  closed off a case file on National

Page 23

1   Seating & Mobility.
2   Q. Yes, sir. Was that the one where
3   Elizabeth was arrested?
4   A. No, ma'am. I don't think so.
5   Q. You say -- was there another file?
6   A. It should be, yes.
7   Q. How many complaints have you
8   investigated or your office have
9   investigated against National Seating &
10  Mobility for alleged fraudulent
11  activity against Medicaid?
12  A. Without having the case file on hand,
13  I'm going to say two. And they were
14  around the same time.
15  Q. Yes, sir.
16  A. Yes.
17  Q. Now, you didn't have any hands-on in
18  the investigation. You just basically
19  assigned --
20  A. Assigned.
21  Q. -- it out?
22  A. That's correct.
23  Q. Did you remember reading in the case

Page 24

1   file statements by Don Williams that
2   Felecia Barrow and Elizabeth Horton
3   were friends?
4   A. I don't recall. I don't remember.
5   Q. And do you know Felecia Barrow?
6   A. Yes, ma'am.
7   Q. Did you have the opportunity to
8   interview her in her office?
9   A. No, ma'am. I talked with her in the
10  office. She was interviewed by the
11  attorney general's office, and I was
12  present during the interview; but I
13  didn't interview her. I was just
14  sitting there, observing the interview.
15  Q. And were you invited in by the attorney
16  general's office?
17  A. No. By Ms. Barrow.
18  Q. Oh, okay. And what, if anything, was
19  stated during that meeting?
20       MR. STEWART: Object to the
21       form.
22  A. Well, it would be hard to say because I
23  don't remember all the exact details.

6 (Pages 21 to 24)

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

| Page 25 |
|---|
| 1  They was asking her questions on the |
| 2  line as what information did she |
| 3  receive regarding National Seating & |
| 4  Mobility and -- regarding them not |
| 5  having provided services or supplies to |
| 6  Medicaid recipients regarding |
| 7  wheelchairs. So all the exact details, |
| 8  I don't remember. I don't recall. |
| 9  Q. Do you remember Felecia saying anything |
| 10  about she had documentation to support |
| 11  the fact that they did have missing |
| 12  dates on some of their documents? |
| 13  A. I would have to say yes. |
| 14       MR. STEWART: Object to |
| 15            form. |
| 16  A. Yes, ma'am. |
| 17  Q. Do you remember her discussing |
| 18  infractions at National Seating & |
| 19  Mobility submitted to her department? |
| 20       MR. STEWART: Object to |
| 21            form. |
| 22  A. I'm trying to understand the question. |
| 23  Q. Such as missing dates on forms. |

| Page 27 |
|---|
| 1          MR. WALKER: Object to the |
| 2            form. |
| 3  Q. Is that correct? |
| 4  A. That's correct. |
| 5  Q. But you also heard Felecia Barrow, |
| 6  witness her saying that she had in fact |
| 7  viewed documents that were infractions. |
| 8       MR. STEWART: Object to the |
| 9            form. |
| 10       MR. WALKER: Object to form. |
| 11  Q. Am I correct? |
| 12  A. That's correct. |
| 13  Q. Is there a possibility that Mr. Green's |
| 14  time frame in putting the NSM on notice |
| 15  that he wanted to review certain files, |
| 16  is there a possibility that infractions |
| 17  could have been corrected? |
| 18       MR. WALKER: Object to the |
| 19            form. |
| 20       MR. STEWART: Object to the |
| 21            form. |
| 22  A. I don't know. |
| 23  Q. All right. Do you require your |

| Page 26 |
|---|
| 1          MR. STEWART: Same |
| 2            objection. |
| 3  A. Yes. |
| 4  Q. What, if anything, did she say? |
| 5  A. Again, I would have to say something on |
| 6  the line where she would say they |
| 7  received forms or documentation from |
| 8  the company where certain dates were |
| 9  not on the form for -- I guess missing |
| 10  dates or . . . |
| 11  Q. And was that part of Elizabeth Horton's |
| 12  complaint as you understood it? |
| 13  A. Yes, ma'am. I would say so, yes. |
| 14  Q. And did Ms. Barrow say that she had |
| 15  personal knowledge or just received |
| 16  information in her office of the same? |
| 17  A. Yes. |
| 18  Q. Investigator Green did the |
| 19  investigation at the office of National |
| 20  Seating & Mobility here in Montgomery. |
| 21  You reviewed his complaint where you |
| 22  said he didn't find any criminal |
| 23  activity. |

| Page 28 |
|---|
| 1  investigators to make an impromptu |
| 2  visit on sites that are under |
| 3  investigation? |
| 4  A. It's not required but we do do |
| 5  impromptu visits on providers, yes, |
| 6  they do. |
| 7  Q. And do you require them on that |
| 8  impromptu visit to immediately pull |
| 9  files for examinations? |
| 10  A. They do. Yes, we do pull files for |
| 11  examination also, yes. |
| 12  Q. Do you know why it was not done in this |
| 13  case? |
| 14       MR. STEWART: Object to the |
| 15            form. |
| 16  A. Okay. His report here indicates that |
| 17  he did review different files. |
| 18  Q. Yes, sir. |
| 19  A. And your question is why he didn't |
| 20  review file on -- |
| 21  Q. That were impromptu. |
| 22       MR. STEWART: Object to the |
| 23            form. |

7 (Pages 25 to 28)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 29

1    MR. WALKER: Same objection.
2  A. I don't know, because he's assigned a
3    case and he works the case, I guess,
4    according to how he feel the case is
5    leading towards a conclusion as to find
6    out if the allegation is either true or
7    false.
8  Q. Is it fair to say if you put someone on
9    notice on, let's just say -- today is
10   January 30th.
11 A. Yes, ma'am.
12 Q. And you tell them, I'll need these
13   files on February 15th. Is it fair to
14   say that they could correct any
15   infractions --
16   MR. STEWART: Object to the
17     form.
18 Q. -- in those files within that period of
19   time?
20   MR. STEWART: Same
21     objection.
22 A. I'll say yes.
23 Q. And is it fair to say that if any

Page 30

1    corrections are made, then the
2    investigator has no other choice but to
3    conclude no criminal activity?
4      MR. WALKER: Objection to
5        form.
6      MR. STEWART: Object to
7        form.
8  A. Yes, ma'am.
9  Q. All right. Let me show you Plaintiff's
10   Exhibit #3, Bates Drab Page 14. If you
11   would, let us look at Paragraph No. 2.
12   Could you read that for the record,
13   please.
14 A. Teresa Surles, RN, questioned the
15   assessment and was told by Gerry
16   Rodgers to get the dates from Emily,
17   National Seating. I informed Teresa
18   that the clinic dates should be kept at
19   CRS where the assessment was conducted.
20   Teresa, under my direction, contacted
21   CRS to get the clinic dates instead of
22   Emily. Jackie, CRS, informed Teresa
23   that the date of the clinic appointment

