# EXHIBIT D

**EXHIBIT**

tabbies®

D

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 3

```
1    IN THE UNITED STATES DISTRICT COURT
     FOR THE MIDDLE DISTRICT OF ALABAMA
2             NORTHERN DIVISION
3
     ELIZABETH HORTON,
4
         Plaintiff,
5              CASE NUMBER
     vs.      2:06cv-526-MHT-TFM
6
     DON WILLIAMS, individually and in his
7    capacity as the Manager of National
     Seating and Mobility, Inc., NATIONAL
8    SEATING AND MOBILITY, INC., GERALD
     SHOCKLEY, individually and in his
9    capacity of a special agent of the
     Alabama Attorney General's Office,
10
         Defendants.
11
12   *  *  *  *  *  *  *  *
13
14        DEPOSITION OF ANTHONY L. GREEN,
15   taken pursuant to stipulation and
16   agreement before Barbara A. Howell, CCR,
17   Commissioner for the State of Alabama at
18   Large, ACCR No. 123, in the Bradley,
19   Arant, Rose & White Conference Room,
20   401 Adams Avenue, Room 712, Montgomery,
21   Alabama, on Wednesday, January 30, 2008,
22   commencing at approximately 9:05 a.m.
23
```

```
1              I N D E X
2
     EXAMINATION BY:              PAGE
3
4    MS. NICKSON.....................    5
5    MR. WALKER......................   55
6    MR. STEWART.....................   66
7    MR. WALLACE.....................   78
8    MS. NICKSON.....................   82
9    MR. WALKER......................   90
10   MS. NICKSON.....................   97
11   MR. STEWART.....................  101
12   MR. WALLACE.....................  104
13   EXHIBITS                  PAGE
14   PLAINTIFF'S EXHIBIT #1...........   14
15     Medicaid Complaint 8-04-0150
       (continuation)
16
     PLAINTIFF'S EXHIBIT #2............   88
17
       National Seating Recipient List
18
     PLAINTIFF'S EXHIBIT #3...........   88
19
       Memo Dated February 16, 2005,
20     from Ms. Barrow to Ms. McIntyre
21   DEFENDANT'S EXHIBIT #4...........   94
22     Summary Report of Investigation
23
```

Page 2

```
1        A P P E A R A N C E S
2
     FOR THE PLAINTIFF:
3
       Ms. Deborah M. Nickson
4      LAW OFFICE OF DEBORAH M. NICKSON
       2820 Fairlane Drive, Suite A-10
5      Montgomery, Alabama 36116
6
     FOR DEFENDANT DON WILLIAMS:
7
       Mr. Dorman Walker
8      BALCH & BINGHAM
       105 Tallapoosa Street, Suite 200
9      Montgomery, Alabama 36104
10
     FOR DEFENDANT NATIONAL SEATING &
11   MOBILITY:
12     Mr. Charles A. Stewart, III
       BRADLEY, ARANT, ROSE & WHITE
13     401 Adams Avenue, Suite 780
       Montgomery, Alabama 36104
14
15   FOR DEFENDANT GERALD SHOCKLEY:
16     Mr. Jack Wallace, Jr.
       OFFICE OF THE ATTORNEY GENERAL
17     State of Alabama
       11 South Union Street
18     Montgomery, Alabama 36130
19
     FOR THE ALABAMA MEDICAID AGENCY:
20
       Ms. Tammy Hudson
21     ALABAMA MEDICAID AGENCY
       501 Dexter Avenue
22     Montgomery, Alabama 36104
23
```

Page 4

```
1         S T I P U L A T I O N S
2         It is hereby stipulated and agreed
3    by and between counsel representing the
4    parties that the deposition of
5    ANTHONY L. GREEN is taken pursuant to
6    the Federal Rules of Civil Procedure and
7    that said deposition may be taken before
8    Barbara A. Howell, Court Reporter and
9    Commissioner for the State of Alabama at
10   Large, without the formality of a
11   commission; that objections to questions
12   other than objections as to the form of
13   the questions need not be made at this
14   time but may be reserved for a ruling at
15   such time as the deposition may be
16   offered in evidence or used for any
17   other purpose as provided for by the
18   Federal Rules of Civil Procedure.
19        It is further stipulated and agreed
20   by and between counsel representing the
21   parties in this case that said
22   deposition may be introduced at the
23   trial of this case or used in any manner
```

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 5

1  by either party hereto provided for by
2  the Federal Rules of Civil Procedure.
3
4  *  *  *  *  *  *  *  *
5
6          ANTHONY L. GREEN
7      The witness, having first been duly
8  sworn or affirmed to speak the truth,
9  the whole truth, and nothing but the
10  truth, testified as follows:
11          THE REPORTER: Usual federal
12              stipulations?
13          MS. NICKSON: Yes.
14          MR. WALKER: Yes.
15          EXAMINATION
16  BY MS. NICKSON:
17  Q. Would you state your name for the
18      record.
19  A. I'm Special Investigator Anthony L.
20      Green.
21  Q. Mr. Green, I am Deborah Nickson. I am
22      a local attorney here in Montgomery and
23      I represent Elizabeth Horton, who is a

Page 6

1      plaintiff in this lawsuit. Are you
2      familiar with Elizabeth Horton?
3  A. Yes, I am.
4  Q. And Elizabeth was arrested as a result
5      of alleged statements that she made
6      during the course of an investigation
7      against National Seating & Mobility.
8      National Seating & Mobility, Mr. Gerald
9      Shockley, and Mr. Don Williams, they
10      are defendants in this lawsuit. And
11      Elizabeth's contention is that she was
12      wrongfully arrested. And I saw your
13      name in the record as one of the
14      investigators that may have had some
15      contact with Elizabeth maybe shortly
16      after the arrest in doing some further
17      investigation concerning some
18      complaints against National Seating &
19      Mobility. Did you do any investigation
20      regarding fraudulent activity, alleged
21      fraudulent activity, committed by
22      National Seating & Mobility?
23  A. Yes.

Page 7

1          MR. STEWART: Object to
2              form.
3          MR. WALKER: Same objection.
4  Q. You can answer.
5  A. Yes, I did.
6  Q. And first let me ask you, you said you
7      are a special investigator. And with
8      what division?
9  A. Alabama Medicaid Agency.
10  Q. How long have you been with the
11      Medicaid Agency?
12  A. Approximately two and a half years.
13  Q. Two and a half years?
14  A. Yes, ma'am.
15  Q. And what did you do prior to that?
16  A. Prior to that, I worked for the
17      Veterans Administration as a police
18      officer. I was lieutenant of
19      operations for Tuskegee University
20      Security Department. I worked with the
21      New York State Police for twenty-one
22      years, and I was in the military prior
23      to that.

Page 8

1  Q. Yes, sir. And the various prior
2      employers that you've listed, did you
3      have experience in investigating cases,
4      matters, events?
5  A. Yes, I did.
6  Q. And you said that your employment with
7      Medicaid has been two and a half years?
8  A. Yes, that's correct.
9  Q. And you are assigned as a special
10      investigator.
11  A. That's correct.
12  Q. And as a special investigator, what are
13      your duties and responsibilities?
14  A. We deal with cases involving Medicaid
15      fraud or suspected Medicaid fraud.
16  Q. And in your two and a half years with
17      Medicaid, how many cases have you
18      investigated, approximately?
19  A. I would think that a safe estimate
20      would be about seventy.
21  Q. About seventy?
22  A. Yes.
23  Q. And of the seventy cases, how many have

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

| Page 9 | Page 11 |
|---|---|
| 1   been confirmed on the allegations? | 1   complainant, if known, at that point; |
| 2   A. I'm going to say 50 percent. | 2   and the person that the complaint was |
| 3   Q. And for the 50 percent that you were | 3   against. |
| 4   not able to confirm the allegations, | 4   Q. And did you receive a case file where |
| 5   were any arrests recommended or made as | 5   Elizabeth Horton was an alleged |
| 6   a result thereof? | 6   complainant? |
| 7   A. I'm sorry. Repeat that. | 7   A. Yes, I did. |
| 8   Q. Okay. For the 50 percent where the | 8   Q. Okay. |
| 9   claims or -- the claims of a person | 9   A. Well, I'm just trying to think back to |
| 10   alleging fraudulent activity were not | 10   the actual complaint form. I know I've |
| 11   substantiated, were arrests the result | 11   spoke to Elizabeth, but I no longer |
| 12   of it? | 12   remember if she was actually listed as |
| 13   A. No. | 13   the actual complainant on that form. |
| 14   Q. In your two and a half years with | 14   Q. All right. Do you remember the time |
| 15   Medicaid, have you ever known of a | 15   frame of your investigation concerning |
| 16   complainant to be arrested for the | 16   National Mobility? |
| 17   complaint not being confirmed? | 17   A. I remember receiving the actual |
| 18   A. The only case that I'm aware of is the | 18   complaint, I want to say, October- |
| 19   one that I'm presently here for. | 19   November of '05. And I think I |
| 20   Q. And that is Elizabeth Horton? | 20   actually worked on it on and off for |
| 21   A. Yes, ma'am. | 21   maybe two months, roughly. I don't |
| 22   Q. What, if anything, was different about | 22   remember the exact dates, but I would |
| 23   her complaint, if you know? | 23   think that that was -- that's roughly |

| Page 10 | Page 12 |
|---|---|
| 1        MR. STEWART: Object to | 1   the time frame. |
| 2        form. | 2   Q. Were you ever told that the complainant |
| 3   A. From my perspective, it was, I would | 3   filed an -- I'm going to spell this for |
| 4   say, a regular complaint. There was | 4   the record because I'm not certain of |
| 5   nothing that I can think of that was | 5   how you pronounce it. And if you know, |
| 6   different from any of the other various | 6   then just let me know. It's Q-U-I |
| 7   complaints we've received. | 7   T-A-M. Have you ever heard that term? |
| 8   Q. Let's talk about how you got involved | 8   A. Q-U-I -- |
| 9   in the case. How did you get involved | 9   Q. Qui tam. |
| 10   with the complaint that was allegedly | 10        MS. NICKSON: Counsel? |
| 11   made by Elizabeth? | 11        MR. STEWART: Qui tam. |
| 12   A. I received it in the same manner we | 12   Q. Qui tam. |
| 13   receive virtually all our cases. The | 13   A. I've heard the term. I don't remember |
| 14   cases come in and my supervisor, Chief | 14   what it stands for, but I do remember |
| 15   Investigator Cliff Johnson, assigned | 15   the term. But no, I was not advised |
| 16   the case to me. | 16   that she had done that. |
| 17   Q. Yes, sir. And did he give you a file? | 17   Q. Did you review a report by Felecia |
| 18   A. Yes, he did. | 18   Barrow that indicated that a |
| 19   Q. Do you remember what was contained in | 19   complainant had filed a qui tam lawsuit |
| 20   the file? | 20   with the attorney general's office? |
| 21   A. There would have been a standard | 21   A. Can -- just so that I make sure I |
| 22   complaint form, which would have | 22   understand what we're talking about, |
| 23   contained the basic allegation; the | 23   can you just define qui tam for me? |

3 (Pages 9 to 12)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 13

1  Q. Well, as I understand, it's a legal
2     provision in the United States. It's
3     under the False Claims Act, 31 USC.
4     And this allows a private individual --
5     or it's the nature of a whistle blower
6     with knowledge of alleged fraudulent
7     activity that's committed against the
8     government. It's means by which they
9     can, I guess --
10 A. Just a basic complaint?
11 Q. Yes, sir.
12 A. All right. I just wanted to be sure.
13    But yes.
14 Q. All right. And you were told that
15    Ms. Horton had filed a complaint?
16 A. Yes, I was.
17 Q. Did you ever see the complaint?
18 A. What I received was the complaint form,
19    and I received information that was
20    given to another individual, I believe.
21    Elizabeth Horton spoke with Felecia
22    Barrow and I believe -- is it Alecia
23    Barrow or -- Felecia Barrow. I'm

Page 14

1     sorry.
2  Q. Yes.
3  A. I believe she was the one that
4     formulated a written complaint.
5  Q. So to the best of your knowledge, you
6     never reviewed a complaint made by
7     Ms. Horton?
8  A. To the best of my recollection at this
9     point, yes.
10 Q. Did you ever see anything with her
11    signature on it?
12 A. No.
13 Q. I'm going to show you what we'll mark
14    as Plaintiff's Exhibit #1.
15    (Plaintiff's Exhibit #1 was
16    marked for identification.)
17 Q. If you would, review that for me.
18    (Brief pause while witness
19    reviews document)
20 Q. Okay. Are you familiar with this
21    document?
22 A. Yes, ma'am.
23 Q. And if you would, just describe this

Page 15

1     document for the record.
2  A. The cover letter or the cover sheet is
3     actually the complaint form that I
4     referred to earlier. This is a
5     standard complaint form used by my
6     department.
7           MR. WALKER: If I could ask,
8           for the record, for
9           somebody to put in the
10          Bates numbers on that so
11          that we know what they
12          are.
13          MS. NICKSON: Yes. He's
14          going to do it.
15          MR. WALKER: There are some
16          numbers in the lower
17          right-hand corner that
18          have been placed onto
19          the document. Would you
20          indicate what the
21          numbers are? They're --
22          MS. NICKSON: This is what
23          we call --

Page 16

1           MR. WALKER: -- 0001 through
2           what?
3           MS. NICKSON: Bates drab
4           (phonetic) numbers.
5           THE WITNESS: This is 001
6           through 006.
7           MR. WALKER: Thank you.
8  A. Okay. Followed by -- this is actually
9     the paperwork that was contained in my
10    report. The second sheet is actually
11    the cover letter for my report where it
12    identifies the provider, information
13    regarding the provider, the address.
14    It also summarizes findings of any
15    fraudulent activity.
16 Q. And is the date of the report July 6th,
17    2006?
18 A. Yes, ma'am. And the case number on
19    this report is 8-04-0150.
20 Q. Let's go back to the cover sheet on
21    this. At the top, it's indication that
22    there's a continuation?
23 A. Yes, ma'am.

