> mess up the vendor? And he said, oh, I think I may have said too much. Uh, we just are told, we're told not to put dates.

SHOCKLEY: Who is this receiving this conversation?

BARROW: This was uh, Teresa Sorrells in the office who works for me.

SHOCKLEY: Okay.

BARROW: She's one of my nurse reviewers and she was speaking with an M. Maddox. I don't know his first name. It might be Michael, I think.

SHOCKLEY: He's a therapist?

BARROW: He's a physical therapist.

SHOCKLEY: Where is he located?

BARROW: Ohh, let's see where he is because this is the memo that I had done indicating that uh, there was a visit done where he didn't put a date on here. CRS Dothan, he's in the Dothan office, Dothan, AL.

SHOCKLEY: Okay.

BARROW: And uh, he said he didn't want to say much more but that you know if he needed to be dating them then just let him know. It's just that what he was told was never to put a date on them.

SHOCKLEY: Who told, you did he say told him to say that?

BARROW: National Seating and Mobility

SHOCKLEY: Okay, all right.

BARROW: In Montgomery.

SHOCKLEY: Okay, let me go on the allegation that there were recipients that did not receive the wheelchairs and I understand all of this other is important but I want to just get right down to the fraud portion of it though where wheelchairs were paid for that was not delivered.

BARROW: Uhmm.

| | |
|---|---|
| SHOCKLEY: | Do you have any information concerning or were you given any information names of recipients that allegedly did not receive the wheelchairs and if so, who gave it to you? |
| BARROW: | Well Elizabeth Horton again, uh, provided this information uh, once she was terminated that uh, there she had a file, or had the names of the clients, uh, where there were wheelchair repairs uh, done and the parts were received from other places or that, CR, uh, National Seating, I'm sorry had the part, uh, on site, did not have to order these parts but they would go ahead and repair the wheelchair but submit a prior authorization request to us in order to pay for the part to be reimbursed for a part, but they really weren't being reimbursed for a new part it was just a part that they had. |
| SHOCKLEY: | This is what Elizabeth was telling you? |
| BARROW: | Yes. |
| SHOCKLEY: | Okay, did she give you any names of recipients that would be affected by this? |
| BARROW: | Hmm, I think she did provide me with a few names and I think I had, uh, put all that information together to send uh here to Investigations, uh, and I would have my copy of, you know, of what I had uh submitted. |
| SHOCKLEY: | She was interviewed by Mike Roeder, who has since retired from the Medicaid Fraud Control Unit, the Attorney General's Office. |
| BARROW: | Yes. |
| SHOCKLEY: | And she was saying there were a lot of chairs that were not delivered. |
| BARROW: | Hmm. |
| SHOCKLEY: | I hear you talking about parts. Are you familiar with the allegation that there was chairs not delivered? |
| BARROW: | I think that she had mentioned something like that to me but there was nothing that I witnessed in the office from the request that we received that would indicate or calls from recipients that, hey I didn't get my chair from National Seating. |

54

SHOCKLEY: That's what she was telling you, that she got calls from recipients and responses?

BARROW: No, she was telling me that there were, she knew that there were cases where the chairs had not been delivered to clients and even cases where they would order a chair for a client but let another client borrow the chair and use it for a period of time and then turn it back in and then they would get it to another recipient as a new chair.

SHOCKLEY: Uhmm.

BARROW: But I never saw anything that would, you know, show as documented proof.

SHOCKLEY: How well do you know Elizabeth?

BARROW: Hmm, not very well. Uhmm, we did discuss a lot of things over the phone because she would call me almost on a daily basis to get an extension request for a PA so she called me quite a bit and we did, you know, discuss other things other than business when she did call me we may talk about a concert that may have come to town or something like that.

SHOCKLEY: Did you go to concerts with her?

BARROW: No.

SHOCKLEY: No. Did you, let me ask you this, did you socialize with her at all or was it strictly professional?

BARROW: It was professional.

SHOCKLEY: Strictly professional, okay.

