# EXHIBIT H

Case 2:06-cv-00526-MHT-CSC    Document 69-16    Filed 02/19/2008    Page 1 of 5

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

ELIZABETH HORTON, )
)
    Horton, )
)
vs. ) CASE NO. 02:06-CV-00526-MHT-DRB
)
DON WILLIAMS, et al., )
)
    Williams. )

### AFFIDAVIT OF DON WILLIAMS

1. Pursuant to 28 U.S.C. § 1746, I, Don Williams, certify that the following declaration is based upon my personal knowledge.

2. In 2004, as an employee of Kelly Services, a temporary staffing agency, Elizabeth Horton was assigned to work at National Seating and Mobility's ("NSM") Montgomery, Alabama branch.

3. I worked for NSM at that time as a technician. My wife, Emily, was the branch manager.

4. NSM is an approved Medicaid provider of made-to-order wheelchairs and seating systems for Medicaid patients, mostly children, who have been diagnosed with a permanent or long-term loss of mobility, and whose disability requires them to use individually-prescribed wheelchairs.

5. As the branch manager, Emily worked hands-on with patient's physicians and physical therapists to develop a plan for medical equipment, including customized wheelchairs, that met each patient's individual needs.

189712.1


EXHIBIT
H

6.  Emily was responsible for assembling the paperwork for submission to the Alabama Medicaid Agency ("Medicaid"), Prior Approval Unit. After a plan for medical equipment was prepared and the appropriate prescriptions and paperwork were received from the client's physician or physical therapist, NSM would submit the prescriptions and other documents to Medicaid for preliminary approval. Once preliminary approval was obtained, I would order any specialized parts that a particular chair required (although some parts were maintained in our inventory), assemble the chair according to the prescription, and have it delivered to the patient. After the equipment was delivered, Emily would submit the delivery ticket to Medicaid, and then Medicaid would pay NSM for the wheelchair.

7.  I did not deal directly with the physicians, therapists, and paperwork. My primary responsibility was to assemble the individualized wheelchairs, which were ordered for our clients, from specialized parts, and to handle shipping, packing, and delivering the assembled equipment to NSM's clients.

8.  At NSM, Horton's responsibilities were clerical. Her primary duties were to answer the telephone and to send to Medicaid packets of information assembled by Emily.

9.  Horton was a temporary worker at NSM from approximately April 9, 2004 to June 25, 2004. Not long after she began at NSM, Emily and I noticed problems with Horton's work and work habits. She dressed inappropriately for work. In addition, she appeared to develop an inappropriate relationship with Felecia Barrow, who at the time was the Associate Director of Medicaid's Prior Approval Unit. Their apparent relationship was troubling because NSM submits requests for approval and payment to Medicaid. Relationships between NSM's workers and Medicaid must remain strictly professional in order to avoid an appearance of impropriety and creation of a conflict of interest. I believe Horton had more than a professional

189712.1

relationship with Barrow. For example, Horton discussed personal matters on the telephone with Barrow during work hours, invited Barrow to the NSM office during lunch, and arranged to attend a concert with her. In part, because of Horton's apparent personal relationship with Barrow, I recommended that Horton be terminated. Her unprofessional relationship with Barrow could threaten NSM's professional relationship with Medicaid.

10. In May and in June 2005, about a year after Horton had been transferred from NSM, I was interviewed by Gerald Shockley about Horton's allegations that NSM fraudulently billed Medicaid. I believe that Horton made complaints against NSM in retaliation for the fact that NSM asked for her to be reassigned.

11. In addition to the two telephone interviews by Shockley, I discussed with Shockley the possibility of scheduling a face-to-face meeting. These telephone calls were my only involvement in the investigations of Horton's allegations by the Attorney General's Office and the Medicaid Agency. I had no involvement in the decision of the Attorney General's Office to file a complaint against Horton and to arrest and prosecute her. I testified at her trial because I was subpoenaed as a witness.

12. I have reviewed the notes of Gerald Shockley made during his interviews with me in May 2005 and June 2005, and they correctly reflect what we discussed during the interviews.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 15th day of February, 2008.

_Don A. Williams_
Don Williams

Sworn to and subscribed before me on this the 15th day of February, 2008.

_Deborah H Ham_
Notary Public
My Commission Expires: 6/7/2010

189712.1