THE STATE OF TEXAS

Tarrant _____ COUNTY

AFFIDAVIT

Before me, *Kathleen Shannonks* ~~Elizabeth Horton~~, a Notary Public in and for said County in said State, personally appeared Elizabeth Horton whose name is signed to this Affidavit and who is known to me, and who being by me first duly sworn deposes and says as follows:

1.  That my name is Elizabeth Horton, and I reside in Montgomery County, Alabama, and I am over the age of 19 years.

2. I was employed for approximately two months through Kelly Services as a temporary employee assigned to work at a place of business operated by National Seating and Mobility, Inc., and because of that fact I was seeking permanent employment with other businesses that offered better opportunities.

3. Before and during my assignment to work at National Seating and Mobility, Inc., I understood that my employment was purely temporary; therefore I had no expectation that the employment would be made permanent.

4. The office of National Seating and Mobility, Inc., where I worked was managed by Mrs. Emily Williams and her husband, Don William was employed as a technician there.

5. During my short tenure with National Seating and Mobility, Inc., it became readily apparent that Don Williams had great influence at the office.

6. During the course of my employment with National Seating and Mobility, Inc., I came to know Felicia Barrow who was I learned employed with the Alabama Medicaid Agency.

7. I did not then nor do I now consider Ms. Barrow a friend.

8. During the course of my employment with National Seating and Mobility, Inc., NSM was interested only in profits not how its employees arrived at the profits.

9. I was not informed that my job performance at NSM was unsatisfactory to the extent that it could cause a problem with an agency that regulated NSM.

10. Retired special agent Michael Roeder apologized to me after I was acquitted on the charge of filing a false report with a law enforcement agency. He further informed me that defendant Shockley was upset with me because I did not meet with him for an interview.

11. I believed that the information I provided to the Alabama Medicaid Agency was true.

Further, Affiant saith not. 

                    Elizabeth Horton, Affiant

Sworn and subscribed to before me on this the 11th day of March, 2008.

                    Notary Public

KATHLEEN M. SHANNON
MY COMMISSION EXPIRES
February 6, 2010

Page 8

```
1    Q.    Yes, sir.  And the various prior

'2         employers that you've listed, did you

3          have experience in investigating cases,

4          matters, events?

5    A.    Yes, I did.

6    Q.    And you said that your employment with

7          Medicaid has been two and a half years?

8    A.    Yes, that's correct.

9    Q.    And you are assigned as a special

10         investigator.

11   A.    That's correct.

12   Q.    And as a special investigator, what are

13         your duties and responsibilities?

14   A.    We deal with cases involving Medicaid

15         fraud or suspected Medicaid fraud.

16   Q.    And in your two and a half years with

17         Medicaid, how many cases have you

18         investigated, approximately?

19   A.    I would think that a safe estimate

20         would be about seventy.

21   Q.    About seventy?

22   A.    Yes.

23   Q.    And of the seventy cases, how many have
```

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services    Anthony Green Deposition

Page 9

1    been confirmed on the allegations?

2    A.  I'm going to say 50 percent.

3    Q.  And for the 50 percent that you were

4        not able to confirm the allegations,

5        were any arrests recommended or made as

6        a result thereof?

7    A.  I'm sorry.  Repeat that.

8    Q.  Okay.  For the 50 percent where the

9        claims or -- the claims of a person

10       alleging fraudulent activity were not

11       substantiated, were arrests the result

12       of it?

13   A.  No.

14   Q.  In your two and a half years with

15       Medicaid, have you ever known of a

16       complainant to be arrested for the

17       complaint not being confirmed?

18   A.  The only case that I'm aware of is the

19       one that I'm presently here for.

20   Q.  And that is Elizabeth Horton?

21   A.  Yes, ma'am.

22   Q.  What, if anything, was different about

23       her complaint, if you know?

```
:RO372              ALABAMA JUDICIAL INFORMATION SYSTEM        CASE: DC 2005 002380.00
PER: VIL                    CASE ACTION SUMMARY
AGE:  1                     DISTRICT  CRIMINAL                 RUN DATE: 08/08/2005
```

IN THE DISTRICT COURT OF MONTGOMERY                                    JUDGE: LUM

STATE OF ALABAMA                    VS      HORTON ELIZABETH WALTON
                                            2600 VAUGHN LAKES APTS
CASE: DC 2005 002380.00                       #914
                                            MONTGOMERY, AL  36117 0000

DOB: 06/18/1963      SEX: F  RACE: B  HT: 5 05  WT: 125    HR: BLK EYES: BRO
SSN: 432378397  ALIAS NAMES: HORTON BETH

CHARGE01: FALSE REPORTING TO L CODE01: FRPO  LIT: FALSE REPORTIN TYP: M #: 001
OFFENSE DATE: 04/15/2005                     AGENCY/OFFICER: 0OSO000 OLIVER

DATE WAR/CAP ISS:                    DATE ARRESTED: 08/05/2005
DATE     INDICTED:                   DATE     FILED: 08/08/2005
DATE   RELEASED: 08/06/2005          DATE   HEARING:
BOND      AMOUNT:      $1,500.00 S   SURETIES: JJ'S RAPID BAIL BOND

