**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | |
|---|---|
| ELIZABETH HORTON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )   CASE NO. 02:06-CV-00526-MHT |
| | ) |
| DON WILLIAMS, et al., | ) |
| | ) |
| Defendants. | ) |

## TRIAL BRIEF

Pursuant to this Court' May 20, 2008 Pretrial Order, Defendants National Seating and Mobility, Inc. (NSM) and Don Williams (Williams) submit this trial brief outlining NSM's defenses against Plaintiff's claims.

## FACTUAL BACKGROUND

1. In 2004, Plaintiff Elizabeth Horton ("Horton") was, for two and a half months, a temporary worker at defendant NSM. Her employer was Kelly Services. She was reassigned from NSM because her performance was unsatisfactory and because she threatened to cause a problem with an agency that regulated NSM's business.[1]

2. In 2004, while Horton was an employee of Kelly Services, a temporary staffing agency, she was assigned to work at NSM's small office in Montgomery. NSM provides customized wheelchairs and seating systems for Medicaid patients, mostly children, who have been diagnosed with a permanent or long-term loss of mobility, and whose disabilities require them to use made-to-order wheelchairs for mobility.

---

[1] Plaintiff claims that she became aware that Emily and Don Williams were putting falsified dates on Medicaid applications. She alleges that she reported this alleged fraud to the Director of Prior Approval Department. She also stated in her deposition that she voluntarily left her assignment at NSM.

3.  While Horton was at NSM, Williams also worked there as a technician. His wife, Emily Williams (Emily), was the branch manager. Emily worked with physicians and physical therapists to develop a plan for medical equipment, including customized wheelchairs, that met the individual needs of each patient who sought NSM's services. After a plan for medical equipment was prepared, and the appropriate prescriptions and paperwork received, Emily was responsible for submitting the prescriptions for preliminary approval to the Alabama Medicaid Agency's ("Medicaid") Prior Approval Unit. Unlike Emily, who dealt primarily with the physicians, therapists, and paperwork, Williams' primary responsibility as a technician was to assemble each individualized wheelchair from specialized parts, and to handle shipping, packing, and delivering the assembled equipment to NSM's clients.

4.  Medicaid's Prior Approval Unit reviewed and approved these submissions. The approval process requires a provider of durable medical equipment, such as NSM, to obtain Medicaid's approval before a wheelchair can be built for a patient, and to prove that the equipment was delivered to the patient before the provider can receive payment from Medicaid. The request for approval should be submitted to the Prior Approval Unit within 60 days after a prescription is written for a wheelchair, and the Prior Approval Unit must act on the request within 60 days.

5.  Horton was a temporary employee assigned to NSM from approximately April 9, 2004 to June 25, 2004. While Horton was at NSM, her duties were clerical; she was responsible primarily for answering the telephone and forwarding to Medicaid information prepared by Emily. Soon after Horton began at NSM, Emily and Don Williams noticed problems with Horton's work and work habits. It was believed that Horton, who wore mini-skirts and other unprofessional attire, often dressed inappropriately for work. However, more troubling was the

1/1740821.3

2

relationship Horton appeared to develop with Felecia Barrow, who at the time was the Associate Director of Medicaid's Prior Approval Unit. Because NSM submits requests for approval and payment to Medicaid, relationships between its workers and Medicaid must be strictly professional. To that end, NSM strives to avoid the appearance of impropriety and potential conflicts of interest. Despite this objective, it appeared that Horton was developing a personal relationship with Barrow. For example, Horton and Barrow discussed personal matters during telephone calls, and planned to attend a concert together. Horton also invited Barrow to visit the NSM workplace during lunch; an invitation that Barrow accepted, although she denied that she ate lunch with Horton, and later claimed the visit was work-related. Shortly after this event, and primarily because of the concern that Horton was developing an inappropriate personal relationship with Barrow, Williams recommended that NSM ask Kelly Services to reassign Horton. William's recommendation was accepted, and Horton completed her last day of work with NSM on June 25, 2004.