Page 31

1    was July 20th, 2004. The PA request
2    was submitted in February 2005. A
3    subsequent fax was received from Gerry
4    Rodgers indicating that the assessment
5    was reviewed on 2/15/05 and was still
6    okay. I conferred with Teresa and
7    Debbie and thought that we needed
8    updated clinic notes telling the
9    current condition of the clinic. On
10   another client, both the physician
11   notes and medical necessity and the PT
12   assessment were lacking dates.
13 Q. So when they failed to put dates on the
14   assessments, doesn't that alter the
15   system?
16   MR. STEWART: Object to the
17     form.
18   MR. WALKER: Object to the
19     form.
20 Q. Requirements.
21 A. Yes, ma'am.
22 Q. So that's actually where the fraud
23   occurred. Am I correct?

Page 32

1      MR. STEWART: Object to the
2        form.
3      MR. WALKER: Object to the
4        form.
5  A. Yes, ma'am. If I'm following you, yes,
6    ma'am.
7  Q. So your answer is yes, that's where the
8    fraud occurred?
9      MR. STEWART: Object to the
10       form.
11     MR. WALKER: Object to the
12       form.
13 A. You saying where the fraud occurs
14   so . . .
15 Q. Yes, sir. Where you leave dates open.
16     MR. STEWART: Object to the
17       form.
18     MR. WALKER: Same objection.
19 Q. In other words, isn't there a
20   particular time frame when recipients
21   apply and then there's a certain time
22   frame that it has to be completed?
23     MR. WALKER: Object to the

8 (Pages 29 to 32)

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 33

1        form.
2        MR. STEWART:  Object to the
3        form.
4  A. According to the program, yes.  But I'm
5    not familiar with this PA program, so I
6    would say --
7  Q. Sure.
8  A. They have guidelines to follow, yes.
9  Q. Yeah, sure.  And if placing dates on
10   these documents are the trail by which
11   you see whether or not these vendors
12   are in compliance with the Medicaid
13   regulations, failure of the adequate
14   information would actually alter the
15   approvals.  Am I correct?
16       MR. WALKER:  Object to the
17       form.
18       MR. STEWART:  Object to the
19       form.
20  A. I'm following your comment, but I'm
21    trying to see how can I answer that
22    question.  You made a comment, so I'm
23    trying to put it in question form for

Page 34

1    me to answer it.
2  Q. Okay.  Just tell me what -- what do you
3    understand about the dates on these
4    documents and the importance of them?
5       MR. STEWART:  Object to the
6       form.
7  A. Again, I'll say I'm not --
8       MR. WALKER:  Object to the
9       form.
10  A. -- familiar with that program.  If the
11   dates are missing on the form or
12   documents, the program requires
13   providers or vendors to have dates on
14   the assessment.  Now, what is -- did
15   you say is that considered fraud or
16   misuse/abuse with the date missing,
17   that I don't know.
18  Q. All right.  But the Medicaid Agency
19   does not have or the prior approval
20   department does not have any way of
21   verifying when that recipient first
22   requests service unless a date is on
23   documents; right?

Page 35

1  A. I'll say yes.
2       MR. STEWART:  Object to the
3       form.
4       MR. WALKER:  Object to the
5       form.
6  A. That's correct.
7  Q. And then from this document, it appears
8    that the Medicaid Agency also needs
9    dates as to when that recipient is
10   serviced by the physical therapist.  Am
11   I correct?
12  A. That's correct.
13  Q. But this document is suggesting that
14   dates were in fact missing.  Am I
15   correct?
16  A. Correct also.
17       MR. STEWART:  Object to the
18       form.
19  Q. And was that one of the complaints that
20   Elizabeth Horton had?
21       MR. STEWART:  Object to the
22       form.
23  A. Yes, ma'am.

Page 36

1  Q. So is it fair to say that this
2    assessment by Teresa Surles questioning
3    the assessments and missing dates,
4    would that pretty much be lining up
5    with the complaint that Elizabeth
6    Horton had?
7       MR. STEWART:  Object to the
8       form.
9  A. Yes, ma'am.
10      MR. WALKER:  Object to the
11      form.
12  Q. Was that a yes, Mr. Johnson?
13      MR. STEWART:  Object to the
14      form.
15  A. Yes.
16  Q. All right.  Now, if we can read the
17   next paragraph for the record.
18  A. Teresa came across another assessment
19   completed by M. Maddox and placed a
20   call to the PT to find out why the
21   dates was missing.  The PT replied,
22   Maybe we're not supposed to do this,
23   pause, but I never put dates on the

9 (Pages 33 to 36)

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

| Page 37 |
|---|

1  assessment or the prescription because
2  it messes up the vendors, like we're on
3  a time clock. It is odd that the
4  assessments that Mr. Maddox has done
5  for other vendors have a date on them,
6  but the ones done for National Seating
7  do not have dates. This was the same
8  information that was reported by former
9  National Seating employee, Elizabeth
10  Horton.
11  Q. Now, looking at this document, you have
12  the same thing that Elizabeth Horton
13  complained of. You have a Medicaid
14  Agency employee that's firsthand
15  witness to it. Am I correct?
16       MR. STEWART: Object to
17       form.
18       MR. WALKER: Object to form.
19  A. That's correct.
20  Q. All right. Just based on this memo.
21  A. Yes.
22  Q. And this memo is written by whom?
23  A. Felecia Barrow.

| Page 38 |
|---|

1  Q. Felecia Barrow. Now, did you see in
2  any of the investigation that was
3  conducted by Mr. Green any conversation
4  he may have had with his registered
5  nurse, Teresa Surles, regarding this
6  memo?
7  A. No, ma'am.
8  Q. Mr. Green testified that he reviewed
9  their file. He did tell us that this
10  memo was actually -- it predated his
11  employment with the Medicaid Agency.
12  But he said he reviewed the file. Do
13  you know why Teresa Surles was not
14  contacted?
15  A. By my investigator or --
16  Q. That is correct.
17  A. -- by whom?
18  Q. By the investigator.
19  A. No, ma'am, I don't know.
20  Q. Do you know why the physical therapist
21  was not contacted?
22       MR. STEWART: Object to the
23       form.