4 (Pages 13 to 16)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 17

1   Q. Does that mean that there's a prior
2      investigation?
3   A. Yes.
4   Q. Okay.
5   A. And from that point on, it's just
6      information that I came through during
7      the course of my investigation.
8   Q. All right. During the course of your
9      investigation, did you talk with a
10     young lady by the name of Chaseley
11     Weeks?
12  A. Yes, I did.
13  Q. What, if anything, did Ms. Weeks tell
14     you?
15  A. I spoke with Ms. Weeks, and basically
16     she informed me that she worked at
17     National Seating & Mobility; she's no
18     longer employed there. I'd just like
19     to refer back to see exactly what I
20     wrote.
21  Q. Yes, sir, you can.
22  A. Okay. I spoke with Ms. Weeks
23     initially, and she had agreed to meet

Page 18

1   with me on a later date and time so we
2   could sit down and conduct an actual
3   interview. On the date, May 6th --
4   should be May 8th -- of 2006 when I
5   spoke with her, she was -- I believe
6   she was on her way to pick up a child
7   or something. In either case, she was
8   not going to be able to give me time to
9   conduct an interview. She agreed to
10  meet with me at a later date, and we
11  were never able to do that.
12  Q. Did she say whether or not she had any
13     knowledge concerning alleged fraudulent
14     activity at National Seating &
15     Mobility?
16  A. She said she had some information. She
17     believed that there had been some cases
18     that Medicaid may want to investigate.
19     One of the things we were going to do
20     was discuss specific information which
21     would help to give me a direction to go
22     at this information and just obtain any
23     fraudulent information that she may

Page 19

1   have had.
2         But, again, that meeting never
3   took place. After the initial meeting,
4   I tried several times to contact her
5   and was never able to do so.
6   Q. Do you know whether Mr. Gerald Shockley
7      or anybody else contacted Chaseley
8      Weeks?
9   A. I don't know.
10  Q. If we can, start on the front page.
11     This would be Bates Drab 001. The
12     complaint that you received, the
13     allegation, is this allegation
14     allegedly made by Elizabeth Horton?
15  A. I can only go by what's stated here,
16     and it's stated as an anonymous
17     complaint. So I have no idea who
18     actually contacted us with this
19     information.
20  Q. How did you come about talking to
21     Elizabeth Horton?
22  A. Once I received this investigation, I
23     was advised that the attorney general's

Page 20

1   office had also conducted an
2   investigation on this. I requested a
3   copy of their report; and from there, I
4   went through to see who their
5   complainants and witnesses were, and I
6   attempted to contact individually the
7   same people. And -- and with finding
8   out that Elizabeth Horton was a
9   complainant in this case, that's pretty
10  much how I came in on her and that's
11  why she was contacted.
12  Q. And what, if anything, did Elizabeth
13     tell you?
14  A. I had several conversations with
15     Elizabeth -- should be Ms. Horton.
16     Over the course of our conversations,
17     she advised me that she felt that there
18     were some things going on with National
19     Seating & Mobility that she felt may
20     have been fraudulent.
21  Q. So her statements were pretty much one
22     and the same as Chaseley Weeks'?
23  A. Yes.

5 (Pages 17 to 20)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 21

1     MR. STEWART: Object to the
2         form.
3     MR. WALKER: Object to the
4         form.
5  A. Yes. To some degree, yes.
6  Q. All right. You can go on.
7  A. During the conversations, we just
8     discussed what she thought may have
9     been going on. She explained to me
10    that one of the problems were that
11    National Seating & Mobility were
12    requesting extensions and the reason
13    for this was because they weren't
14    getting the equipment ready in time.
15    And we just kind of went back and forth
16    with information of that. I asked her
17    if she had any specifics. She told me
18    that she would be able to get me some
19    names of people she remembered, but she
20    wasn't able to clearly state that these
21    are definitely people with fraudulent
22    claims.
23  Q. All right. So she just remembered some

Page 22

1     clients --
2  A. Yes, ma'am.
3  Q. -- but didn't say whether or not these
4     people had complained?
5  A. It wasn't so much whether or not they
6     had complained. She was not able to
7     say whether or not they actually were
8     the ones where fraudulent activity had
9     taken place.
10 Q. Was she still working for the company
11    when you spoke with her?
12 A. No, ma'am.
13 Q. Can you remember her last employment
14    date with the company?
15 A. No; I don't.
16 Q. You spoke to her in 2005. Am I
17    correct?
18 A. It would have been 2006.
19 Q. Of 2006.
20 A. Okay.
21 Q. Did you have a chance to review
22    anything regarding the alleged
23    complaints that she made earlier than

Page 23

1     when she met you?
2     MR. STEWART: Object to
3         form.
4  A. I had a chance to review the -- the
5     investigative report from the attorney
6     general's office. The case prior to
7     that, I don't believe -- and I'm not
8     sure on this -- I don't believe
9     involved Ms. Horton, so I don't believe
10    that that tied in as far as she was
11    concerned at this point. So the only
12    thing prior to my investigation that I
13    think involved her was actually the
14    attorney general's investigation.
15 Q. All right. Now, on Ms. Horton, you
16    interviewed quite a few people. As I
17    understand it, you've done over seventy
18    cases, approximately seventy cases.
19 A. Approximately.
20 Q. Just let me get your opinion of
21    Ms. Horton. Did you see her to be a
22    liar?
23    MR. STEWART: Object to

Page 24

1         form.
2     MR. WALKER: Object to the
3         form.
4  A. My opinion of Ms. Horton was that she
5     had information that she thought and
6     she suspected that something was going
7     on that wasn't correct or appropriate.
8     Do I think she was a liar? From my --
9     my time with her, no, I don't think she
10    was lying to me. But I will say that
11    one of the problems I did have with
12    Ms. Horton was after -- actually, she
13    was very, very, very, very difficult to
14    get in touch with, which made it very
15    difficult to follow up on some of the
16    information to keep the investigation
17    going. I believe that she believed
18    something was going on, but I don't
19    believe that she was as cooperative as
20    she could have been and possibly as she
21    should have been.
22 Q. Did she give the impression that she
23    didn't want to get involved?

6 (Pages 21 to 24)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 25

1   A. No. And the reason I say that was, she
2      would set an appointment and miss it
3      and almost immediately after time had
4      expired for the appointment, she would
5      call to reestablish another date and
6      time. So my feelings were, if you
7      didn't want to be involved and you miss
8      an appointment, then you would not
9      initiate any contact. I mean, there
10     was times that I called her, but she
11     also would make it a point to get back
12     in touch with me so that we could
13     reschedule. And because she was
14     rescheduling, I assumed that was
15     something she wanted to do.
16  Q. Now, let me just ask you one more
17     question in this area. Now, you said
18     that you reviewed a file where
19     Elizabeth's name may have appeared in
20     the prior complaint against National
21     Seating & Mobility. Am I correct?
22  A. The prior complaint that I'm referring
23     to --

Page 26

1   Q. Yes, sir.
2   A. -- is the complaint -- the
3      investigation that was conducted by the
4      attorney general's office.
5   Q. Yes, sir.
6   A. I don't believe that her name was in
7      the prior complaint in the actual
8      Medicaid case.
9   Q. Yes, sir. Okay. All right. But you
10     never saw any documentation, no
11     affidavit, nothing that Elizabeth
12     signed stating that National Seating &
13     Mobility had in essence not delivered
14     wheelchairs? Was that one of the
15     complaints?
16  A. That was one of the complaints. To the
17     best of my recollection, was no, there
18     was nothing signed by Ms. Horton.
19  Q. All right. Let me then ask you, did
20     you ever show Ms. Horton a list of
21     recipients that National Seating &
22     Mobility had serviced?
23  A. Yes, I did.

Page 27

1   Q. What, if anything, did she do to
2      identify those recipients?
3   A. In an attempt to find out some of the
4      people that she thought may have been
5      defrauded, I asked her to go through
6      the list of recipients of National
7      Seating & Mobility clients only and
8      just identify anyone that she could
9      remember or anyone that may have -- or
10     if there was anyone in particular that
11     she knew there was some sort of
12     fraudulent activity with. And what she
13     did was she went through the list as I
14     sat there and she just identified,
15     again, people that she remembered. But
16     she was not able to give any specifics
17     as to any inappropriate action towards
18     anyone on that list.
19  Q. Do you find that to be unusual?
20         MR. STEWART: Object to the
21         form.
22         MR. WALKER: Same objection.
23  A. Unusual? No. No.

Page 28

1   Q. All right. Is that due to -- what?
2          MR. STEWART: Object to the
3          form.
4   A. I think a lot of times people will call
5      in with a complaint and not necessarily
6      know all there is to know about a
7      particular area and may think that
8      something is wrong. And in a high-
9      volume business such as National
10     Seating & Mobility where you've got a
11     bunch of names coming through, you
12     don't necessarily remember each
13     individual. I'm sure from time to time
14     there's someone that stands out, but as
15     a general rule, I wouldn't find that to
16     be unusual.
17  Q. All right. Ms. Horton worked for
18     National Seating & Mobility. She was
19     assigned there through a temporary
20     agency, and she worked from April to
21     June of 2004. 2005 -- I think it may
22     have been April of 2005 is when she was
23     contacted by the attorney general's

7 (Pages 25 to 28)

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 29

1  office in reference to giving some
2  information on an alleged complaint
3  that she may have made. Now, she was
4  presented this list.
5  A. This was a list presented by the
6  attorney general's office?
7  Q. Yes.
8      MR. WALKER: I'm going to
9      object to the form.
10 Q. To my understanding.
11     MR. STEWART: Same
12     objection.
13 Q. Okay. Now, just in your years of
14  investigation -- we're looking at an
15  employee separated from a company
16  nearly a year. Would you say that it
17  would be highly likely that that
18  employee could look at this list and
19  choose recipients specifically that may
20  have been violated --
21     MR. STEWART: Object to the
22     form.
23     MR. WALKER: Object to the

Page 30

1      form.
2  Q. -- while she yet worked there?
3      MR. STEWART: Same
4      objection.
5  A. You're asking me if, a year later, if
6  presented with this list, would it be
7  unlikely that she would be able to
8  identify people. I wouldn't say it
9  would be highly unlikely. I mean,
10  there's -- again, people recall some
11  things that ordinarily they may not. I
12  mean, certain things trigger certain
13  memories. So I will say it's possible
14  that she could remember someone. I
15  wouldn't say highly unlikely. I would
16  say it's possible that she could and
17  it's possible that she couldn't.
18     MR. WALKER: Mr. Green,
19      could I ask you to put
20      in the Bates numbers for
21      that document you're
22      looking at so that the
23      record is clear?

Page 31

1      THE WITNESS: 0045 -- would
2      you like me to do that
3      for anything?
4      MR. WALKER: Please.
5      THE WITNESS: Okay. I'm
6      sorry.
7      MR. WALKER: And what's the
8      last page?
9      THE WITNESS: Oh, I'm sorry.
10      Four five to five zero.
11      MR. WALKER: Thank you,
12      Deborah.
13 Q. (By Ms. Nickson) Did you present her
14  with a list of this nature or what did
15  you present Elizabeth with?
16 A. It would have been basically the same
17  list.
18 Q. And you said that her conduct for
19  identifying on your list was simply
20  what?
21 A. She identified names that she had
22  remembered during the time of her
23  employment with National Seating &

Page 32

1  Mobility and that she was not able to
2  identify anyone specifically who had
3  been defrauded. She was merely able to
4  give a list of names of people that she
5  remembered from her employment.
6  Q. What is your position concerning how
7  she even got involved in -- did she
8  make an initial contact or did you all
9  contact her? What happened?
10     MR. WALKER: Objection to
11      form.
12     MR. STEWART: Same.
13 A. I reached out for her because, from my
14  understanding and from what I was able
15  to come up with at that point, she was
16  a vital piece. She was the one with
17  direct information at that point in
18  time because she was the employee for
19  National Seating & Mobility.
20 Q. As Chaseley Weeks as well?
21 A. Chaseley Weeks was not a name that I
22  was familiar with at that particular
23  time. Chaseley Weeks was a name that

8 (Pages 29 to 32)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 33

1    was actually given to me by Ms. Horton.
2    So I reached out for her when I began
3    my investigation.
4    Q. All right. Did you have the
5    opportunity to talk with Mr. Don
6    Williams?
7    A. I believe I spoke with Mr. Williams. I
8    met with his wife. I'm just trying to
9    go back through my mind with this. I
10   believe I spoke with him, because at
11   that point in time, he had left the
12   company.
13   Q. And what, if anything, did Mr. Williams
14   tell you?
15   A. I'm just referring back through the
16   report. I don't have anything noted in
17   my report. If I remember correctly, my
18   conversation with Mr. Williams was
19   that, after speaking with Ms. Williams,
20   if I needed to speak with him, would he
21   be available for an interview, which he
22   stated yes.
23   Q. Did he ever tell you or make a

Page 34

1    statement to you that Elizabeth and
2    Felecia Barrow were friends?
3    A. That was -- I don't recall that.
4    Q. All right. Did you speak with anybody
5    else concerning the alleged fraudulent
6    activity at National Seating &
7    Mobility?
8           MR. STEWART: Object to the
9           form.
10          MR. WALKER: Same objection.
11   A. I spoke with Ms. Williams. I spoke
12   with -- Mrs. Williams. Spoke briefly
13   with Mr. Williams. Spoke with
14   Mr. Maddox, who was an employee of
15   National Seating & Mobility. I spoke
16   with Ms. Weeks, Ms. Barrow. I spoke
17   with Gerry Rodgers, who is a physical
18   therapist. And I spoke with another
19   employee from National Seating &
20   Mobility, but that was almost a spot
21   check, just trying to get an
22   understanding as to how they did
23   things, but there wasn't anything that

Page 35

1    actually applied to this report. And I
2    spoke with Ms. Gilley, a CRS in Dothan.
3    Q. What, if anything, did Ms. Gilley say?
4           MR. STEWART: I'm not sure
5           he was finished his
6           answer.
7    Q. Oh, I'm sorry.
8    A. And I spoke with -- I believe that's
9    it.
10          MR. STEWART: I'm sorry. I
11          thought he was still
12          going.
13          THE WITNESS: I was actually
14          looking, just trying to
15          make sure.
16   Q. What, if anything, did Ms. Gilley say?
17   A. When I spoke with Ms. Gilley, I asked
18   her for records of some of the
19   recipients that had received product
20   from National Seating & Mobility.
21   Reviewed records and spoke with her
22   about if there were any problems she
23   was having with them, her feelings, why

Page 36

1    she was dealing with them, things of
2    that nature. And I'm just trying to
3    skim over this real quick. Just,
4    basically, Ms. Gilley had no real
5    complaints with National Seating &
6    Mobility. She produced two records;
7    and from those records, I was not able
8    to find anything that identified any
9    wrongdoings on the part of National
10   Seating & Mobility.
11   Q. And that was the result of your report.
12   Am I correct?
13   A. Yes, ma'am.
14   Q. Now, in reference to the receipt -- one
15   of the complaints was forging receipts
16   on names on delivery tickets for the
17   medical equipment?
18   A. Uh-huh.
19   Q. Did you all match any signatures? What
20   did you do?
21   A. I didn't -- no, I didn't match any
22   signatures. Some of the recipients
23   were suffering from cerebral palsy and

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 37

1 would have been unable to sign. Some
2 of the facilities, to my understanding,
3 has the authority to sign for equipment
4 in various forms. So no, I didn't do
5 that and --
6 Q. Okay. Do you know whether or not --
7        MR. WALKER: Objection. I
8        think he was still
9        talking.
10 Q. Oh, I'm sorry.
11 A. No. I was just saying no, I didn't do
12 that. My main concern at this point
13 was trying to identify, well, one, had
14 any equipment not been delivered or if
15 we had any clear-cut cases of where we
16 could identify something that in either
17 person's allegation that this is one
18 that was actually forged. And I was
19 not able to find that information, so I
20 didn't do that.
21 Q. Now, I'm going to ask you, as an
22 investigator, what was your gut
23 feeling?

Page 38

1        MR. STEWART: Object to the
2        form.
3 A. My gut feeling?
4 Q. Uh-huh.
5        MR. WALKER: Object to the
6        form.
7 Q. You have two complainants. You have
8 Chaseley Weeks, former employee, said
9 something is going on. Then you have
10 Elizabeth Horton, a former employee,
11 saying something was going on. What
12 was your gut feeling?
13        MR. STEWART: Object to the
14        form.
15        MR. WALKER: Same objection.
16 A. My only gut feeling was, is they
17 contacted with a complaint, as do many
18 other people. When I receive a
19 complaint, I assume that the people
20 that are calling believe that their
21 complaint is legitimate; and I look
22 into it from that basis until I prove
23 or disprove. So my gut feeling was, is

Page 39

1 that they believe that they had
2 something that they should notify us
3 about. I received the information; I
4 looked into it until I was satisfied
5 that there was nothing there.
6 Q. Okay. I'm going to show you this
7 document, and this will be Bates
8 Drab 14. Would you identify this
9 document for the record, please?
10 A. This is a document that was generated
11 by the Alabama Medicaid Agency
12 February 16th of 2005. This is a
13 memorandum from Dr. McIntyre, who's
14 medical director for the Medicaid
15 Agency.
16 Q. All right. If you would, just read
17 that first sentence for the record for
18 me, please.
19 A. Where it says --
20        MR. WALKER: It's from
21        Felecia Barrow, is who
22        it's to.
23 Q. Okay. The memorandum is to whom?