BARROW: Yeah.

SHOCKLEY: Okay, uh, I know that she was only employed there for 2-3 months....

BARROW: Uhmm.
SHOCKLEY: And uh, what she's done is look over a list of, of various recipients that we provided a list for, Mike Roeder did.

BARROW: Uhmm.

SHOCKLEY: And she's checked off thirty something names of people who did not receive wheelchairs. Did she ever give you those names?

BARROW: No, she just told me to look out for certain requests. She didn't say anything about them. She just told me, you know, look out for this request and I think that what she was trying to get at was the fact that they had sent in a request for an extension on a delivery because they said that the client didn't come to clinic and they couldn't get up with the client's parents and they never showed up and all of this, so I was taking that as, okay, this is legitimate, you know, the client sometimes will miss clinic or they'll miss an appointment and I can understand their frustration and they need an extension so I would grant it, uh, but later found out from Elizabeth that these were not true reasons, you know, that they were providing me, uh, that they just held onto requests. They just sat on a desk and the client is in need of the equipment; however, they can't get it because National Seating has not either ordered it or they haven't sent it for whatever reason.

SHOCKLEY: Wouldn't it be in their best interest though to uh, cause that's their, that is their purpose for being in business, is to go ahead and order immediately and uh, supply and then bill for it because that's the only way they get paid is that correct?

BARROW: Yeah, uhmm.

SHOCKLEY: Did you ever get the feeling that Elizabeth may not have had as much information as what she was alleging to have.

BARROW: No, I never had any reason to doubt what she was saying and, and the reason I say that is because we ran into several problems with them recently, uh they had another staff turnover and when that new staff person came in it was everyday, asking for extensions on requests. They were telling parents that it's Medicaid's fault that you don't have what you need because they're sitting on your request. Parents would call us and when those parents started calling I would question the parents as to, you know, when did you first start this process? Uh, when, when did you go to uh clinic for your assessment? When did they tell you they submitted the PA request? And in every case, the parents were saying, you know, they're telling me that, you know, I can't get my equipment because it's outdated. The time limit has expired and you know, I explained to the parent every time we give

them 60 days to dispense the equipment. Once it's approved, you have two months to get that equipment out, get it ordered and get it out to them, uh, the parents were being notified a week before an expiration date that we impose upon them. We give them 60 days and on that expiration date, we say if you don't have this equipment dispensed by this date, we're not going to pay you for it, uh, so the parents were getting a call a week before the expiration date to say, hey, you know we got this authorization from Medicaid, we need to get in here to clinic and sometimes it wasn't convenient for the parents to get in there within that week. If it expired they would tell the parents we can't give you the equipment so now my question to National Seating was, you need to dispense this equipment in order to get reimbursed for it, why don't you do that, uh, so I never knew what the problem was.

KEESHAN: Okay, uh, National Seating, they, these are specialized wheelchairs, right?

BARROW: Yes they are.

KEESHAN: Where the way the child has to sit in the chair or uses their arms, legs, what not so they don't custom make them on-site I don't think.

BARROW: No.

KEESHAN: But they order them.

BARROW: They have to order them.

KEESHAN: Is 60 days, and I'm just wondering how much of this might have run into the manufacturer of the special part...

BARROW: Uhmm.

KEESHAN: Would possibly outrun the 60 days verses how many of the incidences you think may be the result of the manufacturer and how many, uh, as a result of National Seating maybe not processing in time?

BARROW: Well, uh, every other vendor, we have several DME suppliers who deal with specialized medical equipment of high-end rehab and 60 days they are always able to make the 60 days. The only problems that we've had have come from National Seating. Now, we always let providers know even though our

policy states 60 days, you can always contact us before that expiration date to say this going on, this is going on would you please grant an extension and in most cases, we'll grant it and in all cases we were granting those extensions. It's only when National Seating contacts us a month after the extension has run out to say can you please extend this PA because we need to get paid for it and we, we dispensed it. Of course they dispensed it after the expiration, you know the expiration date without notifying us ahead of time, that hey, we're having problems you know there are some delays so we always offer them, you know, that flexibility uh, it can't be something on an on-going basis but you know

SHOCKLEY: You're going to run into problems every once in a while.