DATE 1: 08/15/2005  DESC: PLEA       TIME: 0800 A
DATE 2:             DESC:            TIME: 0000  STATE OF ALABAMA
                                                MONTGOMERY COUNTY
TRACKING NOS: WR 2005 000444 00  /              I, MELISSA RITTENOUR CLERK OF THE
                                                DISTRICT COURT OF MONTGOMERY
   DEF/ATY: Thomas Goggans           TYPE:      COUNTY, HEREBY CERTIFY THAT THE
                                                WITHIN IS A TRUE AND CORRECT COPY
                          00000                 OF THE _____CAS_____
PROSECUTOR: Bruce Lieberman Ag. Atc             ON FILE IN SAID OFFICE.
                                                    WITNESS MY HAND AND THE SEAL
                                                OF SAID COURT IS HERETO AFFIXED.
OTH CSE: WR200500044400 CHK/TICKET NO:               THIS THE ___ DAY OF JAN.   08
COURT REPORTER: _____  SID NO:        _____
DEF STATUS: BOND         DEMAND:      000000000     Melissa Rittenour        Co.
                                                CLERK DISTRICT COURT
DATE        ACTIONS, JUDGEMENTS, AND NOTES

| DATE | ACTIONS, JUDGEMENTS, AND NOTES |
|------|-------------------------------|
| 8/8/05 | Docket notice sent Δ + 5001 |
| 8/12/05 | Plea of not Guilty and waiver of arraignment fld |
|  | by Thomas M. Goggans atty for Δ |
| 8/12/05 | Motion to Continue for trial setting |
| 8/15/05 | Docket notice sent Δ, Δ atty + 5001 |
| 8/23/05 | Iss'd (1) subp.      (1) served |
| 8/29/05 | Motion to Continue  Blankd  LUM |
| 8/30/05 | Docket notice sent Δ, Δ atty, 5001, + Prosecutor |
| 9/1/05 | Request for Production |
| 9/2/05 | Order |
| 9/7/05 | Motion to Continue fld by State of Ala |
| 9/15/05 | Iss'd (4) subp. Atty General etc |
| 9-26-05 | BENCH TRIAL HELD ON THIS DATE |
|  | JUDGMENT OF ACQUITTAL Lum |



PLAINTIFF'S
EXHIBIT
A

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 7

```
 1          for Medicaid?

 2   A.     From 1999 until 2005.

 3   Q.     And what was your position there?

 4   A.     I held several positions.  Do you want

 5          all of those in . . .

 6   Q.     Yes, ma'am.

 7   A.     Okay.  I was a Medicaid Administrator I

 8          with the medical services division in

 9          1999.  In 2001, I became the associate

10          director in the long-term care

11          division.  And in 2003, I moved to the

12          prior approval unit, which was within

13          the medical director's office, where I

14          was associate director.

15   Q.     All right.  And why did you leave the

16          Medicaid Agency?

17   A.     Oh, I left because of a better job

18          opportunity.

19   Q.     All right.  More money?

20   A.     Yes.  Yes.

21   Q.     And during your employment with the

22          Medicaid Agency, did you address any

23          concerns regarding infractions or
```

Page 24

```
 1         vendor that we would come in contact
 2         with on a, you know, continuous basis.
 3    Q.   If someone told an investigator that
 4         you and Ms. Horton were friends, would
 5         they be lying?
 6              MR. WALKER:  Object to the
 7                   form.
 8    A.   I would not consider us friends.
 9         Acquaintances perhaps, simply because
10         of the nature of dealing with one
11         another on a daily basis.
12    Q.   So you knew her in the professional
13         capacity?
14    A.   Yes.
15    Q.   Did you ever attend a concert with her?
16    A.   No, I didn't.  She had informed me that
17         there was a concert that was happening
18         in the city.  And she did not attend
19         the concert; however, I did, with a
20         friend of mine.
21    Q.   What was your understanding of Don
22         Williams' position with National
23         Seating & Mobility at that time?
```

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 26

1      Chaseley prior to Elizabeth coming on

2      board, I believe.

3    Q.   Did Chaseley make any complaints or

4         talk about any infractions --

5    A.   Not to me.

6              MR. WALKER:  Object to the

7                  form.

8    Q.   Have you ever been told that anybody

9         stated that Emily Williams advised one

10        of the physical therapists not to place

11        dates on prescriptions?

12             MR. STEWART:  Object to the

13                 form.

14             MR. WALKER:  Object to the

15                 form.

16   A.   I believe that we did get a phone call

17        from a therapist.  One of my staff

18        members, one of my nurse reviewers, had

19        received a phone call and we were

20        questioning the date.  She questioned

21        the date being missing.  And he

22        informed her that they were told not to

23        put dates on the forms.

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 28

1        would look at the attachments to

2        Plaintiff's Exhibit #6.

3                    (Brief pause while witness

4                    reviews document)

5    A.   Okay.

6    Q.   Now, in your memo -- and I'll just

7        reference Plaintiff's Exhibit #6 --

8        your first statement in paragraph 1,

9        you say, Please find attached exhibits

10       of wheelchair assessments that have

11       been submitted by National Seating &

12       Mobility-Montgomery that were missing

13       the clinic dates.  And I'm going to

14       show you once again the attachments to

15       Plaintiff's Exhibit #6, which is your

16       memo dated February 16, 2005.  Now, is

17       this an example --

18   A.   Yes.

19   Q.   -- of clinic dates missing?

20   A.   Yes.

21   Q.   Is this a violation of the policy?

22                    MR. STEWART:  Object to

23                    form.