6. After Horton's reassignment from NSM, she alleged that NSM engaged in fraudulent Medicaid billing. On July 9, 2004, Felecia Barrow, acting as Associate Director of the Medicaid Prior Approval Unit, sent a memorandum to the Medicaid Review Department alleging that NSM had made fraudulent claims. Barrow alleged that a former employee of NSM was willing to provide information regarding the allegations. Barrow has acknowledged that the complaint she received and upon which her July 2004 memorandum was based came from Horton. Sometime later, Medicaid received an anonymous complaint about NSM, which again alleged that NSM was billing for services not rendered and was forging recipients' names on delivery tickets for equipment.

7. Medicaid investigated these allegations, as did the Attorney General's office. Michael Roeder, with the Attorney General's Office Medicaid Fraud Control Unit, interviewed Horton on April 15, 2005. Horton alleged that NSM was engaged in fraudulent activity, primarily alleging that NSM had billed Medicaid for wheelchairs that it had not delivered. Roeder showed Horton a printout of patients for whom NSM had submitted invoices to Medicaid, and Horton identified 37 names that she recognized, and said that she recognized those names as instances where she believed wheelchairs were not received.

8. Subsequently, Senior Special Agent Gerald Shockley handled the investigation by the Attorney General's office. Shockley was a highly experienced investigator. During the course of the investigation, he interviewed 24 of the 37 parents or guardians of Medicaid-recipient children who Horton had identified to Roeder. All of the children had received their wheelchairs from NSM. None of the clients with whom Shockley spoke substantiated Horton's allegations that NSM had billed for wheelchairs that had not been delivered. As part of Shockley's investigation, he also interviewed Williams twice. Williams denied Horton's allegations of fraud and provided documentation to Shockley which established that the wheelchairs for which Medicaid had been billed were in fact delivered to NSM's clients. Under questioning from Shockley, Williams stated his belief that Horton had made the anonymous complaints against NSM and that she was doing so in retaliation for her dismissal from NSM.

9. Shockley found no support for the allegation that NSM was engaged in fraudulent activity, and concluded that Horton had made the unsubstantiated allegations. Medicaid, at the conclusion of its investigation, also found no support for the allegations against NSM. After he closed his investigation, Shockley discussed the matter with Assistant Attorney General Bruce M. Lieberman, the Director of the Attorney General's Medicaid Fraud Control unit. Mr.

Lieberman, after hearing the facts, instructed Shockley to file a complaint in Montgomery County District Court for violation of Alabama Code § 13A-10-9 (1975) (making a false report to law enforcement), and to obtain a warrant for the arrest of Horton. On August 1, 2005, Shockley appeared before Montgomery County District Court Magistrate Holly Faems, filed a complaint, and after reviewing the facts with the Magistrate, he was issued an arrest warrant. Horton was subsequently arrested, and was tried in a non-record bench trial on October 13, 2005. The trial witnesses were Felecia Barrow, Don Williams, Gerald Shockley, and Michael Roeder.

10. NSM never asked the Attorney General's office or Medicaid to investigate Horton; NSM and Williams did not do anything other than respond to the Attorney General's investigation. NSM and Williams did not provide the Attorney General's office anything that resulted in Horton's arrest. Williams did not swear out a warrant, sign a statement, make a complaint, or sign an affidavit directed at or requesting Horton's arrest. Neither NSM nor Williams had any agreement with the State of Alabama to have Horton arrested.

## ISSUES

The Amended Complaint has three counts. Count One is directed at defendant Special Agent Gerald Shockley for alleged violations of Horton's rights under the Fourth, Fifth, and Fourteenth amendments as a result of allegedly causing her to be arrested and prosecuted without probable cause. Count Two, which is directed at defendant Williams, alleges violations of these same constitutional rights because Williams, allegedly acting "in conjunction with defendant Shockley," "caused her to be subjected to a criminal proceeding whose sole basis was the now proven false statement of defendant Williams" in which "he accused her of lying because her employment with National Seating and Mobility, Inc. was terminated." Count Three is directed

at NSM and alleges that it has liability for the alleged acts of Williams under the doctrine of *respondeat superior*.