| Page 39 |
|---|

1       MR. WALKER: Same.
2  A. No, ma'am.
3  Q. Does anybody know what he meant when he
4  said, according to Teresa, that I never
5  put dates on the assessment?
6  A. No, I don't know.
7  Q. Did anybody find out what he meant when
8  he said the prescriptions -- or the
9  prescriptions because it messes up the
10  vendor?
11       MR. WALKER: Object to the
12       form.
13       MR. STEWART: Same.
14  A. And the question is?
15  Q. Did anybody find out what he meant by
16  that?
17       MR. WALKER: Same.
18       MR. STEWART: Same
19       objection.
20  A. No, ma'am.
21  Q. Now, I'm just asking you as an
22  investigator. If you got National
23  Seating & Mobility know that they need

| Page 40 |
|---|

1  dates, then you have a physical
2  therapist consistently submitting
3  assessments or prescriptions without
4  dates, then you have your Medicaid
5  employee, Felecia Barrow, receiving
6  information, how can any report that
7  Felecia Barrow gave be fraudulent?
8       MR. STEWART: Object to
9       form.
10       MR. WALKER: Object to form.
11  Q. I mean not Felecia but Elizabeth Horton
12  gave be fraudulent?
13       MR. STEWART: Same
14       objection.
15       MR. WALLACE: Objection to
16       form.
17       MR. WALKER: Object to the
18       form.
19  A. It can't be.
20  Q. So doesn't this suggest that there was
21  some kind of evidence or there was
22  something going on at National
23  Seating & Mobility?

10 (Pages 37 to 40)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| Page 41 | Page 43 |
|---|---|
| 1  MR. STEWART: Object to the | 1  MR. STEWART: Sorry. |
| 2  form. | 2  Q. -- just you as an investigator? |
| 3  A. Yes, ma'am. | 3  MR. WALKER: Sorry. Object |
| 4  MR. WALKER: Object to the | 4  to form. |
| 5  form. | 5  MR. STEWART: Object to the |
| 6  A. Yes, ma'am. | 6  form. |
| 7  Q. But you all just were not able to prove | 7  A. No -- no difference. |
| 8  it through your investigation. Am I | 8  Q. No difference? |
| 9  correct? | 9  A. No. |
| 10  MR. STEWART: Object to the | 10  Q. So she said the same thing as Felecia |
| 11  form. | 11  Barrow? |
| 12  MR. WALKER: Object to the | 12  MR. STEWART: Object to the |
| 13  form. | 13  form. |
| 14  A. Again, with this letter here and again | 14  A. Yes, ma'am. |
| 15  the complaint that Mr. Green had also, | 15  MR. WALKER: Object to the |
| 16  there was several other concerns with | 16  form. |
| 17  National Seating & Mobility so . . . | 17  Q. She said pretty much the same thing as |
| 18  Q. Now, I'm just asking, have you ever | 18  Teresa Surles? |
| 19  worked in law enforcement? | 19  MR. STEWART: Object to the |
| 20  A. Yes, ma'am. | 20  form. |
| 21  Q. Yes. Prior to your position with the | 21  A. I would say yes. |
| 22  Medicaid Agency. | 22  MR. WALKER: Object to the |
| 23  A. Corrections. | 23  form. |

| Page 42 | Page 44 |
|---|---|
| 1  Q. Department of corrections. Okay. | 1  Q. And then if in fact the physical |
| 2  A. Yes, ma'am. | 2  therapist said what he said, then |
| 3  Q. Now, I got to ask this question now. | 3  Elizabeth said the same thing he said. |
| 4  You got the employee from the Medicaid | 4  Am I correct? |
| 5  Agency saying she sees something | 5  MR. STEWART: Object to the |
| 6  firsthand. | 6  form. |
| 7  A. Okay. | 7  MR. WALKER: Object to the |
| 8  Q. Then you have Teresa Surles who's also | 8  form. |
| 9  talked with somebody; she's a | 9  A. Yes, ma'am. |
| 10  registered nurse. | 10  Q. Now, your anonymous caller on, yes, |
| 11  A. Yes, ma'am. | 11  Plaintiff's Exhibit #1 said the same |
| 12  Q. And then now you have an anonymous | 12  thing -- am I correct? |
| 13  complainant saying the same thing: | 13  MR. STEWART: Object to the |
| 14  Something is wrong; they're not putting | 14  form. |
| 15  dates on forms or -- and then you also | 15  MR. WALKER: Object to the |
| 16  have Elizabeth Horton saying the same | 16  form. |
| 17  thing. I got to ask you this question. | 17  Q. -- as Elizabeth Horton? |
| 18  What was different about Elizabeth | 18  MR. STEWART: Same |
| 19  Horton's complaint -- | 19  objection. |
| 20  MR. STEWART: Object to the | 20  MR. WALKER: Same objection. |
| 21  form. | 21  A. It's somewhat similar, yes. |
| 22  MR. WALKER: Object to the | 22  Q. Yes, sir. Similar complaint; right? |
| 23  form. | 23  A. Yes, ma'am. |

11 (Pages 41 to 44)

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 45

1    MR. STEWART: Object to the
2        form.
3    Q. Can you tell me or do you have any
4        suggestion why Elizabeth out of
5        everybody that said the same thing, why
6        was she the one that was arrested?
7            MR. WALLACE: Object to the
8                form. You're misstating
9                the evidence.
10           MR. WALKER: Object to the
11               form.
12           MR. STEWART: Object to the
13               form.
14   A. I understand -- I don't know.
15   Q. Mr. Johnson, approximately how many
16       complaints do you all handle where
17       people are calling either anonymously
18       or identify themselves, you know,
19       calling in fraud against the Medicaid
20       Agency?
21           MR. WALKER: Object to the
22               form.
23   A. It varies on a daily basis, anywhere

Page 46

1        from twenty-five to thirty-five calls.
2    Q. So if we take twenty-five to
3        thirty-five calls a day --
4    A. Okay.
5    Q. -- and then there's on the average
6        thirty, thirty-one days in a month --
7    A. Yes, ma'am.
8    Q. -- well, let's just go --
9            MS. NICKSON: Now, you said
10               we're not good with
11               math. Anybody got a
12               calculator?
13   Q. So in a week, that's about a hundred
14       and fifty-five calls?
15   A. Yes, ma'am.
16   Q. So over five hundred calls a month?
17   A. Okay.
18   Q. Approximately. And we're just dealing
19       with approximation.
20   A. Yeah.
21   Q. Have you ever known anybody to be
22       arrested that has been a complainant
23       and the investigation have not been

Page 47

1        able to sustain the complaint?
2    A. No, ma'am.
3    Q. Is Elizabeth Horton the first person
4        that you've known to be arrested that's
5        been a complainant?
6    A. Yes, ma'am.
7    Q. Do you know why she was singled out?
8    A. No, ma'am, I do not.
9    Q. Anybody ever told you anything as to
10       why?
11   A. From reading the report that was done
12       by the other agency, it says she
13       provided false information to a law
14       enforcement officer. So that's the --
15   Q. And what was that false information?
16   A. Again, I don't know.
17   Q. Have you ever seen any reports that
18       Elizabeth filed?
19   A. No, ma'am.
20   Q. Have you read a statement that she
21       gave?
22   A. No, ma'am.
23   Q. You just read what everybody else said.