Page 40

1 A. The memorandum is to -- I'm sorry. The
2 memorandum is to Dr. McIntyre and it's
3 from Ms. Barrow.
4 Q. And who is Dr. McIntyre?
5 A. Dr. McIntyre is the medical director at
6 Medicaid.
7 Q. And Felecia Barrow, who is she?
8 A. She's a former employee of Medicaid.
9 She was the associate director for the
10 prior approval unit.
11 Q. And she's writing this memorandum in
12 reference to?
13 A. Issues with wheelchair assessments
14 received.
15 Q. Now, in the first paragraph, what does
16 she state?
17 A. It's just saying that -- she's saying,
18 Please find an example of wheelchair
19 assessments that have been submitted by
20 National Seating & Mobility in
21 Montgomery that were missing client
22 dates.
23 Q. Clinic dates.

10 (Pages 37 to 40)

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 41

1   A. Clinic dates. I'm sorry. Let me see.
2       And two of the assignments were
3       conducted by Gerry Rodgers, who is
4       someone that I'd spoke to, and one by a
5       Michael Maddox, both of Children's
6       Rehab Services.
7   Q. Now, did you ever look at a
8       relationship between Gerry Rodgers,
9       Michael Maddox, Emily Williams, and Don
10      Williams?
11  A. I inquired about the relationship.
12      Mr. Maddox and Mr. Rodgers worked
13      together at CRS. That was one of the
14      questions I had. In my report, when I
15      spoke with Mr. Rodgers, he stated that
16      97 percent of their business went to
17      National Seating & Mobility.
18  Q. Did you find that to be unusual?
19  A. I found that to be a little unusual,
20      only because it's a state agency and my
21      past experience outside of the State of
22      Alabama with state agencies do tend to
23      be more companies involved.

Page 42

1   Q. Did you find whether or not they knew
2       each other outside of the business
3       relationship?
4           MR. STEWART: Object to the
5           form.
6           MR. WALKER: Same objection.
7   A. The information that was given to me by
8       them was that they had a working
9       relationship.
10  Q. Now, when you spoke with Elizabeth, did
11      she say anything about clinic dates
12      being missing on some of the forms?
13  A. There was mention that -- the complaint
14      dealt with dates, signatures, delivery
15      times of equipment. Well, the answer
16      to your question is yes.
17  Q. And February 2005 -- actually, this
18      memo from Felecia Barrow, it suggests
19      that there were in fact missing dates,
20      clinic dates. Am I correct?
21  A. Yes.
22          MR. STEWART: Object to the
23          form.

Page 43

1           MR. WALKER: Object to the
2           form.
3   Q. Do you know what attachments she had --
4       was this part of your file?
5   A. This -- I don't remember if this was a
6       part of the original file or if this
7       was a part of my file, because this
8       date is prior to my employment with
9       Medicaid.
10  Q. All right. So, now, you had an
11      opportunity to meet Ms. Barrow. Am I
12      correct?
13  A. Yes, I did.
14  Q. Would she have had a reason to be lying
15      about missing clinic dates?
16          MR. STEWART: Object to the
17          form.
18          MR. WALKER: Object to the
19          form.
20  A. I don't know if she had a reason to.
21  Q. All right. Let me just ask you as an
22      investigator, if you had that memo in
23      the file with attachments showing

Page 44

1       missing clinic dates on some documents,
2       would you investigate?
3   A. I would look into it. And when I spoke
4       with Ms. Gilley, I believe, in thinking
5       back, that some of her documents did in
6       fact have missing dates. With speaking
7       to them, it's -- I'm looking at this
8       report and I know some of the
9       information has been -- my report --
10      and I know some of the information has
11      been removed. But I believe one of the
12      things was they were advised was just
13      to make sure that they document their
14      paperwork, which is not an uncommon
15      thing.
16  Q. Did you talk with anyone that stated
17      that Emily or Don told them not to put
18      dates on their forms?
19  A. That was one of the allegations, but
20      that was something that I was never
21      able to substantiate. I know that
22      Ms. Barrow said that she had heard
23      that, but there was nothing that -- no

11 (Pages 41 to 44)

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 45

1 one could ever produce a form that we
2 were able to say this is the form, this
3 is an example of what they were told
4 not to do. I mean, missing dates
5 happen. But because I was not with any
6 certainty able to identify anything, I
7 wasn't able to do anything else with
8 that.
9 Q. Right here -- and I'm referencing the
10 third paragraph on Bates Drab 14.
11 Okay? Teresa is identified in this
12 document as an RN. Would you just read
13 that into the record for me, the third
14 paragraph.
15 A. Teresa Surles is a former employee of
16 Medicaid. I don't know if you were
17 aware of that or not.
18 Q. I am not. Okay.
19 A. But Teresa came across another
20 assessment completed by M. Maddox and
21 placed a call to PT to find out why the
22 dates were missing. The PT replied,
23 Maybe we were not supposed to do this,

Page 46

1 pause, but I never put dates on
2 assessments or prescriptions because
3 it -- it messes up vendors, okay, like
4 we are on a time clock. It is odd that
5 on assessments that Mr. Maddox had done
6 for vendors have a date and not --
7 excuse me -- have a date on them but
8 the ones done by National Seating &
9 Mobility do not have dates.
10 MR. WALKER: That's "ones
11 done for National
12 Seating do not have
13 dates."
14 A. Okay. Done for National Seating &
15 Mobility do not have dates. This was
16 the same information that was reported
17 by a former National Seating & Mobility
18 employee, Elizabeth Horton.
19 Q. And is that the same information that
20 Chaseley Weeks had indicated?
21 MR. STEWART: Object to the
22 form.
23 MR. WALKER: Same objection.

Page 47

1 A. Again, with Chaseley Weeks, my
2 recollection of her was she spoke of
3 some possible wrongdoings, but we
4 really never sat down and able to get
5 into exactly what she was talking
6 about.
7 Q. Did you speak to Felecia Barrow?
8 A. Yes, I did.
9 Q. And what, if anything, did Felecia tell
10 you?
11 A. Ms. Barrow stated that she was having a
12 problem with National Seating &
13 Mobility. And the basic problem with
14 them was that their claims were coming
15 in late. And one of the problems she
16 was having is that not only were they
17 coming in late, but they were starting
18 to become later and later. And she
19 requested that any time they need an
20 extension, that they had to explain why
21 in order for her to approve the prior
22 approval.
23 Q. Did Ms. Barrow state that they had more

Page 48

1 requests than what was normal?
2 MR. WALKER: Object to the
3 form.
4 MR. STEWART: Same.
5 A. They were getting a high number of,
6 yes, requests for extensions than
7 normal.
8 Q. Would this have been considered what we
9 would say a red flag that maybe
10 something is wrong?
11 MR. WALKER: Object to the
12 form.
13 MR. STEWART: Object to the
14 form.
15 A. Possibly. But she also identified
16 another problem, and that problem was
17 that the Medicaid Agency and her unit
18 in particular were actually running a
19 little bit behind with getting this
20 information out. So that posed a
21 problem from both sides.
22 Q. Now, the mere fact that Felecia Barrow,
23 being the associate director, would

12 (Pages 45 to 48)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 49

1  send a memo to Dr. McIntyre, normally
2  when this is done, is that a suggestion
3  that maybe there is something that she
4  suspects to be wrong in the company's
5  activity?
6      MR. STEWART: Object to the
7      form.
8      MR. WALKER: Object to the
9      form.
10 A. It suggests that she's seen something
11 possibly out of the ordinary.
12 Q. All right. Now, on the complaint that
13 you investigated, you indicated that
14 the complainant was anonymous?
15 A. Yes.
16 Q. And your testimony was that you learned
17 that Elizabeth Horton was the prior
18 complainant?
19 A. Yes, that was my testimony.
20 Q. Now, let's talk about just your process
21 or what you do when someone complains
22 and they identify themselves; they do
23 not remain anonymous. What's the

Page 50

1  process?
2  A. If we receive a complaint and the
3  person gives their information --
4  typically what happens, a complaint may
5  come in and it may sit dormant for
6  several months. If I receive a
7  complaint with a complainant, the first
8  thing I attempt to do is to contact the
9  complainant. I want to understand
10 exactly what their complaint is, if
11 they have any information that will
12 support their complaint, is there
13 anything in addition to what was
14 denoted on the complaint form that I
15 may -- that may be beneficial to me.
16 And I gather information; I try to sit
17 down with them and do an actual
18 interview, gather any information that
19 I can from them, and then follow on
20 with my complaint.
21 Q. Now, at any point does the complainant
22 give an affidavit?
23 A. Yes, there's times that that's done.

Page 51

1  Q. And did you ever see an affidavit from
2  Elizabeth Horton?
3  A. I don't recall seeing one from
4  Ms. Horton.
5  Q. All right. Is there anything else that
6  you can tell us about your involvement
7  in the investigation of the alleged
8  fraud committed by National Seating &
9  Mobility?
10 A. Nothing else I can think of.
11 Q. And you spoke to Don Williams?
12 A. Yes.
13 Q. What was his position with the company,
14 if you remember?
15     MR. STEWART: Object to the
16     form.
17 A. If I remember correctly, when I spoke
18 to Mr. Williams, I believe he was no
19 longer employed with the company. And
20 when I spoke with his wife, she was
21 leaving, I believe, within the next
22 week or two.
23 Q. All right. Do you know why she was

Page 52

1  leaving?
2  A. I believe that they were becoming
3  involved in real estate, possibly real
4  estate agents, but I'm not sure.
5  Q. Have you ever seen Emily Williams' name
6  involved with any other fraudulent
7  investigation against any company?
8      MR. STEWART: Object to the
9      form.
10     MR. WALKER: Same objection.
11 A. Nothing that I'm aware of.
12 Q. How about Don Williams?
13     MR. STEWART: Same
14     objection.
15     MR. WALKER: Same objection.
16 A. I don't recall the names. I'm not
17 saying that I haven't seen them, but
18 there's nothing that comes up in my
19 mind.
20 Q. All right. Now, twenty-one years of
21 law-enforcement background. And let me
22 ask you this question. When you look
23 at Ms. Horton's case, was there

13 (Pages 49 to 52)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 53

1    probable cause to arrest her in this
2    case?
3         MR. STEWART: Object to the
4    form.
5         MR. WALKER: Object to the
6    form.
7    A. That's -- I can't -- I can't answer
8    that without having all the
9    information. I don't know what, if
10   anything, else they had, so I wouldn't
11   be able to base that. I have had cases
12   where I have arrested the complainant,
13   but that was after the conclusion of my
14   investigation and I was clearly able to
15   show that they were lying and their
16   intent was to cause harm to another
17   person. Now, that was not while with
18   the Medicaid Agency. But I have on
19   occasions arrested complainants.
20   Q. So you looked at maliciousness or
21   malicious intent --
22   A. Yes, ma'am.
23   Q. -- to harm. And did you feel in any

Page 54

1    way that Elizabeth had a malicious
2    intent to harm National Seating &
3    Mobility, Don Williams, or Emily
4    Williams?
5         MR. WALKER: Object to the
6    form.
7         MR. STEWART: Object to the
8    form.
9    A. I don't know what her intent was. The
10   only thing I knew is that she had a
11   complaint and I just investigated the
12   complaint.
13   Q. But she was like a normal complainant?
14        MR. STEWART: Object to the
15   form.
16        MR. WALKER: Object to the
17   form.
18   A. Yes.
19   Q. Did she ever express maliciousness?
20        MR. STEWART: Object to the
21   form.
22        MR. WALKER: Object to the
23   form.

Page 55

1    A. Not to me, no.
2         MS. NICKSON: All right. No
3         further questions.
4         EXAMINATION
5    BY MR. WALKER:
6    Q. Let me ask you a question, please, sir.
7    If you would look at Exhibit #1 and,
8    particularly, if you would look at
9    page 2 and if you would read the
10   paragraph, summary of fraudulent
11   activity.
12   A. On June 1st, 2006, I met with Ms. Emily
13   Williams -- if I can skip the
14   abbreviations there -- with National
15   Seating & Mobility, 646 Oliver Road,
16   Montgomery, Alabama, and Tim Maddox of
17   National Seating & Mobility, 377
18   Riverside Drive, Suite 300, Franklin,
19   Tennessee, and reviewed -- and reviewed
20   the requested files. A review of these
21   files revealed no signs of any criminal
22   activity or wrongdoing. At no time did
23   this investigation reveal any signs of

Page 56

1    criminal or wrongdoing. I request this
2    case be closed.
3    Q. And is that the conclusion that you
4    yourself reached after investigating
5    this case and based on your many years
6    of experience in law enforcement?
7    A. That's correct.
8    Q. And do you believe today that that was
9    a correct conclusion?
10   A. Yes, I do.
11   Q. And then on the next page, does that
12   show that your supervisor, Mr. Cliff
13   Johnson, concurred with your
14   recommendation?
15   A. Yes, it does.
16   Q. Look at pages 4 through 6. And let me
17   ask you, are these notes that you made
18   as you went through your investigation?
19   A. That's correct.
20   Q. And would you have recorded here
21   anything of importance, of substantive
22   importance, that you did or that you
23   were told in the investigation?