BARROW: Exactly.

SHOCKLEY: Right.

KEESHAN: Let me, can I ask another question?

SHOCKLEY: Sure.

KEESHAN: On the parts, well I don't think that's part of the allegation, I'm curious. If they are taking parts out of inventory...

BARROW: Uhmm.

KEESHAN: They're still allowed to bill for them are they not, or is there a problem with that?

BARROW: Well...

KEESHAN: Do they ever replace them so?

BARROW: Well now they were saying there may have been parts that uh, manufacturers had sent, just sent them, you know, uh, that may not have been Medicaid related at all. It could have been some other insurer that you know, uh, that they might have billed, I'm not sure.

KEESHAN: Uhmm.

BARROW: But these were parts that were there at the company uh, I don't know that Medicaid, you know, if it were a Medicaid client or a Blue Cross client or you know whoever. Uh, might have

|  |  |
|---|---|
|  | reimbursed them for that part but then you send in another request as, I mean a request to Medicaid, and if, you know, this is a brand new part that I just had to order. |
| KEESHAN: | But there still, if Blue Cross had ordered it, they still have to furnish the part for that. |
| BARROW: | Uhmm. |
| KEESHAN: | Somewhere there has got to be inventory in and out. |
| BARROW: | Somewhere, somehow that is going on. At least that was what was alleged uh that, that was going on. |
| SHOCKLEY: | You don't have any, you don't have any independent knowledge of that other than that what you were told by Elizabeth? |
| BARROW: | Exactly, I do not. |
| SHOCKLEY: | In fact you don't have any independent knowledge, you don't even have the names of recipients who did not receive wheelchairs... |
| BARROW: | No. |
| SHOCKLEY: | She never gave you that either? |
| BARROW: | No. |
| SHOCKLEY: | The only information you have is what Elizabeth gave to you? |
| BARROW: | Exactly. |
| SHOCKLEY: | Okay and basically everything you've told me this afternoon is something that Elizabeth has told you rather than something that you have detected in the documentation here at Medicaid? |
| BARROW: | With exception of... |
| SHOCKLEY: | With the exception of... |
| BARROW: | For the assessment date. |
| SHOCKLEY: | The assessment date was not put on the form. |

BARROW: As well as you know the uh information of them not having the equipment sent out in a timely manner.

SHOCKLEY: Okay and you know that's documented here...

BARROW: It is documented.

SHOCKLEY: Sometimes it's not uh sent out in a timely manner but you don't have any complaints though from recipients saying that uh they did not get the wheelchair even though it may have been a little late, you don't have anybody calling and saying they didn't get the wheelchair?

BARROW: No

SHOCKLEY: Well I tell you, I'm having a little difficulty with what Elizabeth has said because there's indications that uh all these wheelchairs were in fact delivered and that why she would say they were not delivered is just beyond me.

BARROW: I have no idea. Uh, you know the information that we received we just got it from her.

SHOCKLEY: Uhmm.

BARROW: Uhmm, and I thought that possibly you know disgruntled employees, you know, but we had had so many other problems with National Seating. Why wouldn't I believe what she had to say?

KEESHAN: Well, you....

BARROW: I didn't investigate it.

SHOCKLEY: Right, sure I understand that.

BARROW: Uhmm.

KEESHAN: You didn't take any actual action based on what she told you, you just watched even closer?