MERRILL LEGAL SOULTIONS    Felecia Barrow Deposition
Court Reporting*Legal Videography*Trial Services

Page 32

1    A.    That the vendor, National Seating &

2          Mobility, would be able to hold a

3          request for an unlimited period of time

4          and still submit it to the Medicaid

5          Agency without us being able to verify

6          the date in which the assessment was

7          actually done.

8    Q.    And is this what you all consider as

9          fraudulent activity?

10                    MR. STEWART:  Object to the

11                          form.

12   A.    We consider --

13                    MR. WALKER:  Object to the

14                          form.

15   A.    I would say that it was inappropriate

16         in order for them to leave off dates.

17         It goes against policy.

18   Q.    All right.  Now, Plaintiff's

19         Exhibit #6, the memo states that two of

20         the assessments were conducted by Gerry

21         Rodgers, of physical therapy, and one

22         of Michael Maddox, RPT, both of

23         Children's Rehab Services.  Okay?

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Felecia Barrow Deposition

Page 33

1        Teresa Surles, a registered nurse,

2        questioned the assessments and was told

3        by Gerry Rodgers to get the dates from

4        Emily at National Seating.  Now, is it

5        appropriate for Emily at National

6        Seating to give dates to place --

7                    MR. STEWART:  Object to

8                         form.

9   Q.   -- for clinic dates?

10                   MR. WALKER:  Object to the

11                        form.

12                   MR. STEWART:  Object to

13                        form.

14  A.   As I understood it, Emily was the

15       person who would be working along with

16       the PT in clinic with the client.  So

17       it would be appropriate for her to

18       provide a date.

19  Q.   So this Children's Rehabilitation

20       Service report of visit, would Emily

21       provide a date for this visit?

22  A.   Yes, it would be appropriate for her to

23       do so.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services
Felecia Barrow Deposition

Page 35

```
1                    MR. STEWART:  Object to the

2                    form.

3                    MR. WALKER:  Object to the

4                    form.

5    A.   Yes, it is.

6    Q.   Was this one of the complaints that

7         Elizabeth had against the company,

8         failure for them to place dates?

9                    MR. STEWART:  Object to the

10                   form.

11   A.   I do recall her mentioning that there

12        were dates missing from forms.

13   Q.   Did she ever tell you that they wanted

14        her to fill in some of these dates?

15                   MR. STEWART:  Object to

16                   form.

17   A.   I don't recall if they were clinic

18        dates that they wanted her to fill in.

19   Q.   But do you recall her saying they

20        wanted her to fill in any dates --

21   A.   Yes.

22   Q.   -- on any of the forms?

23   A.   Yes.
```

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Felecia Barrow Deposition

Page 37

1    dating the delivery tickets?

2                MR. WALKER:   Object to the

3                form.

4                MR. STEWART:   Object to the

5                form.

6    A.   If a vendor does not put a date or have

7         the client date a delivery ticket, it

8         basically does not give the Medicaid

9         Agency any indication that the

10        equipment was delivered in the time

11        frame allowed by policy.

12   Q.   And failure to deliver the equipment in

13        a timely manner, what would be the

14        adverse consequence?

15                MR. STEWART:   Object to the

16                form.

17   A.   It goes against policy.  And that would

18        have been left up to the directors at

19        the agency as to what the consequence

20        would be.

21   Q.   All right.  Now, to continue reading in

22        the second paragraph for Plaintiff's

23        Exhibit #6, it says, Subsequent fax was

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Felecia Barrow Deposition

Page 40

1              MR. STEWART:  Object to

2                  form.

3              MR. WALKER:  Object to the

4                  form.

5    A.  Yes, because it goes against policy.

6    Q.  And is it misleading the --

7              MR. STEWART:  Object to the

8                  form.

9              MR. WALKER:  Object to the

10                 form.  Sorry.  Go ahead.

11   Q.  Is it misleading the Medicaid Agency?

12             MR. WALKER:  Object to the

13                 form.

14             MR. STEWART:  Object to the

15                 form.

16   A.  Yes.

17   Q.  And, actually, is it fair to say that

18       it's fraud?

19             MR. WALKER:  Object to the

20                 form.

21             MR. STEWART:  Object to the

22                 form.

23   A.  Yes.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Felecia Barrow Deposition

Page 42

1    Q.   Who told you that?

2    A.   Mr. Rodgers.

3    Q.   Now, this last sentence in paragraph --

4         in the third paragraph, Plaintiff's

5         Exhibit #6, you said, This was the same

6         information that was reported by former

7         National Seating employee, Elizabeth

8         Horton.

9    A.   Yes.

10   Q.   So Elizabeth Horton had reported the

11        same information that you witnessed

12        firsthand.

13   A.   Yes.

14   Q.   So based on what Ms. Horton had

15        reported and what you had reviewed, did

16        you request an investigation?

17   A.   Yes, I did.

18   Q.   Now, I'm going to show you what we'll

19        mark as Plaintiff's Exhibit #8.

20                 (Plaintiff's Exhibit #8 was

21                  marked for identification.)

22              MR. WALKER:   I'm sorry,

23                  Deborah.   Which exhibit

ALABAMA MEDICAID AGENCY

February 16, 2005

*[handwritten: 02-17-05 Refer to Jackie (Thomas) Johnson to Clifford Johnson]*

MEMORANDUM

To:        Mary G. McIntyre, M.D., M.P.H.
           Medical Director
           Office of the Commissioner

From:      Felecia S. Barrow, M.P.A. *[handwritten initials]*
           Associate Director
           Prior Approval Unit

Re:        Issues with Wheelchair Assessments Received

Please find attached examples of wheelchair assessments that have been submitted by National Seating and Mobility – Montgomery, that were missing the clinic dates. Two of the assessments were conducted by Gerry Rodgers, P.T. and one by Michael Maddox, R.P.T., both of Children's Rehab Services.