I.   **FIFTH AMENDMENT CLAIM**

When a party brings a section 1983 claim alleging a violation of the Fifth Amendment, it must meet the 1983 requirements and the Fifth Amendment requirements. *See Whitehorn v. Harrelson*, 758 F.2d 1416, 1419 (11th Cir. 1985). A Fifth Amendment deprivation occurs when a party is "deprived of life, liberty, or property, without due process of law." *U.S. Const. amend. V*. Importantly, "the Fifth Amendment's due process clause applies to only the federal government." (Order and Opinion, doc. no. 42 p.4 (citing *Riley v. Camp*, 130 F.3d 958, 972 n.19 (11th Cir. 1997).) Thus, under a Fifth Amendment Section 1983 claim, a party must plead and prove a federal action in order to establish liability. *See id*. Horton cannot claim that NSM or Williams violated her Fifth Amendment rights because there is no federal action.

11.   Horton has brought suit against two private parties, NSM and Williams, and one state employee, Shockley. She has not alleged that any federal employee conspired with these parties.

12.   Horton's claims involve only her state criminal investigation and state court trial. The federal government was not involved in Horton's investigation or trial.

II.   **FOURTEENTH AMENDMENT CLAIM**

The Fourteenth and the Fourth Amendment each contain a due process clause. *See U.S. Const. amend. IV, XIV*. The "Fourteenth Amendment by its terms applies to States," and the Fourth Amendment applies to the States because its terms have been "incorporated" by the Fourteenth Amendment. (*See* doc. no. 42 at 5.) When a plaintiff brings a 1983 action, she

cannot allege that both her Fourteenth Amendment and Fourth Amendment due process rights have been violated. (*See id.*) Importantly, under Section 1983, when a party brings a claim for arrest without probable cause, she must assert a Fourth Amendment claim and not a Fourteenth Amendment claim. *See Albright v. Oliver*, 510 U.S. 266, 273 (1994). Thus, the Fourteenth Amendment claim can only be asserted as a mechanism for applying the Fourth Amendment to a state, *see, e.g., Baker v. McCollan*, 443 U.S. 137, 142 (1979), and not as a separate and distinct claim, *see Albright*, 510 U.S. at 273.

It is not clear whether Horton has alleged a separate and distinct Fourteenth Amendment claim, or whether she simply claims that her Fourth Amendment right to due process, as incorporated by the Fourteenth Amendment, was violated.

13.    Because *Albright* clearly explains that a Fourteenth Amendment claim cannot be brought separately from a Fourth Amendment claim, Horton cannot bring a separate and distinct Fourteenth Amendment claim against either NSM or Williams.

## II.    FOURTH AMENDMENT CLAIM

Horton's claims against NSM are intertwined with her claims against Williams, NSM's employee. Horton's only allegation against NSM is that it is liable for Williams's alleged actions. However, because Williams cannot be liable for any of his actions, NSM cannot be held liable for those actions. Also, even if Williams could be held liable for his actions, there can be no *respondeat superior* liability against NSM.

A.  **Williams is not liable for any of his alleged actions.**

   1.  *Williams is immune from suit.*

Testifying witnesses are provided "with immunity from Section 1983 liability." *Charles v. Wade*, 665 F. 2d 661, 666 (5th Cir. 1982); *see generally Briscoe v. LaHue*, 460 U.S. 325, 345-46 (holding that testimonial witnesses are immune from suit under Section 1983). This immunity applies regardless of whether the testimony is truthful. *See Briscoe*, 460 U.S. at 345 (stating that testimonial immunity can prevent redress from police officers who testify falsely). This immunity extends to those who "'conspire to present perjured testimony in furtherance of a criminal conviction . . . .'" *Jones v. Cannon*, 174 F.3d 1271, 1289 (11th Cir. 1999) (holding that a detective who suborns false testimony is immune from suit). Similarly, "a witness's absolute immunity from liability for testifying forecloses any use of that testimony as evidence of the witness's membership in a conspiracy prior to his taking the stand." *Rowe v. City of Ft. Lauderdale*, 279 F.3d 1271, 1282 (11th Cir. 2002).