Page 48

1        Am I correct?
2    A. That's correct.
3            MR. STEWART: Object to the
4                form.
5            MR. WALKER: Same objection.
6    Q. Do you know what the arrest was based
7        on other than somebody saying that she
8        made a false statement?
9            MR. STEWART: Object to the
10               form.
11   A. Again, no, ma'am, I do not.
12   Q. Did you heard her voice on a tape
13       recording making a statement?
14   A. No.
15   Q. Were you there at the criminal trial of
16       Elizabeth Horton?
17   A. Yes, ma'am.
18   Q. And how did the Court find her?
19   A. Not guilty.
20           MR. WALKER: Object to the
21               form.
22   A. I guess the case was thrown out.
23   Q. Not guilty?

12 (Pages 45 to 48)

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 49

1  A. Yes.
2  Q. What, if anything, was said at the
3     bench?
4     MR. STEWART: Object to the
5        form.
6     MR. WALKER: Object to the
7        form.
8  A. I don't recall.
9  Q. Who was there to testify?
10 A. Ms. Horton, Ms. Felecia Barrow, and the
11    staff from the attorney general's
12    office -- Bruce Lieberman, Gerald
13    Shockley, and Mike Roeder.
14    MR. STEWART: Who before
15       Gerald Shockley?
16    THE WITNESS: Bruce
17       Lieberman.
18    MS. NICKSON: He was the
19       prosecutor.
20 Q. Was he the prosecutor in the case?
21 A. Yes.
22    MR. STEWART: And the last
23       name you mentioned?

Page 50

1     THE WITNESS: Gerald
2        Shockley and Mike
3        Roeder.
4     MR. STEWART: Mike Roeder.
5        Thank you.
6  Q. All right. Did you get to hear the
7     testimony of these people?
8  A. I wasn't -- yes, I did. Yes.
9  Q. And what did Felecia Barrow say?
10    MR. STEWART: Object to the
11       form.
12    MR. WALKER: Same objection.
13 A. Again, I don't recall all the exact
14    wordage so --
15 Q. Okay. Best you can remember.
16    MR. STEWART: Same
17       objection.
18    MR. WALKER: Same objection.
19 A. She basically made the statement to the
20    fact that she received a call -- a
21    complaint regarding National Seating &
22    Mobility regarding the complaint that
23    was -- we have on file from

Page 51

1     Investigator Green as to what was not
2     being done. And she was asked
3     questions by the attorney and the
4     prosecutor asked what transpired with
5     that complaint. Her response to the
6     question that was asked, I can't recall
7     all the exact wordage so . . .
8  Q. All right. Do you remember her making
9     a statement that Elizabeth Horton never
10    said that people did not receive their
11    wheelchairs?
12    MR. STEWART: Object to the
13       form.
14    MR. WALKER: Object to the
15       form.
16 A. I don't recall that, so . . .
17 Q. What, if anything, did Gerry Shockley
18    say?
19    MR. STEWART: Same
20       objection.
21 A. Again, I don't recall all the details.
22    He just made his statements regarding
23    his report that he had against

Page 52

1     Ms. Horton. And I'm pretty sure the
2     questions was asked of him by attorney
3     and prosecutor. I don't recall all the
4     questions that was asked to him.
5  Q. Do you remember any discussion at the
6     bench that Elizabeth had been
7     terminated from National Seating &
8     Mobility?
9     MR. WALLACE: Objection.
10       This is not --
11 A. Yes, I do.
12    MR. WALLACE: This question
13       is not calculated to
14       lead to discoverable
15       evidence.
16    MR. WALKER: Objection to
17       form.
18    MR. STEWART: Object to the
19       form.
20 A. Yes, ma'am.
21 Q. And do you have any documentation,
22    anything in your investigative file,
23    that would suggest that she was

13 (Pages 49 to 52)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 53

1    employed by National Seating &
2    Mobility?
3            MR. STEWART: Object to the
4        form.
5    A. I'm trying to think as -- I would say I
6        don't recall, so I don't -- I don't
7        know.
8    Q. All right. But you've not read
9        anything or seen any documents where
10        National Seating & Mobility actually
11        terminated Elizabeth --
12    A. No, I have not.
13    Q. -- have you? Okay. All right. Did
14        you have the opportunity to speak with
15        Ms. Horton on that day of trial?
16    A. Afterwards, yes.
17    Q. Did she ever tell you that she never
18        met Gerry Shockley?
19    A. I don't recall, no.
20    Q. Did Gerry Shockley ever state that he
21        had met Elizabeth Horton?
22    A. Not to me.
23    Q. Do you know whether or not he met her?

Page 54

1    A. No, I don't know.
2    Q. All right. Do you know where Elizabeth
3        was working at the time of her arrest?
4    A. From the report done by Investigator
5        Green, yes, ma'am.
6    Q. Where was she working?
7    A. At the Hyundai plant.
8    Q. And, now, as a matter of fact, it was
9        nearly eleven months between the time
10        of her employment with National
11        Seating & Mobility to the time that the
12        investigation began. Am I correct?
13            MR. STEWART: Object to
14        form.
15    A. You say eleven months from what time
16        frame?
17    Q. Okay. Elizabeth was employed for
18        National Seating & Mobility, the
19        documents suggest, from April '04 to
20        June '04.
21    A. Okay.
22            MR. STEWART: Object to the
23        form, if that's a

Page 55

1        question.
2    Q. So when did you all begin your
3        investigation?
4    A. According to Investigator Green's
5        report, it would have to be May 19,
6        '04.
7    Q. Okay. May 19th, '04? Okay. Is that
8        when the complaint --
9    A. Yes, the complaint came in, yes.
10    Q. -- was lodged, May 19th, '04? Okay.
11        Have you known of people to, in
12        businesses, to get angry when
13        complaints are filed against them?
14            MR. STEWART: Object to the
15        form.
16    A. I can say it -- it happens. But no,
17        I -- I haven't encountered that.
18    Q. All right. You didn't talk with Don
19        Williams?
20    A. No, ma'am.
21    Q. You didn't speak with anybody directly.
22        You just read --
23    A. The report.