14 (Pages 53 to 56)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 57

1   A. Yes, sir.
2   Q. Now, I notice that it does not say
3       anywhere that you met with or talked
4       with Don Williams.
5   A. I spoke with Mr. Williams, and my
6       conversation with him was merely to set
7       up an appointment, if necessary. And
8       because we didn't discuss anything, in
9       my opinion, of substance other than a
10      potential date, I didn't record it.
11  Q. So you and he talked about setting up a
12      meeting. And I believe you testified
13      he said, If you need to talk to me, I'm
14      available, or words to that extent?
15  A. Yes, sir.
16  Q. And that was the substance of your
17      communication with him?
18  A. To the best of my recollection.
19  Q. About how long did that -- was that a
20      telephone conversation or face-to-face?
21  A. I believe that was just a telephone
22      conversation.
23  Q. And about how long did that

Page 58

1       conversation last?
2   A. I just remember a very brief exchange
3       with him.
4   Q. Did you have any other communication
5       with him beyond that one?
6   A. Nothing that I recall at this time.
7   Q. To the best of your knowledge, did he
8       have any other communication with
9       anyone else in your agency, such as
10      Cliff Johnson?
11  A. To my knowledge, I don't believe so.
12  Q. Did he during the course of the
13      investigation with you indicate in any
14      way that he was part of an agreement to
15      injure someone or Elizabeth Horton by
16      lawful or unlawful means?
17  A. If I had received any information of
18      that nature, I would have notated it.
19  Q. And you did not.
20  A. I did not.
21  Q. You testified that you had done about
22      seventy cases and in about fifty of
23      these cases, you had confirmed the

Page 59

1       allegations -- in 50 percent of the
2       cases, you had confirmed the
3       allegations and about 50 percent of the
4       remainder you were not able to confirm
5       the allegations; is that correct?
6   A. Yes.
7   Q. And then you said, of those cases where
8       you were not able to confirm the
9       allegations, none of those complainants
10      were arrested?
11  A. That's correct.
12  Q. How many of those complainants were and
13      remained anonymous throughout the
14      investigation?
15  A. I have -- I don't know.
16  Q. You don't know one way or the other?
17  A. No, sir.
18  Q. So you could not tell us how many of
19      that 50 percent of complainants you
20      were able to even identify?
21  A. No, I couldn't tell you that at this
22      time.
23  Q. And, obviously, if you could not

Page 60

1       identify them, you could not arrest
2       them.
3   A. That's correct.
4   Q. Now, I noticed also that -- if you'll
5       turn to 0005 of the exhibit, and take a
6       moment to read over the second
7       paragraph on that page dealing with
8       Ms. Chaseley Everage. In fact, would
9       you read that into the record, please,
10      sir?
11  A. It says, On May 8th, I contacted
12      Ms. Chaseley Weeks, former employee of
13      National Seating & Mobility. And
14      actually, her name is Chaseley Weeks
15      but this Everage, I believe, is her
16      married name; so that's why the two
17      names are there, why I'm using the two
18      names.
19          Despite several attempts, she
20      refused to cooperate with this
21      investigation and would not return call
22      nor set up a meeting.
23  Q. So it doesn't say anything in there

15 (Pages 57 to 60)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 61

1    that she said she had some information
2    or believed that there may have been
3    some cases that Medicaid might want to
4    investigate. Could you have been
5    mistaken when you earlier testified
6    that that's what she told you?
7  A. No, sir. What happened was, I
8    basically found her -- I arrived at her
9    doorstep one day, identified myself,
10   asked to speak to her regarding
11   National Seating & Mobility. She
12   stated that she had someplace to be,
13   and I told her that I would like to sit
14   down and interview her and if we could
15   schedule another time where we could
16   sit down and discuss this. She agreed
17   to do so. But after that point, I was
18   never able to reach her. She would not
19   return my calls. I placed several
20   phone calls in an attempt to set up
21   this interview.
22  Q. Did she at that time tell you that she
23   had some information?

Page 62

1  A. She told me she had some information
2    about National Seating & Mobility,
3    there was some things that we may have
4    been interested in, but there was
5    nothing that was elaborated on at that
6    point.
7  Q. Do you know whether this information
8    that she claimed to have even related
9    to the subject that you were
10   investigating?
11  A. Well, I spoke to her about my
12   investigation of National Seating &
13   Mobility. I don't know what the
14   information was she had.
15  Q. So you don't know if it related to
16   allegations of fraudulent signatures or
17   double-billing for parts or people not
18   getting the wheelchairs they were
19   supposed to be, the same allegations
20   that apparently were made by
21   Ms. Horton?
22  A. No, I don't.
23  Q. You don't know one way or the other?

Page 63

1  A. No, sir.
2  Q. On page 0004 through 0005, you
3    summarized what Ms. Horton told you.
4    If you want to take moment to look over
5    that, please do.
6        (Brief pause while witness
7         reviews document)
8  A. Okay.
9  Q. And is this paragraph on these two
10   pages a fair and accurate
11   representation of what Ms. Horton told
12   you when you met with her?
13  A. Yes, sir.
14  Q. And did you understand yourself at the
15   time you wrote this summary to be under
16   an obligation to be truthful in what
17   you wrote down?
18  A. Yes, sir.
19  Q. And complete and accurate?
20  A. Yes, sir.
21  Q. And did you fulfill that obligation so
22   far as you know?
23  A. Yes, sir.

Page 64

1  Q. Did Ms. Horton tell you anything about
2    what her job responsibilities were at
3    National Mobility?
4  A. We discussed them, but I don't recall
5    them at this point.
6  Q. Are there any other people that you
7    spoke with who are not indicated in the
8    report?
9  A. No one that I can think of.
10  Q. And you would have written down other
11   people that you spoke with if they told
12   you anything substantive?
13  A. Yes, sir.
14  Q. You said that Felecia Barrow complained
15   that they were getting an unusually
16   large number of requests from National
17   Mobility System for extensions?
18  A. Yes, sir.
19  Q. Do you know what percentage of the
20   paperwork Ms. Barrow's office was
21   receiving from providers was from
22   National Mobility System as opposed to
23   others?

16 (Pages 61 to 64)

Page 65

1  A. No, sir.
2  Q. So it could have been that simply --
3      I'll just make up a hypothetical -- 75
4      percent of the paperwork she was
5      receiving was from National Mobility;
6      and if that were the case and they were
7      requesting extensions, unless you went
8      back and looked at that, you wouldn't
9      have known that they were requesting
10     extensions at the same rate as other
11     people, if you understand my
12     hypothetical.
13  A. I wouldn't even want to attempt to
14     address that. I have no idea.
15  Q. But without knowing what percentage of
16     the requests they were receiving, what
17     percentage of the paperwork they were
18     receiving, was from which provider, you
19     really couldn't determine whether or
20     not somebody was making an above-
21     average number of requests for
22     extensions, could you?
23  A. I wouldn't have access to that

Page 66

1      information. I would not be able to
2      come up with an answer for that.
3  Q. All right. So that was her conclusion
4      but not your conclusion?
5  A. That's her conclusion.
6  Q. Did anyone at any time ever tell you
7      that Mr. Williams was trying to get
8      Elizabeth Horton, or any words to that
9      effect?
10  A. Not that I recall, no.
11  Q. Or that Mr. Williams was in a
12     conspiracy to get Ms. Elizabeth Horton?
13  A. Not that I'm aware of.
14  Q. You have no information about that one
15     way or the other?
16  A. No, sir.
17        MR. WALKER: That's all I
18        have at this time.
19        Thank you, sir.
20        EXAMINATION
21  BY MR. STEWART:
22  Q. Mr. Green, we've met before. My name
23     is Chuck Stewart and I represent NSM.

Page 67

1      In speaking with Chaseley Weeks, you
2      said you went out to her house and met
3      with her there?
4  A. Yes, sir.
5  Q. And did she appear to have someplace
6      that she was actually headed?
7  A. I just accepted her at her word.
8  Q. I mean, did you sit around to see if
9      she actually left after --
10  A. No, I didn't do that.
11  Q. Did she tell you why she was no longer
12     at NSM?
13  A. Not that I recall. My recollection of
14     Ms. Weeks, we spoke -- I don't think we
15     spoke for much more than five, ten
16     minutes. Most of that was my
17     introduction and explaining why I'm
18     here and why I would like to sit down
19     and talk to her.
20  Q. Did she say anything about whether she
21     left NSM on good terms or bad terms?
22  A. I don't recall.
23  Q. Do you know if she was employed at the

Page 68

1      time you met with her?
2  A. My understanding is that she wasn't at
3      that time.
4  Q. Whatever it was that she had to say,
5      she was not specific on that date; is
6      that correct?
7  A. That's correct.
8  Q. When you showed Ms. Horton this list of
9      recipients, where is it that you had
10     gotten that list of recipients, I guess
11     clients, I think you called it at one
12     time, NSM's clients?
13  A. What we're able to do is, each
14     provider -- which NSM would be
15     considered, is a provider -- you're
16     assigned a number. And with your
17     number, we would be able to put that
18     into our system and then pull up a
19     client list of yours, of our recipients
20     only.
21  Q. So that's a list that you pulled from
22     your own in-house data?
23  A. Yes, sir.

17 (Pages 65 to 68)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 69

1  Q. Mr. Green, if you had found any
2     evidence of fraud, would you have
3     reported it?
4  A. Yes, sir.
5  Q. You talked with a number of folks, and
6     I won't take you back through all
7     those. But it looked like almost as
8     many as ten different people that you
9     spoke with?
10 A. Approximately, yes.
11 Q. And then you also had a number of
12    people on the NSM client list that you
13    called?
14 A. Yes.
15 Q. Did I see somewhere in the report that
16    you may have called as many as
17    twenty-three people?
18 A. No, sir. I believe what it is, is I
19    identified the -- well, she identified
20    twenty-three; and of the twenty-three,
21    I contacted a sampling.
22 Q. Did you feel like you spoke with enough
23    of those people to reach the

Page 70

1     conclusions that you did?
2  A. Yes, sir.
3  Q. Do you feel that your investigation was
4     thorough?
5  A. Yes, sir.
6  Q. In addition to reviewing the documents
7     that you had in-house to speaking with
8     a sampling of the twenty-three NSM
9     clients and to interviewing the various
10    witnesses, were you also provided with
11    some documents?
12 A. Yes, sir.
13 Q. And did you get documents from NSM?
14 A. Received the information from NSM, yes.
15 Q. Did NSM control your investigation in
16    any respects?
17 A. No, sir.
18 Q. Did you tell NSM what it was that you
19    wanted to see?
20 A. Yes, I did.
21 Q. Was NSM forthcoming in providing the
22    information you wanted to see?
23 A. Yes, sir.

Page 71

1  Q. Did they make their files available to
2     you?
3  A. Yes, they did.
4  Q. Did you talk with in-house counsel of
5     NSM and ask to see some documents?
6  A. Yes, I did.
7  Q. And did you receive those documents
8     that you requested?
9  A. Yes, I did.
10 Q. Were any kept from you?
11 A. To the best of my recollection, I was
12    given what I asked for.
13 Q. Did you detect anything in your
14    conversation with in-house counsel that
15    he was being somehow cagey with you or
16    not being forthright and honest?
17 A. No. I had no problems with their
18    attorneys.
19 Q. And did you receive the information you
20    requested promptly?
21 A. Yes.
22 Q. Did you also ask to review files at the
23    local office of NSM?

Page 72

1  A. Yes, I did.
2  Q. And did you make copies of those files
3     or do you know which ones you reviewed
4     actually?
5  A. I believe we reviewed most of them. I
6     think there were some copies made. I
7     don't exactly remember what. But I was
8     able to go through and obtain what I
9     needed.
10 Q. Did anybody say you can't have that
11    document?
12 A. No, sir.
13 Q. Or put up any roadblocks to your
14    investigation?
15 A. No, sir.
16 Q. Were the files of NSM in Montgomery
17    made available to you?
18 A. Yes, sir.
19 Q. And is it true that you investigated
20    this matter until you were convinced
21    that there was nothing there in terms
22    of fraud?
23 A. Yes, sir.

18 (Pages 69 to 72)

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 73

1  Q. In your investigation, you said that
2     Felecia Barrow told you that she had
3     requested that NSM provide her with an
4     explanation for any late claim forms.
5  A. Or extensions.
6  Q. So any explanation for -- excuse me --
7     for any extension, she was going to
8     require NSM to provide an explanation?
9  A. Yes, sir.
10 Q. Do you know whether she ever required
11    any of the other durable medical
12    equipment providers to provide an
13    explanation for their extensions?
14 A. I wouldn't know the answer to that.
15 Q. Do you know why Ms. Barrow is no longer
16    at Alabama Medicaid?
17 A. She took another position.
18 Q. Also with Alabama Medicaid or is she
19    employed somewhere else?
20 A. I believe it's another position with
21    the state, but not Medicaid.
22 Q. Do you know whether she was asked to
23    leave state Medicaid?

Page 74

1  A. I don't know.
2  Q. Do you know where she is employed now?
3  A. I don't have it with me, but I was able
4     to contact her so -- but no, I don't
5     know right off the top of my head.
6  Q. You did not make the decision to arrest
7     Elizabeth Horton?
8  A. No. That was done all prior to my
9     involvement in this investigation.
10 Q. And you testified in response to
11    Ms. Nickson's questions that you don't
12    know what all they had in terms of
13    probable cause?
14 A. That's correct.
15 Q. And by "they had," who is it that you
16    mean?
17 A. When I say "they," I'm referring to the
18    attorney general's office, who I
19    believe lodged the charges.
20 Q. National Seating did not arrest
21    Ms. Horton, did they?
22 A. No.
23 Q. Did they ask you to arrest her?

Page 75

1  A. I have no arrest authority.
2  Q. Well, did they ask that somebody arrest
3     her?
4  A. This was done prior to my involvement,
5     so I have no idea as to any comments
6     that may have taken place between the
7     attorney general's office and National
8     Seating.
9  Q. In your investigation, did you see
10    anything in there where NSM had asked
11    or suggested that Ms. Horton be
12    arrested?
13 A. Nothing that I noticed, no.
14        (Brief pause)
15 Q. In your experience as an investigator,
16    I'm sure you've received some type of
17    training in interview techniques?
18 A. Yes, sir.
19 Q. Have you received training in how to
20    tell if someone is telling you the
21    truth or not telling the truth?
22 A. I've received training on it, yes.
23 Q. Have you received training on how

Page 76

1     important it is not to jump to a
2     conclusion that someone is necessarily
3     lying to you?
4  A. That's correct.
5  Q. There are a number of factors that you
6     need to have as an investigator before
7     you're able to conclude that someone is
8     actually lying to you?
9  A. Yes, sir.
10 Q. Do you feel like you have all those
11    factors that you would need to
12    determine whether someone was lying to
13    you with respect to Ms. Horton?
14 A. With respect to Ms. Horton, yes, I feel
15    that I received the factors. And I
16    feel that she believed she was telling
17    me or giving me credible information.
18    And this information just didn't pan
19    out.
20 Q. Do you know anything about her mental
21    state at the time you were
22    investigating her?
23 A. No, sir.

19 (Pages 73 to 76)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 77

1  Q. Do you know whether she was on any
2     medication at the time you investigated
3     her?
4  A. I would not have gotten into all of
5     that.
6  Q. How much time total did you spend with
7     her?
8  A. Well, I want to say the first day we
9     spoke -- I want to say the first day,
10    we spoke for maybe forty-five minutes
11    to an hour. We've had probably a dozen
12    or so phone conversations. I couldn't
13    give you any time on that. So I don't
14    really know how to quantitate that, but
15    I've had several or just say numerous
16    opportunities to speak with Ms. Horton.
17 Q. And in that one-hour meeting and the
18    dozen or so phone calls that followed,
19    was -- she was never able to identify
20    one single piece of evidence to
21    substantiate her claim that some fraud
22    was taking place?
23 A. That's correct.