BARROW: Yeah, and I really didn't watch them all that close uh, if there was something that came up about it you know like, you know a month after an expiration date, you're asking for an

|  |  |
|---|---|
|  | extension, and like I would do for anybody else, any other DME company. |
| SHOCKLEY: | Did she tell you about any personal problems that she had, uh, National Seating and Mobility or was it just that she was terminated. And I, seems like when she was terminated, the reason was that, I think the reason was I think you just said that she was terminated the following day after you had been out there and because you had come out there she was terminated. Is that what I hear you saying? |
| BARROW: | Well, well, I thought it was a coincidence that uh, you know before, we had not had any complaints or anything on, you know, oh, she's not sending in the right information, oh I've got staff here that just you know. We never received complaints of that nature. In fact, my staff was very elated uh that she was there because we could get all the information that we needed whereas before that was not happening all the time. Uh, so there were never any complaints about her. It was just coincidental to me that, you know, I go there one day and the next day she's not there. Uh... |
| SHOCKLEY: | What was her purpose for calling you and telling you that she had been terminated? |
| BARROW: | Uh, she just wanted to let me know that she would not be the one that we would dealing with on wheelchairs any longer. I didn't receive any other calls from any one else. |
| SHOCKLEY: | Did she ask you do anything for her? |
| BARROW: | No. |
| SHOCKLEY: | Okay. Alright, is there anything else? Let me just state again that we've contacted a number of people and all of them have received their wheelchairs... |
| BARROW: | Uhmm. |
| SHOCKLEY: | And uh, even though there may have been some slight delays in some of them because of maybe a part or maybe because uh, there was a delay due to if they're all prescription type wheelchairs getting them in and the process just takes a few months but, uh, nevertheless they all got their wheelchairs and... |

| | |
|---|---|
| BARROW: | Uhmm. |
| SHOCKLEY: | All of them are satisfied with what happened and uh, I, my purpose for wanting to talk with you is do you have some additional information that would support the allegation that Elizabeth Horton made? |
| BARROW: | No. |
| SHOCKLEY: | Okay. |
| BARROW: | All I had was her information. |
| JOHNSON: | (unintelligible) ---- other former employees that worked there at National Seating that were either fired or left and may have a problem with National Seating. |
| SHOCKLEY: | Who now, these are notes that Elizabeth gave to you? |
| JOHNSON: | No, no those are my notes that I took when I talked to her. |
| SHOCKLEY: | Oh, I see. |
| BARROW: | Uhmm, yeah, this... |
| SHOCKLEY: | Your notes from talking to Felecia? |
| BARROW: | Yes. Uh, Chasly Weeks was the employee who we dealt with before Elizabeth got there, uh, Karen was another person. Karen was there after Elizabeth and now they have, uh, I believe, uh, I can't think of her name right now but I, uh, I've got her email, Lynn, uh, Constantino or something like that but Lynn is the new person. Lynn is the one that was sending in all the emails requesting extensions after the expiration dates. |
| SHOCKLEY: | Was some of that due to change of employees out there, getting backlogged on it? |
| BARROW: | I don't think so because, uh you know, with a DME company you've always got to have somebody there, uh, the clients are being referred to you so you've got to accommodate the client. If you can't accommodate the client, you need to send them to another DME company. Uh, so there was still an employee there. There were still an employee there, there were two there; Emily and her husband so uh, both of them were capable of getting the information we needed. They knew the |

|  |  |
|---|---|
|  | process so we didn't understand why there would be that lag time. |
| KEESHAN: | So Lynn, who followed Elizabeth, was submitting a lot of these late approvals? |
| BARROW: | She followed Karen actually. Karen followed Elizabeth and then Lynn came after Karen. |
| KEESHAN: | Okay, wondering if... |
| BARROW: | But when Elizabeth got there... |
| KEESHAN: | (Unintelligible) --- the predecessor didn't do the processing. |
| BARROW: | Well, I mean will before, uh, or when Elizabeth got there, she was asking me for extensions everyday. |
| KEESHAN: | Okay. |
| BARROW: | Uh, you know every time it was, oh, they didn't make clinic, you know. Uh, the parents didn't show up for their appointments. We've been trying to get up with the parents and she later told me that, that was not true, uh, with Lynn, she had stated that, you know, all the parents didn't make clinic and then I would call Clinic find out if the parents were missing clinic and they would tell us no. Uh, so you know, I knew I couldn't believe everything Lynn was telling me either, uh, because she was just trying to get it processed, you know to get, get the payment. |
| SHOCKLEY: | Okay, is there anything else that you think is important that, uh, I should know that I just failed to formulate the question to get the answer. |
| BARROW: | No, nothing at all. |
| SHOCKLEY: | Regarding National Seating and Mobility? |
| BARROW: | Nothing that I can think of at this point. |
| SHOCKLEY: | Richard, do you have anything else you could ask? |
| KEESHAN: | No, I don't. |
| SHOCKLEY: | Okay, Cliff, do you have questions? |