Teresa Surles, R.N. questioned the assessments and was told (by Gerry Rodgers) to get the dates from Emily, National Seating. I informed Teresa that the clinic dates should be kept at CRS where the assessment was conducted. Teresa, under my direction, contacted CRS to get the clinic date instead of Emily. Jackie (CRS) informed Teresa that the date of the clinic appointment was July 20, 2004. The PA request was submitted in February 2005. A subsequent fax was received from Gerry Rodgers indicating that the assessment was reviewed on 2/15/05 and was "still o.k." I conferred with Teresa and Debbie and thought that we needed updated clinic notes telling us the current condition of the client. On another client, both the physician's note of medical necessity and the P.T. assessment were lacking dates.

Teresa came across another assessment completed by M. Maddox and placed a call to the P.T. to find out why the date was missing. The P.T. replied, "...maybe we're not supposed to do this (pause), but I never put dates on the assessments or the prescriptions because it messes up the vendor"..."like, we're on a time clock...". It is odd that on the assessments that Mr. Maddox has done for other vendors have a date on them, but the ones done for National Seating do not have dates. This was the same information that was reported by former National Seating employee, Elizabeth Horton.

I would like to refer this information to Clifford Johnson, Chief Investigator, Program Integrity Division. If it is too premature at this point, I will wait.



PLAINTIFF'S
EXHIBIT

*6 - Barrow*

## CHILDREN'S REHABILITATION SERVICE
## REPORT OF VISIT

SSN:        PATIENT: KATIE LYNN SMITH        DATE:

Katie Lynn is a cute little 4-year-old. She is very premature. She had hydrocephalus and CP. Mary has followed her and is concerned with her left hip and her right heelcords. On exam, there are problems with the left leg and left tendo-achilles. There are definitely tight, and I cannot get it quite to neutral. Right side is passively correctable, but she does have increased tone, and she likes to hold it in equinos. On my exam, the hips feel steady and leg lengths appear to be equal. I really think an AP and frog lateral hip x-rays would be appropriate. We are going to do serial casting on the left leg. She will need a set of fixed AFOs. I will see her back in this clinic in three months.

(Joseph Curtis, M.D.)/sl

## CHILDREN'S REHABILITATION SERVICE
## REPORT OF VISIT

SSN:        PATIENT: KATIE LYNN SMITH

PHYSICAL THERAPY:

Katie Lynn is unable to ambulate and needs a chair for mobility. She is getting too long to be carried and she has good use of her upper extremities so we would like for her to be able to push some whi she is in a seated position. She goes to daycare at school, and they need a way to get her around in these areas also. I feel that at this point due to the family situation, we may need to get a stroller tha can be transported in many different vehicles that is easy to fold up and easy to get around. We can also get some large wheels where she can push herself on it sometimes. Katie Lynn can sit up with hand supports so I feel like with a five-point harness, she could sit up in the stroller very well. A prescription for this was given to Don from National Seating and Mobility today. She does not have current EPSDT, and once this is done, we need to get a copy and forward it over to National Seatin along with a copy of this clinic dictation so that they can submit it to Medicaid. Once it is approved, will be ordered. When it comes in, we will schedule a time for delivery. She had a wheelchair recommended a couple of years ago through Seating Clinic. It was approved and ordered, but we were never able to get a hold of the family for delivery, so the chair had to be sent back. Katie Lynn much larger than she was then, so what we ordered then would not be appropriate, and we need a new seating system this time.

(Gerry Rodgers, PT, PCS)/sl

CHILDREN'S REHABILITATION SERVICE
REPORT OF VISIT

SSN: 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    PATIENT: JASMINE WILLIAMS    (7/20/04 per Jackie @ CRS)

PHYSICAL THERAPY:

Jasmine's seating system has been wearing out. Foam is visible through most of the different pads and seating systems. In addition, her scoliosis has worsened, and her spine is actually shortened, so the back is too tall. In addition, the back posts get out of whack according to the mom. They were uneven today, and I evened them back up. I described the rigidizing bar that would go in-between there, but it would be one more step in folding the chair. Mom would like to go ahead and do this. We need to repair the brake on the left side of the chair. Otherwise, the frame is in pretty good shape. I do think that we need to get her new seating to continue to support her in her wheelchair. She needs a solid seat and back, thoracic pads and hip guides to keep her trunk and hips in the midline. She needs an abductor to keep her hips apart. Her right leg tends to adduct excessively. She needs a three-piece headrest for posterior and lateral head support. She needs a rigidizer bar to keep the frame from getting out of line and brake repair on the left. EPSDT and prescription were given to Emily from National Seating and Mobility. We need to send a copy of this clinic dictation to her so that she can submit it to Medicaid. Once the approval is received from Medicaid, the chair will be ordered. When it comes in, we will schedule a time for delivery.

(Gerry Rodgers, PT, PCS)/sl

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Felecia Barrow Deposition

Page 44

1       billing activities.

2    Q.   And failure to put in dates, would that

3         be connected to the billings?

4              MR. STEWART:   Object to the

5                   form.

6    A.   That would be connected to billing.

7    Q.   All right.  So if they manipulate

8         dates -- if National Seating &

9         Mobility, Don Williams, Emily Williams,

10        were manipulating dates on these clinic

11        dates and the delivery dates, that

12        affects billing --

13   A.   Yes.

14             MR. STEWART:   Object to the

15                  form.