"A complaining witness is one 'who actively instigated or encouraged the prosecution of the plaintiff.'" *Patterson v. Burge*, 328 F. Supp. 2d 878, 891 (N.D. Ill. 2004) (quoting *Curtis v. Bembenek*, 48 F.3d 281, 285 (7th Cir.1995)); *Rivera v. Leal*, 359 F. 3d 1350, 1355 (11th Cir. 2004); *see also*, 174 F.3d 1271, 1287 n.10 (11th Cir. 1999) (refusing to waive immunity for grand jury testimony of complaining witness); *cf. Mastronianni v. Bowers*, 173 F.3d 1363 (11th Cir. 1999) (noting that an investigator who reports findings to a prosecutor is not a complaining witness). Complaining witnesses are subject to suit when "'the complaint was made maliciously and without probable cause.'" *Kalina v. Fletcher*, 522 U.S. 118, 127 n.14 (quoting *Malley v. Briggs*, 475 U.S. 335, 340-41 (1986)). A complaint is malicious when it is willful and purposeful. *Willis v. Parker*, 814 So. 2d 857, 863-64 (Ala. 2001). A complaining witness also

acts with malice when he knows his actions are wrong and unlawful but continues to act wantonly or carelessly. *Id*. Probable cause exists when there are facts or circumstances that "'would cause a prudent person to believe, under the circumstances shown, that the suspect has committed . . . an offense.'" *Jordon v. Mosley*, 487 F.3d 1350, 1355 (11th Cir. 2007) (citing and quoting *Miller v. Harget*, 458 F.3d 1251, 1259 (11th Cir. 2006)).

The facts show that Williams is not a complaining witness.

14. Williams denied the fraud allegations made against NSM, provided proof that NSM complied with Medicaid requirements, and opined that Horton was a disgruntled temporary employee.

15. Williams did not sign affidavits or statements, execute documents for further prosecution, or file complaints that could lead a reasonable juror to conclude that Williams engaged in any activities to encourage Horton's prosecution. Indeed, Williams' only involvement in the Attorney General's investigation was responding to questions in two telephone interviews, nearly a year after Horton's temporary employment with NSM ceased.

16. Williams' statement was not made maliciously. It was his opinion and belief and not a statement of fact. He was accused of fraud by a temporary employee whom he recommended be sent elsewhere, and he suggested that she might be seeking to retaliate. He had every reason to believe that Horton's allegations were directly tied to her employment; to infer otherwise would be unreasonable.

17. Williams' opinion of Horton's motive was made with probable cause. Williams believed that Horton was asked not to return to NSM due to her bad performance. Williams was then informed that Horton made fraud allegations against NSM after she was asked not to return.

Because the allegations were false, the timing and the nature of the allegations gave Williams a reasonable belief that Horton was retaliating.

> **2.     *There is no state action.***
>
> 42 U.S.C. § 1983 provides in pertinent part:
>
> > Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

There are two general requirements for a plaintiff to state successfully a cause of action for deprivation of civil rights under 42 U.S.C. § 1983. The plaintiff must show that the conduct complained of was "committed by a person acting under color of state law", and she must prove that the conduct "deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or the laws of the United States." *Whitehorn v. Harrelson*, 758 F.2d 1416, 1419 (11th Cir. 1985).

The U.S. Supreme Court has acknowledged that there is a right of action under Section 1983 against a private corporation. *See Dennis v. Sparks*, 449 U.S. 24, 27-28 (1980). A corporation is liable when it is involved in a state action. *See id.* at 29. It is not simply enough for a corporation to be regulated by the government. *See Barber v. Dale County Mental Health Ctr.*, 898 F. Supp. 832, 836-37 (M.D. Ala. 1995) (determining that accepting Medicaid does not make a company a state actor). State action is only present when a corporation is jointly engaged with a state actor to violate a constitutionally protected right. *Dennis*, 449 U.S. at 27-29. In defining the level of collusion required to establish a conspiracy between a private actor and a

state actor, the Eleventh Circuit has ruled that there must be a tacit understanding among the parties to deny the plaintiff of her federally protected rights. *N.A.A.C.P. v. Hunt*, 891 F.2d 1555, 1563 (11th Cir. 1990).