Page 56

1    Q. -- Investigator Green's report?
2    A. Yes, ma'am.
3    Q. All right. Investigator Green said
4        that he -- and I'm going to show you
5        Plaintiff's Exhibit #2. He said that
6        that's not the list of recipients that
7        he showed to Elizabeth. Did you look
8        at a list of recipients where Elizabeth
9        identified twenty-three people that she
10        may have remembered getting service
11        during the time of her employment?
12    A. Okay. And you're saying did I see this
13        list?
14    Q. Yes, sir. Have you ever seen a list?
15    A. On the report that Investigator Green
16        has in his case file.
17    Q. He did?
18    A. (Witness nodded.)
19    Q. Okay. He indicated that she had
20        initialled along the side. Do you
21        remember seeing her initials?
22    A. No, ma'am.
23    Q. All right. Do you all have guidelines,

14 (Pages 53 to 56)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 57

1  Mr. Johnson, if someone is
2  intentionally making a false report, do
3  you have guidelines by which you would
4  suggest prosecution of that person?
5  A. No, ma'am.
6  Q. Did you ever hear the name Chaseley
7    Weeks?
8  A. Yes.
9  Q. Do you know whether anybody from the
10   attorney general's office attempted to
11   contact her?
12  A. I don't know.
13  Q. Did you ever read a statement or
14   anything from her?
15  A. No, ma'am.
16  Q. Do you know whether or not Elizabeth
17   and Felecia were friends?
18  A. Again, I don't know.
19  Q. Did you ever ask Felecia?
20  A. No.
21  Q. Let's see.
22      (Brief pause)
23  Q. Do you recall Mr. Green, Investigator

Page 58

1    Green, actually stating that Elizabeth
2    never identified any of those
3    recipients as to missing wheelchairs or
4    fraud being committed against those
5    exact recipients that she identified on
6    the ledger that he showed her?
7  A. The ledger or the names that
8    Investigator Green showed regarding
9    those twenty-seven or twenty-three
10   names?
11  Q. Yes, sir.
12  A. From talking with him, those are the
13   names that he was saying Ms. Horton
14   just remembered while working at
15   National Seating & Mobility.
16  Q. Okay. But not necessarily that
17   infractions had incurred --
18  A. No.
19  Q. -- had occurred with them? Let me ask
20   you this. Elizabeth left National
21   Seating & Mobility June '04. April
22   '05, she was interviewed by the
23   investigator, Roeder, if I'm not

Page 59

1    mistaken.
2  A. Roeder.
3  Q. Yeah, Roeder. Is it foreseeable that
4    if she was shown this list nearly
5    eleven months later, that she could go
6    through there and identify --
7        MR. WALLACE: Object to the
8        form.
9  Q. -- recipients?
10        MR. WALLACE: You're calling
11        for him to speculate.
12        Rephrase your question.
13  Q. Is it foreseeable that a witness --
14        MR. WALLACE: Object to the
15        form.
16  Q. -- just in your mind --
17        MS. NICKSON: I'm asking an
18        expert.
19        MR. WALLACE: You're
20        requesting him to
21        speculate. He can only
22        testify as to things to
23        which he has personal

Page 60

1      knowledge.
2        MS. NICKSON: Okay. We'll
3        straighten out if
4        objections later.
5  Q. But just in your course of
6    investigation, you're dealing with a
7    prior employee -- and this is your
8    experience as an investigator. You're
9    dealing with an employee who left a
10   company nearly eleven months ago. Is
11   it foreseeable that that person could
12   identify --
13        MR. WALLACE: Object to the
14        form.
15  Q. -- thirty-seven people that had a fraud
16   activity going on in their files at the
17   time of their employment?
18        MR. STEWART: Object to
19        form.
20        MR. WALKER: Object to form.
21  A. Again, that I don't know. But to
22   say --
23  Q. I mean reasonable.

15 (Pages 57 to 60)

**MERRILL LEGAL SOULTIONS**
Court Reporting*Legal Videography*Trial Services

Page 61

1    MR. STEWART: Object to the
2        form.
3        MR. WALKER: Object to form.
4    A. Again, I don't know. She can say, you
5        know, I recall certain names. But to
6        say can she remember those names
7        committing fraud activity, again, I
8        don't know that.
9    Q. I mean, just an investigator,
10        reasonable based on your experience.
11        MR. WALKER: Asked and
12            answered. Object to the
13            form.
14    Q. Is it reasonable?
15        MR. STEWART: Object to the
16            form.
17    A. For me or the person could identify the
18        name or could I identify the names?
19    Q. Yeah. Could a layperson just identify
20        thirty-seven names and say yes, this
21        was missing wheelchair and gone from
22        the company eleven months?
23        MR. WALLACE: Object to

Page 62

1            form.
2        MR. STEWART: Object to the
3            form.
4        MR. WALKER: Object to form.
5        MR. WALLACE: When you say a
6            layperson, please
7            explain whether or not
8            the layperson has
9            significant mental
10            illness or whether they
11            are normal and whether
12            or not they're taking
13            medications.
14    A. And now? Waiting for my response?
15    Q. Yes, sir.
16    A. Like I say, a reasonable person could
17        identify the names, yes.
18    Q. Okay. Could identify the names.
19    A. Yes.
20    Q. And without documentation, can you
21        identify exactly what was going on?
22        MR. STEWART: Object to the
23            form.

Page 63

1    A. Yes.
2    Q. All right. Okay. Great. Thank you.
3        EXAMINATION
4    BY MR. WALLACE:
5    Q. I'm Jack Wallace and I'm from the
6        attorney general's office. I represent
7        Gerald Shockley. Now, earlier we had
8        some testimony concerning the
9        allegations made by Ms. Horton. Would
10        you tell me each and every allegation
11        that you are aware of that Ms. Horton
12        made?
13    A. All I have and know about is the
14        reports that was filed by Investigator
15        Anthony Green and her name surmised
16        [sic] that she was the person that
17        filed a qui tam complaint with the AG's
18        office.
19    Q. And in that report, do you know the
20        nature of the allegations? Was it
21        strictly that there were improper dates
22        used or dates were omitted on the
23        documentation?