Page 78

1  Q. She was not able to give you one single
2     name of a witness that had any evidence
3     of fraud?
4  A. That's correct.
5        MR. STEWART: That's all I
6        have. Thank you, sir.
7           EXAMINATION
8  BY MR. WALLACE:
9  Q. I'm Jack Wallace. I represent Gerald
10    Shockley. I believe that you testified
11    earlier that Ms. Horton made some
12    allegations that wheelchairs were not
13    delivered to clients?
14 A. That . . .
15       MR. WALLACE: Where's your
16       list?
17       (Off-the-record discussion)
18 Q. Let me ask you to identify the document
19    that I've handed you, the Bates
20    numbers, please, sir.
21 A. They're Bates Nos. 0045 through 51.
22 Q. And what is that document?
23 A. This is a list of National Seating &

Page 79

1     Mobility's Medicaid recipients or
2     clients.
3  Q. Have you seen that list before?
4  A. Yes, sir, I have.
5  Q. Did you discuss this list with
6     Ms. Horton?
7  A. Yes, sir, I did.
8  Q. Did she give you any information about
9     that list?
10 A. Did she give me any information about
11    it?
12 Q. Yes, sir. Did she state to you
13    anything about that list, whether the
14    significance of the list or whether it
15    was insignificant?
16 A. She just produced a list, as I recall.
17 Q. There are checkmarks by a number of the
18    names on that list. Did you make those
19    checkmarks?
20 A. Judging by the writing that's on here,
21    I'm going to say no.
22 Q. Did Ms. Horton make those checkmarks?
23 A. The list that I had Ms. Horton review,

Page 80

1     I also had her initial. Okay? And I
2     don't see her initials here, and I
3     don't see any markings from myself on
4     here. So I'm going to say that this is
5     not the list that we used.
6  Q. Is this the list that you were shown
7     earlier --
8  A. Yes, sir.
9  Q. -- in this deposition?
10       MS. NICKSON: That's the
11       same one.
12 Q. So there is yet another list out there;
13    is that correct?
14 A. Yes.
15 Q. Is that in your files at Medicaid?
16 A. Yes, it will be.
17 Q. Thank you. But did Ms. Horton at any
18    time say that there were clients who
19    did not receive the wheelchairs they
20    were supposed to receive?
21 A. They didn't receive the wheelchairs --
22    mostly it was they didn't receive them
23    in a timely fashion, things of that

20 (Pages 77 to 80)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 81

1    nature.
2    Q.  Now, were those the twenty-three
3       clients that you interviewed or
4       contacted?
5    A.  I didn't interview the whole
6       twenty-three.  I interviewed a sampling
7       of the twenty-three people that she
8       identified from a list similar to this
9       one.
10   Q.  I'm sorry.  I misspoke.  My question
11      is, the twenty-three that she
12      identified, did she identify those as
13      people who were having difficulties
14      with the wheelchairs, either not
15      receiving them or not receiving them in
16      a timely manner?
17   A.  The way she explained it to me was
18      these are people that she remembered
19      from her time of employment with
20      National Seating & Mobility.  She was
21      not able to clearly state that these
22      are people that have problems.  These
23      are merely names that I remember from

Page 82

1       my employment there.
2    Q.  And based on your sampling, you did not
3       identify any problems with the receipt
4       of services by those clients?
5    A.  They had received their products.
6       That's correct.
7           MR. WALLACE:  That's all I
8       have.
9           EXAMINATION
10   BY MS. NICKSON:
11   Q.  Just a few more.  Was your visit to
12      National Seating & Mobility, was it
13      impromptu?
14   A.  Yes, it was.
15   Q.  And at your impromptu visit, what did
16      you do?  Did you review the files?  Did
17      you have a list of files with you and
18      did they pull them at that time and let
19      you review them?
20   A.  Well, there's two visits.  My initial
21      visit was, I went -- it was an
22      impromptu visit.  I went with Chief
23      Investigator Johnson, where we just

Page 83

1       asked questions of National Seating &
2       Mobility, how do they do certain
3       things, just to kind of get some
4       understanding.
5    Q.  Yes, sir.
6    A.  Okay.  After that, they were pretty
7       much advised as to what we were looking
8       for, and that information was hand-
9       delivered later.  The amount of
10      information that we were attempting to
11      review would have been too much for
12      them to pull at that moment.
13   Q.  So at your impromptu visit, there was
14      no review of the files.  You were just
15      basically talking to them,
16      understanding their system?
17   A.  To some degree, yes.
18   Q.  And then letting them know that you
19      would do a further investigation?
20   A.  Yes.
21   Q.  All right.  And then at some point in
22      time, you requested a list of files for
23      your review?

Page 84

1    A.  Yes, ma'am.
2    Q.  And is it fair to say that they could
3       have corrected any deficiencies --
4           MR. STEWART:  Object to the
5       form.
6           MR. WALKER:  Objection to
7       form.
8    Q.  -- between the time of the request and
9       the time that you reviewed?
10          MR. STEWART:  Same
11      objection.
12          MR. WALKER:  Same objection.
13   A.  The only way I can answer that question
14      is that there was a time difference
15      between the time that I requested and
16      the time that I received the
17      information.  But there was no
18      indications that I was able to pick up
19      on that anything had been modified.
20   Q.  All right.  But it is fair to say that
21      they could have corrected any
22      infractions?
23          MR. STEWART:  Object to the

21 (Pages 81 to 84)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 85

1  form.
2  MR. WALKER: Same objection.
3  A. They had -- there was time. They could
4  have.
5  Q. Yeah. Okay. Now, the files that you
6  reviewed for the possible infractions,
7  are these files that had already been
8  approved by Medicaid?
9  A. I would say yes, because the equipment
10  was delivered and they were paid for.
11  Q. All right. Let me ask you this. In
12  your investigation, did you request to
13  look at a sample of -- I don't know
14  what to call it. When a recipient
15  makes a request for a product service,
16  did you -- and the request has not yet
17  been approved -- did you look at any of
18  those files?
19  A. Are you referring to, like, the prior
20  approval request?
21  Q. Yes, sir.
22  A. Is that what you're referring --
23  Q. Yes, sir.

Page 86

1  A. Yes, I did look at some.
2  Q. Did you look at any files where there
3  had been service by the physical
4  therapist?
5  A. I looked at the physical therapist
6  files; I looked at some of theirs.
7  Repeat that question for me. I'm
8  not . . .
9  Q. Okay. In your review, were there any
10  dates left off of the physical therapy
11  clinic visits?
12  A. There were some dates missing, yes.
13  Q. All right. Did you make a copy of
14  those that were missing dates?
15  A. I remember copying files; and in those
16  files, it should contain files both
17  with and without dates.
18  Q. Okay. And for the documents where the
19  physical therapy clinic visit dates
20  were missing, should dates have been on
21  those documents?
22  MR. STEWART: Object to the
23  form.

Page 87

1  MR. WALKER: Same objection.
2  A. They should have been dated, to my
3  understanding.
4  Q. All right. But you didn't list that in
5  your report?
6  A. No, ma'am, I did not.
7  Q. All right. Based on your
8  understanding, that would have been a
9  violation of the policy with Medicaid.
10  Am I correct?
11  MR. WALKER: Object to the
12  form.
13  MR. STEWART: Object to the
14  form.
15  A. I would have -- yes, I would have
16  looked at that as a minor violation.
17  Q. But it would also confirm a complaint
18  that Elizabeth had made. Am I correct?
19  MR. STEWART: Object to the
20  form.
21  MR. WALKER: Object to the
22  form.
23  A. It would have confirmed that point,

Page 88

1  yes.
2  Q. All right. Now, you also talked about
3  when you -- Elizabeth identified
4  twenty-three people off a list, and
5  you've already said that the list as
6  before you is not the one that she used
7  to identify your sample of twenty-three
8  people.
9  A. That's correct.
10  MS. NICKSON: If we could
11  mark -- it's Bates Drab
12  0045 through 0051. If
13  we could mark that as
14  Exhibit #2.
15  (Plaintiff's Exhibit #2 was
16  marked for identification.)
17  MS. NICKSON: And while
18  we're at it . . .
19  (Plaintiff's Exhibit #3 was
20  marked for identification.)
21  Q. Now, you've said that she may have
22  chosen names off of a similar-looking
23  list, but this one that we're marking

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 89

1  as Exhibit #2 is not the list that you
2  used.
3  A. That's correct.
4  Q. And your list, actually, you said she
5  initialled?
6  A. I asked her to initial.
7  Q. And that's good investigative skills.
8  Am I correct?
9  A. I don't know if it's good or not, but
10  it's a system.
11  Q. If anybody has a question in the future
12  as to who identified that particular
13  line, then you would have proof --
14  A. Yes, ma'am.
15  Q. -- that's it the complainant by the
16  initial. Am I correct?
17  A. Yes.
18  Q. Just simply looking at that document,
19  you can't really identify who checked
20  that, can you?
21  A. No.
22  Q. All right. Now, you said you
23  interviewed a sample of the

Page 90

1  twenty-three that Elizabeth identified
2  for you. What number out of the
3  twenty-three did you consider as a good
4  sample?
5  A. I contacted maybe six of the families.
6  Q. Okay. Six out of twenty-three. And
7  they said no problem?
8  A. They had no problem.
9  Q. But Elizabeth never did say
10  specifically that any of the
11  twenty-three had a problem. She just
12  identified these as clients or
13  recipients she remembered --
14  A. That's correct.
15  Q. -- when she was employed there?
16  A. I'm sorry. Yes, that's correct.
17      MS. NICKSON: All right. No
18      further questions.
19      EXAMINATION
20  BY MR. WALKER:
21  Q. Mr. Green, if I may ask you a few more
22  questions. And earlier when I was
23  asking you questions, I failed to

Page 91

1  introduce myself, but I think we know
2  each other. But for the record, I'm
3  Dorman Walker and I represent Don
4  Williams. And did you know who I
5  represented when I was asking you
6  questions earlier?
7  A. We spoke when I walked in, yes.
8  Q. So you did. Okay. Would it have made
9  any difference in how you answered?
10  A. No, sir.
11  Q. All right. Look at the list which has
12  been marked as Defendants' Exhibit #2
13  [sic]. And do you have --
14      MS. NICKSON: Plaintiff's
15      Exhibit.
16      MR. WALKER: Deborah, I
17      don't have, for some
18      reason, a Bates-numbered
19      copy of the AG report.
20      Do you have those pages
21      that come after that
22      that I could --
23      MS. NICKSON: Which one,

Page 92

1  now?
2      MR. WALKER: It would be
3      right after the last
4      page of the --
5      MS. NICKSON: Sure.
6      MR. WALKER: The hand-
7      numbered page 22
8      through, I guess --
9      MS. NICKSON: Are you saying
10      the list of the
11      recipients?
12      MR. WALKER: No. The stuff
13      in the AG's report that
14      comes after the list,
15      all the way through to
16      the end.
17      MR. STEWART: He's talking
18      about Bates No. 62
19      through 107 and No. 22
20      through 67.
21      MS. NICKSON: I probably --
22      I don't have just a
23      whole report. I wrote

23 (Pages 89 to 92)

**MERRILL LEGAL SOULTIONS**
Court Reporting*Legal Videography*Trial Services

Page 93

1    mine down. I'm sorry.
2    Q. (By Mr. Walker) Let me show you what
3    I'm going to mark as --
4         MR. WALKER: You've written
5         on yours. Mine is
6         unBates-numbered. Can
7         we agree that I'll put
8         this in without Bates
9         numbers and then, for
10        our future convenience,
11        substitute with a Bates-
12        numbered copy of this?
13        Does anybody --
14        MS. NICKSON: We can agree
15        on that.
16        MR. WALKER: -- have an
17        objection to that?
18        MS. NICKSON: No.
19        MR. WALKER: I'm going to
20        mark this as Defendant
21        Exhibit Williams #1 or
22        do y'all want to
23        continue numbers for

Page 94

1    exhibits consecutively
2    throughout this case?
3         MS. NICKSON: Probably
4    continuous.
5         MR. WALKER: That makes it
6    easier. So this would
7    be #4.
8         (Defendants' Exhibit #4 was
9    marked for identification.)
10   Q. (By Mr. Walker) Mr. Green, let me show
11   you what I've marked as Exhibit #4 and
12   ask you if you can identify that, sir.
13   A. This is a copy of the report that I
14   received from Mr. Shockley, Special
15   Agent Shockley, from the attorney
16   general's office.
17   Q. And did you review and consider that
18   report as a part of your investigation?
19   A. Yes, I did.
20   Q. And turn to page 22, please, sir, of
21   that report, hand-numbered page 22.
22        (Witness complied.)
23   Q. And it looks to me like what follows

Page 95

1    are a series of summaries of interviews
2    that Mr. Shockley did with people
3    who -- if I may look with you for just
4    a second. I apologize -- with people
5    who received or were clients of
6    National Seating; is that correct?
7    A. Yes, sir.
8    Q. And that would go from page 22 to --
9    hand-numbered pages 22 through 48; is
10   that correct?
11   A. Yes, sir.
12   Q. And take a moment to look at that if
13   you want to.
14        (Brief pause while witness
15        reviews document)
16   Q. And did any of the clients of National
17   Seating who were interviewed indicate
18   they had any problems with National
19   Seating or any dissatisfaction?
20   A. The only thing that I -- was ever
21   identified was sometimes that the
22   equipment was a little slow in getting
23   there. But other than that, they were

Page 96

1    satisfied with the equipment and had no
2    complaints.
3    Q. And you considered those interviews
4    done by Mr. Shockley as well as your
5    own interviews in reaching your
6    conclusion, did you not?
7    A. Yes, sir, I did.
8    Q. Was that an appropriate thing for you
9    to do as an investigator?
10   A. Yes, sir.
11   Q. And why is that?
12   A. I think that as an investigator, if
13   there is an investigation done, you
14   should consider that information as
15   well and couple that with your own to
16   come to your own conclusion. Based on
17   the fact that he had conducted what
18   we're estimating to be twenty or so
19   interviews, there was really no need
20   for me to go out and do the same work.
21   Q. You didn't feel a need to reinterview
22   the same people?
23   A. No, sir.

24 (Pages 93 to 96)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 97

1  Q. And did you have reason to believe or
2     to have confidence in the quality of
3     the investigation done by Agent
4     Shockley?
5  A. I have no question in his investigative
6     ability, so I would accept that he did
7     what he was supposed to do, yes.
8        MR. WALKER: That's all I
9           have, Mr. Green. Thank
10          you very much.
11       MR. STEWART: I don't have
12          any questions. I've got
13          a statement to make at
14          the end.
15          EXAMINATION
16  BY MS. NICKSON:
17  Q. I'm just wondering, like, with the
18     registered nurse, Teresa, Teresa makes
19     a statement in that memo that's given
20     by Felecia Barrow, identified as
21     Plaintiff's Exhibit #3. She said that
22     she spoke with that physical therapist
23     and, in essence, that there were no

Page 98

1     dates.
2        MR. STEWART: What document
3           are you on?
4        MS. NICKSON: Plaintiff's
5           Exhibit #3.
6        MR. STEWART: Bates number?
7        MS. NICKSON: Bates No. 14.
8  Q. Teresa came across another assessment,
9     which means -- another assessment means
10    that there was one before, which
11    suggests that -- completed by Michael
12    Maddox and placed a call to the
13    physical therapist to find out why the
14    date was missing. The PT replied,
15    Maybe we're not supposed to do this,
16    but I never put dates on the
17    assessments or the prescriptions. It
18    messes up the vendor, like we're on a
19    time clock. And it is odd on the
20    assessments that Mr. Maddox has done
21    for the vendors have a date on -- for
22    other vendors have dates on them. Did
23    you review this --

Page 99

1        MR. STEWART: Object to the
2           form.
3        MR. WALKER: Object to the
4           form.
5  Q. -- February 16, 2005, memo?
6        MR. STEWART: Same
7           objection.
8  Q. That was done -- now, that was part of
9     the prior investigation against
10    National Seating & Mobility.
11       MR. STEWART: Object to the
12          form.
13       MR. WALKER: Same objection.
14  A. I have looked at this. I looked into
15     this.
16  Q. Did you talk with Teresa?
17  A. Yes, I did.
18  Q. And did she say?
19  A. When I spoke with Teresa, we spoke
20     briefly about National Seating &
21     Mobility --
22  Q. Yes, sir.
23  A. -- just the way that the operation kind

Page 100

1     of works, how the complaint -- not the
2     complaint but how the information from
3     the PT comes in and then she will talk
4     a little bit about the time frame. But
5     there was nothing where she came up to
6     me or she produced a document that says
7     Document No. 111 is dated so and so and
8     this was the one that they didn't do, I
9     guess, properly or didn't date.
10  Q. Do you know why she would say that the
11     physical therapist said that they were
12     not supposed to put dates on them or
13     something, it would mess up the vendor?
14        MR. STEWART: Object to the
15           form.
16        MR. WALKER: Same objection.
17  A. I don't know why she said that. I do
18     know that there is a timetable involved
19     in this.
20  Q. Yes, sir.
21  A. There's X number of days from the time
22     that the prior approval is first given
23     to delivery of the product.