63

JOHNSON:     No.

SHOCKLEY:    All right then I'm going to turn the tape recorder off right now and I thank you for your time.

BARROW:      Okay.

Officials at National Seating and Mobility Headquarters, Franklin, TN furnished the following comments as to the voice mail left by Felecia Barrow on the voice mail of Daniele Perkle 6/28/04.

Felecia Barrow was leaving the impression in this voice mail that it would be in the best interest for National Seating and Mobility to rehire Elizabeth Horton. At the very least it was believed that who ever the replacement would be for Elizabeth Horton reimbursements to National Seating and Mobility could be delayed or, National Seating and Mobility could expect to come under greater scrutiny. The worst case scenario of the interpretation of the voice mail left by Felecia Barrow was that there was a veiled threat that unless Elizabeth Horton was rehired, payments from Medicaid would be delayed or denied.

In any event, officials of National Seating and Mobility believed the call from Felecia Barrow was inappropriate; that the decision the terminate Elizabeth Horton employment is solely the discretion of National Seating and Mobility and should not be a concern of Felecia Barrow or of anyone with the Alabama Medicaid Agency.

12 Page

File #77282-001

Assistant Attorney General Bruce Lieberman after hearing the facts of this case, advised that he would authorize prosecution of Elizabeth Horton for furnishing a false report to a law enforcement in violation of Alabama Code 13A-10-9.

On August 1, 2005, Special Agent Gerald Shockley filed a complaint with District Court Montgomery County, Montgomery, AL after which Magistrate Holley Faems issued a warrant for the arrest of Elizabeth Horton charging, furnishing a false report to law enforcement in violation of Alabama Code 13A-10-9. Magistrate Faems placed a $1500 bond on Elizabeth Horton.

On August 5, 2005, Montgomery County Sheriff's Office arrested Elizabeth Horton and she was thereafter released on bond.

6650

**ALABAMA ATTORNEY GENERAL'S OFFICE**
**MEDICAID FRAUD DIVISION**
**INTERVIEW REPORT FORM**

<u>August 9, 2005</u>
**TRANSCRIPTION DATE**

**Telephonic contact with Elizabeth Horton**
**Matter ID #77282-001**

On this date, August 8, 2005, Elizabeth Horton telephonically contacted this office and left a voice mail inquiring as to why she had been arrested for furnishing a false statement when she had not filed a statement with the Attorney General's Office or with the Medicaid Agency. She also left a return telephone number for me to contact her.

As requested by Ms. Horton, I did attempt to contact her on August 8, 2005 and I left a voice mail for her to call me.

A few minutes later at approximately 10:00 a.m. on 8/8/05, Elizabeth Horton did call me and inquired why I had caused her to be arrested and I responded stating that if she wanted to discuss the matter she could make herself available at my office and I would be glad to talk to her concerning the entire matter. She stated she had an attorney and maybe I should talk to him. I responded by stating that if she had an attorney, I would not talk with her without her attorney being present and that this conversation should be terminated. I inquired as to a name of her attorney and his telephone number and Elizabeth Horton thereafter terminated the call without giving me the name of her attorney or his telephone number.

DATE OF INTERVIEW  August 8, 2005

BY  Gerald Shockley  SPECIAL AGENT

FILE #77282-001

57