16             MR. WALKER:   Object to the

17                  form.

18   Q.   -- and would amount to fraudulent

19        billing practices?

20             MR. WALKER:   Object to the

21                  form.

22             MR. STEWART:   Object to the

23                  form.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services          Felecia Barrow Deposition

Page 45

1   A.   Yes.

2   Q.   All right.  I'm just going to ask you

3        about this because I don't know myself

4        what that means.  You may recognize

5        that screen.  I'm not even sure if I'm

6        going to admit that as an exhibit.  Is

7        that some kind of computer screen or

8        something maybe?

9   A.   Yes.

10  Q.   If you don't recognize it, that's fine.

11       Do you recognize that?

12  A.   Yes.

13  Q.   Well, what is this document?

14  A.   This is their provider eligibility

15       screen, which allows us to put in a

16       provider number and bring up the

17       information, basically, on the

18       provider.  It should give the effective

19       date of enrollment as a Medicaid

20       provider as well as their specialty

21       type, if there is one.

22  Q.   Would it also allow you to print out a

23       list of the recipients --

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Felecia Barrow Deposition

Page 59

```
1        at the delivery tickets and the dates

2        and -- that were on the delivery

3        tickets.

4   Q.   And what, if anything, did you find?

5   A.   We did not find any discrepancies as,

6        if we had found something, we would

7        have caught it in the beginning.

8   Q.   All right.  But it's your position

9        today that you did find infractions on

10       your own.  Am I correct?

11  A.   Yes.

12                MR. STEWART:  Object to the

13                     form.

14                MR. WALKER:  Object to the

15                     form.

16  Q.   And you did bring those to the

17       attention of the investigator?

18  A.   Yes.

19                MS. NICKSON:  All right.  No

20                     further questions.

21                     EXAMINATION

22       BY MR. STEWART:

23  Q.   We met before we began, Ms. Barrow.
```

Page 7

```
 1          Medicaid Agency?

 2   '  A.   I'm the chief investigator for the

 3          investigation unit.

 4      Q.   And how long, Mr. Johnson, have you

 5          been with them?

 6      A.   With Medicaid?

 7      Q.   Yes, sir.

 8      A.   Since 1993.  So what's that?

 9      Q.   Okay.  Well, what, about sixteen years

10          or thirteen, fourteen years?

11      A.   Yeah.

12      Q.   Yes.

13      A.   That sounds right.

14               MR. STEWART:  Lawyers aren't

15                    good at math.

16      Q.   So you've been with the Medicaid Agency

17          for approximately fifteen years?

18      A.   Yes.

19      Q.   And you're the chief?

20      A.   Yes, ma'am.

21      Q.   Excellent.  And Mr. Anthony Green, does

22          he work under your supervision?

23      A.   Yes, he does.
```

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services    Clifford Johnson Deposi

Page 25

```
 1        They was asking her questions on the

 2        line as what information did she

 3        receive regarding National Seating &

 4        Mobility and -- regarding them not

 5        having provided services or supplies to

 6        Medicaid recipients regarding

 7        wheelchairs.  So all the exact details,

 8        I don't remember.  I don't recall.

 9   Q.   Do you remember Felecia saying anything

10        about she had documentation to support

11        the fact that they did have missing

12        dates on some of their documents?

13   A.   I would have to say yes.

14              MR. STEWART:  Object to

15                   form.

16   A.   Yes, ma'am.

17   Q.   Do you remember her discussing

18        infractions at National Seating &

19        Mobility submitted to her department?

20              MR. STEWART:  Object to

21                   form.

22   A.   I'm trying to understand the question.

23   Q.   Such as missing dates on forms.
```

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Clifford Johnson Deposition

Page 26

```
 1              MR. STEWART:  Same

 2              objection.

 3    A.  Yes.

 4    Q.  What, if anything, did she say?

 5    A.  Again, I would have to say something on

 6        the line where she would say they

 7        received forms or documentation from

 8        the company where certain dates were

 9        not on the form for -- I guess missing

10        dates or . . .

11    Q.  And was that part of Elizabeth Horton's

12        complaint as you understood it?

13    A.  Yes, ma'am.  I would say so, yes.

14    Q.  And did Ms. Barrow say that she had

15        personal knowledge or just received

16        information in her office of the same?

17    A.  Yes.

18    Q.  Investigator Green did the

19        investigation at the office of National

20        Seating & Mobility here in Montgomery.

21        You reviewed his complaint where you

22        said he didn't find any criminal

23        activity.
```

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Clifford Johnson Deposition

Page 30

1    corrections are made, then the

2    investigator has no other choice but to

3    conclude no criminal activity?

4              MR. WALKER:  Objection to

5                   form.

6              MR. STEWART:  Object to

7                   form.

8    A.  Yes, ma'am.

9    Q.  All right.  Let me show you Plaintiff's

10       Exhibit #3, Bates Drab Page 14.  If you

11       would, let us look at Paragraph No. 2.

12       Could you read that for the record,

13       please.