There are three separate tests used in the Eleventh Circuit to determine if there is a state action: (1) the "public function" test; (2) the "state compulsion" test; and (3) the "nexus/joint action" test. *See Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263 (11th Cir. 2003). Because there is no state action under the public function test, the state compulsion test, or the nexus/joint action test, Williams was not a state actor and is not liable to Horton. Since Williams is not liable to Horton, NSM cannot be liable to Horton.

i.  *Public Function Test*

Under the public function test, a court will find state action when a private party performs a task that is traditionally reserved for state operation. *Rowe v. City of Ft. Lauderdale*, 279 F.3d 1271, 1277 (11th Cir. 2002). For example, when a private corporation assumes the administration of a state prison, it is a state actor under the public function test. *Id*. In order for private parties' actions to be construed as state action under the public function test, the challenged action must be an act that the government traditionally performs to the exclusion of all others. *Campbell v. Civil Air Patrol*, 131 F. Supp. 2d 1303, 1310 n. 8 & 1311 (M.D. Ala. 2001) (discussing public function test in a *Bivens* action). NSM and Williams are not liable under the public function test.

18.  In the instant case, Horton has alleged that Williams lied to the State's investigator and that he testified as a witness.

19. Historically, fact witnesses, whether in an investigation or at trial, could be state officials or private individuals.

20. Because fact witnesses historically could be individuals, Williams did not engage in an activity reserved for the State.

    ii. *State Compulsion Test*

The state compulsion test imputes state action when a state actor coerces or encourages the challenged action. *See Rowe*, 279 F.3d at 1277. This test is only applied in the limited instances where a state actor compels or significantly encourages the private actor to commit the complained of act. *NBC v. Commc's Workers of Am.*, 860 F.2d 1022 (11th Cir. 1988). A private party must be compelled to participate in the alleged wrong; he cannot be a willful participant. *Lowe v. Aldridge*, 958 F.2d 1565, 1572 (11th Cir. 1992). The conduct of NSM and Williams clearly fails the state compulsion test.

21. In the instant case, Horton has alleged that Williams lied to the State's investigator and that he testified as a witness.

22. Shockley did not compel or encourage Williams' statement or testimony.

23. Because Williams' actions were not compelled or encouraged by the State, there is no state action under the state compulsion test.

    iiii. *Nexus/Joint Action Test*

When "the state has so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in the enterprise", there is a state action under the nexus/joint action test. *See Rowe*, 279 F.3d at 1277. Under this approach,

private actions are state actions when the State is a joint participant in an enterprise that the private party undertakes. *Focus on the Family*, 344 F.3d at 1277; *Loren v. Sasser*, 309 F.3d 1296, 1303 (11th Cir. 2002) (A close nexus exists when the private action "'may be fairly be treated as that of the State itself.'" (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001))). In determining whether the actions of a private individual can be attributed to the State under the nexus/joint action test, the court should determine whether there is a symbiotic relationship between the State and a private party. *Lowe*, 958 F.2d at 1572; *see also Fullman v. Graddick*, 739 F. 2d 553, 563-64 (11th Cir. 1984) (holding that engaging an accused in a conversation cannot establish a conspiracy, and that blank assertions, without more, that a private individual conspired with police officers and fabricated conversations with the accused in order to have an arrest warrant issued are insufficient to establish a conspiracy).

The third test, the nexus/joint action test, fails to implicate NSM or Williams. There was no "symbiotic relationship" between NSM or Williams and Shockley. *See Willis v. Univ. Health Srvs., Inc.*, 993 F.2d 837, 840 (11th Cir. 1993).