Page 64

1    A. Don't know. I have -- well, the
2        letter -- I have the letter that came
3        out to my office and to AG's office.
4        That's all I have, yes.
5    Q. So you don't know exactly what
6        allegations she may have made.
7    A. No.
8    Q. So, therefore, you cannot testify as to
9        whether or not she made the same
10        allegations as whether an anonymous
11        caller -- that an anonymous made?
12    A. That's correct.
13        MR. WALLACE: That's all I
14            have.
15        EXAMINATION
16    BY MR. STEWART:
17    Q. Chuck Stewart again for National
18        Seating. We referred to this -- or I
19        didn't, but Ms. Nickson referred to
20        this person as an anonymous caller, and
21        then she referred to Elizabeth Horton.
22        Do you have any information that would
23        lead you to conclude that the anonymous

16 (Pages 61 to 64)

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 65

1  caller was not Elizabeth Horton?
2  A. No.
3  Q. Do you know whether the anonymous
4  caller was Elizabeth Horton?
5  A. No, I don't.
6  Q. Is it possible the anonymous caller was
7  Elizabeth Horton?
8  MS. NICKSON: Object to the
9  form.
10  A. It's possible.
11  Q. Let me talk a little bit about your
12  investigator, Anthony Green. He seems
13  to have a good bit of experience. Does
14  he?
15  A. Yes, sir.
16  Q. Of your investigators, where does he
17  fall?
18  A. All fall -- I have seven -- six, seven
19  investigators. All -- they have their
20  own unique style of solving crime or
21  solving problems, all around the same
22  category, not one superior or above
23  another.

Page 66

1  Q. Is there anything about Mr. Green that
2  you consider to be substandard in terms
3  of his investigative abilities?
4  A. No, sir.
5  Q. Do you consider his investigative
6  abilities to be above standard?
7  A. Yes.
8  Q. Do you consider them to be excellent?
9  A. You can say yes.
10  Q. Now, you did not review everything that
11  Investigator Green reviewed, did you?
12  A. No, I did not.
13  Q. You did not review everything that the
14  attorney general's office had on this
15  case, did you?
16  A. No, sir.
17  Q. You were basically not involved in the
18  investigation at all.
19  A. I was not.
20  Q. Now, you attended an interview with
21  Ms. Barrow. I want to just set that
22  aside for a second. Other than that
23  interview that you attended, did you

Page 67

1  actually interview anybody yourself?
2  A. No, sir.
3  Q. Did you actually look at any physical
4  evidence?
5  A. Only after the completed file was done
6  by my investigator, Green, yes.
7  Q. And then when you attended the
8  interview with Ms. Barrow, was that at
9  her request?
10  A. Yes, it was.
11  Q. You weren't there passing judgment on
12  whether or not some wrongdoing had
13  occurred?
14  A. No.
15  Q. Now, there was a number of questions
16  where Ms. Nickson asked you about this
17  time frame between an investigator
18  visiting a business and then an
19  investigator coming back some fifteen
20  days or sixteen days later to actually
21  look through documents.
22  A. Okay.
23  Q. You remember those questions?

Page 68

1  A. Yes, I do.
2  Q. Do you remember whether that time frame
3  is at all accurate?
4  A. I don't know.
5  Q. Do you know whether or not Investigator
6  Green actually saw some documents on
7  the first day he was out there?
8  A. No, I don't.
9  Q. Do you know whether NSM engaged in any
10  fraud in the intervening time between
11  visit one and visit two?
12  A. No.
13  Q. Do you know whether they changed any
14  documents?
15  A. No, sir.
16  Q. Has anybody told you that they did?
17  A. No, sir.
18  Q. There was some questions that
19  Ms. Nickson asked you about where
20  dates were not put down on documents.
21  Do you recall those questions?
22  A. Yes, I do.
23  Q. Did you have any information at any

17 (Pages 65 to 68)

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 69

1  time during this investigation that
2  dates were not on documents as a result
3  of someone's specific intent to defraud
4  the Medicaid Agency as opposed to just
5  oversight, carelessness, or mistake?
6  A. That's a long question. Rephrase that
7     or --
8  Q. I'll be happy to. You understand that
9     fraud requires a specific intent by
10    someone to take something away or to
11    keep information from someone?
12 A. Okay. Yes.
13 Q. Did you see any evidence in your
14    limited experience in this case that
15    would indicate to you that someone was
16    trying to defraud somebody as opposed
17    to simply making a mistake or
18    carelessness?
19 A. From Investigator Green's report, there
20    was nothing to determine that fraud and
21    abuse had occurred. So based on that,
22    that's all I had to go on, was the
23    reports, yes.

Page 70

1  Q. All right. And when you went through
2     this document with Ms. Nickson that she
3     took you through -- and I think it's
4     got a Bates No. 14 on it.
5        MR. STEWART: Do you know
6        which exhibit that is?
7  Q. Exhibit #3. I've got one, so I'll just
8     let you borrow that one. Was today the
9     first time that you reviewed that
10    document?
11 A. No.
12 Q. This was part of something that was
13    referred to you early on?
14 A. Yes.
15 Q. Back in February of 2005?
16 A. That's correct.
17 Q. They talk about in the first paragraph
18    there being two assessments, two
19    wheelchair assessments, that missed
20    clinic date on there. The assessments
21    were conducted by Gerry Rodgers and a
22    Michael Maddox, both of Children's
23    Rehab Services.

Page 71

1  A. Okay.
2  Q. Is that correct?
3  A. That's correct.
4  Q. Who didn't put the clinic dates on
5     there?
6  A. I don't know.
7  Q. And then do you know -- well, I guess,
8     if you look at paragraph 2, it appears
9     that Teresa Surles questioned Maddox
10    and Rodgers about the assessments and
11    then Teresa told Felecia Barrow what
12    she learned?
13 A. That's correct.
14 Q. So that's not Felecia Barrow's
15    firsthand information, is it? That's
16    second- or third-hand information,
17    isn't it?
18 A. Yeah.
19 Q. And if I understood you in response to
20    Ms. Nickson's questions, you may get as
21    many as a hundred and fifty-five
22    complaints per week or more than five
23    hundred a month?

Page 72

1  A. Well, that was her tabulation of what I
2     said. We get calls in from twenty-five
3     to thirty calls a day, yes.
4  Q. And let's assume you get thirty a day
5     and that you're not taking complaints
6     on Saturday and Sunday. Is that fair?
7     Or do y'all take complaints on --
8  A. Well, we do. The calls come in on the
9     fraud hotline. We would treat them on
10    the next -- well, the Monday. So yes,
11    we do have calls on the weekends also.
12 Q. So when you were saying twenty-five to
13    thirty you were including Saturdays and
14    Sundays?
15 A. Yes.
16 Q. So seven times thirty is two ten. Two
17    ten a week times four. About eight
18    hundred a month?
19 A. I think that's . . .
20       (Simultaneous speaking of
21        the parties)
22 Q. Eight forty a month, according to
23    someone in the room who can do math.