Page 101

1  Q. And not placing dates would actually
2     default the system, wouldn't it?
3         MR. STEWART:  Object to the
4         form.
5         MR. WALKER:  Object to the
6         form.
7  A. Yes.
8  Q. Yes, sir.  Thank you.
9         EXAMINATION
10 BY MR. STEWART:
11 Q. Mr. Green, some say lawyers have a
12    great habit of never shutting up.  I'm
13    guilty of that.
14        I'm looking back at that
15    document we just talked about, Bates
16    No. 14.  That's a memorandum to
17    Dr. McIntyre from Felecia Barrow; is
18    that right?
19 A. Yes, it is.
20 Q. That's not a document you created.
21 A. As I stated earlier, this was done
22    prior to my employment with Medicaid.
23 Q. Right.  And it's not a document that

Page 102

1     you're vouching for as being accurate
2     in all respects, is it?
3  A. I'm not disputing the information
4     but . . .
5  Q. But you have no personal knowledge of
6     how accurate this document is?
7  A. No, sir.
8  Q. In fact, this appears to be hearsay on
9     hearsay; is that right?  Double
10    hearsay.
11 A. Yes.
12 Q. Now, in your conversation with Teresa,
13    did you discuss with her this alleged
14    comment by Mr. Maddox that he never
15    puts -- and I'm quoting -- quote, But I
16    never put dates on the assessments or
17    the prescriptions because it messes up
18    the vendor, end quote?
19 A. I don't remember having that particular
20    conversation with her.
21 Q. Did you ever talk with Mr. Maddox about
22    that statement?
23 A. I want to say I spoke with Mr. Maddox.

Page 103

1     He was no longer employed with National
2     Seating & Mobility at that time.  Wait
3     a minute.  Let me take that back.  I
4     spoke with Mr. Rodgers.  I don't know
5     if I ever spoke with Mr. Maddox,
6     because he was no longer employed
7     during the course of my investigation
8     and I don't know if I was ever able to
9     contact him.
10 Q. The top of that memorandum says that
11    those -- that there were, like, two
12    examples of wheelchair assessments that
13    had been submitted by NSM that were
14    missing the clinic dates.  Two of the
15    assessments were conducted by Gerry
16    Rodgers, PT, and one by Michael Maddox,
17    RPT, both of Children's Rehab Services.
18    Did you ever have any information that
19    Mr. Maddox or Rodgers actually worked
20    for NSM?
21 A. They never worked -- to my knowledge,
22    they never worked for NSM.
23 Q. Do you know, then, why -- well, strike

Page 104

1     that.
2         Did you ever get any information
3     that NSM asked either Maddox or Rodgers
4     to refrain from putting dates on the
5     documents?
6  A. I received no information to that.
7  Q. I mean, to your knowledge, that may
8     have just been something that
9     Children's Rehab did as a service to
10    NSM.
11 A. I have no information one way or
12    another.
13        MR. STEWART:  Okay.  That's
14        all I got.
15        MR. WALLACE:  My turn.
16        EXAMINATION
17 BY MR. WALLACE:
18 Q. Mr. Green, do you routinely investigate
19    people who have not been accused of
20    wrongdoing?
21 A. Do I investigate people that have --
22 Q. Do you routinely investigate people who
23    have not been identified as possible

26 (Pages 101 to 104)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 105

1    wrongdoers?
2    A. No, sir.
3    Q. You investigated the twenty-three names
4    that Ms. Horton furnished to you, did
5    you not?
6    A. Did I investigate them?
7    Q. Yes.
8    A. Yes.
9    Q. And you said earlier that she did not
10   indicate that those twenty-three names
11   were people that had done something
12   wrong but that she just remembered
13   them. But, obviously, there was some
14   implicit allegation against one or more
15   of those twenty-three people --
16        MS. NICKSON: Object to the
17        form.
18   Q. -- was there not?
19        MS. NICKSON: Object to the
20        form.
21   A. There was -- no, there was no
22   allegation.
23   Q. Then why did you investigate them?

Page 106

1    A. I investigated them based on her
2    complaint. These were the names that
3    she remembered from this time period
4    of -- of the allegations, so I wanted
5    to look into them to see if in fact I
6    could identify any fraud. I didn't go
7    through and look at every person that
8    National Seating & Mobility had on
9    their client list. I only looked at
10   those that she identified as names that
11   she was familiar with and not exactly
12   knowing why she was familiar with these
13   names, but I looked at them as
14   potential fraud cases but was unable to
15   determine anything.
16        MR. STEWART: My concern --
17        and this probably does
18        need to be on the
19        record -- is that some
20        of these documents --
21        Mr. Green, are these
22        Social Security numbers
23        that are on this client

Page 107

1    list or something that
2    we need to be concerned
3    about revealing
4    identifying information?
5    THE WITNESS: Yes, these are
6    going to be Social
7    Security numbers.
8    MR. STEWART: I think we
9    need to redact those at
10   some point --
11   MR. WALKER: We really
12   should redact them --
13   MR. STEWART: -- and maybe
14   even their names.
15   MR. WALKER: -- before
16   they --
17   MR. STEWART: Well, I guess
18   we can't do the names.
19   MR. WALKER: Well, I mean,
20   we can put the names and
21   the last four, according
22   to the court rules. But
23   we can't file this with

Page 108

1    the Social Security
2    numbers in it, according
3    to the court rules.
4    MR. STEWART: Can they be
5    made an actual exhibit
6    to the original
7    deposition with the
8    Social Security numbers
9    on it or should we under
10   an abundance of caution
11   white them out?
12   MR. WALKER: Why don't we
13   agree to redact, whoever
14   offered them, to redact
15   out the Social Security
16   numbers. And we all
17   have an original copy of
18   it; we know the AG has a
19   copy of it, should we
20   need that information
21   down the road. But the
22   official exhibit should
23   be redacted with Social

27 (Pages 105 to 108)

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 109

1       Security numbers.  Is
2       that --
3       MR. STEWART:  That's what I
4       think.
5       MR. WALKER:  Yeah, I think
6       so, too.
7       MS. NICKSON:  That's good.
8       MR. STEWART:  And which of
9       these columns is the
10      Social Security number?
11      MS. NICKSON:  On the ICN.
12      THE WITNESS:  No, that's
13      incorrect.
14      MR. STEWART:  The recipient
15      base ID?
16      THE WITNESS:  Yeah.  The
17      recipient base ID is
18      going to be the Social
19      Security number.
20      MR. STEWART:  Okay.  Thanks.
21      *   *   *   *   *   *   *
22      FURTHER DEPONENT SAITH NOT
23      *   *   *   *   *   *   *

Page 110

1       REPORTER'S CERTIFICATE
2
3       STATE OF ALABAMA )
                         )
4       ELMORE COUNTY   )
5
6           I do hereby certify that the above
7       and foregoing transcript was taken down
8       by me in stenotype, and the questions
9       and answers thereto were transcribed by
10      means of computer-aided transcription,
11      and that the foregoing represents a true
12      and correct transcript of the testimony
13      given by said witness.
14          I further certify that I am neither
15      of counsel, nor of any relation to the
16      parties to the action, nor am I anywise
17      interested in the result of said cause.
18
19
20      Barbara A. Howell, Certified
        Court Reporter and Commissioner
21      for the State of Alabama at Large
        ACCR NO. 123 - Expires 9/30/08
22      MY COMMISSION EXPIRES:  12/27/08
23

28 (Pages 109 to 110)

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

[3771_001.pdf]

 **Alabama Medicaid Agency**

**CONFIDENTIAL**
**MEDICAID**
**COMPLAINT**

*Continuation of Case #8-04 0150*

CASE NBR: _____
DATE ASSIGNED: _____
ASSIGNED TO: _____

**COMPLAINANT**

*Anonymous*

**SUBJECT**

*National Seating and Mobility*
*Prov.# 009819350*

**COMPLAINT RECEIVED BY:** *CJ*

**DATE RECEIVED:** *9-23-2005*

**REFERRED BY:**
[ ] P & S
[ ] Intra-Agency
[ ] Interagency
    *Hotline*
[ ] Telephone
[ ] Memo/Letter
[ ] Other

**ALLEGATION:** *Billing for services not rendered to recipients*

**SUMMARY:** *Also is forging recipients names on delivery tickets for durable medical equipment.*

**INVESTIGATOR:** _____

**DISPOSITION:** _____

**ASE REFERRED TO:** _____

**PLAINTIFF'S EXHIBIT**

*1-Green*

**APPROVED** _____

Horton V. Williams- 1001

*[3771_001.pdf]*



**BOB RILEY**
Governor

# Alabama Medicaid Agency

**501 Dexter Avenue**
**P.O. Box 5624**
**Montgomery, Alabama  36103-5624**
www.medicaid.state.al.us
e-mail: almedicaid@medicaid.state.al.us
TDD: 1-800-253-0799
1-800-362-1504      (334) 242-5000



CAROL A HERRMANN-STECKEL, MPH
Commissioner

### REPORT OF INVESTIGATION

CASE NUMBER: <u>8-04-0150</u>

DATE OF REPORT: <u>7/6/2006</u>

INVESTIGATOR: <u>Anthony Green</u>

TELEPHONE NUMBER: <u>(334) 353-4526</u>

PROVIDER NAME: <u>National Seating and Mobility</u>

PROVIDER NUMBER: <u>009814350</u>

ADDRESS: <u>646 Oliver Road</u>    CITY: <u>Montgomery</u>

PHONE: <u>(334) 273-1112</u>

CASE REFERRED FROM: <u>Anonymous Complaint</u>

VIOLATION: Billing services not rendered.

SUMMARY OF FRAUDULENT ACTIVITY:  On June 1, 2006, I met with Ms. Emily Williams, ATS, CRTS of National Seating & Mobility, 646 Oliver Road, Montgomery, Alabama, and Tim Maddox, National Seating & Mobility, Inc., 377 Riverside Drive, Suite 300, Franklin, TN 37064-5393 and reviewed the requested files. A review of these records revealed no signs of any criminal activity or wrong doing. At no time did this investigation reveal any signs of criminal or wrong doing. I request that this case be closed.

INVESTIGATION COMPLETED BY:

NAME    <u>Anthony Green</u>

SIGNATURE

TITLE    <u>Special Investigator</u>

DATE <u>07/06/06</u>

Horton V. Williams-0002

*[3771_001.pdf]*

I have reviewed the results of this investigation and recommend the following:

_____ ✓     Concur

_____     Does Not Concur

Reason for Non-Concurrence:

_____

NAME   Cliff Johnson

SIGNATURE   Cliff Johnson

TITLE   Chief Investigator

DATE:   7-12-2006

Horton V. Williams-0003

*[3771_001.pdf]*

CASE NAME:  National Seating and Mobility ·       CASE NUMBER:  8-04-0150

On May 19, 2004, Chief Investigator Clifford Johnson received a memo from the Prior Approval Unit and Provider Review Unit which stated that National Seating & Mobility Montgomery, Alabama may be involved in forging delivery tickets, improper billing, instructing clients not to date delivery tickets and holding requests with outdated prescriptions.

On November 28, 2005, I received this case for further investigation.

I contacted Senior Special Agent Gerald G. Shockley and requested a copy of his National Seating & Mobility report. A copy of the file was provided.

On April 6, 2006, I contacted Gerry Rodgers, P.T., P.C.S. at the Alabama Department of Children's Rehabilitation Services (CRS), 2127 East South Blvd., Montgomery, Alabama 36116, phone number 334-288-0220. Mr. Rodgers stated that he was a physical therapist working with children. I then asked who provided their DME. Mr. Rodgers said that National Seating and Mobility. Mr. Rodgers went on to state that about 97% of their business is with National Seating and Mobility. When asked why all of his business is with one company, he said they provide good service. Mr. Rodgers went on to state that the patient are allowed to choose the company they want. I then asked if he received any gifts or bonuses from National Seating and Mobility, he said no.

On May 2, 2006, I contacted and met with Felecia Barrow former Director of the Prior Approval Unit of the Alabama Medicaid Agency. Ms. Barrow stated that while working with Medicaid she noticed that a large number of claims from National Seating and Mobility were coming in late. Ms. Barrow went on to state this caused National Seating and Mobility to request a large number of extensions. Ms. Barrow further stated that as time went on National Seating and Mobility requested more extensions, and she then began to request a reason for the extension, and found that the conditional approval had expired before Medicaid had received them. This required that the patient be re-evaluated causing further delays. Ms. Barrow further stated that during this time their office was running a few months behind.

To date, I have made several attempts to contact Ms. Elizabeth Horton, 2600 Vaughn Lakes, Apt. 914, Montgomery, Alabama 36117, phone 334-679-7960, both via the telephone and in person at her residence. I also attempted to contact Ms. Horton at her place of employment Hyundai Manufacturing Plant Montgomery, Alabama. I was advised that Ms. Horton was no longer an employee of Hyundai.

On May 5, 2006, I met and interviewed Ms. Horton. Ms. Horton stated that she was a temporary worker for National Seating and Mobility from 03/04 – 06/04. Ms. Horton went on to state that while working at National Seating and Mobility she noticed that paperwork was coming in without a date. Because there was no date you would be unable to know when the patient was seen by Jerry Rodgers or Emily Williams. The reason this was done was because the paperwork needed to be submitted to Medicaid within sixty day or Medicaid would require that the patient be re-evaluated, so they would use the date paperwork was sent to Medicaid. Ms. Horton further stated she advised Emily of the problem and was told to use the date paperwork was sent to Medicaid. Ms. Horton was

*[3771_001.pdf]*

shown a list of names of which she identified 23 she remembered from her employment with National Seating and Mobility. Ms. Horton went on to state that she was not saying that there's a problem with these names, just that she remembered them. When asked about other issues such as delivery tickets and signatures, Ms. Horton spoke of infractions, but was unable to provide any specific information regarding any particular recipient. Ms. Horton agreed to meet again, but despite numerous attempts she did not keep any of the arranged appointments.

On May 8, 2006, I contacted Ms. Chaseley Everage, former employee of National Seating and Mobility. Ms. Everage despite several attempts, refused to cooperate with this investigation and would not return call nor set up a meeting.

On May 15, 2006, I compiled a list of the names identified by Ms. Horton. These names were faxed to National Seating and Mobility, CRS Montgomery and CRS Dothan, and copies of these records during 2004 & 2005 were requested.

On May 18, 2006, I met and interviewed Ms. Susan H. Gilley, District Supervisor, CRS, Dothan, Alabama. Ms. Gilley advised that there office only had two (2) records from that time frame. Ms. Gilley then turned over the records of                                                          and
any criminal activity or wrong doing.                 A review of these records revealed no signs of

On May 19, 2006, I received copies of the records requested from CRS Montgomery. A review of the following 14 records revealed no signs of any criminal activity or wrong doing.

I contacted the following families; all stated that they received their equipment National Seating and Mobility:

Horton V. Williams-0005

*[3771_001.pdf]*

On May 23, 2006, I received copies of the requested files from National Seating and Mobility.