14   A.  Teresa Surles, RN, questioned the

15       assessment and was told by Gerry

16       Rodgers to get the dates from Emily,

17       National Seating.  I informed Teresa

18       that the clinic dates should be kept at

19       CRS where the assessment was conducted.

20       Teresa, under my direction, contacted

21       CRS to get the clinic dates instead of

22       Emily.  Jackie, CRS, informed Teresa

23       that the date of the clinic appointment

Page 31

```
 1        was July 20th, 2004.  The PA request

 2        was submitted in February 2005.  A

 3        subsequent fax was received from Gerry

 4        Rodgers indicating that the assessment

 5        was reviewed on 2/15/05 and was still

 6        okay.  I conferred with Teresa and

 7        Debbie and thought that we needed

 8        updated clinic notes telling the

 9        current condition of the clinic.  On

10        another client, both the physician

11        notes and medical necessity and the PT

12        assessment were lacking dates.

13   Q.   So when they failed to put dates on the

14        assessments, doesn't that alter the

15        system?

16                  MR. STEWART:  Object to the

17                  form.

18                  MR. WALKER:  Object to the

19                  form.

20   Q.   Requirements.

21   A.   Yes, ma'am.

22   Q.   So that's actually where the fraud

23        occurred.  Am I correct?
```

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

**Clifford Johnson Deposition**

Page 36

1    Q.   So is it fair to say that this

2         assessment by Teresa Surles questioning

3         the assessments and missing dates,

4         would that pretty much be lining up

5         with the complaint that Elizabeth

6         Horton had?

7                    MR. STEWART:  Object to the

8                         form.

9    A.   Yes, ma'am.

10                   MR. WALKER:  Object to the

11                        form.

12   Q.   Was that a yes, Mr. Johnson?

13                   MR. STEWART:  Object to the

14                        form.

15   A.   Yes.

16   Q.   All right.  Now, if we can read the

17        next paragraph for the record.

18   A.   Teresa came across another assessment

19        completed by M. Maddox and placed a

20        call to the PT to find out why the

21        dates was missing.  The PT replied,

22        Maybe we're not supposed to do this,

23        pause, but I never put dates on the

MERRILL LEGAL SOULTIONS    Clifford Johnson Depositi
Court Reporting*Legal Videography*Trial Services

Page 37

```
 1        assessment or the prescription because

 2        it messes up the vendors, like we're on

 3        a time clock.  It is odd that the

 4        assessments that Mr. Maddox has done

 5        for other vendors have a date on them,

 6        but the ones done for National Seating

 7        do not have dates.  This was the same

 8        information that was reported by former

 9        National Seating employee, Elizabeth

10        Horton.

11   Q.   Now, looking at this document, you have

12        the same thing that Elizabeth Horton

13        complained of.  You have a Medicaid

14        Agency employee that's firsthand

15        witness to it.  Am I correct?

16                MR. STEWART:  Object to

17                  form.

18                MR. WALKER:  Object to form.

19   A.   That's correct.

20   Q.   All right.  Just based on this memo.

21   A.   Yes.

22   Q.   And this memo is written by whom?

23   A.   Felecia Barrow.
```

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Clifford Johnson Depo:

Page 39

1                    MR. WALKER:   Same.

2     A.   No, ma'am.

3     Q.   Does anybody know what he meant when he

4          said, according to Teresa, that I never

5          put dates on the assessment?

6     A.   No, I don't know.

7     Q.   Did anybody find out what he meant when

8          he said the prescriptions -- or the

9          prescriptions because it messes up the

10         vendor?

11                   MR. WALKER:   Object to the

12                        form.

13                   MR. STEWART:   Same.

14    A.   And the question is?

15    Q.   Did anybody find out what he meant by

16         that?

17                   MR. WALKER:   Same.

18                   MR. STEWART:   Same

19                        objection.

20    A.   No, ma'am.

21    Q.   Now, I'm just asking you as an

22         investigator.  If you got National

23         Seating & Mobility know that they need

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services
**Clifford Johnson Deposition**

Page 40

1    dates, then you have a physical

2    therapist consistently submitting

3    assessments or prescriptions without

4    dates, then you have your Medicaid

5    employee, Felecia Barrow, receiving

6    information, how can any report that

7    Felecia Barrow gave be fraudulent?

8            MR. STEWART:  Object to

9                 form.

10            MR. WALKER:  Object to form.

11  Q.  I mean not Felecia but Elizabeth Horton

12    gave be fraudulent?

13            MR. STEWART:  Same

14                 objection.

15            MR. WALLACE:  Objection to

16                 form.

17            MR. WALKER:  Object to the

18                 form.

19  A.  It can't be.

20  Q.  So doesn't this suggest that there was

21    some kind of evidence or there was

22    something going on at National

23    Seating & Mobility?

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services    Anthony Green Deposition

Page 5

1          by either party hereto provided for by

2          the Federal Rules of Civil Procedure.

3

4              *      *      *      *      *      *      *      *

5

6                      ANTHONY L. GREEN

7          The witness, having first been duly

8          sworn or affirmed to speak the truth,

9          the whole truth, and nothing but the

10         truth, testified as follows:

11                  THE REPORTER:  Usual federal

12                  stipulations?

13              MS. NICKSON:  Yes.

14              MR. WALKER:  Yes.

15                  EXAMINATION

16     BY MS. NICKSON:

17     Q.   Would you state your name for the

18          record.