24. Horton made an allegation against NSM, and the State investigated this complaint. During the course of the investigation, the State interviewed NSM employees, including Williams, and Williams gave his opinion and belief that Horton was disgruntled and was retaliating against NSM. Williams' opinion was never sworn in an affidavit; he was simply a fact witness.

25. Williams had no involvement in the decision of the office of the Attorney General to file a complaint against Horton and secure her arrest. There was no agreement between NSM or Williams and the State to have Horton arrested, and Williams and NSM did not give any

information to Medicaid that resulted in her arrest. The evidence in this case cannot, therefore, support a finding that there is a state action under the nexus/joint action test.

### B. There cannot be any *respondeat superior* liability.

Generally, corporations are not liable for the constitutional torts of their employees under 42 U.S.C. § 1983. *See Harvey v. Harvey*, 949 F.2d 1127, 1129-30 (11th Cir. 1992) (citations omitted). The Eleventh Circuit has not carved any exceptions to this rule for corporations. At least two Eleventh Circuit district courts, however, have recognized that the municipality exceptions to employer liability also apply to corporations. *See, e.g., Allen v. Morton*, No. CV507-74, 2007 WL 4257070, *2 (M.D. Ga. Nov. 30, 2007) (noting that *Harvey* extended municipal liability rules to private corporations). Thus, "a corporation may be held liable for the unconstitutional acts of employees where there is a policy, custom, or action by those who represent official policy which causes the injury." *Edwards v. Acadia Realty Trust, Inc.*, 141 F. Supp. 2d 1340, 1347-48 (M.D. Fla. 2001) (citing *Davis v. DeKalb County Sch. Dist.*, 233 F.3d 1367, 1375 (11th Cir. 2000), *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991), and *Scutieri v. Estate of Revitz*, 683 F. Supp. 795, 800 (S.D. Fla. 1988)). Under these rules, there can be no *respondeat superior* liability for NSM.

26. Horton's sole claim against NSM is that its employee deprived her of her constitutional rights.

27. NSM had no policies or practices that encouraged, sanctioned, or allowed its employees to cover-up Medicaid fraud.

28. NSM did not maintain any policy or practice that encouraged, sanctioned, or allowed its employees to lie to the State's investigators.

29. NSM did not engage in any pattern, practice, or policy that led to Williams' actions.

30. In light of these facts, *Harvey* establishes that NSM cannot be liable for Williams' alleged actions.

## CONCLUSION

31. Williams and NSM cannot be held liable to Horton.

32. Horton's Fifth Amendment claim must fail because there is no federal involvement in the events at issue.

33. Horton's Fourteenth Amendment must fail because there is no right to bring a separate and distinct Fourteenth Amendment claim.

34. Horton's Fourth Amendment claim must fail because Williams is immune from suit, there is no state action, and there can be no respondeat superior liability against NSM.

Respectfully submitted this the 22nd day of August, 2008.

/s/ Charles A. Stewart III
Charles A. Stewart III (STE067)
Quindal C. Evans (EVA040)
Bradley Arant Rose & White LLP
The Alabama Center for Commerce
401 Adams Avenue, Suite 780
Montgomery, AL 36104
Telephone: (334) 956-7700
Facsimile: (334) 956-7701
**Attorneys for National Seating & Mobility, Inc.**

Dorman Walker (WAL086)
Kelly F. Pate (FIT014)
Balch & Bingham
P.O. Box 78
Montgomery, AL 36101
Telephone: (334) 834-6500
Facsimile: (334) 269-3115
**Attorneys for Defendant Don Williams**

**CERTIFICATE OF SERVICE**

  I hereby certify that on August 22, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

  Deborah M. Nickson
  Attorney for Petitioner
  2820 Fairlane Drive, Suite A-10
  Montgomery, Alabama 36116

  Jack W. Wallace, Jr.
  Office of the Attorney General
  11 South Union Street
  Montgomery, AL 36130

             /s/ Charles A. Stewart III
             Of Counsel