18 (Pages 69 to 72)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 73

1    And is it your recollection as you sit
2    here today that you've only had two
3    complaints against National Seating?
4  A. That's correct.
5  Q. Now, your office has the ability to
6    investigate claims of fraud against
7    Alabama Medicaid Agency.
8  A. Yes, we do.
9  Q. And can you think of a way that would
10   be any more damaging to a company who
11   is subject to Alabama Medicaid Agency
12   than to claim that they're committing
13   Medicaid fraud?
14 A. No.
15 Q. If you were trying to hurt a company,
16   that would be a good way to do it,
17   wouldn't it?
18 A. Yes.
19 Q. Do you recall the interview with
20   Ms. Barrow well enough to state what
21   she's testified to back then?
22 A. Vaguely.
23 Q. Do you recall what she actually said

Page 74

1    she knew of and what other people knew
2    about or said to her?
3  A. During the interview process with
4    Ms. Barrow and Investigator Shockley?
5  Q. Right.
6  A. Again, no. I was there because she had
7    asked me to be there with her, but
8    other -- I can't recall exactly what
9    all was actually said.
10 Q. I mean, it was back in June of '05.
11 A. Okay.
12 Q. I can understand why you wouldn't
13   remember two and half years ago, three
14   years, whatever we're at. I told you
15   we couldn't do math. So I won't ask
16   you any questions about that.
17       MR. STEWART: That's all I
18       have. Thank you.
19       EXAMINATION
20 BY MR. WALKER:
21 Q. I'm Dorman Walker, representing Don
22   Williams, and I've got a few questions
23   for you. Why, if you know, did

Page 75

1    Ms. Barrow ask you to be at her
2    interview?
3  A. She had received a call from, she says,
4    someone from the attorney general's
5    office wanted to interview her, and she
6    did not know the investigator or the --
7    and the agency. And her take was she
8    knows that our staff do investigative
9    work, so she asked me did I know
10   Mr. Shockley. And I in turn told her
11   yes, I do know him. And she said she
12   was not familiar with the court process
13   or question process, would I mind
14   sitting in on her on -- during the
15   interview process. That's all.
16 Q. Did you know Ms. Barrow before the
17   complaint was received against National
18   Seating & Mobility?
19 A. Yes, I did.
20 Q. And how would you characterize your
21   relationship with her?
22 A. She's very professional, thorough, and
23   she'd been director for a lot of years

Page 76

1    in that particular program and other
2    program with the agencies so . . .
3  Q. Was she someone you considered a work
4    friend?
5  A. Just -- friend, no. A work -- work
6    associate, yes.
7  Q. Okay. Somebody you saw at work?
8  A. On a regular basis, yes.
9  Q. And were on friendly terms with?
10 A. Yes.
11 Q. I was just curious. To follow up on
12   something Mr. Stewart asked you, if
13   someone were found to have engaged in
14   fraud or it was believed that they were
15   engaged in fraud, could they lose their
16   provider number?
17 A. Yea.
18 Q. And if they lost their provider number,
19   could they continue to be a provider
20   for Medicaid?
21 A. No.
22 Q. So they would effectively go out of
23   business, at least the business

19 (Pages 73 to 76)

Page 77

1    providing durable medical equipment for
2    Medicaid recipients.
3    A. That's correct.
4    Q. Did you say that you had never spoken
5        with Don Williams?
6    A. Yes, that's correct.
7    Q. And have you ever reviewed or seen --
8        excuse me. Strike that.
9            Have you ever discussed Don
10       Williams with any other person?
11   A. Other than Investigator Green, no.
12   Q. Did you discuss Don Williams with
13       Investigator Green?
14   A. I'm going to say vaguely during this
15       investigation, the name might have come
16       up during the course of investigation.
17   Q. No more than that?
18   A. Yes.
19   Q. Do you have any reason to believe or
20       any evidence to support a belief that
21       Don Williams was engaged in some sort
22       of conspiracy to get Elizabeth Horton?
23   A. No, I don't.

Page 78

1    Q. You don't have any information about
2        that one way or the other?
3    A. No.
4            MR. WALKER: Give me just
5            one second, please. I'm
6            probably done, but if
7            you'd just let me check
8            back over this.
9        (Brief pause)
10           MR. WALKER: That's all I
11           have. Thank you very
12           much, Mr. Johnson.
13           MR. STEWART: Y'all have
14           anything further?
15           MS. NICKSON: No. We're not
16           going round and round
17           this time.
18           MR. STEWART: I do have a
19           few more questions that
20           I neglected to ask, if
21           you don't have any.
22           MS. NICKSON: I don't have
23           any.

Page 79

1            EXAMINATION
2    BY MR. STEWART:
3    Q. You went through the witnesses that
4        testified at the trial, Mr. Johnson.
5        And I think I wrote a list. You had
6        Elizabeth Horton, Felecia Barrow, AG's
7        staff, Gerald Shockley, Bruce
8        Lieberman, and Mike Roeder.
9    A. That's correct.
10   Q. Do you recall anybody from National
11       Seating there at trial?
12   A. Yes. Had to be -- I'm going to say it
13       was Don Williams. It was a man there
14       from National Seating, so yes.
15   Q. Do you know whether he was still
16       employed with National Seating at the
17       time of the trial?
18   A. I don't know.
19   Q. Do you remember anybody else from
20       National Seating?
21   A. No, sir.
22   Q. Did Mr. Williams testify?
23   A. Yes. Someone from National Seating did

Page 80

1        testify, so yes.
2    Q. And do you know if he received a
3        subpoena to be there?
4    A. I would have to say yes.
5    Q. Were you involved at all in asking
6        National Seating to provide information
7        to Alabama Medicaid?
8    A. No.
9    Q. Were you aware that they provided a
10       good bit of information to Alabama
11       Medicaid?
12   A. Yes, I was.
13   Q. During the time, did anybody complain
14       to you that they weren't providing
15       everything that was asked for?
16   A. No.
17   Q. Did you ever hear -- did anybody say
18       during the time of investigation that
19       National Seating was out to get
20       Elizabeth Horton arrested or convicted?
21   A. No, sir.
22   Q. Do you have any information that
23       National Seating did anything other

20 (Pages 77 to 80)