On June 1, 2006, I met with Ms. Emily Williams, ATS, CRTS of National Seating & Mobility, 646 Oliver Road, Montgomery, Alabama and Tim Maddox, National Seating & Mobility, Inc., 377 Riverside Drive, Suite 300, Franklin, TN 37064-5393 and reviewed the requested files. A review of these records revealed no signs of any criminal activity or wrong doing.

At no time did this investigation reveal any signs of criminal or wrong doing. I request that this case be closed.

Horton V. Williams-0006

National Seating & Mobility   10/01/2003 - 12/31/2004

| Full Recipient Name | Recipient Base ID County | Detail First Date | Procedure | Procedure Code Description | ICN | Performing Prov Det | Paid Amount |
|---|---|---|---|---|---|---|---|
| ALEXANDER, APRIL N | 51 | 5/6/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050424720203S | 008814350 | $4,464.80 |
| ALEXANDER, TABRELL S | 51 | 9/27/2004 | E1399 | | 050432820150S | 008814350 | $334.15 |
| AMOR, ZACHARY | 51 | 8/4/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050424520528S | 008814350 | $4,550.40 |
| AUSTIN, OCTAVIOUS D | 57 | 10/31/2003 | E1399 | | 050404121416S | 008814350 | $100.61 |
| AUSTIN, OCTAVIOUS D | 57 | 10/28/2004 | E1399 | DURABLE MEDICAL EQUIPMENT, MISCELLANEOUS | 050436422609S | 008814350 | $131.84 |
| BAILES, TYLER B | 35 | 11/4/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050503822281S | 008814350 | $4,959.40 |
| BAILEY, TIARA M | 51 | 2/16/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050407922325S | 008814350 | $4,496.00 |
| BAKER, KRISTAL L | 51 | 7/28/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 060423124976S | 008814350 | $3,661.60 |
| BARBER, CODY R | 09 | 5/14/2004 | E1399 | | 050424720140S | 008814350 | $587.10 |
| BARBER, LASHUANTAN D | 51 | 12/30/2003 | Z5439 | | 050411320301S | 008814350 | $727.20 |
| BARBER, LASHUANTAN D | 51 | 7/28/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050423124976S | 008814350 | $2,973.60 |
| BILLINGSLEY, DUSTIN V | 11 | 10/20/2003 | Z5439 | | 050403823107S | 008814350 | $2,243.20 |
| BILLINGSLEY, DUSTIN V | 11 | 9/10/2004 | E1399 | | 050434320176S | 008814350 | $494.40 |
| IVNS, DEMARIUS | 24 | 9/8/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050503822281S | 008814350 | $5,028.80 |
| BRADLEY, JESSICA L | 51 | 12/9/2003 | Z5439 | CUSTOMIZED WHEEL CHAIR | 050425207213S | 008814350 | $427.08 |
| BROOKS, OCTAVIA D | 09 | 6/25/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050423126123S | 008814350 | $3,892.00 |
| BROOKS, TIMOTHY J | 41 | 10/24/2003 | E0630 | Patient Lift aspirato w gh Scala slim | 050335220103S | 008814350 | $751.00 |
| BROOKS, TIMOTHY J | 41 | 10/24/2003 | Z5439 | | 050416922114S | 008814350 | $866.80 |
| BRYANT, LAKEYEYA T | 55 | 10/28/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050508322281S | 008814350 | $7,975.35 |
| BRYANT, LATONDRA N | 51 | 11/15/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 060438220028S | 008814350 | $1,749.60 |
| BURNETTE, ELIZABETH D | 51 | 8/3/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050426200569S | 008614350 | $4,509.00 |
| BURRELL, MARCUS M | 66 | 10/30/2003 | Z5439 | | 050418623226S | 008814350 | $4,347.20 |
| BURRELL, MARCUS M | 66 | 7/9/2004 | E1399 | | 050423020062S | 008614350 | $351.00 |
| BUTLER, JOEANDREW J | 61 | 8/6/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050423124976S | 008814350 | $424.80 |
| CALDWELL, DEDUARQIUS J | 51 | 10/11/2004 | E1399 | | 060436422810S | 008814350 | $1,231.20 |
| CALDWELL, JACOB W | 51 | 12/2/2003 | Z5439 | | 500411320301S | 008814350 | $870.00 |
| CALDWELL, JASON W | 51 | 12/12/2003 | Z5439 | | 050413220689S | 008814350 | $941.20 |
| CANNON, LEKESHA L | 26 | 11/5/2003 | Z5439 | CUSTOMIZED WHEEL CHAIR | 050403421942S | 008814350 | $462.76 |

Horton v. Williams — 0045

PLAINTIFF'S EXHIBIT

2-Green

Hotton v. Williams - 0046

| Name | | Date | Code | Description | ID Number | Amount |
|---|---|---|---|---|---|---|
| CARTER, JEREMY D | 24 | 7/29/2004 | E1399 | | 05042342011104 | $1,248.00 |
| CHAMBERS, VICTORIA B | 51 | 10/24/2003 | Z5439 | | 0503336210789 | $3,878.40 |
| CHAMBERS, VICTORIA B | 51 | 12/12/2003 | E1399 | | 0504015204924 | $1,376.40 |
| CHAVERS, JOSHUA T | 24 | 3/8/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 0504321210163 | $4,568.80 |
| CLACK, DONNA N | 41 | 10/1/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 0504309200903 | $4,868.80 |
| CLARK, DRYDEN A | 57 | 10/1/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 0504309200901 | $2,098.00 |
| COLE, NADINE | 35 | 12/31/2003 | K0014 | | 0504139227495 | $7,767.61 |
| CONNER, MIRANDA L | 16 | 10/24/2003 | Z5439 | | 0504140229276 | $1,334.40 |
| COOKS, RICARDO O | 23 | 12/29/2004 | E1220 | | 0505027201127 | $4,943.20 |
| COOK, TYLER D | 23 | 8/26/2004 | E1399 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 0504259200043 | $5,103.60 |
| COPELAND, RONALD A | 26 | 4/1/2004 | E1399 | | 0504168203461 | $311.86 |
| CORSAW, ANGELA G | 57 | 12/31/2003 | E1240 | | 0504124203806 | $1,012.40 |
| CUBA, LOLA S | 57 | 11/21/2003 | Z5439 | | 0504013213354 | $7,767.35 |
| DASHER, JOSHUA A | 62 | 1/22/2004 | E1220 | | 0504132210752 | $2,317.00 |
| DAVIS, DAVID W | 23 | 10/21/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 0505038223331 | $1,766.80 |
| DAVIS, JORDAN C | 55 | 12/21/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 0505035213415 | $5,088.00 |
| DAVIS, TAMEKA D | 07 | 12/11/2003 | Z5439 | CUSTOMIZED WHEEL CHAIR | 5004113203018 | $2,621.60 |
| DEARDEN, KIMBERLY N | 07 | 8/4/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 0504232235982 | $5,213.60 |
| DEARDEN, KIMBERLY N | 41 | 9/8/2004 | E1399 | | 0504273201060 | $440.40 |
| DEBRUNNER, KATHERINE N | 41 | 12/12/2003 | E1399 | | 0504016204925 | $1,166.80 |
| DEBRUNNER, KATHERINE N | 41 | 8/27/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 0504267200053 | $4,656.40 |
| DEMOSS, JEROME L | 59 | 2/9/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 9804155233043 | $303.20 |
| DENNIS, AUSTIN T | 62 | 4/9/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 0504153204055 | $7,724.87 |
| DIX, CANDACE L | 41 | 8/23/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 0504267201066 | $4,899.60 |
| DOMINGUEZ, GISELLA M | 51 | 2/17/2004 | E1220 | | 0504100230026 | $2,166.00 |
| DOTSON, MARY J | 23 | 4/6/2004 | K0014 | OTHER MOTORIZED/POWER WHEELCHAIR BASE | 0504227222688 | $4,563.11 |
| DUDLEY, ISHMAIL K | 51 | 12/9/2003 | Z5439 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 0504009212166 | $3,652.80 |
| DULKIEWICZ, JONATHAN M | 03 | 8/6/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 9605038276033 | $86.48 |
| EBERHARDT, KATRINA K | 51 | 8/25/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 0504362200266 | $3,419.20 |
| EDWARDS, VASHAWN D | 24 | 12/31/2003 | Z5439 | | 0504345214379 | $4,205.60 |
| FARROW, KEVONTE D | 41 | 3/18/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 0504113207221 | $2,088.00 |
| FEARS, KENYA L | 57 | 11/14/2003 | Z5439 | | 0504009212128 | $4,326.40 |
| FLOURNOY, SHANAE A | 16 | 9/29/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 0504303200902 | $1,483.20 |

2

Horton v. Williams - 0047

| Name | | Date | Code | Description | ID | | Amount |
|---|---|---|---|---|---|---|---|
| FRAZIER, MELVIN L | 41 | 1/6/2004 | E0110 | | 050402203625 | 009814350 | $56.00 |
| GIBSON, FORREST E | 51 | 8/16/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050424720059 | 009814350 | $4,695.20 |
| GREENE, KYLE D | 62 | 10/1/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050500423652B | 009814350 | $2,575.20 |
| HARPER, JESSICA D | 23 | 11/5/2003 | Z5439 | | 880402223902 | 009814350 | $2,866.00 |
| HARRIS, LAJESSA D | 41 | 12/30/2003 | E1399 | | 050416320505 | 009814350 | $228.90 |
| HATCHER, CORNEILUS O | 24 | 10/2/2003 | K0004 | | 980412602000 | 009814350 | $4.85 |
| HAYES, ARIEL Z | 51 | 6/10/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050425322270E | 009814350 | $217.57 |
| HAYES, CURTAZAFRU T | 51 | 4/22/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050413222109D | 009814350 | $3,230.40 |
| HIGGINS, MARCUS A | 51 | 5/6/2004 | E1399 | | 050424720306B | 009814350 | $1,374.84 |
| HIGGINS, MARCUS A | 35 | 8/5/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050423124976D | 009814350 | $4,501.60 |
| HIGHTOWER, MICHAEL C | 51 | 8/25/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050428720106B | 009814350 | $4,990.60 |
| HILL, BRANDON M | 51 | 1/23/2004 | E1399 | | 050410721101S | 009814350 | $376.27 |
| HILL, BRANDON M | 51 | 7/29/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050423125123S | 009814350 | $4,742.40 |
| HILL, LISA C | 51 | 11/13/2003 | Z5439 | | 500408720100A | 009814350 | $4,000.80 |
| HILL, SABRINA N | 01 | 8/2/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050423125123S | 009814350 | $2,700.00 |
| HILL, TRAVIS L | 62 | 4/10/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050413923501D | 009814350 | $441.60 |
| HILL, TRAVIS L | 62 | 7/9/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050500423711Z | 009814350 | $2,427.40 |
| HINES, EMMANUEL J | 56 | 10/1/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050430920164B | 009814350 | $2,182.40 |
| HOVEY, JOHN M | 26 | 10/8/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050438520142B | 009814350 | $8,792.81 |
| HOVEY, JOHN M | 26 | 10/6/2004 | E1399 | | 050439921049S | 009814350 | $376.27 |
| HUGHES, SHIANNE M | 35 | 7/21/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050424720306S | 009814350 | $3,312.80 |
| IVERSON, MORRIS D | 35 | 12/10/2004 | Z5439 | | 050419922653Z | 009814350 | $2,966.40 |
| IVEY, ERIKA E | 56 | 11/14/2003 | Z5439 | | 050400920819M | 009814350 | $1,946.40 |
| JERKINS, WILLIAM D | 35 | 9/29/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050435220402S | 009814350 | $11,881.01 |
| JERKINS, WILLIAM D | 35 | 12/4/2004 | E1399 | | 050503220012B | 009814350 | $625.35 |
| JOHNSON, EDWARD D | 51 | 5/11/2004 | E1399 | | 980500623504B | 009814350 | $124.17 |
| JOHNSON, GREGORY T | 24 | 11/5/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050436422367Z | 009814350 | $2,513.60 |
| JOHNSON, GREGORY T | 24 | 11/5/2004 | E1399 | | 050436422367S | 009814350 | $292.03 |
| JOHNSON, JAMES D | 55 | 5/13/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050424720059S | 009814350 | $3,080.80 |
| JOHNSON, REBECCA M | 35 | 10/30/2004 | Z5439 | | 050402020870D | 009814350 | $1,035.87 |
| JOINER, TIFFANY A | 61 | 8/30/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050427920126S | 009814350 | $502.28 |
| JONER, SHAWN G | 35 | 11/5/2003 | Z5439 | | 500411320012S | 009814350 | $4,495.75 |
| JONES, DEANDRE L | 57 | 11/19/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050436620151S | 009814350 | $4,646.40 |

3

| Name | | Date | Code | Description | | 009814350 | Amount |
|---|---|---|---|---|---|---|---|
| JONES, DOMINQUE B | 51 | 12/8/2003 | E1399 | | 050401521252 | 009814350 | $384.70 |
| JONES, DYLAN K | 23 | 2/4/2004 | E1399 | | 050404121193 | 009814350 | $231.90 |
| JONES, KENJI G | 09 | 12/12/2003 | Z5439 | | 500411203019 | 009814350 | $399.20 |
| JONES, KENJI G | 09 | 8/6/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050429420102 | 009814350 | $8,080.96 |
| JONES, QUINTON E | 51 | 8/26/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050430426101 | 009814350 | $2,456.40 |
| JORDAN, MARIEL A | 41 | 12/8/2003 | E1399 | DURABLE MEDICAL EQUIPMENT, MISCELLANEOUS | 050401521251 | 009814350 | $460.40 |
| LANE, CRYSTAL G | 34 | 3/22/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050414222161 | 009814350 | $1,687.79 |
| LEDBETTER, EMILY P | 62 | 5/17/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050424720093 | 009814350 | $4,552.00 |
| LEWIS, JEFFERY | 24 | 8/9/2004 | E1399 | | 050429420102 | 009814350 | $1,248.00 |
| LOCKHART, CLARENCIA M | 41 | 10/3/2003 | Z5439 | | 050332320183 | 009814350 | $1,232.00 |
| LOWERY, JEREMY T | 16 | 8/10/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050429420101 | 009814350 | $19,285.84 |
| MACK, GERMANICE S | 51 | 5/27/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050424720604 | 009814350 | $4,476.80 |
| MADDEN, NIGEL E | 41 | 12/29/2003 | Z5439 | | 500411203002 | 009814350 | $4,411.20 |
| MADDOX, JESSICA N | 31 | 3/8/2004 | E1399 | | 050413923423 | 009814350 | $433.77 |
| MARLOWE, KIMBERLY E | 51 | 7/15/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050423921075 | 009814350 | $8,637.66 |
| MATTHEWS, HILLARY I | 51 | 7/28/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050430201550 | 009814350 | $4,643.20 |
| MCBRIDE, MATTHEW W | 51 | 5/6/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050424720406 | 009814350 | $4,757.60 |
| MCBRIDE, MATTHEW W | 51 | 10/2/2003 | Z5439 | CUSTOMIZED WHEEL CHAIR | 050470620546 | 009814350 | $433.25 |
| MCCORMACK, MICHAEL J | 26 | 5/12/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050424720203 | 009814350 | $2,060.00 |
| MCCURDY, BRITTNEY L | 61 | 8/4/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050434200100 | 009814350 | $2,794.60 |
| MCGUIRE, MAGGIE N | 51 | 7/8/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050423020082 | 009814350 | $9,565.73 |
| MCLEAN, ERICA N | 01 | 3/10/2004 | E1399 | | 050418207127 | 009814350 | $978.12 |
| MCLENDON, ASHTON B | 23 | 8/6/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 980503827603 | 009814350 | $2,347.60 |
| MCLEOD, SHERITA M | 23 | 12/29/2004 | E1220 | | 050502720112 | 009814350 | $5,762.16 |
| MCMULLAN, SHOOTER A | 41 | 7/9/2004 | E1220 | | 980424524003 | 009814350 | $2,168.00 |
| MILLS, DONALD W | 16 | 10/15/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050431020813 | 009814350 | $1,576.00 |
| MITCHELL, ANTONIO T | 37 | 12/31/2003 | E1399 | DURABLE MEDICAL EQUIPMENT, MISCELLANEOUS | 050400920932 | 009814350 | $250.00 |
| MITCHELL, ANTONIO T | 37 | 5/26/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050424720203 | 009814350 | $4,416.80 |
| MITCHELL, BRYSON T | 16 | 6/13/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050424720598 | 009814350 | $4,613.60 |
| MITCHUM, DARYL E | 43 | 11/15/2003 | E1399 | | 050405121910 | 009814350 | $184.78 |
| MORRIS, JEFFERY W | 44 | 11/14/2003 | Z5439 | | 050409200319 | 009814350 | $2,026.40 |
| NEAL, CAMBREL | 51 | 12/31/2004 | E1399 | | 050503823330 | 009814350 | $1,374.84 |
| NEAL, TRUMAINE R | 37 | 7/30/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050423020620 | 009814350 | $2,343.40 |