19     A.   I'm Special Investigator Anthony L.

20          Green.

21     Q.   Mr. Green, I am Deborah Nickson.  I am

22          a local attorney here in Montgomery and

23          I represent Elizabeth Horton, who is a

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services    Anthony Green Deposition

Page 7

```
 1                  MR. STEWART:  Object to

'2                      form.

 3                  MR. WALKER:  Same objection.

 4    Q.  You can answer.

 5    A.  Yes, I did.

 6    Q.  And first let me ask you, you said you

 7        are a special investigator.  And with

 8        what division?

 9    A.  Alabama Medicaid Agency.

10    Q.  How long have you been with the

11        Medicaid Agency?

12    A.  Approximately two and a half years.

13    Q.  Two and a half years?

14    A.  Yes, ma'am.

15    Q.  And what did you do prior to that?

16    A.  Prior to that, I worked for the

17        Veterans Administration as a police

18        officer.  I was lieutenant of

19        operations for Tuskegee University

20        Security Department.  I worked with the

21        New York State Police for twenty-one

22        years, and I was in the military prior

23        to that.
```

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services    **Anthony Green Deposition**

Page 8

1    Q.    Yes, sir.  And the various prior

2          employers that you've listed, did you

3          have experience in investigating cases,

4          matters, events?

5    A.    Yes, I did.

6    Q.    And you said that your employment with

7          Medicaid has been two and a half years?

8    A.    Yes, that's correct.

9    Q.    And you are assigned as a special

10         investigator.

11   A.    That's correct.

12   Q.    And as a special investigator, what are

13         your duties and responsibilities?

14   A.    We deal with cases involving Medicaid

15         fraud or suspected Medicaid fraud.

16   Q.    And in your two and a half years with

17         Medicaid, how many cases have you

18         investigated, approximately?

19   A.    I would think that a safe estimate

20         would be about seventy.

21   Q.    About seventy?

22   A.    Yes.

23   Q.    And of the seventy cases, how many have

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services    Anthony Green Deposition

Page 9

```
 1          been confirmed on the allegations?

 2     A.   I'm going to say 50 percent.

 3     Q.   And for the 50 percent that you were

 4          not able to confirm the allegations,

 5          were any arrests recommended or made as

 6          a result thereof?

 7     A.   I'm sorry.  Repeat that.

 8     Q.   Okay.  For the 50 percent where the

 9          claims or -- the claims of a person

10          alleging fraudulent activity were not

11          substantiated, were arrests the result

12          of it?

13     A.   No.

14     Q.   In your two and a half years with

15          Medicaid, have you ever known of a

16          complainant to be arrested for the

17          complaint not being confirmed?

18     A.   The only case that I'm aware of is the

19          one that I'm presently here for.

20     Q.   And that is Elizabeth Horton?

21     A.   Yes, ma'am.

22     Q.   What, if anything, was different about

23          her complaint, if you know?
```

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services     Anthony Green Deposition

Page 10

1                    MR. STEWART:  Object to

2                         form.

3    A.   From my perspective, it was, I would

4         say, a regular complaint.  There was

5         nothing that I can think of that was

6         different from any of the other various

7         complaints we've received.

8    Q.   Let's talk about how you got involved

9         in the case.  How did you get involved

10        with the complaint that was allegedly

11        made by Elizabeth?

12   A.   I received it in the same manner we

13        receive virtually all our cases.  The

14        cases come in and my supervisor, Chief

15        Investigator Cliff Johnson, assigned

16        the case to me.

17   Q.   Yes, sir.  And did he give you a file?

18   A.   Yes, he did.

19   Q.   Do you remember what was contained in

20        the file?

21   A.   There would have been a standard

22        complaint form, which would have

23        contained the basic allegation; the

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 17

1    Q.   Does that mean that there's a prior

2         investigation?

3    A.   Yes.

4    Q.   Okay.

5    A.   And from that point on, it's just

6         information that I came through during

7         the course of my investigation.

8    Q.   All right.  During the course of your

9         investigation, did you talk with a

10        young lady by the name of Chaseley

11        Weeks?

12   A.   Yes, I did.

13   Q.   What, if anything, did Ms. Weeks tell

14        you?

15   A.   I spoke with Ms. Weeks, and basically

16        she informed me that she worked at

17        National Seating & Mobility; she's no

18        longer employed there.  I'd just like

19        to refer back to see exactly what I

20        wrote.

21   Q.   Yes, sir, you can.

22   A.   Okay.  I spoke with Ms. Weeks

23        initially, and she had agreed to meet

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Anthony Green Deposition

Page 20

1        office had also conducted an

2        investigation on this.  I requested a

3        copy of their report; and from there, I

4        went through to see who their

5        complainants and witnesses were, and I

6        attempted to contact individually the

7        same people.  And -- and with finding

8        out that Elizabeth Horton was a

9        complainant in this case, that's pretty

10       much how I came in on her and that's

11       why she was contacted.

12   Q.  And what, if anything, did Elizabeth

13       tell you?

14   A.  I had several conversations with

15       Elizabeth -- should be Ms. Horton.

16       Over the course of our conversations,

17       she advised me that she felt that there

18       were some things going on with National

19       Seating & Mobility that she felt may

20       have been fraudulent.

21   Q.  So her statements were pretty much one

22       and the same as Chaseley Weeks'?

23   A.  Yes.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Anthony Green Deposition

Page 24

```
 1                       form.

 1                       MR. WALKER:  Object to the

 3                       form.

 4   A.   My opinion of Ms. Horton was that she

 5        had information that she thought and

 6        she suspected that something was going

 7        on that wasn't correct or appropriate.

 8        Do I think she was a liar?  From my --

 9        my time with her, no, I don't think she

10        was lying to me.  But I will say that

11        one of the problems I did have with

12        Ms. Horton was after -- actually, she

13        was very, very, very, very difficult to

14        get in touch with, which made it very

15        difficult to follow up on some of the

16        information to keep the investigation

17        going.  I believe that she believed

18        something was going on, but I don't

19        believe that she was as cooperative as

20        she could have been and possibly as she

21        should have been.

22   Q.   Did she give the impression that she

23        didn't want to get involved?
```

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 38

1                    MR. STEWART:  Object to the

2                         form.