Page 81

1  than just respond to the investigating
2  agency's inquiries?
3  A. No, I do not.
4  Q. Thank you.
5      MR. WALKER: Nothing further
6      from me.
7      MS. NICKSON: I do.
8      EXAMINATION
9  BY MS. NICKSON:
10 Q. Let me ask you a question about Felecia
11    Barrow. Have you had any complaints
12    that she acts in a manner that is not
13    consistent with Medicaid policy
14    concerning her relationship with the
15    vendors?
16     MR. WALKER: Objection to
17     form.
18 A. No.
19 Q. All right. Don Williams, in a report
20    by Mr. Shockley, he told Mr. Shockley
21    that Felecia came and ate lunch with
22    Elizabeth Horton. Based on your time
23    that you've known Felecia, have there

Page 82

1      been any complaints that she
2      fraternizes with the vendors' --
3  A. No.
4  Q. -- employees?
5      MR. WALKER: Let her ask the
6      question.
7  Q. Yeah. With the vendor employees?
8      MR. WALKER: Objection to
9      form.
10     MR. STEWART: Same.
11 A. No.
12 Q. Did Felecia ever say that she was
13    friends with Elizabeth?
14 A. No, not to me.
15 Q. Based on the investigation, did
16    anything turn up that they had a
17    relationship outside of the work
18    environment?
19 A. No, ma'am.
20     MS. NICKSON: No further
21     questions.
22     MR. WALKER: Let me follow
23     up on that, if I may.

Page 83

1      EXAMINATION
2  BY MR. WALKER:
3  Q. You're not saying that you know whether
4     or not in fact that Felecia Barrow and
5     Elizabeth Horton had lunch at National
6     Seating one day, are you? Let me
7     rephrase that. If the allegation was
8     made that Felecia Barrow came out to
9     National Seating and had lunch with
10    Elizabeth Horton there, do you know
11    whether or not that is correct?
12 A. I don't know.
13 Q. Do you have any information about that
14    one way or the other?
15 A. No, I do not.
16     MR. WALKER: Thank you very
17     much.
18     MR. STEWART: Let me ask a
19     follow-up question as
20     well.
21     EXAMINATION
22 BY MR. STEWART:
23 Q. Felecia Barrow, as associate director

Page 84

1  of the prior approval unit, would it be
2  appropriate for someone in her position
3  to be eating lunch with the very people
4  that she is charged with overseeing?
5  A. Again, I wouldn't know.
6  Q. Would it be appropriate for her to go
7     to concerts with employees of a company
8     she's overcharged with overseeing -- or
9     she's charged with overseeing?
10 A. If they are friends or family, it would
11    be. But, again, I wouldn't know. If
12    they are friends or associates, I -- I
13    would say that would be appropriate.
14 Q. So it would be all right to be friends
15    with somebody that you're overseeing?
16 A. Yes.
17 Q. To become friends with them after
18    you're charged with overseeing them?
19 A. Say it again, now.
20 Q. How about becoming friends after you're
21    charged with overseeing them?
22 A. I don't know.
23 Q. It would give you a little cause for

21 (Pages 81 to 84)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 85

1    concern, then, if you've learned that
2    the director was accepting meals or
3    gifts or concert tickets or something
4    from someone?
5    A. Yes.
6          MR. STEWART:  That's all I
7             have.  Thank you.
8          MR. WALKER:  That's all I
9             have.  Thank you, sir.
10
11    *   *   *   *   *   *   *   *
12       FURTHER DEPONENT SAITH NOT
13    *   *   *   *   *   *   *   *
14
15
16
17
18
19
20
21
22
23

Page 86

1        REPORTER'S CERTIFICATE
2
3    STATE OF ALABAMA )
                )
4    ELMORE COUNTY   )
5
6        I do hereby certify that the above
7    and foregoing transcript was taken down
8    by me in stenotype, and the questions
9    and answers thereto were transcribed by
10    means of computer-aided transcription,
11    and that the foregoing represents a true
12    and correct transcript of the testimony
13    given by said witness.
14        I further certify that I am neither
15    of counsel, nor of any relation to the
16    parties to the action, nor am I anywise
17    interested in the result of said cause.
18
19
20    Barbara A. Howell, Certified
       Court Reporter and Commissioner
21    for the State of Alabama at Large
       ACCR NO. 123 - Expires 9/30/08
22    MY COMMISSION EXPIRES:  12/27/08
23

22 (Pages 85 to 86)

[3771_001.pdf]



BOB RILEY
Governor

# Alabama Medicaid Agency

501 Dexter Avenue
P.O. Box 5624
Montgomery, Alabama 36103-5624

www.medicaid.state.al.us
e-mail; almedicaid@medicaid.state.al.us
Telecommunication for the Deaf: 1-800-253-0799
1-800-362-1504      (334) 293-5500



CAROL A HERRMANN, MPH
Commissioner

## MEMORANDUM

DATE:       June 14, 2005

TO:         File

FROM:       Cliff Johnson, Chief Investigator
            Investigations Unit

SUBJECT:    Case #8-04-0150
            National Seating and Mobility

This case was initiated upon a complaint received from an anonymous caller indicating that National Seating and Mobility, Provider #009814350, is billing the Medicaid Agency for services not provided to recipients. The caller alleged that fraudulent activities consisted of forgery of recipients' signatures on delivery tickets for durable medical equipment and supplies; improper billing practices; and using outdated prescriptions to submit for services and supplies. The caller also stated that she is an ex-employee of this company and that she had reported this fraudulent complaint to the district attorney's office and the Attorney General's office and that she has filed a Quai Tam lawsuit with the Attorney General's office.

On 2/16/2005, I contacted Special Agent Mike Roeder, Medicaid Fraud Control Unit at the Attorney General's office, concerning the allegations in this case. Agent Roeder stated that they had received a complaint on this provider from the anonymous caller and that he is in the process of locating the complainant for a direct interview concerning the allegations in this case. Agent Roeder went on to state that MFCU will be conducting a preliminary investigation on this provider following the information they receive from the complainant and that they will contact the Alabama Medicaid Agency's Investigations Unit concerning any assistance/joint investigative actions.



PLAINTIFF'S
EXHIBIT

5-Johnson

Our Mission - to provide an efficient and effective system of financing health care for our beneficiaries.

Horton V. Williams-0011

*[3771_001.pdf]*

# ALABAMA MEDICAID AGENCY

## MEMORANDUM

DATE:       July 12, 2004

TO:         Cliff Johnson, Investigator
            Investigations Unit

FROM:       John Andersen, Associate Director
            Provider Review

SUBJECT:    Referral of National Seating and Mobility

I am referring this DME provider to you for your assessment and recommendation.
Please see the referral from the URC.
They supply a number of customized wheelchairs to disabled Medicaid children. Indeed,
that seems to be their primary business focus. Let me know if I may be of help.

cc: Jackie Gray

Horton V. Williams-0012