Horton v. Williams - 0049

| Name | | Date | Code | Description | Number | | Amount |
|---|---|---|---|---|---|---|---|
| NELSON, CARTER W | 51 | 7/28/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 0504231249766 | 009814350 | $5,712.00 |
| NEVIN, TYLER E | 24 | 10/24/2003 | Z5439 | | 980400823I015 | 009814350 | $1,981.60 |
| NICHOLS, WESLEY B | 24 | 12/19/2003 | Z5439 | | 0504281202274 | 009814350 | $195.12 |
| NORRIS, KATRINA A | 35 | 4/1/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 0504153206026 | 009814350 | $1,873.60 |
| OSBORNE, CELENAL | 26 | 5/10/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 0504247203070 | 009814350 | $4,417.60 |
| OSBORNE, CELENAL | 26 | 5/10/2004 | Z5439 | | 0505004237116 | 009814350 | $390.31 |
| OSBORN, TAYLOR M | 41 | 12/19/2003 | Z5430 | | 5004113203005 | 009814350 | $1,283.89 |
| PACE, BRANDI L | 57 | 2/4/2004 | E1220 | | 0504124211629 | 009814350 | $4,652.80 |
| PARKS, CURTIS A | 31 | 11/24/2003 | E1389 | | 0503342216015 | 009814350 | $68.44 |
| PARKS, MAURICE B | 24 | 11/24/2003 | Z5439 | CUSTOMIZED WHEEL CHAIR | 0503336217224 | 009814350 | $4,765.20 |
| PARKS, MAURICE B | 24 | 1/13/2004 | E1399 | DURABLE MEDICAL EQUIPMENT, MISCELLANEOUS | 0504132213100 | 009814350 | $1,185.60 |
| PARRISH, JAMES T | 41 | 5/28/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 0504247201407 | 009814350 | $5,193.60 |
| PASLEY, DARRYAN J | 51 | 4/2/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 0504166221980 | 009814350 | $438.40 |
| PASLEY, DARRYAN J | 51 | 8/16/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 0504247220231 | 009814350 | $588.60 |
| PATTERSON, COREY L | 51 | 10/29/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 0504364223876 | 009814350 | $4,668.00 |
| POLLARD, ZANE W | 51 | 1/6/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 0504071205559 | 009814350 | $2,303.20 |
| PORTER, TIMOTHY D | 55 | 12/31/2003 | E1399 | | 0504007208707 | 009814350 | $137.56 |
| POSS, COLEMAN H | 08 | 10/1/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 0505027200249 | 009814350 | $3,143.20 |
| PROCTOR, BOBBY J | 23 | 12/31/2003 | Z5439 | | 5004113203006 | 009814350 | $8,890.33 |
| PRYOR, LOREN R | 51 | 12/16/2003 | Z5439 | | 0504141206702 | 009814350 | $2,458.40 |
| RAMSEY, CALLIE R | 11 | 9/23/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 0504308201647 | 009814350 | $6,577.00 |
| RELF, RONALD E | 51 | 10/21/2003 | E0146 | | 980408226S040 | 009814350 | $59.80 |
| REYNOLDS, CHRISTINA S | 56 | 11/4/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 0504364226099 | 009814350 | $4,596.00 |
| SALINAS, JOSE E | 35 | 9/29/2004 | E1399 | | 0504364228102 | 009814350 | $1,374.84 |
| SANDERS, KERSTIN W | 43 | 5/6/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 980436525?037 | 009814350 | $522.00 |
| SCOTT, AARON V | 35 | 12/31/2003 | Z5439 | | 0504136236012 | 009814350 | $552.28 |
| SCOTT, JOSEPH G | 03 | 8/27/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 0504303204070 | 009814350 | $550.40 |
| SCOTT, JOSEPH G | 03 | 8/30/2004 | E1389 | | 0504303202125 | 009814350 | $525.55 |
| SENN, TARAH M | 21 | 12/27/2003 | E1220 | | 980405126406 | 009814350 | $356.00 |
| SENN, TARAH M | 21 | 12/30/2003 | E1399 | | 880405126403? | 009814350 | $472.90 |
| SESSIONS, JAYSON T | 55 | 12/4/2003 | Z5439 | | 5004113203004 | 009814350 | $17,223.11 |
| SETZER, FISHER L | 51 | 1/16/2004 | E1399 | | 0504100230003 | 009814350 | $1,042.80 |
| SHUFORD, DECORRY J | 43 | 12/2/2003 | Z5439 | | 500411320302? | 009814350 | $4,176.00 |

| Name | | Date | Code | Description | Number 1 | Number 2 | Amount |
|---|---|---|---|---|---|---|---|
| SIMS, JASON R | 16 | 7/30/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050433921049 | 009814350 | $4,656.80 |
| SIMS, SHAKETHA L | 53 | 10/20/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050436422367 | 009814350 | $1,252.00 |
| SINGLETON, HEATHER L | 28 | 8/11/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050426520178 | 009814350 | $3,791.20 |
| SMITH, MICHAEL T | 56 | 7/9/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050423124976 | 009814350 | $2,180.00 |
| SMITH, RASHAD H | 51 | 8/2/2004 | E1399 | | 050422620149 | 009814350 | $1,374.84 |
| SMITH, TRAVIS C | 35 | 9/29/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050430920060 | 009814350 | $3,175.20 |
| SMITH, TRAVIS C | 35 | 9/29/2004 | E1399 | | 050430020164 | 009814350 | $1,185.60 |
| SORRELL, ALLYSON L | 51 | 2/5/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 980435525703 | 009814350 | $862.60 |
| SPEARS, JARVIS M | 35 | 11/19/2003 | Z5439 | | 980429921004 | 009814350 | $3,279.40 |
| SPENCER, DEENA M | 57 | 12/12/2003 | E0630 | | 050033572009 | 009814350 | $751.00 |
| SPENCER, DEENA M | 57 | 12/12/2003 | Z5439 | | 500411320300 | 009814350 | $7,289.58 |
| STENSLAND, JAMES C | 03 | 7/28/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 980432325003 | 009814350 | $451.38 |
| STRICKLIN, JEREMY M | 51 | 12/8/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050436621036 | 009814350 | $4,760.20 |
| STUDYMIRE, SHAYLA M | 51 | 1/17/2004 | E1220 | | 980427127603 | 009814350 | $476.18 |
| TADAYON, FATEMEH | 51 | 8/16/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050424720140 | 009814350 | $408.92 |
| TAYLOR, KEDDRICK L | 24 | 10/20/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050431020813 | 009814350 | $2,174.40 |
| TEAGUE, DESTINY S | 35 | 8/26/2004 | E1399 | | 050426720106 | 009814350 | $1,231.20 |
| TELLIS, QUANTRAIV L | 51 | 12/30/2003 | E1399 | | 050402820035 | 009814350 | $235.76 |
| TELLIS, QUANTRAIV L | 51 | 12/10/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050501120106 | 009814350 | $2,358.40 |
| THOMPSON, JERMAINE D | 26 | 10/5/2004 | E1399 | | 050502720025 | 009814350 | $1,231.20 |
| TIMMONS, JASON C | 61 | 10/6/2003 | Z5439 | | 500411320301 | 009814350 | $4,424.00 |
| TOLBERT, JEFFERY J | 51 | 11/13/2004 | Z5439 | | 050401321335 | 009814350 | $3,327.40 |
| TRUELOVE, ZACHARY K | 51 | 8/16/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050424720307 | 009814350 | $5,163.20 |
| TURNER, JASON A | 55 | 10/31/2003 | E0146 | | 050403422211 | 009814350 | $26.50 |
| WADE, DEAUDRE M | 51 | 7/29/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 620427920134 | 009814350 | $3,295.36 |
| WALKER, ZARIUS O | 51 | 12/12/2003 | Z5439 | | 500411320300 | 009814350 | $1,422.40 |
| WASHINGTON, MARQUETTI | 51 | 4/8/2004 | E1399 | | 050434520080 | 009814350 | $228.90 |
| WATTS, JEREMY J | 51 | 1/23/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 050435820137 | 009814350 | $9,861.75 |
| WHITE, JAJIE A | 09 | 1/23/2004 | E1220 | DURABLE MEDICAL EQUIPMENT, MISCELLANEOUS | 050407922232 | 009814350 | $4,936.00 |
| WHITE, JESSICA L | 57 | 12/12/2003 | E1390 | | 050411720374 | 009814350 | $631.32 |
| WHITE, JESSICA L | 57 | 12/12/2003 | Z5439 | | 500411320300 | 009814350 | $4,006.40 |
| WILBURN, MARKEVIOUS V | 09 | 12/24/2003 | Z5439 | | 520413320811 | 009814350 | $2,232.00 |
| WILLIAMS, ESTRACIA N | 34 | 12/31/2003 | Z5439 | | 500423620001 | 009814350 | $253.67 |

6

Horton v. Williams - 0050

//

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| WILLIAMS, ESTRACIA N | 34 | 8/26/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 0504287200054 | 009814350 | $3,306.40 |
| WILLIAMS, IRVIN C | 44 | 12/12/2003 | Z5439 | | 5004113203021 | 009814350 | $1,134.40 |
| WILLIAMS, JALESSIA L | 07 | 12/19/2003 | E1399 | DURABLE MEDICAL EQUIPMENT, MISCELLANEOUS | 0504174203218 | 009814350 | $199.46 |
| WILLIAMS, JAMIAS L | 51 | 6/29/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 9804281234018 | 009814350 | $451.88 |
| WILLIAMS, JEWEL G | 34 | 8/26/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 0504267200052 | 009814350 | $4,504.00 |
| WILLIAMS, KATARRA C | 44 | 4/22/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 0504132221089 | 009814350 | $229.00 |
| WILLIAMS, NATEAVEONE T | 06 | 12/16/2003 | Z5439 | | 0504177208673 | 009814350 | $2,088.00 |
| WILLIAMS, PAMELA L | 56 | 10/20/2003 | Z5439 | | 0503323202882 | 009814350 | $2,291.20 |
| WILSON, RAVEN E | 51 | 8/11/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 0504324201695 | 009814350 | $4,991.20 |
| WILSON, TYLYN C | 24 | 10/24/2003 | Z5439 | | 0504029208354 | 009814350 | $4,098.40 |
| WINSTON, DERRICK T | 24 | 12/31/2003 | Z5439 | CUSTOMIZED WHEEL CHAIR | 0504230201551 | 009814350 | $4,350.00 |
| WOFFORD, JESSICA D | 35 | 5/13/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 0504247200603 | 009814350 | $3,421.60 |
| WOMBLES, MARY C | 41 | 10/21/2003 | E0146 | FOLDING WALKER, WHEELED, WITH SEAT | 0504007208709 | 009814350 | $148.50 |
| WOOD, EMILY K | 41 | 1/23/2004 | E1399 | | 0504189231550 | 009814350 | $50.00 |
| WORTHINGTON, JOSHUA F | 26 | 12/20/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 0505032200125 | 009814350 | $3,549.60 |
| WRIGHT, JEREMIAH D | 51 | 7/22/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 0504230200680 | 009814350 | $4,860.40 |
| WYNN, JAVARES M | 41 | 6/9/2004 | E1399 | | 0504339210496 | 009814350 | $1,374.84 |
| WYNN, JAVARES M | 41 | 8/23/2004 | E1220 | WHEELCHAIR; SPECIALLY SIZED OR CONSTRUCTE | 0504287201069 | 009814350 | $4,556.00 |
| | | | | | | | 591,009.14 |

Horton v. Williams - 0051

*[3771_001.pdf]*

ALABAMA MEDICAID AGENCY

February 16, 2005

**MEMORANDUM**

To:       Mary G. McIntyre, M.D., M.P.H.
          Medical Director
          Office of the Commissioner

From:     Felecia S. Barrow, M.P.A.
          Associate Director
          Prior Approval Unit

Re:       Issues with Wheelchair Assessments Received

Please find attached examples of wheelchair assessments that have been submitted by National Seating and Mobility – Montgomery, that were missing the clinic dates. Two of the assessments were conducted by Gerry Rodgers, P.T. and one by Michael Maddox, R.P.T., both of Children's Rehab Services.

Teresa Surles, R.N. questioned the assessments and was told (by Gerry Rodgers) to get the dates from Emily, National Seating. I informed Teresa that the clinic dates should be kept at CRS where the assessment was conducted. Teresa, under my direction, contacted CRS to get the clinic date instead of Emily. Jackie (CRS) informed Teresa that the date of the clinic appointment was July 20, 2004. The PA request was submitted in February 2005. A subsequent fax was received from Gerry Rodgers indicating that the assessment was reviewed on 2/15/05 and was "still o.k." I conferred with Teresa and Debbie and thought that we needed updated clinic notes telling us the current condition of the client. On another client, both the physician's note of medical necessity and the P.T. assessment were lacking dates.

Teresa came across another assessment completed by M. Maddox and placed a call to the P.T. to find out why the date was missing. The P.T. replied, "...maybe we're not supposed to do this (pause), but I never put dates on the assessments or the prescriptions because it messes up the vendor"..."like, we're on a time clock..." It is odd that on the assessments that Mr. Maddox has done for other vendors have a date on them, but the ones done for National Seating do not have dates. This was the same information that was reported by former National Seating employee, Elizabeth Horton.

I would like to refer this information to Clifford Johnson, Chief Investigator, Program Integrity Division. If it is too premature at this point, I will wait.



**PLAINTIFF'S EXHIBIT**

3 -Green

Horton V. Williams-0014

**ALABAMA ATTORNEY GENERAL'S OFFICE**
**MEDICAID FRAUD DIVISION**
**INTERVIEW REPORT FORM**

<u>**August 12, 2005**</u>
**TRANSCRIPTION DATE**

# State of Alabama
# Office of the Attorney General



**DX 4 SHOCKLEY REPORT**
**IS EXHIBIT A TO**
**THE 2ND SHOCKLEY AFFIDAVIT**

## Summary Report of Investigation

## Elizabeth Horton a.k.a. Beth Walton

## August 11, 2005

## Prepared By:
## Senior Special Agent Gerald G. Shockley

Def Ex
hillimo 4