3      A.  My gut feeling?

4      Q.  Uh-huh.

5                    MR. WALKER:  Object to the

6                         form.

7      Q.  You have two complainants.  You have

8          Chaseley Weeks, former employee, said

9          something is going on.  Then you have

10         Elizabeth Horton, a former employee,

11         saying something was going on.  What

12         was your gut feeling?

13                   MR. STEWART:  Object to the

14                        form.

15                   MR. WALKER:  Same objection.

16     A.  My only gut feeling was, is they

17         contacted with a complaint, as do many

18         other people.  When I receive a

19         complaint, I assume that the people

20         that are calling believe that their

21         complaint is legitimate; and I look

22         into it from that basis until I prove

23         or disprove.  So my gut feeling was, is

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Anthony Green Deposition

Page 39

```
 1         that they believe that they had

 2         something that they should notify us

 3         about.  I received the information; I

 4         looked into it until I was satisfied

 5         that there was nothing there.

 6    Q.   Okay.  I'm going to show you this

 7         document, and this will be Bates

 8         Drab 14.  Would you identify this

 9         document for the record, please?

10    A.   This is a document that was generated

11         by the Alabama Medicaid Agency

12         February 16th of 2005.  This is a

13         memorandum from Dr. McIntyre, who's

14         medical director for the Medicaid

15         Agency.

16    Q.   All right.  If you would, just read

17         that first sentence for the record for

18         me, please.

19    A.   Where it says --

20              MR. WALKER:  It's from

21                   Felecia Barrow, is who

22                   it's to.

23    Q.   Okay.  The memorandum is to whom?
```

Page 40

1    A.    The memorandum is to -- I'm sorry.  The

2          memorandum is to Dr. McIntyre and it's

3          from Ms. Barrow.

4    Q.    And who is Dr. McIntyre?

5    A.    Dr. McIntyre is the medical director at

6          Medicaid.

7    Q.    And Felecia Barrow, who is she?

8    A.    She's a former employee of Medicaid.

9          She was the associate director for the

10         prior approval unit.

11   Q.    And she's writing this memorandum in

12         reference to?

13   A.    Issues with wheelchair assessments

14         received.

15   Q.    Now, in the first paragraph, what does

16         she state?

17   A.    It's just saying that -- she's saying,

18         Please find an example of wheelchair

19         assessments that have been submitted by

20         National Seating & Mobility in

21         Montgomery that were missing client

22         dates.

23   Q.    Clinic dates.

Page 54

1    way that Elizabeth had a malicious

2    intent to harm National Seating &

3    Mobility, Don Williams, or Emily

4    Williams?

5                    MR. WALKER:  Object to the

6                        form.

7                    MR. STEWART:  Object to the

8                        form.

9    A.  I don't know what her intent was.  The

10    only thing I knew is that she had a

11    complaint and I just investigated the

12    complaint.

13    Q.  But she was like a normal complainant?

14                    MR. STEWART:  Object to the

15                        form.

16                    MR. WALKER:  Object to the

17                        form.

18    A.  Yes.

19    Q.  Did she ever express maliciousness?

20                    MR. STEWART:  Object to the

21                        form.

22                    MR. WALKER:  Object to the

23                        form.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Anthony Green Deposition

Page 55

1    A.   Not to me, no.

2              MS. NICKSON:  All right.  No

3                   further questions.

4                   EXAMINATION

5    BY MR. WALKER:

6    Q.   Let me ask you a question, please, sir.

7         If you would look at Exhibit #1 and,

8         particularly, if you would look at

9         page 2 and if you would read the

10        paragraph, summary of fraudulent

11        activity.

12   A.   On June 1st, 2006, I met with Ms. Emily

13        Williams -- if I can skip the

14        abbreviations there -- with National

15        Seating & Mobility, 646 Oliver Road,

16        Montgomery, Alabama, and Tim Maddox of

17        National Seating & Mobility, 377

18        Riverside Drive, Suite 300, Franklin,

19        Tennessee, and reviewed -- and reviewed

20        the requested files.  A review of these

21        files revealed no signs of any criminal

22        activity or wrongdoing.  At no time did

23        this investigation reveal any signs of'

Display Data Specifications

Infotype Edit Goto Extras System Help

| | | | |
|---|---|---|---|
| Personnel No | 1119737 | Name | HORTON , ELIZABETH W |
| Pers.area | EDS Employees | | Withdrawn |
| Subarea | SE Alabama | EE group | Leave of Absence |
| EE subgrp | Hr/Partial Pay/Bene | | |
| Start | 07/21/2004 | to | 12/31/9999 |
| Chng | 06/19/2005 | S2A9G5 | |

Date Specifications

| Date type | Date | Date type | Date |
|---|---|---|---|
| 01 Techn.date of entry | 07/21/2004 | 42 Last day worked | 02/15/2005 |
| 44 Vacation Calc.Date | 07/21/2004 | H2 Last Date Employed | [illegible]/14/200[illegible] |

PL1 (1) (010) jusplsap120 OVR 12:49

PLAINTIFF'S EXHIBIT B